## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Eric Meyer, individually and as executor of the estate of Joan Meyer, | ) ) ) |
| and | ) ) |
| The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, | ) ) ) |
| Plaintiffs, | ) **Case No.** ) |
| v. | ) **Jury Trial Demanded** ) |
| City of Marion, Kansas, | ) ) |
| Former Marion Mayor David Mayfield, in his official and individual capacities, | ) ) ) |
| Former Marion Police Chief Gideon Cody, in his official and individual capacities, | ) ) ) |
| Acting Marion Police Chief Zach Hudlin, in his individual capacity, | ) ) ) |
| Board of County Commissioners of the County of Marion, | ) ) ) |
| Marion County Sheriff Jeff Soyez, in his official and individual capacities, | ) ) ) |
| and | ) ) |
| Marion County Detective Aaron Christner, in his individual capacity, | ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Eric Meyer, both individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, for their Complaint, state as follows:

**Introduction**

1.      When Marion Police Chief Gideon Cody led a swarm of armed police officers on a series of illegal raids which included the newsroom of the *Marion County Record* and the home of the newspaper's co-owners, Joan Meyer and her son Eric, Joan hauntingly told the officers, "You know, if I have a heart attack and die it's going to be all your fault."

2.      Twenty-four hours later, ninety-eight-year-old Joan Meyer died of a sudden cardiac arrest brought on by the stress of the illegal raid.

3.      Eric Meyer and the *Record* bring this lawsuit to seek justice for the intolerable violation of their constitutional rights and the constitutional rights of Joan Meyer, and to deter the next crazed cop from threatening democracy the way Chief Cody did when he hauled away the newspaper's computers and its reporters' cell phones in an ill-fated attempt to silence the press.

4.      To do anything less would be a disservice to Joan Meyer, who told Chief Cody during the illegal raid on her home, "Boy, are you going to be in trouble."



**Marion Mayor David Mayfield**

5.      Marion is in south central Kansas and has a population of less than 2,000 people.

6.      From 2020 until earlier this year, the city was led by Mayor David Mayfield, a former Kansas Highway Patrol trooper who later became Marion's police chief, and who now works part-time for Marion County Sheriff Jeff Soyez transporting prisoners.

7.      Mayor Mayfield is a law enforcement hanger-on; for example, his e-mail address is "khp[****]@yahoo.com," which is Mayfield's old Kansas Highway Patrol badge number.

8.      Just last year, Mayor Mayfield's wife, Jami Mayfield, posted a photo of "Trooper Dave Mayfield" from the early 1990s on Facebook, describing him as "Facebook famous."



**Sheriff Jeff Soyez**

9.      In late 2022, the Marion city administrator was fired and the police chief quit.

10.     Rather than hiring a new city administrator—who would then select the new police chief—Mayor Mayfield decided to hire a new chief first, ensuring he got a top cop of his liking.

11.     Mayor Mayfield asked Marion County Sheriff Jeff Soyez to help him find a new police chief.

12.     Prior to being appointed Marion County Sheriff in 2022, Soyez had been a railroad detective for the Union Pacific Railroad in Kansas City, Missouri.

13.     During the time he lived in Kansas City, Soyez was friends with Captain Gideon Cody of the Kansas City, Missouri Police Department.

14.     Sheriff Soyez contacted Cody and encouraged him to apply for the job.

15.     Cody agreed and applied to be the Marion police chief in April 2023.

16.     Sheriff Soyez strongly urged Mayor Mayfield, who worked part-time for Soyez transporting prisoners, to hire Cody.

**The "Marion Crime" Vigilante Group**

17.     Gideon Cody's candidacy was also strongly supported by "Marion Crime," a secretive Facebook vigilante group, which sent private messages to community leaders touting Cody's candidacy, saying he "is what the community needs."



18.     The group touted Cody's supposed SWAT experience, including "extensive train-ing in active shooter and other highly stressful situations;" the group pushed for a SWAT operator as Marion's police chief even though Marion is so small it does not have a single stoplight.

19.     The messages said, "Marion should be proud that we have attracted someone with his credentials."

20.     The Marion Crime group compared Cody to Sheriff Soyez, saying Cody would bring "new blood" to the police department, just as Soyez did to the Sheriff's Office.



*Marion County Record*

21.     The *Marion County Record* is a weekly newspaper published in Marion, Kansas, and is the paper of record for the City of Marion and Marion County.



22.     Since 1874, the paper has been owned by two families: the Hoch family, which owned it for 124 years, and the Meyer family, which first became involved in the paper in 1948 when Bill Meyer began working at the paper as an associate editor.

23.     The Meyer family bought the *Record* in 1998 to keep it locally owned; they chose to keep the "Hoch Publishing" name.

24.     Following Bill's death in 2006, the *Record* has been primarily owned by Joan Meyer (Bill's spouse), along with Joan and Bill's son, Eric Meyer.

25.     Eric Meyer graduated from the William Allen White School of Journalism at the University of Kansas in 1975, followed by a master's in journalism from Marquette University.

26.     Eric then worked as a reporter and editor for the *Milwaukee Journal* for 16 years, and later spent 25 years teaching journalism at the University of Illinois Urbana-Champaign.

27.     Eric Meyer returned to Marion at the outset of the COVID-19 pandemic to take care of his mother and became editor and publisher of the *Record* in 2021.

### The *Marion County Record* Starts Investigating Gideon Cody

28.     As soon as the *Record* reported that Gideon Cody was a candidate for the Marion police chief position, the newspaper began receiving tips about Cody from persons who were afraid to be identified for fear of retribution by Cody.

29.     One source called Cody "the absolute worst commander I ever experienced," said "his ego would not allow him to listen to what anyone below his rank said," and described him as a "toxic/ego-centric commander."

30.     Another source reported that when an officer refused to kick in a door, "Cody … pushed him out of the way and forced the door open," and later said that "officer would [now] cross the street in order to avoid Cody because that officer is a coward."

31.     Three sources told the paper that Cody ran over a dead body at a crime scene.

32.     The tipsters also reported that Cody was about to be demoted by the Kansas City Police Department from captain to sergeant because of offensive conduct towards other officers.

33.     Multiple sources reported a conversation in which Cody expressed his disdain for working in dispatch and said if he had not been transferred out of dispatch he would have found "the skinniest and prettiest girl down there and f*cked her" to force a reassignment.

### The City is Warned

34.     On April 21, 2023, *Marion County Record* editor Eric Meyer and reporter Deb Gruver met with Zach Collett, a member of the Marion City Council, and asked him to comment on the many tips the paper had received about Cody.

35.     Collett told Gruver to stop investigating and "mind your own business."

### Cody Lawyers Up

36.     Two days later, *Record* reporter Deb Gruver contacted Cody and asked him to comment on the many reports the paper had received about his time in Kansas City.

37.     Cody told Gruver he was angry the newspaper was investigating him.

38.     Cody also told Gruver he had hired a Kansas City lawyer, Dawn Parsons.

39.     According to her profile on her law firm's website, Parsons specializes in representing "police officers facing claims of excessive use of force."

### Cody is Hired

40.     At the City Council meeting on May 1, 2023, Mayor Mayfield announced he had offered Cody the police chief position and that Cody would be sworn in at the next meeting.

41.     No vote was taken at that meeting—or any prior meeting of the City Council—to authorize the mayor to extend an offer of employment to Cody.

42.     And in a bizarre City Council meeting on May 30, 2023, Cody took the oath of office before the City Council ever voted to hire him.



43.     In his new position, Chief Cody was making $60,000 a year—or roughly half the $115,000 a year he was making as a captain in the Kansas City, Missouri Police Department, where he had worked for 24 years.

**Cody Begins His Crackdown**

44.     Immediately upon taking office, Chief Cody began cracking down on the release of information to the *Marion County Record*.

45.     For example, Chief Cody stopped providing weekly police activity reports.

46.     In response, the newspaper began printing a notice where the reports formerly appeared in the paper, indicating that Chief Cody was refusing to provide the weekly report.

47.     This is the notice in the most recent edition the *Record* published prior to the August 11, 2023 raids.

# POLICE
## ACTIVITY REPORTS

*Law enforcement agencies provided these reports of their activities this past week. Routine activities such as patrols, inspections, training, report-writing, and assistance to other agencies are excluded. Dates may reflect starting or ending dates of officers' shifts rather than actual dates of occurrence.*

### HILLSBORO

**July 31** — Questions about a civil matter were answered.

**Aug. 1** — An incident involving two juveniles at the city pool was discussed and dismissed. A driver in the 900 block of S. Ash St. was warned about speeding. Another driver was warned about making an exhibition of speed in the 100 block of S. Main St. Police helped a driver locked out of a vehicle on US-56 at K-15/Bison Rd.

**Aug. 2** — Vandalism at the city park was investigated. Police helped with a disabled vehicle at Ash St. and Willow Rd. and with a vehicle blocking a driveway.

**Thursday** — Police helped look for a juvenile who left home without permission. A gate found to be open was secured.

**Friday** — Drivers at Ash St. and Grand Ave. were warned about speeding and about running a stop sign. At the same intersection, police helped put scaffolding back on a trailer it had fallen off of.

**Saturday** — Weather caused a false alarm in the 100 block of N. Ash St. Storm debris was removed from streets.

**Sunday** — Police notified the city pool's manager about storm damage at the pool.

### MARION

Newly appointed chief Gideon Cody has discontinued providing a weekly report of Marion police activities.

*Last modified Aug. 10, 2023*

48.     On June 12, 2023, *Record* reporter Deb Gruver sent an e-mail to the Marion City Administrator and Chief Cody asking for a copy of the PowerPoint presentation from that evening's City Council meeting concerning pay scales for the Police Department.

49.     The next morning, Chief Cody sent an e-mail to the City Administrator refusing to provide the information and stating: "I don't want to have our pay scale on the Daily Recorder [sic]."

50.     Chief Cody refused to provide this information even though the Kansas Open Records Act explicitly states that "positions [and] salaries … of officers and employees of public agencies" are open records. K.S.A. 45-221(a)(4).

51.     Chief Cody also refused to sit down for an interview with Deb Gruver for a profile story on him as Marion's new police chief.

52.     Chief Cody also refused to make Jonathon Benavidez, a newly-hired Marion police officer, available for an interview for a story on the new officer.

### Cody the Entrepreneur

53.     In addition to having served on the Kansas City police force, Gideon Cody fancies himself an entrepreneur.

54.     His LinkedIn profile states that in addition to being a Kansas City, Missouri police officer he co-founded several businesses and self-describes himself as a "real estate investor."



55.     Cody still has the entrepreneurial streak—after he became the Marion Police Chief in May of last year, Cody approached another reporter for the *Marion County Record*, Phyllis Zorn, and offered to invest in a competing newspaper if Zorn would leave the *Record*.

56.     Cody told Zorn the *Record* in general—and editor Eric Meyer and reporter Deb Gruver (who was investigating Cody) in particular—were too "negative" and he wanted to see a new, more positive newspaper replace it.

### Congressman Comes to Town

57.     In late July 2023, U.S. Congressman Jake LaTurner announced he would be visiting Marion on August 1, 2023, for "Coffee With Your Congressman."

58.     Rep. LaTurner represents Kansas' Second Congressional District; Marion County had recently moved from the First Congressional District to the Second Congressional District as part of Kansas' 2022 congressional reapportionment.

59.     Rep. LaTurner's Communications Director specifically reached out to *Record* editor and publisher Eric Meyer and invited him to attend the event.

> Hi Eric—
>
> I hope you're doing well. I want to invite you to Rep. LaTurner's rescheduled *Coffee With Your Congressman* event in Marion County. This event is an opportunity for folks to talk to the Congressman about issues impacting them and their families and ask about his work in Washington. Let me know if you plan to attend. Feel free to share with your readers as well. Thanks!

60.     The event was to be held at Kari's Kitchen, a Marion coffee shop owned by Kari Newell, who also owns the upscale Chef's Plate in the Historic Elgin Hotel across the street.

61.     The hotel is owned by Jeremy and Tammy Ensey, the brother and sister-in-law of Marion County Attorney Joel Ensey.

62.     Kari's Kitchen posted its own invitation to the event on its Facebook page, describing it as an "open meet and greet."[1]



63.     *Record* editor Eric Meyer and reporter Phyllis Zorn attended the August 1st "open meet and greet"—or at least intended to.

64.     While waiting for Rep. LaTurner to arrive, Kari Newell told Zorn to leave, saying "I will not have members of the media in my establishment. You have to leave."

65.     Shortly thereafter, Chief Cody approached both Meyer and Zorn and told them to leave; he said that Newell asked that the two journalists "be evicted."

**"Thank You Kari Newell"**

66.     Later that same day, the Marion Police Department posted a "thank you" to Kari Newell on Facebook for inviting Chief Cody to the event.



67.     The post included a photo of Newell and Chief Cody, at the head of the room, along with Rep. LaTurner.

---

[1] This post has disappeared from Kari's Kitchen's Facebook page.



**The Confidential Tip on Kari Newell**

68.     The following day, Wednesday, August 2, 2023, *Marion County Record* reporter Phyllis Zorn received a message via Facebook about Newell.

69.     The tipster stated that Newell's driver's license was suspended due to a prior DUI conviction.

70.     The tipster also told Zorn that local law enforcement had known for years that Newell was driving without a valid driver's license, but had taken no action against Newell.

71.     That same day, the tipster sent Zorn, via Facebook messenger, a copy of an August 1, 2023 letter from the Kansas Department of Revenue to Newell.

72.     The header to the message shows it was received by Zorn on August 2, 2023.

| 8/2/23, 2:41 PM | Facebook |
|---|---|

73.     And the footer shows the letter was received as an attachment to a message sent via Facebook Messenger.

| https://www.facebook.com/messenger_media/?attachment_id=987825275877677&message_id=mid.%24cAABa-Qw-B8GP8QkKnWJt8Qst6m2Z&thre... |
|---|

74.     The letter is addressed to Newell and includes Newell's full name, address, driver's license number and date of birth (to comply with this Court's redaction rules, all but the last four

of Newell's driver's license number and all but the year of her birth have been redacted; that in-

formation was not redacted from the letter provided to Zorn by her source).



Driver Solutions
300 SW 29th Street
PO Box 12021
Topeka KS 66601-2021

**Kansas**
Department of Revenue
*Division of Vehicles*

Telephone: (785) 296-3671
Fax: (785) 296-6851
www.ksrevenue.gov

Mark A. Burghart, Secretary

Laura Kelly, Governor

08/01/2023

NEWELL KARI ANNE
301 E SANTA FE ST
301 E SANTA FE ST
MARION, KS 66861

DL Number: ███5505
Date of Birth: ███1977

75.    The letter set forth various requirements Newell would have to meet in order to

restore her driving privileges, including having an ignition interlock device installed on her car.

> **Pending Suspension**
> **Driver's License Examination Requirement**
> **(K.S.A 8-241)**
>
> Before your driving privileges can be restricted to only operate a motor vehicle equipped with an ignition interlock device you must complete the following requirements within 30 days from the date of this letter:

76.    Zorn printed the copy of the letter from Facebook and shared it with Eric Meyer.

**Who, What, Where, When and Why**

77.    After talking to Zorn and reviewing the letter, Eric Meyer had several questions,

including, how did the source obtain the letter and why had local law enforcement allowed Newell

to drive for years without a valid license?

78.     Meyer's first question, *i.e*., how did the source obtain the letter, was of interest to Meyer because Meyer knew the source had law enforcement connections and Meyer wondered whether the source had obtained the letter illegally.

79.     The second question, *i.e*., why had local law enforcement allowed Newell to drive for years without a valid license, was only triggered if the information about Newell's driver's record was true.

80.     The source had told Zorn that she (Zorn) could confirm the status of Newell's license through the Department of Revenue website, by using Newell's name, address, driver's license number, and date of birth—all of which were on the letter from the Department of Revenue.

81.     The source also told Zorn she could obtain a copy of the August 1, 2023, letter from the Kansas Department of Revenue to Newell from the same website.

**Kansas Driver's License Status Check Tool**

82.     The following day, Thursday, August 3, 2023, Eric Meyer located the webpage titled "Kansas Driver's License Status Check" on the Kansas Department of Revenue website by performing a simple Google search.



83.     The tool allows anyone to check the status of a Kansas driver's license so long as the person knows the driver's license number, first and last name, and date of birth of the driver they are checking on.

84. This public-facing webpage does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.

85. In fact, the so-called "Disclaimer" on the website merely warns users that the information "is a summary only and will not display any sanctions from another state."



**Disclaimer**

The information contained on the Kansas Driver's License Status Check is a summary only and will not display any sanctions on record from another state. Completion of the items listed does not ensure your driving privileges are now valid. If your driving privileges are currently suspended, revoked, restricted, or cancelled, please contact Driver Solutions at 785-296-3671 to determine your eligibility for reinstatement and the requirements for you to be reinstated. Additional contact information: fax number 785-296-6851.

Have you moved? If your address is different than the address on file with Driver Solutions you are required to notify us of the change per K.S.A. 8-248. To update your address please click on the link https://www.kdor.ks.gov/Apps/MotorVehicles/motorvehicle/default

**Journalism 101 – Verify Facts**

86. Using the information from the August 1, 2023 Department of Revenue letter which the source had provided Zorn, *i.e.*, Newell's first and last name, address, driver's license number, and date of birth, Eric Meyer used the Kansas Driver's License Status Check tool on the webpage to confirm Newell's DUI conviction and the fact Newell's license was suspended.

87. Meyer did not, however, see the August 1, 2023 letter from the Kansas Department of Revenue to Newell which Zorn's source had provided via Facebook Messenger.

88. The next day, Zorn called the Department of Revenue and was told the document was available on the same public-facing website, a user simply must keep clicking to find the link.

89. Zorn then went to the same website Eric Meyer had used and saw that at the bottom of the screen showing Newell's DUI conviction and suspension there was a box to click to view "Documents."

90. When Zorn clicked on that box, a form appeared on the webpage and asked for "Requester's Information."

91. Zorn then inserted her own name (*i.e.*, Phyllis Zorn) into the form.

**Requester's Information**

First Name: Phyllis

Last Name: Zorn

92. Zorn then entered Newell's driver's license number and address.

93. The Kansas Driver's License Status Check tool on the webpage then required Zorn to check a box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)."

☐ I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form).

94. After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen—the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell, *i.e.*, the same document the source had previously provided Zorn.

95. Having confirmed that the document her source had provided was legitimate, Zorn informed Eric Meyer that she had verified that the information (and document) provided by the confidential source was accurate.

96. Zorn's use of the Driver's License Status Check tool for this purpose was 100% legal under both state and federal law.

**Kansas Law Regarding Driver's License Records**

97.     Kansas law on driver's license records is clear: the very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

98.     Zorn's use of the Kansas Driver's License Status Check tool to confirm that Newell's driver's license was suspended due to a DUI conviction—and that she could get her license reinstated only by installing an ignition interlock device—does not relate to any of the three exempted topics set forth in K.S.A. 74-2012(a)(1) & (b).

99.     Furthermore, Zorn's use of the Kansas Driver's License Status Check tool to confirm that Newell's driver's license was suspended due to a DUI conviction plainly related "to the operation of a motor vehicle and to public safety," given the allegation that local law enforcement knowingly permitted an unlicensed driver to drive in the City of Marion and in Marion County.

100.    Accordingly, Zorn's use of the Kansas Driver's License Status Check tool to confirm the authenticity of the letter and that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device fully complied with Kansas law.

**Federal Law Regarding Driver's License Records**

101.    The federal law regarding driver's license records is the Driver's Privacy Protection Act.

102.    The Driver's Privacy Protection Act was designed to protect the public from criminal conduct resulting from disclosure of "personal information" from state motor vehicle records

(*i.e.*, preventing stalkers from learning the name and address of a driver by looking up their vehicle license plate number) while at the same time ensuring access to information for legitimate purposes, such as public safety.

103.    The Act struck this balance in two ways.

104.    First, the Act defines protected "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, **but does not include information on vehicular accidents, driving violations, and driver's status**." 18 U.S.C. § 2725(3) (emphasis added).

105.    Therefore, an individual's "**driver's status**" is explicitly **not** "protected information" under the Driver's Privacy Protection Act.

106.    Thus, the "Kansas Driver's License **Status** Check" tool on the Kansas Department of Revenue's public-facing website is **not** covered by the Driver's Privacy Protection Act.



107.    To be clear, no one from the *Record* used the Driver's License Status Check tool to obtain "information that identifie[d]" Kari Newell; rather, the *Record* had been already provided with Newell's name, address, driver's license number, and date of birth by the tipster when the tipster furnished the paper with a copy of the August 1, 2023 Kansas Department of Revenue letter.



Driver Solutions
300 SW 29th Street
PO Box 12021
Topeka KS 66601-2021

**Kansas**
Department of Revenue
*Division of Vehicles*

Telephone: (785) 296-3671
Fax: (785) 296-6851
www.ksrevenue.gov

Mark A. Burghart, Secretary

Laura Kelly, Governor

08/01/2023

NEWELL KARI ANNE
301 E SANTA FE ST
301 E SANTA FE ST
MARION, KS 66861

DL Number: ███5505
Date of Birth: ███1977

108.     Instead, what Zorn did was use this information to obtain the status of Newell's driver's license, *i.e.*, the fact her license was suspended due to a DUI conviction and that to restore her driving privileges, Newell would have to obtain an ignition interlock device.

---

**Pending Suspension**
**Driver's License Examination Requirement**
**(K.S.A 8-241)**

Before your driving privileges can be restricted to only operate a motor vehicle equipped with an ignition interlock device you must complete the following requirements within 30 days from the date of this letter:

---

109.     Because the Act explicitly states that protected personal information "does not include information on vehicular accidents, **driving violations, and driver's status**," the information which the *Record* obtained from the Kansas Driver's License Status Check tool (*i.e.*, the status of Newell's driver's license) is not covered by the Driver's Privacy Protection Act.

110.     Moreover, the Driver's Privacy Protection Act provides that "A State department of motor vehicles … shall not knowingly disclose or otherwise make available to any person … personal information." 18 U.S.C. § 2721(a)(1).

111.    It would therefore be illegal for the Kansas Department of Motor Vehicles to have a public-facing website that provides protected "personal information."

112.    The official spokesperson for the Kansas Department of Revenue, Zach Denney, has repeatedly confirmed that so long as the requester has the identifying information it is perfectly legal to use the Kansas Driver's License Status Check to verify the status of anyone's driver's license.

- "That's legal. The website is public facing, and anyone can use it." (AP)

- "As long as the requestor has the required information, this information is public record and available online." (KC Star)

- "The motor vehicle driver's checker is public-facing and free-use. If you have my [identifying] information, you can pull it [my driver's record] out." (NBC News)

113.    The second way the Driver's Privacy Protection Act achieves this balance is through a list of permitted exceptions.

114.    One permitted exception allows for personal information to be disclosed for "any … use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety." 18 U.S.C. § 2721(b)(14).

115.    As noted above, Kansas law provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

116.    Thus, the information which the *Record* accessed, *i.e.*, that Newell's driver's license was suspended due to a DUI conviction, was specifically authorized under Kansas law, which states such information is subject to the Kansas Open Records Act.

117.    Another permitted exception allows for personal information to be disclosed "for use in connection with matters of motor vehicle or driver safety." 18 U.S.C. 2721(b)(2).

118.    The *Record*'s use of the Kansas Driver's License Status Check tool to confirm the authenticity of the source's letter and the fact that Newell had been driving with a suspended license was "for use in connection with matters of motor vehicle or driver safety" because the *Record* was investigating allegations that local law enforcement routinely permitted an unlicensed driver to drive in and around Marion, posing an obvious risk to other drivers. 18 U.S.C. 2721(b)(2).

119.    Another permitted exception allows personal information to be disclosed "for use in research activities . . . so long as the personal information is not published, redisclosed, or used to contact individuals."  18 U.S.C. 2721(b)(5).

120.    The *Record*'s use of the Kansas Driver's License Status Check tool to confirm the authenticity of the source's letter and the fact that Newell had been driving with a suspended license constituted "research," *e.g.* "studious inquiry or examination, the collecting of information about a particular subject." (https://www.merriam-webster.com/dictionary/research).

121.    Moreover, the *Record* had no intent to publish that information, to redisclose that information, or to use the information to contact anyone; instead, it was the newspaper's intent only to report the failure of local law enforcement to stop an unlicensed person from driving.

122.    Thus, even if the information which the *Record* accessed was "personal information" under the Act—which it was not—the *Record*'s use of the Kansas Driver's License Status Check tool to confirm the authenticity of the letter and the fact that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device fell within one or more of the permitted exceptions under the Driver's Privacy Protection Act.

**Kari Newell's Divorce**

123.    Even though Zorn's use of the Kansas Driver's License Status Check tool on the public-facing Kansas Department of Revenue website was legal, Eric Meyer ultimately decided not to publish the information.

124.    Meyer was concerned the newspaper might be being used as a pawn in a bitter ongoing divorce proceeding between Newell and her estranged husband, Ryan Newell.

125.    In that divorce proceeding, Kari Newell had asked the court to order her husband to give her the couple's Toyota Rav4 and even requested the assistance of law enforcement to do so.

> 5.    Petitioner further requests the following items of marital property currently in the respondent's possession which the petitioner needs to maintain a habitable home and which the petitioner fears the-respondent will dispose of unless she is given temporary possession pending the trial of this action:
>
> Toyota Rav 4 he will continue to make payments
>
> 6.    Petitioner requests the aid of local law enforcement officers to obtain possession, if necessary.
>
>
>                          _Kari Newell_
>
>                          Kari Newell
>                          Petitioner

126.    It is easy to see from this motion—and other pleadings in the hotly-contested di-

vorce proceeding—why Eric Meyer could believe the newspaper might be being used as a pawn

by one of the litigants.

### The *Record* Notifies Law Enforcement

127.    While Eric Meyer elected not to publish a report on Newell's DUI conviction and

the fact she was driving without a valid license, he did write an e-mail to the Marion Police Chief

and the Marion County Sheriff to "alert" them about the document the paper had received.

128.    Specifically, on Friday, August 4, 2023, Meyer e-mailed Chief Cody and Marion

County Sheriff Jeff Soyez and told them that a confidential source had provided the paper with a

letter from the Kansas Department of Revenue "to a Marion businesswoman who recently had

been in the news."

129.    Meyer stated that the letter from the Department of Revenue outlined the steps the

businesswoman—whom Meyer did not identify by name—would need to take to get her driver's

license reinstated, including installing an ignition interlock device on her car.

130.    Meyer stated that he was initially concerned the letter may have been obtained ille-

gally, because the source "has personal and family history with law enforcement [and] implied

that she obtained the document because of 'connections.'"

131.    The e-mail explained, however, that the *Record* had checked with the Kansas De-

partment of Revenue and was told "that anyone could obtain the document if he or she possessed

the recipient's Kansas identification card number, name, and date of birth."

132.    The e-mail further explained that after some investigation of his own, Meyer came

to believe the letter came from the businesswoman's "soon-to-be-former spouse," who was appar-

ently contesting an award of vehicles to her as part of their ongoing divorce.

133.    The e-mail also noted that "[o]ur source contends that local law enforcement officers are fully aware that she … ha[s] been driving for some time without [an] active, valid license[]."

134.    Meyer went on to explicitly warn both Chief Cody and Sheriff Soyez that he was considering reporting the fact local enforcement had knowingly allowed someone to drive for many years without a license: "We obviously are concerned how someone could escape detection as having an expired or suspended license for nearly a quarter of a century and might pursue a news story in that regard."

135.    Meyer specifically noted that while the fact local law enforcement had enabled the businesswoman's illegal driving to occur, "we have no desire to invade the privacy of any individual."

136.    Meyer concluded his e-mail by writing:

Because of the confidential nature of our source and privacy expectations of the individual targeted, I am not comfortable sharing additional information unless you inform me that you have cause to believe some crime or misbehavior might have occurred and additional information we might be able to provide could assist in any investigation.

137.    Neither Chief Cody nor Sheriff Soyez ever responded to Meyer's offer to provide any additional information that might help in an investigation of an actual crime.

**The Vice Mayor Forwards a Copy of the Same August 1 Letter**

138.    The same day Eric Meyer sent his e-mail to Chief Cody and Sheriff Soyez, the Marion Vice Mayor, Ruth Herbel, sent an e-mail to the Marion City Administrator, Brogan Jones.

139.    Herbel attached to her e-mail a screenshot of the same August 1, 2023 letter from the Kansas Department of Revenue to Newell setting forth the requirement that Newell have an ignition interlock device installed on her car before her driver's license could be reinstated (again, the redactions to the screenshot below are to comply with this Court's redaction policy.)



140.   Herbel told the City Administrator she had received the copy of the letter on August 2, 2023, from a local resident, Pam Maag, who Herbel said had law enforcement connections.

141.   Pam Maag would later publicly identify herself as the person who had provided the August 1, 2023 letter to Phyllis Zorn at the *Marion County Record* on August 2, 2023.

### The City Administrator Decides Not to Investigate

142.   The City Administrator—who was sending Mayor David Mayfield all of his communications with Herbel—forwarded Herbel's e-mail about Newell to Mayfield.

143.   Specifically, the City Administrator e-mailed the Mayor and the City Clerk and stated that Chief Cody and the police department would not be looking into this because "the State is the oversight for this."

> **From**: Brogan Jones <BJones@marionks.net>
> **Date**: August 4, 2023 at 4:44:28 PM CDT
> **To**: David Mayfield <d.mayfield@marionks.net>
> **Cc**: Janet Robinson <JRobinson@narionks.net>
> **Subject: Email from Ruth**
>
> I received this from Ruth just earlier. First ==I want to state that Chief/PD will not be looking into this==. Secondly the State is the oversight for this and will conduct all this type of research. We as a city need to stay out of this "hear say" or whatever else you want to call it. We will go forward like any other individual and or business and let the State handle their business.

144.    Despite the City Administrator's declaration "that Chief/PD will not be looking into this," Mayor David Mayfield had a different plan.

### The Mayor's Loudest Critics: Ruth Herbel and Eric Meyer

145.    Ruth Herbel assumed office as a member of the Marion City Council in 2020, the same year Eric Meyer moved back to Marion to take care of his mother during the pandemic.

146.    Since then, the pages of the *Marion County Record* have been chock full of reports of attacks and counterattacks between Ruth Herbel and Mayor Mayfield—with Herbel accusing the mayor of repeatedly violating the city charter, giving out unauthorized raises to favored city employees, holding illegal secret meetings, and much more.

147.    During that same time, Eric Meyer's editorials in the *Record* have referred to Mayor Mayfield as a dictator, a bully, as someone who "shows his disdain for the democratic process," as someone who "desires to take all power for himself," and as someone who lies so much he "metaphorically set[s] his pants on fire" on a regular basis.

148.    The conflict between Mayor Mayfield on the one side and Herbel and Meyer on the other came to a head in 2022, when Mayfield proposed amending the city charter to remove the requirement that voters approve adding to the city's debt.

149.     Mayor Mayfield denied that the proposed amendment would disenfranchise voters and accused both Herbel and Meyer—who strongly opposed the proposed amendment—of lying.

150.     The voters, however, agreed with Herbel and Meyer, and Mayor Mayfield's proposed amendment was defeated by a 10-1 margin at the polls in December 2022.

**The Mayfields Launch a Recall Effort Against Herbel**

151.     The next month, Mayor David Mayfield's wife, Jami Mayfield, filed a petition with the Marion County Clerk to recall Vice Mayor Ruth Herbel.

152.     The recall petition stated two wholly frivolous grounds.

153.     First, the petition alleged that Herbel violated the Kansas Open Meetings Act when Herbel "replied all" to a text message to four city council members by writing: "Thanks."

154.     Second, the petition alleged that Herbel had violated the Kansas Open Meetings Act when Herbel informed the public, "via Eric Meyer with the Marion County Record," about Mayor Mayfield's decision to fire former city administrator Mark Skiles, an act which potentially exposed the city to liability for a $75,000 severance payment.



155.     Neither of these alleged violations had any merit whatsoever; instead, they were a mere pretense for Mayor Mayfield's effort to remove Herbel from the City Council.

156.     The petition listed six persons as "sponsors," including both Jami Mayfield and Mayor David Mayfield.

RECEIVED

FEB **08** 2023

SPONSORS FOR COLLECTING SIGNATURES FOR RECALL PETITION ON RUTH HERBEL:

MARION COUNTY CLERK
MARION  KS  66861

1.  Jami Mayfield, 515 S Lincoln, Marion, KS 66861
2.  Kathern Swan, 313 S 4th, Marion, KS 66861
3.  Margaret Wilson, 425 Elm, Marion, KS 66861
4.  David Mayfield, 515 S Lincoln, Marion, KS 66861
5.  Morgan Makovec Looney, 220 Garfield, Marion, KS 66861
6.  Steve Hart, 548 Santa Fe, Marion, KS 66861

157.    In a Facebook post about the recall effort, Jami Mayfield (who was known around town as the "shadow mayor") stated she was not only seeking to recall Herbel, but she was also intending for the recall effort to "silence the MCR" (the *Marion County Record*) because, in her view, the *Record* had published "way more information than was necessary to report 'news.'"

158.    Mayor David Mayfield promptly reposted his wife's message—with its explicit goal of seeking to "silence the MCR"—to his own Facebook page.



David Mayfield
February 8 · 🌐

Jami Kay Mayfield
February 8 · 🌐

My momma taught me a long time ago to stand up to bullies.  So when a city council person misused her authority to harm innocent people and the MCR posted way more information than was necessary to report "news" and then they both bragged about being untouchable, I decided to stand up!!!   Because there is something that can be done,  So if anyone is interested in signing a petition to recall councilor Herbel and silence the MCR in the process let me know.  We only need 201 signatures and then we will need your vote.  Thank you in advance.

The great Martin Luther King Jr said.... In the end, we will remember not the words of our enemies, but the silence of our friends!!

I will NOT be silent!

👍 5

👍 Like          💬 Comment          ↪ Share

159.    The recall effort was failing, so Mayor Mayfield and his wife Jami intensified their efforts to convince citizens to sign the petition.

160.    For example, ten days after Mayor Mayfield reposted his wife's post confirming that the effort was intended to "silence the MCR," Jami Mayfield made a second post.

161.    In this second Facebook post, Jami Mayfield described the recall effort as intending to punish "MCR" because the newspaper "had the audacity to print" information critical of the mayor, which Jami Mayfield described in her Facebook post as an act of "insanity."



Jami Kay Mayfield is with Chelsea Dawn Smith and 3 others.
February 18 ·

Thank you to everyone who has stepped up to sign the petition to stop Councilor Herbel's misuse of power despite her attempt to bully people into not signing. For those of you who have asked , I am doing this to support friends who were hurt by Herbel and the MCR! If they had not bragged about the fact that no one could do anything to her, I would have let it slide, but she abused her executive session privilege and shared that information with ==MCR who had the audacity to print it.== I want them both to understand that we, the public CAN, and WILL, do something about it. The silent majority must speak out to stop what is happening. Please...... stand up and do something. We are over half way there. If you are not intimated by Herbel and ==the MCR and want to put a stop to the insanity,== please let one of us know so we can get this process finalized. Thanks

The great Martin Luther King Jr said.... In the end, we will remember not the words of our enemies, but the silence of our friends!!

I will NOT be silent!

 16                                          6 comments   4 shares

162.    The recall effort failed when the Mayfields could not collect the required signatures.

163.    Again, Mayor Mayfield was furious that his public effort to remove Vice Mayor Herbel had failed.

164.    But Mayor Mayfield was not about to stop.

### The Fake Oath of Office

165.    After the recall effort failed, in June of last year, Mayor Mayfield made still another attempt to remove Vice Mayor Herbel from the council by directing the city administrator to have

all city council members—including Herbel—sign an acknowledgment that read: "I also under-stand and acknowledge that my term with the council of the City of Marion, Kansas, is at will."

166.    This would have effectively allowed Mayor Mayfield to simply remove Herbel, given that her term would be "at [the] will" of the mayor.

167.    Mayor Mayfield's plan was thwarted, however, when Vice Mayor Herbel scratched through the offensive line.



168.    The City Administrator, Brogan Jones, refused to accept the form.



**"The Real Villains"**

169.    The following month, Mayor Mayfield turned to Facebook to vent about Ruth Her-bel's so-called co-conspirator Eric Meyer—who, as noted above, taught journalism before return-ing to Marion to become editor of the *Record*.

170.    Specifically, Mayor Mayfield posted on his Facebook page that the "real villains in America" are "journalists," "teachers," & "professors" who challenge authority, *e.g.*, Eric Meyer, who is a 'journalist,' 'teacher,' & 'professor'.



171.    Days later, Mayor Mayfield would seize an opportunity to seek retribution against "[t]he real villains in America."

**Mayor Mayfield and Chief Cody Go in Search of a "Crime"**

172.    At 7:53 a.m. on Monday, August 7, 2023, Brogan Jones, the City Administrator, forwarded to Mayor Mayfield and the other council members (but not Vice Mayor Herbel) Ruth

Herbel's e-mail from the Friday before in which Herbel had forwarded the August 1, 2023, De-partment of Revenue letter to Kari Newell.

173.   Shortly thereafter, both Mayor Mayfield and Councilmember Zach Collett told Kari Newell that Herbel had learned of Newell's DUI; both men falsely claimed that Herbel planned to use Newell's DUI conviction to oppose Newell's application for a catering license for her upscale restaurant Chef's Plate, which was coming before the city council later that same day.



174.   Newell was requesting the catering license (which would allow her to serve liquor) because the liquor license for Chef's Plate was held in the name of Tammy Ensey—one of the owners of the Historic Elgin Hotel and the sister-in-law of Marion County Attorney Joel Ensey—and Tammy Ensey had chosen not to renew the liquor license.

175.    Mayor Mayfield told Newell the only way he could get Herbel off the city council was if she (Herbel) was convicted of a crime.[2]

176.    Accordingly, that same day, Mayor Mayfield overruled City Administrator Jones and directed Chief Cody to begin an investigation into Herbel and the *Marion County Record*.

177.    Mayfield could do this because, according to the Marion City Code, the mayor "shall … [h]ave superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

178.    Chief Cody then contacted Newell and told her someone had stolen her mail.

179.    When Newell said she did not believe anyone had stolen her mail, Chief Cody said he would get back to her.

180.    When Chief Cody got back to Newell, he told her that someone had stolen her identity in order to access her driver's license record.

181.    Specifically, Chief Cody told Newell that a reporter at the *Record* had stolen Newell's identity and provided Herbel with a copy of her driver's license record.

182.    Chief Cody told Newell this even though Cody knew that:

(a)    Pam Maag—and not anyone at the *Record*—had provided Herbel with a copy of the letter; and

(b)    Maag put the letter on Facebook on August 2, 2023—two days before the *Record* obtained a copy of the letter via the Kansas Department of Revenue website.

---

[2] *See* K.S.A. § 21-6613 ("A person who has been convicted in any state or federal court of a felony shall, by reason of such conviction, be ineligible to hold any public office under the laws of the state of Kansas ….").

183.    Later the same day, Newell appeared before a meeting of the Marion City Council (at which Mayor Mayfield presided) as part of her attempt to obtain a catering license for Chef's Plate.

184.    The catering license would allow Newell to serve liquor on the premises once Tammy Ensey's liquor license expired.



185.    During her appearance, Newell lashed out at Ruth Herbel, calling her "vile," and repeated Chief Cody's false claim that the *Record* had "illegally" obtained Newell's driver's record and had provided Herbel with a copy of Newell's record.

186.    Newell also said that she was going to "place this with the County Attorney" and "this is going to become a case."

187.    The Marion County Attorney is Joel Ensey—the brother-in-law of Tammy Ensey, whose liquor license was expiring.

188.    Following Newell's appearance, Eric Meyer—who was there to report on the council meeting—stood up and said that no one at the *Record* had provided Vice Mayor Herbel with a copy of Newell's driver's record or the August 1, 2023 Kansas Department of Revenue letter.

189.    Marion Police Officer Zach Hudlin was present at the meeting and recorded it.

### Marion County Sheriff Jeff Soyez Joins the Investigation

190.    The very next day, Tuesday, August 8, 2023, Chief Cody met with Marion County Sheriff Jeff Soyez.

191.    Like Chief Cody, Sheriff Soyez had expressed animus toward the *Marion County Record*, editor Eric Meyer, and its staff.

192.    For example, like Chief Cody, Sheriff Soyez regularly said he did not approve of Meyer's negative outlook, saying that Meyer and the paper should be more positive about Marion and, in particular, Marion government and Marion businesses.

193.    And like Chief Cody, Sheriff Soyez was worried the *Marion County Record* was going to expose his office—along with the Marion Police Department—for allowing Kari Newell to drive around Marion for years without a valid driver's license.

194.    During that meeting, Sheriff Soyez agreed to join with Chief Cody and Mayor Mayfield in their illicit plan to take down the *Marion County Record*.

### The Joint Investigation

195.    On the same day Chief Cody met with Sheriff Soyez, the two men met with Marion County Sheriff's Detective Aaron Christner, whom Soyez had appointed to help with the joint investigation of the *Marion County Record* by the Marion Police Department and the Marion County Sheriff's Office (just as Cody had appointed Marion Police Officer Zach Hudlin to help with the joint investigation the day before).

196.    Chief Cody requested Det. Christner to obtain a "preservation warrant" to serve on the *Marion County Record*'s internet provider.

197.    Det. Christner, however, learned that the newspaper's "record domain is hosted by a small hosing [sic] company out of Wisconsin."

198.    Det. Christner told Chief Cody that he had "no legal authority" to make a request to the Wisconsin company and that "they may notify the Marion Record if I do so."

199.    Accordingly, Det. Christner told Chief Cody, "My advice is if you have PC for a search warrant is that we just write that and skip a preservation."

**"I am not comfortable swearing to an affidavit"**

200.    By the next day, Det. Christner had drafted an eight-page application for a search warrant for the *Marion County Record*.

201.    The application included multiple pages titled "DETAILS OF INVESTIGATION," even though Det. Christner—when he forwarded the draft to Chief Cody—admitted he "did not do the investigation."

I attached a draft for a SW. I am not comfortable swearing to an affidavit that I did not do the investigation on. I left my training and expierice in red so you can change it to yours. Let me know what you think.

202.    As a result, the application was replete with either intentional, knowing, or reckless false statements.

203.    For example, the affidavit included the false statement that in order to access the Kansas Department of Revenue website Zorn was required to select from several "options available on the Kansas DOR records website."

204.    Christner even included in his draft a screenshot from some website appearing to list the options.

205.    But the Kansas Driver's License Status Check tool has no such requirement and contains no such listing.

206.    If Christner had gone to the Kansas Driver's License Status Check tool he would have known this statement was false.

207.    The Driver's License Status Check tool is readily available from the Kansas Department of Revenue homepage, by clicking "Online Services."



208.    Det. Christner was directed to this webpage by the August 1, 2023 letter itself, which tells readers to go the Department of Revenue homepage to "check the status of your driving privileges."

The Kansas Department of Revenue website provides electronic, self-help tools at www.ksrevenue.gov where you can update your address and check the status of your driving privileges. You can also download our free mobile app, IKan, on your phone.

209.    Det. Christner could also have found the tool with a simple Google search; for example, the Kansas Driver's License Status Check tool is among the first listing for searches of "kansas driver record lookup;" "kansas driver's license suspended;" "kdor driver's license;" "kdor driver suspended;" "kdor suspension;" and "kansas drivers license status."

Kansas Department of Revenue (.gov)
https://www.kdor.ks.gov › Apps › DLStatus › login ⋮

**Kansas Driver's License Status Check**
If your driving privileges are currently suspended, revoked, restricted, or cancelled, please **contact Driver Solutions at 785-296-3671** to determine your ...

210.    Det. Christner therefore either knew the information he stated in the affidavit, *i.e.*, that someone has to provide a reason for accessing the records on the website, was false or he was grossly reckless in failing to perform even the most basic investigation, which would have revealed the falsity of his claims.

211.    Det. Christner also falsely stated that the only way Zorn could have accessed the Kansas Department of Revenue records was through "either impersonating or lying about the reasons why the record was being sought."

212.    As noted above, the records are open records under both federal and state law and Zorn did not have to impersonate another person or lie about her reasons for obtaining a record in order to lawfully use the Kansas Driver's License Status Check tool.

213.    Again, anyone who used the Kansas Driver's License Status Check tool would have known these statements were false.

214.    Det. Christner also falsely claimed that someone at the *Record* had supplied Vice Mayor Ruth Herbel with the August 1, 2023 letter as part of a plan to retaliate against Kari Newell for having Eric Meyer and Phyllis Zorn removed from the meet-and-greet for Rep. LaTurner.

215.    Det. Christner knew that Phyllis Zorn did not access the Kansas Department of Revenue website until Friday, August 4, 2023, but also knew that Ruth Herbel had received a copy of the letter from Pam Maag on Wednesday, August 2, 2023.

216.    Had Det. Christner been truthful, the affidavit would have failed to state even arguable probable cause.

217.    Det. Christner also either intentionally, knowingly, or recklessly omitted material facts which, if included, would have prevented a finding of probable cause, including:

(a)    the fact the *Record* already had Kari Newell's first name, last name, date of birth, and driver's license number, because as Meyer explained to Chief Cody and Sheriff Soyez, the *Record* was given the August 1, 2023 letter by a source, and the letter contained all this information;

(b)    the Driver's License Status Check tool permits any requester with Newell's first name, last name, date of birth, and driver's license number to view the status of Newell's driver's license;

(c)    the Driver's License Status Check tool permits any requester with Newell's first name, last name, date of birth, and driver's license number to view documents concerning the status of Newell's driver's license—including the August 1, 2023 letter—so long as they certify that "I will use the information requested in a manner that is specifically authorized by Kansas law

and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form);"

(d)     the fact that the Kansas statute on driver's license records explicitly states that driver's license records are "open records" under the Kansas Open Records Act, with exceptions not applicable here;

(e)     the fact that records concerning a person's "driving violations" or "driver's status" are not covered by the federal Driver's Privacy Protection Act;

(f)     the fact the Driver's Privacy Protection Act allows "personal information" to be disclosed pursuant to state law; for matters of motor vehicle or driver safety; or for research purposes;

(g)     the fact it would be illegal for the State of Kansas to operate a public-facing webpage that allows users to access protected "personal information;"

(h)     the fact that both Chief Cody and Sheriff Soyez knew the *Record* was investigating allegations that local law enforcement had wrongly permitted Kari Newell to drive for years without a valid license;

(i)     the fact that Eric Meyer had offered to assist in any law enforcement investigation into this allegation;

(j)     the fact the United States Supreme Court has stated that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude;'"

(k)     the fact the United States Supreme Court has stated that "rummag[ing] at large in newspaper files" is not allowed;

(l)     the fact the United States Supreme Court has stated that "[w]here presump-

        tively protected materials [under the First Amendment] are sought to be

        seized, the warrant requirement should be administered to leave as little as

        possible to the discretion or whim of the officer in the field." *Zurcher v.*

        *Stanford Daily*, 436 US. 547, 564 (1976);

(m)     the fact the United States Supreme Court has stated that "the warrant re-

        quirement [should be applied] with particular exactitude when First Amend-

        ment interests would be endangered by the search;"

(n)     the fact the federal Privacy Protection Act prohibits the search of a news-

        room or other place where reporters maintain newsgathering materials, with

        certain exceptions not applicable here; and

(o)     the fact the Kansas Shield Law protects the disclosure of newsgathering

        material without a prior court hearing, during which a reporter can object to

        the production of such materials.

218.    Det. Christner knew all of the material facts listed above or would have known
them had he performed even the most basic investigation.

219.    Det. Christner intentionally, knowingly or recklessly omitted these material facts
from the draft affidavit.

220.    Had these facts not been omitted, the affidavit would have failed to state even ar-
guable probable cause.

221.    Det. Christner then sent his completed draft search warrant application to Chief
Cody, who shared it with Officer Hudlin.

**Garbage In, Garbage Out**

222.     By the next morning, August 10, 2023, Chief Cody had taken Det. Christner's draft

application for the *Record* and copied over contents of the draft application and pasted them into

virtually identical applications for the homes of Vice Mayor Ruth Herbel and Pam Maag.

223.     Chief Cody shared those draft applications with Officer Hudlin and Det. Christner.

224.     Later the same day, Chief Cody discussed the drafts with Sheriff Soyez, and a de-

cision was made to add a fourth target of the raids: the home Eric Meyer shared with his mother.

> After speaking with Jeff Soyez, the sheriff reminded me that Eric Meyer works from home. His computer will
> be at his residence.
>
> I attached a SW and affidavit for his residence.
>
> Chief Gideon Cody

225.     Each of Chief Cody's affidavits contain all the same false statements as Det. Christ-

ner's draft affidavit.

226.     Chief Cody knew or should have known these statements were false for the same

reasons Det. Christner knew or should have known they were false.

**Additional Garbage**

227.     Chief Cody's affidavits also included additional false statements.

228.     For example, Chief Cody's affidavits state that:

While the initial front page of the website is public, as seen above a selection must
be made to show a legal reason to obtain the information according to the Drivers'
Privacy Protection Act of 1994. To access the records a confidentiality agreement
is displayed prior to a user accessing the search function. A section of the confiden-
tiality agreement states 'Under the Driver's Privacy Protection Act of 1994, as
amended (DPPA) (18 U.S.C. § 2721), personal information obtained by the Kansas
Department of Revenue cannot be released unless the request for information falls
within one of the exceptions within the Act.

229.     This statement is false; the Kansas Driver's License Status Check tool contains no such language.

230.     Cody's affidavits also state that:

Under the confidentiality agreement it states "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the federal Drivers' Privacy Protection Act of 1994, as amended. I further declare that any personal information I receive will not be used to sell or offer for sale any property or service."

231.     Again, this statement is false; the Kansas Driver's License Status Check tool contains no "confidentiality agreement" and contains no such language.

232.     Had Chief Cody performed even the most basic of investigation, such as going to the actual Kansas Driver's License Status Check tool (which he could have found from either the August 1, 2023 letter or by performing a simple Google search) he would have known these statements were false.

233.     Had Chief Cody been truthful, the affidavits would have failed to state even arguable probable cause.

234.     Chief Cody likewise made the same omissions of material fact in his affidavits that Det. Christner made in his draft.

235.     Chief Cody knew all of the material facts listed above or would have known them had he performed even the most basic investigation.

236.     Chief Cody intentionally, knowingly or recklessly omitted these material facts from the affidavits.

237.     Had these facts not been omitted, the affidavits would have failed to state even arguable probable cause.

**Christner Drafts the Actual Search Warrants**

238.     After receiving Chief Cody's final draft of the affidavits, Det. Christner prepared the actual search warrants for the magistrate to sign (which would be submitted with the search warrant applications) and sent those draft warrants to Chief Cody.

**The Search Warrant Applications Are Submitted to Magistrate Judge Laura Viar**

239.     The Honorable Susan Robson is the District Judge for Marion County; Judge Robson had previously served as the Marion County Attorney.

240.     The four search warrant applications,[3] however, were not presented to Judge Robson, but were presented to Magistrate Judge Laura Viar, of Morris County.

241.     Judge Viar, who was appointed January 1, 2023, to fill a vacant magistrate judge position, had twice been previously arrested for driving under the influence; at the time of both arrests she was the prosecutor for Morris County.

242.     In January 2012, Judge Viar was arrested for DUI and later entered into a diversion agreement; the agreement was later extended by six months when she refused to get an alcohol and drug evaluation.

243.     While she was on diversion for her first DUI, Judge Viar was arrested a second time for DUI; the second DUI arrest should have been a violation of her diversion agreement.

244.     There is no record of the result of Judge Viar's second arrest; nor is there a record of what, if any, consequences Judge Viar suffered as a result of violating her diversion agreement from her first arrest.

---

[3] One of the applications was for a search of the offices of the *Marion County Record*, one was for the home of Joan and Eric Meyer, one was for the home of Vice Mayor Ruth Herbel, and one was for the home of Pam Maag.

245.    Judge Viar knew or should have known from reviewing the search warrant applications prepared by Chief Cody and Det. Christner that Kari Newell's driver's record included one or more DUIs and that the *Marion County Record* was attempting to learn about Newell's DUI infractions.

246.    As such, Judge Viar was plainly not a "neutral and detached" magistrate.

**The Search Warrants Were Based on False Statements and Material Omissions**

247.    Judge Viar signed the search warrants for the newsroom of the *Marion County Record*, the Meyer home, and the Herbel home, based on the false statements of material facts contained in the affidavits.

248.    Had the affidavits been truthful—and had the affidavits included the material facts which were omitted from the affidavits—Judge Viar would not have signed the search warrants.[4]

**Chief Cody Did Not Personally Appear Before Magistrate Viar**

249.    The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, and **supported by Oath or affirmation**." U.S. Const. amend. IV (emphasis added).

250.    Kansas law similarly provides that a search warrant may only be issued "upon the oral or written statement … of any person **under oath or affirmation**." K.S.A. 22-2502(a) (emphasis added).

251.    Pursuant to that provision, the written search warrant applications for the *Record*'s offices, Joan and Eric Meyer's home, and Ruth Herbel's home each had a space for a notary to sign the application.

---

[4] Notably, Judge Viar refused to sign a search warrant for the home of Pam Maag—the individual who actually provided the August 1, 2023 letter to Ruth Herbel.

252.    However, on each of the applications, Judge Viar scratched out "Notary" and signed the applications herself, attesting that Chief Cody swore the applications had been "SUB-SCRIBED and SWORN to **before me**." (Emphasis added).



253.    But Chief Cody never appeared before Judge Viar, making Judge Viar's statement that Cody swore to the applications "before me" false.

254.    On August 30, 2023, former *Marion County Record* reporter Deb Gruver sued Chief Cody in the United States District Court of the District of Kansas for violating her civil rights when he raided the *Record*'s offices, yanked her cell phone out of her hand and injured her, and searched her desk in the *Record*'s newsroom.

255.    In his Answer to Gruver's lawsuit, Chief Cody specifically states that "[t]he Applications for Search Warrant [were] taken by the County Attorney's office to Judge Viar for approval." Answer ¶ 22, *Gruver v. Cody*, No. 23-cv-01179, Dist. of Kan. (Oct. 4, 2023).

256.    Additionally, Marion County Attorney Joel Ensey provided Jessica McMaster, an investigative reporter at KSHB-TV in Kansas City, a statement following the filing of Chief Cody's Answer in the Gruver case.

257.     In his written statement, Marion County Attorney Ensey confirmed that "my office staff did take the warrants up for the judge to review."

> I don't want to comment extensively on the pending litigation between Ms. Gruver and Mr. Cody. I will say that, although I was aware that the Marion PD was investigating what it believed was a crime in which Kari Newell was a victim, my involvement in that investigation is being overstated. I was first emailed the search warrants on Thursday the 10th, while I was out of the office dealing with personal matters. I first saw the search warrants when I returned to work on Friday. I previewed the warrants, but did not fully review them as I was prepping for a full day in Court. I did not know the warrants were going to be served on that Friday, until my staff received a call from Mr. Cody stating he had a team ready to serve the warrants. At that time, my office staff did take the warrants up for the judge to review, but at no time prior to their execution did I approve them or provide a legal opinion as to their sufficiency.

258.     Judge Viar's act of notarizing the applications was invalid under Kansas law, which provides as follows: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear **personally** before the notarial officer." K.S.A. 53-5a606 (a) (emphasis added).

259.     The search warrants were not issued "upon the oral or written statement … of any person under oath or affirmation" and were therefore invalid and void.

**Chief Cody Leads the Raids**

260.     On Friday, August 11, 2023, Chief Cody spearheaded a team of armed law enforcement officers in conducting raids on the offices of the *Marion County Record*, the home of Joan and Eric Meyer, and the home of Ruth Herbel.

261.     The first raid occurred at the offices of the *Marion County Record*, where Chief Cody led a squad consisting of himself, Marion police officer Zach Hudlin, Marion police officer Jonathon Benavidez, Marion County Sheriff's detective Aaron Christner, and Marion County Sheriff's detective Steven Janzen.

262.    The officers approached the building from the rear, where they confronted *Record* reporters Phyllis Zorn and Deb Gruver.

263.    Chief Cody forcibly yanked Gruver's cell phone from her hand, injuring her.



264.    The officers then entered the offices of the *Record*, led by Chief Cody.



**The Sham "Preview Search"**

265.    The "warrant" obligated the officers to conduct a "preview search" of any electronic devices so that the officers only seized items that were actually used in connection with the so-called "identity theft."

> 5.  Conduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the identity theft, by use of manual or automated preview tools.

266.    In accordance with this requirement, Marion County Sheriff's Det. Aaron Christner connected an external drive via a USB port to reporter Phyllis Zorn's desktop computer in the *Record*'s newsroom.

267.    He then executed a software application titled osTriage, which he had previously loaded onto the external drive.

268.    The program allows a user to conduct a keyword search on the connected computer and its storage media, thereby allowing a user to make a determination in the field as to whether the device was used in the commission of a crime.

269.    But the keywords selected for the preview search of the *Record*'s desktop computers and network server were so vague and indistinct they constituted a sham search.

270.    For example, one of the keywords was the word "vehicle," while another keyword was the word "Kansas."

271.    As a result, the search returned scores of "hits" that were utterly irrelevant.

272.    Predictably, when searching the computer files of a Kansas newspaper, the keyword "Kansas" produced scores of irrelevant "hits," including a "hit" for a job applicant's writing sample titled "The Haunted Hotel of Ar*kansas*."



**Behind-the-scenes: THE HAUNTED HOTEL OF ARKANSAS**

Posted Thursday, October 20, 2016, at 3:26 PM

The Haunted Hotel is now open for business!

273.    The keyword "Kansas" also produced a "hit" for the logo of the "*Kansas* Eighth Judicial District."



274.    Other search terms produced similarly worthless results.

275.    For example, the keyword "DOR" produced a "hit" for the logo for the Pan*dor*a internet radio station website.



276.    The keyword "DOR" also produced a "hit" for a newspaper advertisement for a local car dealership which sponsored a drive-in movie-showing of "FINDING *DOR*Y."



**The Keyword Searches – Part 2**

277.    Det. Christner also ran searches on certain names—but those searches returned similarly irrelevant "hits."

278.    For example, the only "hits" for "Maag" (it was Pam Maag who gave the letter to both Vice Mayor Ruth Herbel and the *Record*) were to prep sports stories on *Maag*'s son, who graduated from Marion High School in 2010.

279.    The only "hit" for "Pam" was to another *Pam* who was formerly a city council member in Peabody, Kansas, another city in Marion County.

280.    Similarly, the only "hit" for "Kari" was to a twenty-year-old article on the former administrator of a Marion nursing home whose first name also happened to be *Kari*.

281.    And the only "hit" for "Ruth" was for *Ruth* Meyer, Eric's grandmother and a former *Wichita Eagle* reporter who, after retiring from the *Eagle* in the 1960s, worked for the *Record*.

### The "Preview Searches" Reveal No Evidence of Criminality

282.    As a result, none of the "hits" from the "preview search" of Phyllis Zorn's computer were even suggestive of a crime.

283.    Instead, it is obvious the keyword search terms were a sham and were never designed to comply with the requirement in the "search warrant" that officers conduct a preview search "to exclude from seizure those which have not been involved in the identity theft."

284.    The name searches similarly produced false "hits" 100% of the time.

285.    Despite the fact the "preview searches" revealed no evidence Phyllis Zorn's computer was used to commit any crime, Chief Cody nevertheless directed Zorn's computer be seized.

### "Do YOU Want to Look Through This Desk?"

286.    While Det. Christner was running the preview search on Phyllis Zorn's computer, Officer Zach Hudlin was conducting a physical search of the *Marion County Record*'s newsroom, reading papers on countertops, going through reporter's purses, and rifling through files in reporter's desks.

287.    When Officer Hudlin got to Deb Gruver's desk (it was Gruver who had been inves-tigating the tips which the paper had received about Chief Cody) Hudlin paid particular attention to the files in the bottom, right-hand drawer in Gruver's desk.



288.    Among the files Officer Hudlin observed in Gruver's desk drawer was Gruver's investigative file on the confidential tips the *Record* had received about Gideon Cody from officers with the Kansas City, Missouri Police Department describing Cody's rampant misconduct; the file was in a folder titled "Capt. Gideon Cody," which was Cody's rank in the Kansas City Police Department when he applied to be Marion's top cop.



289.    Inside the folder was a color-printed copy of the LinkedIn profile (complete with photograph) of Gruver's primary confidential informant; the profile had been printed at 5:30 p.m. on April 27, 2023.



290.    Also inside the folder was information about other confidential sources who pro-vided information about Gideon Cody.

291.    After Officer Hudlin located Gruver's file on Cody—and while Hudlin was stand-ing next to Gruver's desk—Hudlin had the following conversation with Chief Cody:

Hudlin:  "You want to look through this desk?

Cody:    "You have the right to look for yourself."

Hudlin:  "I know, I'm asking do YOU want to look through this desk?

Cody:    "Man, you got a right to …"

Hudlin:  "I understand. You will understand shortly."

292.    Chief Cody is then seen on Officer Hudlin's body camera footage bending down to look inside Gruver's bottom right-hand desk drawer, where Gruver's file on Cody was located.



293.   A short time later, Chief Cody is recorded as saying: "Hmm. … Keeping a personal file on me."

294.   Chief Cody thereby admits to having viewed Gruver's file on her investigation of the many tips the *Record* had received about him, which included information about (and even at least one photograph of) Gruver's confidential sources.

**The Missing Body Camera Footage**

295.   The Marion Police Department produced hours of video in response to a Kansas Open Records Act request for Chief Cody's body camera footage of the raids; that footage includes video of Chief Cody relieving himself at Casey's General Store between the search of the Herbel home and the search of the Meyer home.



296.     While Chief Cody did not turn off his body camera while relieving himself, he apparently chose to turn it off while he reviewed Gruver's confidential investigative file on him, for the Marion Police Department did not produce any body camera footage from Chief Cody of him looking through Gruver's file on him.

**"Let's Get the F*ck Out of Here"**

297.     According to the log created by the osTriage software application, Det. Christner began his "preview search" on Phyllis Zorn's computer at 11:11:57 a.m.

298.     That same log shows Det. Christner did not complete the "preview search" until 12:32:05 p.m.

299.     Following the completion of the "preview search" on Zorn's computer, Officer Hudlin said, "We'd be here all freakin' day if we were going to do that to all those computers."

300.     By noon, Chief Cody's body camera footage had already recorded him saying, "I'm starvin'."

301.    Shortly after Officer Hudlin made his "all freakin' day" comment, Chief Cody spoke on the phone with his co-conspirator, Marion County Sheriff Jeff Soyez.



302.    Chief Cody brought Sheriff Soyez up to speed on the search and is then heard saying, "Alright, we'll just take them all."

303.    Chief Cody then turned to Det. Christner and Officer Hudlin and said, "Let's get the f*ck out of here."

304.    Chief Cody's decision to ignore the requirement in the "search warrant" that he conduct a "preview search" to exclude devices not used in the so-called "identity theft" and, instead, to "just take them all," *i.e.* to seize the other computers without performing a "preview search" on them, was based on what he variously described on the body camera recordings as:

- "I have a feeling that numerous people had it in this office, and that's just the gut;"

- "I have a feeling it's on that one too;" and

- "This is just me playing instinct."

305.    Yet, Chief Cody was repeatedly caught on body camera footage acknowledging he was out of his element:

- "If I'm forgetting something guys, you gotta let me know, I'm out of practice, you know;" and

- "I'm out of practice. You see something I'm forgetting you just let me know."

306.    Based on his "gut," and after consultation with his co-conspirator, Sheriff Soyez, Chief Cody directed that Eric Meyer's computer, Deb Gruver's computer, and the network file server be seized without attempting a preview search on those computers.

307.    Officer Hudlin then physically removed the equipment from the *Record*'s offices.



308.    Chief Cody's action in ordering the seizure of the four computers was in clear violation of the requirement in the "search warrant" to conduct a preview search "to exclude from seizure those which have not been involved in the identity theft."

309.     By seizing the computers of Eric Meyer, Phyllis Zorn, Deb Gruver, and the network file server, Chief Cody seized all of the newsroom computers in the *Marion County Record*'s newsroom, effectively shutting down the newspaper.

310.     Similarly, Chief Cody directed that Officer Hudlin seize the cell phones of *Record* reporters Phyllis Zorn and Deb Gruver, even though no preview search of any sort was conducted on those phones.

### Chief Cody's Failed Interrogations

311.     In addition to searching the newsroom and seizing the newsroom computers, Chief Cody also attempted to interrogate the *Record* staff, who had been told they had to wait outside the *Record*'s offices, even though the temperature was near 100 degrees.

312.     Chief Cody called the staff members inside, one-by-one, so he could question them.

313.     Chief Cody first called *Record* reporter Phyllis Zorn into the newsroom and attempted to give her the *Miranda* warning, but he couldn't recall the wording of the warning.



314.    He nevertheless attempted to get Zorn to incriminate herself, but she said she believed she had done nothing wrong.

315.    Chief Cody also tried to get Zorn to incriminate Eric Meyer, telling her she could disregard orders she believed were illegal; Zorn said she did not believe he did anything illegal.

316.    Chief Cody asked Zorn if she used her phone to access the Kansas Department of Revenue website and she said no.

317.    Despite Zorn's denial, Chief Cody directed Officer Hudlin to seize Zorn's phone, without conducting a "preview search" of any sort on the phone.

318.    Chief Cody then asked Det. Christner for a copy of his (Det. Christner's) *Miranda* warning card so he could use it with *Record* reporter Deb Gruver.

319.    But when Gruver came into the newsroom for her interview, Chief Cody realized he did not have his reading glasses with him and he could not read the card, so he directed Officer Hudlin to read the warning on the card to Gruver.



320.    Gruver—having investigated Chief Cody and being aware of his incompetence—asserted her right to remain silent and did not answer Chief Cody's questions.

321.    Again, however, Chief Cody directed Officer Hudlin to seize Gruver's phone, even though Cody had no factual basis for believing that Gruver participated in the so-called "identity theft" and even though no preview search was done on the phone.

322.    When Chief Cody ordered the seizure of Gruver's phone, he knew that Gruver was leading the *Record*'s investigation into his employment with the Kansas City, Missouri Police Department and had communicated with numerous confidential sources concerning Cody.

323.    Throughout the search, Chief Cody repeatedly indicated the only basis he had for believing that Gruver was involved was "her name was on the newspaper article, that's why she was tied into it."

324.    The newspaper article which Chief Cody was referring to was the article on Kari Newell's temper tantrum at the city council meeting, during which Newell falsely accused someone at the *Record* of providing Vice Mayor Ruth Herbel with a copy of Newell's driver's record.

325.    That article was written by Eric Meyer, but Gruver is listed as having contributed to the story—because Gruver was at the meeting and helped Meyer recall what Newell said at the meeting.

> Reporter Deb Gruver contributed to this story.

326.    The targeting of Gruver for her reporting is a classic case of First Amendment retaliation.

**The Cops Are Warned the Raids Are Illegal**

327.    At the same time Chief Cody and his retinue of armed officers descended on the newsroom of the *Record*, State Fire Marshal Investigator Chris Mercer and Marion County Sheriff's Sergeant Matt Regier knocked on the front door of the home of Joan and Eric Meyer.

328.    When Eric Meyer answered the door, Investigator Mercer—who was armed and wearing an armored tactical vest—handed Eric the search warrant for the home and announced they were there to "take" Eric's digital devices.

329.    Before the officers even entered the home, Eric Meyer stated he objected to the search and requested the ability to consult with an attorney.



330.    The officers refused Eric Meyer's request and entered the home.

331.    When Eric Meyer attempted to use his cell phone to call an attorney, Sgt. Regier demanded Eric's phone, telling Eric that he (Regier) was not waiting and that if Eric did not immediately provide him with his cell phone, he (Regier) was going to physically take it from Eric.

332.     Eric Meyer responded by stating:

You're going to get a suit back against false search. You understand that? … You are in big, deep sh*t right now. You understand that? Do you understand that Officer Cody, who filled this out; we have a whole bunch of damaging information about him we have not published. He is aware of this and this is retaliation by Chief Cody.

333.     Sgt. Regier wholly disregarded Eric Meyer's statement and again demanded that Eric provide Regier with his cell phone.

334.     Eric Meyer responded by stating:

Please note in your return on the search warrant that I have objected to this on the grounds of the shield law, that it is impermissible to seize the electronic devices of a journalist doing work as a journalist. That's what this is about.

335.     Despite Eric Meyer's repeated objections, Sgt. Regier seized Meyer's cell phone.

**The Raid on Joan and Eric Meyer's Home**

336.     The commotion in the living room of the Meyer home caused 98-year-old Joan Meyer, Eric Meyer's mother, to emerge from her bedroom, aided by her walker.



337.    The two officers then announced they had to wait for Chief Cody to arrive before they could continue the search—and they were not leaving until Chief Cody arrived.

338.    During the two and a half hours the two officers waited for Chief Cody to arrive, Joan Meyer became increasingly upset at the presence of the officers in her home.

339.    She said to them, "I'm ninety-some years old and to have the cops in here doing this to me … (Joan begins to cry)."



340.    Joan Meyer couldn't understand why two cops were in her house and said, "I haven't done a thing except live here," and explained she has lived in the house since the day before her son Eric was born (Eric is 70 years old).

341.    She repeatedly said, "this is the worst I've ever seen," and said, "this is the first time I've ever had police in my house threatening me."

342.    When Investigator Mercer tried to justify his presence, Joan said, "I'm not dumb. I may be ninety-some years old, but I know what's going on. And what's going on is illegal as hell."

343.   She continued, saying, "you don't know what you're doing to me," and said, "I'm not happy and I never will be happy anymore."

**Eric Meyer Goes to the *Record***

344.   In the meantime, Eric Meyer repeatedly called the *Record*'s offices on his mother's landline phone, but no one answered—because Chief Cody had kicked all the *Record*'s staff out of the office and had taken everyone's cell phones.

345.   Accordingly, Eric Meyer left and went to the *Record* in an attempt to learn what was going on at the newspaper and to try to get contact information for his attorney.

346.   When Officer Hudlin told Chief Cody that Eric was on his way to the *Record*, Cody told Hudlin, "if he interferes with anything put him in cuffs."

347.   When Eric Meyer arrived, he was denied entry by Chief Cody, who said Meyer could only enter the offices for the purpose of being *Mirandized* and then interrogated by Cody.



348.     Eric Meyer responded to Chief Cody by explaining that he (Eric) needed access to his office to obtain the phone number of his attorney and that by denying him access to this office Cody was effectively denying him the right to counsel.

349.     Chief Cody told his fellow officers he found Eric Meyer's complaints about being denied his right to counsel "amusing."

350.     Eric Meyer further stated that the search of the *Record* was illegal and stated he intended to sue the city for $3 million because "we are going to be put out of business by this."

351.     Eric Meyer then waited outside the *Record*'s offices for Chief Cody and his band of cops to leave so that he could assess the damage done by the officers.

**Kari Newell Calls for an Update on the Raids**

352.     Chief Cody left the *Record* and drove to Joan and Eric Meyer's home.

353.     Enroute to the Meyer home, Chief Cody received a text message from Kari Newell, wanting to talk about the status of the raid.



354.     Chief Cody immediately called Newell back and said, "we can't write anything" (referring to text messages) and Newell replied, "I understand."

355.     Chief Cody then proceeded to give Newell a complete rundown on the status of the raids, telling her, for example, he tried to "download" files from the computers at the *Record*, "but that didn't work, so f*ck it," he just took the computers.

356.     Cody also told Newell that Eric Meyer had threatened a $3 million lawsuit.

**Chief Cody Leads a Mob of Officers to the Meyer Home**

357.     When he arrived at the Meyer home, Chief Cody met Det. Christner, Officer Hudlin, and Officer Benavidez (who all came from the *Record*), along with Marion County Sheriff's Det. Steven Janzen (who had previously been at both the *Record*'s offices and Vice Mayor Ruth Herbel's home); Sgt. Matt Regier and Investigator Chris Mercer were still inside the Meyer home.



358.     Prior to entering the Meyer home, Det. Christner asked Chief Cody if he (Cody) wanted Det. Christner to do a "preview search" of the computers and phones in the Meyer home.

359.     Chief Cody responded, no, "Just take 'em."

**Joan Meyer is Terrorized**

360.     As the officers entered Joan Meyer's home, she asked, "What's going on now?"



361.     As Chief Cody approached Joan Meyer—with his hand on his gun—she said, "Boy, you're going to be in trouble. Boy, are you going to be in trouble."

362.     When Chief Cody said he was there to take her computer, Joan Meyer said, "You take my computer, that's personal property. I've done nothing. Good grief are you in trouble."

363.     When Chief Cody ignored her, she shouted, "Get out of my house!"

364.     Joan Meyer asked how many officers were in her house, and when told seven, she responded, "Seven of you in my house to come take my computer. Oh, God, you guys are crazy. You don't know what you're doing. You don't know what kind of trouble you're getting in."

365.     She then used Alexa to try to call Eric Meyer; in a cruel twist, Eric's phone rang inside an evidence bag that the officers had placed Eric's phone in.

366.    Joan, however, believed her son had answered and told him, "Get 'em out of here."



367.    When Joan Meyer was asked where her basement was, she shouted, "Shut up. You're not going in my basement;" Chief Cody ignored her and searched the basement.



368.     Joan Meyer then said, "I'll never trust a policeman again."

**Chief Cody Seizes Joan Meyer's Computer and Eric Meyer's Cell Phone**

369.     Despite the lack of a preview search on either Joan Meyer's computer, Eric Meyer's

laptop, or Eric Meyer's cell phone, Chief Cody ordered Officer Hudlin to seize the devices.

370.     Officer Hudlin then took the devices, as well as a portable hard drive and a router.

**"That's Going to be Murder"**

371.     Throughout the illegal raid on her home, 98-year-old Joan Meyer repeatedly told

the officers the stress of them ransacking her home was going to kill her.

372.     Before Chief Cody arrived, Joan Meyer told Sgt. Regier and Investigator Mercer,

"If I have another stroke, it will just be one more thing to add to your charges. …I am 98 years

old, I've already had two strokes from stress, if you don't think this is stress, what do you think it

is? … I'm working myself up into another stroke … You're going to cause me to have another

stroke, that's going to be murder."



373.    Six minutes after Chief Cody and his entourage entered Joan Meyer's home, she said to them, "You know, if I have a heart attack and die, it's going to be all your fault; I've had two of 'em already."

374.    Three minutes later, Joan Meyer said, "You don't know what you're doing, you're all going to be in trouble. If I die, you're going to be sued for murder, and I'm just liable to."

### The Officers Discuss Arresting Joan Meyer

375.    As the officers left the Meyer home and assembled outside, Officer Hudlin discussed going back in and arresting Joan Meyer for interfering with their investigation.



376.    Specifically, Officer Hudlin told Chief Cody that Joan Meyer should be arrested for throwing her walker when she approached a step in the house.

377.    Officer Hudlin relented, however, saying, "if she wasn't 100," he would have arrested her.

**Sheriff Soyez Throws a Pizza Party**

378.    Chief Cody then drove to the Marion County Sheriff's Office where he met with his co-conspirator, Sheriff Soyez, to discuss the raids while sharing pizza and drinks, which Soyez had ready for the search teams.



379.    Chief Cody told Sheriff Soyez that when he yanked the cell phone out of the hand of reporter Deb Gruver (the reporter who was investigating Cody's employment problems at the Kansas City Police Department)—it "made my day."

380.    Before Chief Cody could say anything further, Cody's co-conspirator, Sheriff Soyez, pointed out to Cody that he (Cody) had forgotten to turn off his body camera.

381.    Chief Cody then ordered Officer Hudlin to turn off Cody's body camera, telling Hudlin, "I can't get this damn thing to turn off."

**"There is not a probable cause affidavit filed"**

382.    While Sheriff Soyez was hosting the pizza party, *Record* reporter Phyllis Zorn went

to the Marion County Courthouse to request a copy of the probable cause affidavit in support of

the search warrant on the *Record*'s office.

383.    Remarkably, Zorn was told no such affidavit had been filed.

> Ms. Zorn:
>
> This Court is unable to respond to this request as there is not a probable cause affidavit filed.
>
> Dated this 11th day of August at 3:12 p.m.
>
> Sincerely,
>
> LAURA VIAR
> DISTRICT MAGISTRATE JUDGE
>
> By: _____
>          Anita Svoboda, Deputy Clerk

**"Where Are All the Good People?"**

384.    Meanwhile, Joan Meyer was so traumatized over the raid on her home she refused

to eat or drink and refused to go to bed.

385.    She kept comparing the actions of Chief Cody and the other officers who raided

her home for hours to Nazis (she lived through World War II).

386.    Joan repeatedly told her son that her entire life was meaningless if this is what Mar-

ion had become.

387.    She kept asking her son, "Where are all of the good people who are supposed to

stop this from happening?"

388. When Eric Meyer tried to convince her that the good people were coming, she replied: "Yeah, but I won't be alive by the time they arrive."

389. She spent Friday evening into Saturday crying and wholly despondent.

### Joan Meyer (May 23, 1925 – August 12, 2023)

390. Joan Meyer was right: the good people did not arrive in time, and Joan Meyer died 24 hours after Chief Cody walked out the front door of Joan's home.[5]



391. She had been sitting on the side of her bed when she stopped talking, fell back on the bed, and became unresponsive.

392. Eric Meyer called 911 and began CPR until paramedics arrived; paramedics continued CPR but were unable to revive her.

393. Joan Meyer was pronounced dead at 2:53 p.m. on August 12, 2023.

---

[5] The officers did not bother to sync the dates and times on their body cameras.

394.     The report of the coroner—who had been called to the scene—details the events that led up to Joan Meyer's death, as well as her death and the heroic efforts to resuscitate her.

Son Eric recounted events surrounding his mothers death. The day prior police officers had come to the home where Joan and Eric co-reside with search warrants to confiscate computers and cell phones. The search and seizure was also done at the Marion County Record newspaper office the same day. This was extremely upsetting to Joan and caused her to remain angry and upset through out the day and night. She had ref used to eat yesterday and stated she was too upset to go to bed. Eric noted she was still sitting in her chair in her bedroom when was up during the night around 3 or 4 AM. He noted later at 6 AM that she had gone to bed. She got up around 14:00 and again stated she did not want to eat anything. When ask again she then stated she did not feel well and was dizzy. Eric stated she was sitting on the edge of her bed talking and stopped mid sentence and after that had only infrequent gasping respirations. She fell back on the bed unresponsive and Eric called 911. he moved her to the floor and began CPR with instructions from dispatch until EMS arrived and took over. There were no life signs on EMS arrival and despite ACLS protocol with 5 rounds of epinephrine no life signs or return of circulation obtained.

395.     The coroner concluded that Joan Meyer died of "sudden cardiac arrest."

**Chief Cody and Sheriff Soyez Were Not Finished**

396.     The next day, Sunday, August 13, 2023, the Kansas Bureau of Investigation issued a statement saying it was taking over the investigation.

397.     On Tuesday, August 15, 2023, Chief Cody and Marion County Sheriff's Deputy Aaron Christner exchanged drafts of probable cause affidavits supporting arrest warrants for Eric Meyer and Phyllis Zorn on more than a dozen bogus alleged criminal charges.

398.     Det. Christner also sent Chief Cody a draft of a probable cause affidavit supporting the arrest of Ruth Herbel, even though he admitted he could not find any state crime she had even arguably committed.

I have a pc for herbel attached. With the information I have, I am not sure it fits any of the crimes we have discussed expect the US fed code. Maybe there is something I am missing.

399.     Yet Det. Christner was so intent on satisfying his boss, Sheriff Soyez, he nevertheless prepared paperwork to have Ruth Herbel arrested on what he knew where bogus charges.

**The County Attorney Withdraws the Search Warrants**

400.     On Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which Chief District Court Judge Benjamin Sexton granted the same day.

401.     At the same time, Marion County Attorney Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime Chief Cody may have been investigating and "the places searched and the items seized."

402.     The press release stated that Marion County Attorney Ensey was asking local enforcement to return the items seized to their owners.

403.     Marion County Attorney Ensey, however, did not "clear" the *Record* or any of its staff of wrongdoing, meaning they remained under criminal investigation.

404.     The same day, the KBI issued a media release in which it stated its investigation was ongoing and that "[o]nce our investigation concludes we will present findings to the Marion County Attorney for review."

**Sheriff Soyez Tries to Cover-up His Involvement**

405.     Later that same day, Jack Nevins, a forensic examiner retained by the *Record*'s attorney, arrived in Marion to retrieve the seized items, which were being held at the Marion County Sheriff's Office.

406.     The transfer of the items to Nevins was personally supervised by Sheriff Soyez.

407.     At the time, Sheriff Soyez made a point of telling *Record* reporter Phyllis Zorn, 'It's not my search warrant; it was PD's search warrant."

408.     Sheriff Soyez even leaned into Zorn and said: "You didn't see me over there," referring to the offices of the *Marion County Record*.



409.    While it is true that Sheriff Soyez was not physically present during the raids, he actively participated in planning the raids, suggested the search of Joan and Eric Meyer's home, and personally participated in the decision to have all of the *Record*'s newsroom's computers seized, even though the sham "preview" search conducted by his own deputy found no evidence of criminal wrongdoing.

410.    Sheriff Soyez made these misleading statements to Zorn in an intentional—and wrongful—attempt to divert attention from his personal involvement in the illegal raids.

**The Falsified Search Warrant Return**

411.    As part of the transfer, Nevins was provided with an inventory of items seized from the *Marion County Record* during the raid.

412.    As each of the eight items on the list were returned, Nevins both checked and initialed the item on the inventory.

| NO. | Quantity | Description of Property | Est. Value |
|---|---|---|---|
| 1 | 1 | DEB GRUVER CELL PHONE  IPHONE (JN) | |
| 2 | 1 | PHYLLIS TOWER THERMALTAKE CASE (JN) | |
| 3 | 1 | PHYLLIS PHONE  MOTOROLLA (JN) | |
| 4 | 1 | ERIC TOWER  COOLERMASTER (JN) | |
| 5 | 1 | SERVER TOWER  ANTEC CASE (JN) | |
| 6 | 1 | KDOR RECORD (JN) | |
| 7 | 1 | DEB GRUVER THERMALTAKE TOWER (JN) | |
| 8 | 1 | WESTERN DIGITAL  EXTERNAL DRIVE (JN) | |
| 9 | | | |

413.    Later, when an inventory of items seized from the *Record* was filed with the District Court, it contained an additional ninth item not included in the inventory of items used to document the transfer of seized items to Nevins.

| NO. | Quantity | Description of Property | Est. Value |
|---|---|---|---|
| 1 | 1 | DEB GRUVER CELL PHONE  IPHONE | |
| 2 | 1 | PHYLLIS TOWER THERMALTAKE CASE | |
| 3 | 1 | PHYLLIS PHONE  MOTOROLLA | |
| 4 | 1 | ERIC TOWER  COOLERMASTER | |
| 5 | 1 | SERVER TOWER  ANTEC CASE | |
| 6 | 1 | KDOR RECORD | |
| 7 | 1 | DEB GRUVER THERMALTAKE TOWER | |
| 8 | 1 | WESTERN DIGITAL  EXTERNAL DRIVE | |
| 9 | 1 | OS TRIAGE DIGITAL DATA | |

414.    The new item, "OS Triage Digital Data," was the digital drive that Det. Christner had used to extract data from Phyllis Zorn's desktop computer during the raid on the *Record*'s offices.

415.     As noted above, that drive revealed that the required "preview search" in fact showed no criminal activity, but instead produced "hits" for an advertisement for an animated children's movie, the district court's logo, and other innocent files.

416.     That drive was not given to Nevins when he came to retrieve the items which the Court had ordered released.

417.     Both the inventory which the Det. Christner provided to Nevins and the inventory filed with the District Court bear the same control number (791), are signed by Officer Zach Hudlin, and are dated "08/11/2023."



418.     It was not until August 29, 2023—after the *Record*'s attorney threatened to hold Sheriff Soyez in contempt—that the contents of the drive were finally released to the *Record* pursuant to a second order from Chief District Court Judge Benjamin Sexton.

### Chief Cody Destroys Evidence of His Wrongdoing

419.     As the unprecedented, unconstitutional, and illegal raids—and the resulting death of Joan Meyer—triggered growing international condemnation, Chief Cody became concerned his wrongdoing would be exposed.

420.     Accordingly, Chief Cody began e-mailing the contents of his official law enforcement file to his personal e-mail address.

421.    Here, for example, is Chief Cody forwarding the draft probable cause statement from his police e-mail account to his personal e-mail account.



422.    In addition, Chief Cody asked Kari Newell to destroy her text messages with him.

423.    After Kari Newell became concerned with her own criminal liability for deleting her text messages and asked Chief Cody "If attorneys or kbi go digging and see I deleted the texts as you asked me to, will I get in trouble?," Cody responded:



424.    Thus, Chief Cody admits he asked Newell to destroy text messages between the two of them because he "didn't want the[ attorneys] to get the wrong impression" about their relationship.

### Chief Cody Refuses to Defend Himself

425.    On October 2, 2023, Marion Police Chief Gideon Cody resigned.

426.    In his resignation e-mail—which he sent from his personal e-mail address to Mayor Mayfield's personal e-mail address—Chief Cody stated he intended to resign effective October 15, 2023.

427.    In his e-mail Cody wrote: "I do not want to defend my actions to the Council and I do not want for everyone to have to formally discuss any discipline."

### The City Council Ratifies Hudlin's Rampant Illegal Actions

428.    Also on October 2, 2023, the Marion City Council appointed Officer Zach Hudlin as Acting Police Chief.

429.    At the time the City Council made the appointment of Officer Hudlin as Acting Police Chief, its members were already aware of Hudlin's role in the illegal raids and, specifically, the City Council members were aware of Hudlin's role in (a) directing Chief Cody to inspect Deb Gruver's file containing the confidential tips the *Record* had received about Cody when he was employed by the Kansas City, Missouri Police Department, (b) physically removing the computers from the *Record*'s newsroom and the Meyer home in violation of the "preview search" requirement in the search warrant, (c) physically seizing the cell phones of Eric Meyer, Phyllis Zorn, and Deb Gruver in violation of the "preview search" requirement in the search warrant, and (d) nearly arresting Joan Meyer for throwing her walker.

430.    In appointing Officer Hudlin the Acting Police Chief, the City Council ratified the rampant illegal actions taken by Officer Hudlin on August 11, 2023.

431.    The decision of the City Council to appoint Officer Hudlin the Acting Police Chief after its members were aware of Officer Hudlin's role in directing Chief Cody to inspect Deb Gruver's file containing the confidential tips the *Record* had received about Cody when he was employed by the Kansas City, Missouri Police Department was tantamount to direct authorization by the City Council to Officer Hudlin to commit these illegal actions.

432.    Officer Hudlin remains the Acting Police Chief.

### The Kansas Commission on Judicial Conduct Takes Action

433.    Following the raids, a concerned citizen—not connected with the *Marion County Record*—made a complaint with the Kansas Commission on Judicial Conduct about Judge Viar's decision to sign the search warrants.

434.    On November 8, 2023, the Commission took action against Judge Viar.

435.    Specifically, the Commission advised Judge Viar to spend sufficient time to fully review search warrant applications, and to "research appropriate federal and state laws before issuing a search warrant."

436.    The Commission also explicitly stated that while it found there was insufficient evidence to conclude that Judge Viar's signing of the search warrants "crossed the line of incompetence," the Commission was not agreeing the issuance of the search warrants was proper.





line of incompetence. This is not to say that the Commission agrees that the issuance of the search warrant in this instance was reasonable or legally appropriate. The Commission, under Supreme Court Rule 614(b)(1)(B), issued informal advice to Judge Viar to take sufficient time to review all documents and research appropriate federal and state laws before issuing a search warrant.

## Jurisdiction and Venue

437.    This Court has subject matter jurisdiction of Plaintiffs' claims under the federal Civil Rights Act and the federal Privacy Protection Act pursuant to 28 U.S.C. §§ 1331 & 1343(a); this Court has supplemental jurisdiction of Plaintiff *Marion County Record*'s claim under the Kansas Open Records Act pursuant to 28 U.S.C. § 1337(a).

438.    This Court has personal jurisdiction over each of the Defendants because each of the individual Defendants were Kansas residents at the time of the events described herein and Defendant City of Marion, Kansas, is a city in the State of Kansas.

439.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred in this District.

440.    Eric Meyer was duly appointed the executor of the estate of Joan Meyer by Marion County District Court Judge Susan Robson on March 18, 2024.

441.    Eric Meyer brings this action both individually and on behalf of Joan Meyer's estate.

### Count I
### First Amendment – Direct Violation (42 U.S.C. § 1983)
### (All Defendants)

442.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-441.

443.    The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of … the press."

444.    The Fourteenth Amendment to the United States Constitution extends the protections of the First Amendment to actions taken by local governments and by local government officials.

445.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the First Amendment guaranteed the freedom of the press to gather and report information about matters of public concern.

446.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the First Amendment prohibited government officials, including the police, from interfering with the freedom of the press to gather and report information about matters of public concern.

447.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

448.    The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

449.    When the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer were raided, Defendants knew that Eric Meyer, Joan Meyer, Phyllis Zorn, and Deb Gruver were journalists engaged in gathering and reporting information on matters of public concern.

### The Search Warrants Were Not "Issue[d] … Upon Probable Cause"

450.    When the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer were raided, Defendants did not have an objectively reasonable belief that Eric or Joan Meyer, or anyone else associated with the *Record*, was in possession of contraband, fruits, instrumentalities, or evidence of any crime.

451.    No arguable probable cause existed to issue the search warrants for the *Marion County Record* newsroom and the home of Joan and Eric Meyer and no reasonable police officer could have believed there was arguable probable cause to issue the search warrants.

452.    The search warrants were issued based on materially false statements of fact by Chief Cody, including, but not limited to, the following:

    a.    the federal Driver's Privacy Protection Act applied to the August 1, 2023, letter from the Kansas Department of Revenue to Kari Newell;

    b.    in order to access a copy of the letter someone from the *Record* had to "l[ie] about the reasons why the record was being sought;"

    c.    in order to use the Kansas Driver's License Status Check tool a user has to provide a reason (or reasons) for accessing the information;

    d.    in order to use the Kansas Driver's License Status Check tool a user has to "show a legal reason to obtain the information according to the Driver's Privacy Protection Act of 1994;"

    e.    the Kansas Driver's License Status Check tool states: "Under the Driver's Privacy Protection Act of 1994, as amended (DPPA) (18 U.S.C. § 2721), personal information obtained by the Kansas Department of Revenue

cannot be released unless the request for information falls within one of the exceptions within the Act;"

f.  the Kansas Driver's License Status Check tool states: "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the Federal Driver's Privacy Protection Act of 1994, as amended. I further declare that any personal information I received will not be used to sell or offer for sale any property or service;"

g.  the Driver's Privacy Protection Act protects the fact Kari Newell's driver's license was suspended; and

h.  the Driver's Privacy Protection Act protects the fact Kari Newell was convicted to driving under the influence.

453.  The true facts are that the Kansas Driver's License Status Check tool on the Kansas Department of Revenue's website is available for anyone to use.

454.  The Kansas Driver's License Status Check tool does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.

455.  The Kansas Driver's License Status Check tool is not covered by the Driver's Privacy Protection Act.

456.  The federal Driver's Privacy Protection Act protects what the statute calls "personal information." 18 U.S.C. § 2721(a)(1).

457.  The Driver's Privacy Protection Act explicitly states that "personal information" "does **not** include information on vehicular accidents, driving violations, and **drivers' status**." 18 U.S.C. § 2725(3) (emphasis added).

458.  Thus, the Kansas Driver's License **Status** Check tool on the Kansas Department of Revenue's public-facing website is not covered by the Driver's Privacy Protection Act.

459.  The information provided by the Driver's License Status Check tool concerning the status of Kari Newell's driver's license is not protected by either state or federal law.



460.    Moreover, the Driver's Privacy Protection Act further provides that "[a] **State department of motor vehicles** … shall not knowingly disclose or otherwise make available to any person … personal information." 18 U.S.C. § 2721(a)(1) (emphasis added).

461.    Thus, it would be illegal for the Kansas Department of Motor Vehicles to have a public-facing website that provides protected "personal information."

462.    Chief Cody either knew the statements he made in the applications were false or acted with reckless disregard for whether they were false.

463.    Chief Cody made these false statements for the purpose of inducing Magistrate Judge Viar to issue the search warrants for the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer.

464.    Magistrate Judge Viar issued the search warrants for the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer based on these materially false statements.

465.    Had the affidavits included truthful facts—and included the material facts that were omitted—Magistrate Judge Viar would not have issued the search warrants.

466.    Thus, the search warrants were not "issue[d] … upon probable cause," as required by the Fourth Amendment, nor where they supported by even arguable probable cause.

467.    As such, the search warrants were invalid and void.

**The Search Warrants Were Not "Supported by Oath or Affirmation"**

468.    The search warrant applications for the *Record*'s offices and Joan and Eric Meyer's home each had a space for a notary to sign the application.

469.    However, on each of the applications, Judge Viar scratched out "Notary" and signed the applications herself, attesting that Chief Cody swore the applications had been "SUB-SCRIBED and SWORN to **before me**." (Emphasis added).



470.    But Chief Cody never appeared before Magistrate Viar, making Judge Viar's statement that Cody swore to the applications "before me" false.

471.    Judge Viar's act of notarizing the applications was invalid under Kansas law, which provides as follows: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear **personally** before the notarial officer." K.S.A. 53-5a606 (a) (emphasis added).

472.    Accordingly, the search warrants were not issued "upon oath or affirmation," as required by the Fourth Amendment.

473.    As such, the search warrants were invalid and void.

## The Search Warrants Were Overbroad – Part 1

474.    The search warrants for the *Record*'s newsroom and Joan and Eric Meyer's home did not "particularly describe the place to be searched, and the persons or things to be seized."

475.    This is particularly troubling given the U.S. Supreme Court's explicit direction that "[w]here presumptively protected materials [under the First Amendment] are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." *Zurcher v. Stanford Daily*, 436 US. 547, 564 (1976); *id* at 565 ("the warrant requirement [should be applied] with particular exactitude when First Amendment interests would be endangered by the search").

476.    For example, the search warrants authorized the seizure of "[d]ocuments and records pertaining to Kari Newell," as well as "[c]orrespondence or other documents (whether digital or written) pertaining to Kari Newell."

477.    Newell was a prominent local businessperson in Marion and, as such, she would be the subject of numerous materials held by the *Record* that have nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

478.    The search warrants also authorized the seizure of "[d]igital software and application software installation and operation media."

479.    Such a search topic is plainly overbroad; for example, the *Record*'s software for creating mailing labels for its subscribers has nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

480.    The search warrants also authorized the seizure of "[d]igital storage media and the digital content which are, or have been, used to store documents and items of personal information as defined by K.S.A. 21-6107."

481.    K.S.A. 21-6107 defines "personal identifying information" as including "[n]ame."

482.    K.S.A. 21-6107 also defines "personal identifying information" as including "address."

483.    K.S.A. 21-6107 also defines "personal identifying information" as including "telephone number."

484.    K.S.A. 21-6107 also defines "personal identifying information" as including "credit or debit card information."

485.    Thus, every computer hard drive or portable storage device which contained copies of the newspaper's published reports which included anyone's "name" or the "address" of an incident, or the "address" or "telephone number" of an advertiser was subject to seizure.

486.    Similarly, every computer hard drive or portable storage device which contained reporter's work product, including the "name," "address," or "telephone number" of the reporter's sources, was subject to seizure.

487.    Likewise, every computer hard drive or portable storage device which includes subscribers' "name," "address" and "credit or debit card information" (which are used to mail and pay for subscriber's subscription) was subject to seizure.

488.    As a result, such a search violated not only the freedom of the press clause of the First Amendment, it also violates the First Amendment right of association as well. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

### The Search Warrants Were Overbroad – Part 2

489.    Based on the search warrant applications he submitted to Magistrate Judge Laura Viar, Chief Cody stated that Phyllis Zorn—and Zorn alone—had downloaded Kari Newell's driver's license record.

490.    The search warrant applications do not provide any factual basis to even suggest that anyone else in the *Record* newsroom had downloaded Kari Newell's driver's license record or that Joan or Eric Meyer had downloaded Kari Newell's driver's license record.

491.    Yet Chief Cody requested (and obtained) a search warrant for the entire newsroom of the *Marion County Record*, as well as a search warrant for the home of Joan and Eric Meyer.

492.    As such, the search warrants for the entire newsroom and the home of the newspaper's owners were a classic fishing expedition.

### The Seizure Exceeded the Scope of the Search Warrant

493.    Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the Fourth Amendment prohibited the government, including the police, from conducting warrantless raids on a person's home or a corporation's offices except in strictly limited circumstances, such as exigent circumstances, with consent of the property owner, an item is in plain view, etc.

494.    No exceptions to the warrant requirement applied to the August 11, 2023, raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer.

495.    Yet numerous items were seized which were not listed on the search warrant.

496.    For example, the search warrant authorized the seizure of "[a] computer or digital device that **has been used** to access the Kansas Department of Revenue records website." (Emphasis added).

497.    The search warrant also authorized the seizure of "[d]igital communications devices allowing access to the Internet or to cellular digital networks **which were or have been used** to access the Kansas Department of Revenue records website." (Emphasis added).

498.    Despite the requirement that any such device "has/have been used" to access the Kansas Department of Revenue website, computers and cell phones were seized that had never been used to connect to the Kansas Department of Revenue's records website.

499.    The search warrant also required officers to "conduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the identity theft."

500.    Despite the fact the so-called "preview search" conducted by Det. Christner at the *Record*'s office failed to identify a single device involved in the alleged identity theft, the desktop computers of Eric Meyer, Phyllis Zorn, and Deb Gruver were seized, along with the *Record*'s network server.

501.    Despite the fact the so-called "preview search" conducted by Det. Christner at the *Record*'s office failed to identify a single device involved in the alleged identity theft, Phyllis Zorn's and Deb Gruver's cell phones were seized.

502.    Moreover, following the raid on the *Record*'s newsroom, *Record* reporter Deb Gruver went to the Marion County Sheriff's office and asked Chief Cody to return her phone, explaining that she had nothing to do with any search of the Kansas Department of Revenue's website.

503.    Chief Cody responded, "I actually believe you," but refused to return Gruver's phone to her.

504.    Despite the search warrant's requirement of a preview search, no "preview search" was conducted on Joan Meyer's home computer, Eric Meyer's laptop, or Eric Meyer's cell phone.

505.    Despite that fact Joan Meyer's home computer, Eric Meyer's laptop, and Eric Meyer's cell phone were all seized.

506.     Such warrantless seizures were done without consent of any person, no exigent circumstances existed, and no other exception to the warrant requirement applied.

507.     Such "rummag[ing] at large in newspaper files" is plainly unconstitutional. *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978).

### The "Capt. Cody" File

508.     Moreover, Officer Hudlin and Chief Cody's review of the contents of Deb Gruver's file on "Capt. Cody" was plainly overbroad.

509.     Neither officer had any basis for believing that Gruver accessed the Kansas Department of Revenue website or reviewed the Newell letter and, as such, neither officer had a basis for believing that Gruver's files would contain evidence related to the website or the letter.

510.     Neither officer had any basis for believing the newspaper file on "Capt. Cody" would contain information about accessing the Kansas Department of Revenue website.

511.     Moreover, both officers knew the *Record* had promised confidentiality to sources who provided information about Cody.

512.     Despite that knowledge, both officers reviewed the contents of the "Capt. Cody" file.

513.     The officers did so to illegally obtain the newspaper's confidential research—and the identity of the newspaper's confidential sources—regarding Chief Cody's past, in retaliation for the newspaper's investigation into, and criticism of, Chief Cody.

### The Marion County Attorney Withdraws the Search Warrants

514.     On Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which Chief District Court Judge Benjamin Sexton granted the same day.

515.    At the same time he filed his motion, County Attorney Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime Chief Cody may have been investigating and "the places searched and the items seized."

516.    The press release stated that Marion County Attorney Ensey was asking local enforcement to return the items seized to their owners.

517.    Thus, even the County Attorney agrees "the places searched and the items seized" exceeded the allowable scope under the Fourth Amendment.

**"Do YOU want to look through this desk?"**

518.    Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that a reporter's promise of confidentiality to a source was protected by the First Amendment. *See Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 438 (10th Cir. 1977); *In re Pennington*, 224 Kan. 573, 574, 581 P.2d 812, 814 (1978).

519.    Moreover, the Kansas Shield Law extends the journalist's privilege to "**any** information gathered, received or processed by a journalist, whether or not such information is actually published, and whether or not related information has been disseminated, and includes, but is not limited to, all notes, outtakes, photographs, tapes and other recordings or other data of whatever sort that is gathered by a journalist in the process of gathering, receiving or processing information for communication to the public." K.S.A. 60-480(b) & 60-481 (emphasis added).

520.    The Kansas Shield Law provides that "[t]he party claiming the privilege … shall be entitled to a hearing" before that party can be compelled to provide any protected information. K.S.A. 60-483.

521.   The Kansas Shield Law also provides that "[i]f the court finds that the party seeking to compel disclosure had no reasonable basis to request such disclosure, the court may assess costs and attorney's fees against the party seeking to compel disclosure." K.S.A.64-484.

522.   The Kansas Shield Law further provides that "[t]he rights and privileges by this act are in addition to any other rights guaranteed by the constitutions of the United States or the state of Kansas." K.S.A. 60-485.

523.   When Officer Hudlin rifled through Deb Gruver's desk and identified Gruver's file on "Capt. Cody," he violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

524.   When Officer Hudlin beckoned Chief Cody—with his "Do YOU want to look through this desk?" invitation—he violated both the First Amendment privilege and the journalist privilege enshrined in the Kansas Shield Law.

525.   When Chief Cody reviewed the *Record*'s file on him—which included both the identity of, and information from, numerous confidential sources—he violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

526.   When all the other Defendants searched the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, they violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

### The Raids Interfered with the Freedom of the Press

527.   When Defendants seized the computers of Eric Meyer, Phyllis Zorn, Deb Gruver, and Joan Meyer, as well as the network server for the *Marion County Record* and the cell phones of Eric Meyer, Phyllis Zorn, and Deb Gruver, Defendants abridged the First Amendment rights of

the *Record* and its owners by restricting their ability to gather and report information about matters of public concern.

528.    For example, while the *Record*'s website was hosted on an off-site computer network that was not seized, the staff had no ability to access the website to timely report the news.

529.    Without their cell phones and without access to their e-mail accounts, the staff had no way to contact sources of information and obtain the news.

530.    Because the *Record*'s network server was seized, the *Record*'s page layouts, advertisements—even the newspaper nameplate (the title of the newspaper on the front page)—were inaccessible.

531.    The *Record* had to cobble together a patchwork computer network from borrowed and otherwise obsolete computers in an attempt to publish the weekly print edition of the newspaper.

532.    That effort required back-to-back all-nighters, during which the staff was unable to gather and report on other news events.

### The Chilling Effect

533.    The unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, and threatened pursuit of criminal charges against Eric Meyer and Phyllis Zorn, would chill a person of ordinary firmness from reporting on local events in Marion.

534.    In fact, the month following the raids, *Record* reporter Deb Gruver—who had worked as a reporter for more than 30 years— resigned.

535.    Gruver, who lives in Wichita, stated she was afraid to come to Marion for fear of what the local police might do.

536.    That fear did not dissipate when Chief Cody resigned, because Officer Zach Hudlin—who had rummaged through Gruver's desk, had found her file on "Captain Cody," and had showed the file to Chief Cody—was appointed acting police chief.

537.    As such, the proverbial fox was now guarding the henhouse.

### The Anguish Brought on By the Raids

538.    Gruver is not alone in being anguished over the raids.

539.    *Marion County Record* reporter Phyllis Zorn has suffered—and is continuing to suffer—severe mental anguish as a result of the raid on the *Record* newsroom.

540.    As a result, Zorn has had to reduce her level of reporting, thereby causing still more damage to the *Record*.

541.    *Marion County Record* Office Manager Cheri Bentz, who was present at the *Record* during the raids and was one of the persons Chief Cody attempted to interrogate, has suffered—and is continuing to suffer—severe mental anguish as a result of the raid on the *Record* newsroom.

542.    As a result, Bentz has had to reduce her workload as well.

543.    *Marion County Record* editor Eric Meyer is not only severely anguished over what happened to (and at) his family's newspaper, but is heartbroken over the loss of his mother, who was literally hounded to death by Chief Cody and his army of law enforcement officers.

544.    Eric Meyer watched as the last 24 hours of his mother's life were filled with tears and fears—and anger— over what had happened to her in the home in which she had lived for 70 years, causing both Eric and Joan to suffer extreme mental distress and emotional suffering.

545.    But Eric could do little to console his mother because he too could not understand—nor explain to his mother—how this could happen in Marion, Kansas … how this could happen anywhere in America.

### The Financial Costs

546.    The *Marion County Record* was required to retain skilled media counsel to deal with the legal consequences of the raids.

547.    It was through the work of legal counsel that the *Record* was able to obtain the return of the items that were illegally seized during the raids.

548.    Counsel was required to employ a forensic expert to examine the items that were seized to determine whether information on the items had been viewed, deleted, or altered.

549.    Additionally, it was counsel who discovered that the inventory of items returned to the *Record* did not match the inventory of items submitted to the court.

550.    As a result, counsel had to obtain the return of the hard drive which Det. Christner had used to illegally copy data from the *Record*'s computer network.

551.    Finally, because the Marion County Attorney has yet to formally "clear" the *Record* or its reporters of criminal charges, counsel has had to prepare for the possibility that baseless criminal charges may still be filed in an effort to justify the illegal raids.

552.    These legal fees were incurred solely because of the raids and are, therefore, damages which can be recovered in this lawsuit.

### The Defendants' Malicious and Wanton Actions

553.    Defendants acted maliciously and wantonly in violating the First Amendment rights of the *Marion County Record* and Joan and Eric Meyer.

554.    Defendants' actions were prompted by ill will or spite towards the *Record* and its owners, as evidenced, for example, by Chief Cody's repeated prior actions to harass the *Record*, including gleefully removing Eric Meyer and Phyllis Zorn from the "open" meet and greet for

Rep. LaTurner, offering to fund a competing newspaper, refusing to provide clear open records to the *Record*, etc.

555.    Defendants' actions were also motivated by ill will or spite towards the *Record* because Eric Meyer informed Chief Cody and Sheriff Soyez the paper was investigating the allegations that the Marion Police Department and the Marion County Sheriff's Office permitted Kari Newell to drive without a license for years.

556.    Defendant's actions demonstrate a conscious desire to violate the constitutional rights of the *Record* and its owners, as well as an awareness of the consciousness of their guilt, such as when they tried to hide their illegal activities.

557.    Such actions include, for example, Sheriff Soyez' dissembling comments to Phyllis Zorn while witnessing the return of the illegally seized devices.

558.    At that time, Sheriff Soyez said to Zorn, "You didn't see me over there," referring to the raid of the *Marion County Record* newsroom.

559.    But it was Sheriff Soyez who personally told Chief Cody "just take them all" when Cody called Soyez from the *Record*'s newsroom and told Soyez about the failed "preview search."

560.    Such actions also include Chief Cody's explicit warning to Kari Newell "we can't write anything," as well as his direction to Newell to destroy the couple's text messages.

561.    Such actions also include Officer Hudlin's use of coded language to inform Chief Cody that he (Hudlin) had successfully found Deb Gruver's file on Cody in Gruver's desk.

562.    Officer Hudlin, who knew he was being recorded on his body camera, tried to hide his wrongdoing by saying to Chief Cody:

Hudlin:   "You want to look through this desk?"

Cody:     "You have the right to look for yourself."

Hudlin:   "I know, I'm asking do YOU want to look through this desk?

Cody:    "Man, you got a right to …"

Hudlin:   "I understand. You will understand shortly."

563.    Such actions also include Mayor Mayfield's public comments after the raids in which he falsely claimed he did not believe Chief Cody did anything wrong.

564.    Defendants also demonstrated a callous disregard for the rights of Joan and Eric Meyer, as evidenced by, among other things, Chief Cody's and Officer Hudlin's repeated suggestions to arrest Joan and Eric Meyer during the raids.

565.    Defendants also evidenced an extreme callous disregard for the rights of Joan Meyer by making her wait for Chief Cody to finish raiding the newsroom of the *Record* and the home of Ruth Herbel, all the while Joan was under armed guard and while she was becoming increasingly anxious and increasingly agitated.

**Official Municipal Policies**

566.    The Marion City Code gave Mayor Mayfield "superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

567.    Accordingly, Mayor Mayfield's actions, along with the actions of the Marion police officers who participated in the illegal searches under the direction of Mayor Mayfield, were undertaken pursuant to official municipal policy.

568.    The Marion City Code gave Chief Cody "power to make such rules and regulations as may be necessary for the proper and efficient conduct of the department." Code of the City of Marion, Kan. § 10-103.

569.   Accordingly, Chief Cody's actions, along with the actions of the Marion police officers who participated in the illegal searches under the direction of Chief Cody, were undertaken pursuant to official municipal policy.

570.   Moreover, the Marion City Council ratified the illegal search when it appointed Officer Zach Hudlin the Acting Police Chief, despite the Council's knowledge of Hudlin's illegal actions undertaken during the search.

571.   Accordingly, the actions of the Marion police officers who participated in the illegal searches were undertaken pursuant to official municipal policy.

572.   The Kansas statutes provide that the Sheriff is a separately elected official whose terms, duties, training, and authorities are established by statute. K.S.A. 19-801a.

573.   The Sheriff is charged by statute with "keep[ing] and preserv[ing] the peace in their respective counties." K.S.A. 19-813.

574.   Sheriff Soyez, therefore, sets official municipal policy for the Marion County, Kansas, Sheriff's Office.

575.   Accordingly, Sheriff Soyez' actions, along with the actions of the Marion County Sheriff's personnel who participated in the illegal searches under the direction of Sheriff Soyez (including Det. Christner), were undertaken pursuant to official municipal policy.

576.   Nevertheless, the Kansas statutes provide that "[i]n all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county commissioners of the county of _____.'" K.S.A. 19-105.

577.   Accordingly, Plaintiffs have named both the Board of County Commissioners and Sheriff Soyez in his official capacity as defendants, to eliminate any doubt as to the proper defendant.

**Failure to Train or Supervise**

578.     The City of Marion did not provide training to its police officers as to the rights of the news media to be protected from government intrusion under the First Amendment, the federal Privacy Protection Act, and the Kansas Shield Law.

579.     This failure is evident from the complete absence of any mention of these issues during the investigation or in the search warrant affidavits.

580.     That failure to train is the result of Mayor Mayfield and Chief Cody's animus toward the *Marion County Record* and reflects deliberate indifference on the part of the City.

581.     Marion County and Sheriff Soyez did not provide training to the members of the Sheriff's Office as to the rights of the news media to be protected from government intrusion under the First Amendment, the federal Privacy Protection Act, and the Kansas Shield Law.

582.     Again, this failure is evident from the complete absence of any mention of these issues during the investigation or in the search warrant affidavits.

583.     This failure to train is the result of Sheriff Soyez' animus toward the *Marion County Record* and reflects deliberate indifference on the part of the County and the Sheriff.

WHEREFORE, Plaintiffs Eric Meyer, both individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, request they be awarded actual and punitive damages against Defendants City of Marion; former Mayor David Mayfield, in his official and individual capacities; former Marion Police Chief Gideon Cody, in his official and individual capacities; Officer Zach Hudlin, in his individual capacity; Board of County Commissioners of the County of Marion; Sheriff Jeff Soyez, in his official and individual capacities; and Det. Aaron Christner, in his individual capacity, together with Plaintiffs'

attorney's fees pursuant to 42 U.S.C. § 1988(b) and K.S.A. 60-484, the costs of this action, and such other and further relief as this Court deems just.

## Count II
### First Amendment – Retaliation (42 U.S.C. § 1983)
### (City of Marion, Former Mayor Mayfield, Former Chief Cody,
### Board of County Commissioners, and Sheriff Soyez)

584.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-583.

585.    The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of speech."

586.    The Fourteenth Amendment to the United States Constitution extends the protection of the First Amendment to actions taken by local governments and by local government officials.

587.    Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the government, including the police, cannot retaliate against a person for engaging in protected activity under the First Amendment.

### "Silence the MCR"

588.    Prior to the raids, the *Marion County Record* had published numerous reports, columns, and editorials about Marion city government generally, about Mayor Mayfield specifically, and about Chief Cody.

589.    Additionally, Chief Cody knew the *Record* was investigating his prior employment with the Kansas City, Missouri Police Department.

590.    Each of these activities is a protected First Amendment activity.

591.    Both Mayor Mayfield and Chief Cody were incensed over these activities and both verbalized an intent to seek retribution against the *Record* and its owners.

592.     Specifically, Mayor Mayfield had vowed to "silence the MCR" and Chief Cody had offered to fund a competing newspaper in an effort to put the *Record* out of business.

### Sheriff Soyez' Support of Mayor Mayfield and Chief Cody's Plan

593.     Sheriff Soyez had solicited Gideon Cody to become the Marion Police Chief and had urged Mayor Mayfield to select Cody as the police chief; Soyez believed that criticism of Chief Cody was also therefore criticism of his recommendation.

594.     Sheriff Soyez also harbored his own personal animus against the *Record*.

595.     Both Sheriff Soyez and Chief Cody also knew the *Record* was threatening to expose them for allowing Kari Newell to driver around Marion for years without a valid license.

596.     Sheriff Soyez therefore affirmatively chose to join with both Mayor Mayfield (his own employee) and Chief Cody (his Kansas City law enforcement 'brother') in their illicit plan to take down the *Marion County Record*.

597.     In the eyes of Sheriff Soyez and Chief Cody, the two men were fulfilling Marion Crime's mandate of inserting "new blood" into Marion.

### The Retaliatory Acts

598.     Mayor Mayfield's actions in overruling the City Administrator and authorizing Chief Cody to investigate the newspaper and its staff, and his actions in authorizing Chief Cody to raid the *Record*'s newsroom and the Meyer home, were motivated by his desire to seek retribution against the *Record* and its owners.

599.     Chief Cody's actions in seeking the search warrants for the *Record*'s newsroom and the Meyer home, in making false statements in the applications for the search warrants, as well as his actions in executing the illegal search warrants, were motivated by his desire to seek retribution against the *Record* and its owners.

600.    Sheriff Soyez' actions in assisting Chief Cody with the investigation, in planning the raids with Chief Cody, in suggesting the search of the Meyer home, in supplying Sheriff's deputies for the illegal raids, and in agreeing with Chief Cody to disregard the preview search requirement before seizing the computers and other devices, were motivated by his desire to seek retribution against the *Record* and its owners.

601.    Each of these actions were intended to intimidate the owners and reporters of the *Marion County Record*.

602.    And when the owners and reporters of the *Marion County Record* were defiant in the face of this attempted intimidation, Chief Cody, working with Sheriff Soyez' office, drew up applications for arrest warrants for Eric Meyer and Phyllis Zorn.

### The Raids Were Unprecedented

603.    In the 154-year history of the *Marion County Record*—prior to Mayor Mayfield and Chief Cody assuming office—the Marion Police Department had never sought a search warrant involving the newspaper or its reporters.

604.    In the 154-year history of the *Marion County Record*—prior to Mayor Mayfield and Chief Cody assuming office—the Marion County Sheriff's Office had never sought a search warrant involving the newspaper or its reporters.

605.    In the 154-year history of the *Marion County Record*—prior to Mayor Mayfield and Chief Cody assuming office—the Marion Police Department had never sought to charge the newspaper or any of its reporters with a crime.

606.    In the 154-year history of the *Marion County Record*—prior to Mayor Mayfield and Chief Cody assuming office—the Marion County Sheriff's Office had never sought to charge the newspaper or any of its reporters with a crime.

607.    Upon information and belief—based on the 154-year history of the *Marion County Record* as the paper of record for both the City of Marion and Marion County—prior to Mayor Mayfield and Chief Cody taking office, the Marion Police Department had never sought a search warrant involving identity theft or unauthorized use of a computer as the result of someone accessing a public-facing government website.

608.    Upon information and belief—based on the 154-year history of the *Marion County Record* as the paper of record for both the City of Marion and Marion County—prior to Mayor Mayfield and Chief Cody taking office, the Marion County Sheriff's Office had never sought a search warrant involving identity theft or unauthorized use of a computer as the result of someone accessing a public-facing government website.

609.    Upon information and belief—based on the 154-year history of the *Marion County Record* as the paper of record for both the City of Marion and Marion County—prior to Mayor Mayfield and Chief Cody taking office, the Marion Police Department had never sought to charge someone with identity theft or unauthorized use of a computer as the result of that person's access of a public-facing government website.

610.    Upon information and belief—based on the 154-year history of the *Marion County Record* as the paper of record for both the City of Marion and Marion County—prior to Mayor Mayfield and Chief Cody taking office, the Marion County Sheriff's Office had never sought to charge someone with identity theft or unauthorized use of a computer as the result of that person's access of a public-facing government website.

611.    Defendants' actions were unprecedented and the result of their retaliatory animus.

**The Search Warrants Were a Pretext**

612.    The pretextual nature of Defendants' actions is further demonstrated by Defend-
ants' decision to only investigate Eric Meyer, Ruth Herbel, the *Marion County Record*, and the
*Record*'s confidential source (Pam Maag) for the crimes of identity theft and unauthorized use of
a computer, while choosing not to investigate other persons for the same crimes.

613.    Prior to the execution of the illegal search warrant on the Meyer home, Chief Cody,
Det. Christner, and Det. Janzen were caught on body camera footage discussing the fact that "Mar-
ion Crime," a secretive vigilante Facebook page, "always" contained information that had been
illegally obtained from the Kansas Criminal Justice Information System, or CJIS.



614.    Specifically, Det. Janzen was caught stating: "The whole Marion Crime Facebook
page, like, they always have random information that somebody with, like, CJIS access is giving
them information on it, from one thing or another."

615.     When Chief Cody asked Det. Janzen what law enforcement officer was providing this confidential information to the "Marion Crime" Facebook page, Det. Janzen stated: "My thought was [***********], he's buddy-buddy with all them."

616.     Det. Janzen was referring to former Marion County Sheriff's Deputy [***********].[6]

### The Kansas Criminal Justice Information System

617.     The Kansas Criminal Justice Information System, or CJIS, is a secure computer network used to store confidential criminal history information and is maintained by the Kansas Bureau of Investigation.



618.     To access the CJIS, users must have a username and password, are told the "secure web site" is "for authorized criminal justice users only," and are warned that "Unlawful use of data may result in agency sanctions and/or criminal penalties."

User Agreement

This is a secure web site for use by authorized criminal justice users. Data obtained through this site is restricted and controlled by Kansas and federal laws. All transactions are logged by user identification and subject to audit. Unlawful use of data may result in agency sanctions and/ or criminal penalties.

---

[6] Defendants have the body camera footage in question and therefore know the identity of the deputy.

619.    Moreover, users of the Kansas Criminal Justice Information System must explicitly agree that the information accessed on the system may only be shared with other "criminal justice professionals with a need to know," must agree to "[n]ever allow unauthorized persons to view the web site or the data therein," and must agree to "[n]ever release data from the web site to any unauthorized persons."

In using the KCJIS web site, I understand and agree to:

- Properly tender my user ID and password to access the system.
- Accurately identify the purpose for access to restricted files.
- Only use the information I receive for the purpose stated.
- Restrict information sharing to criminal justice professionals with a need to know.
- Never allow unauthorized persons to view the web site or the data therein.
- Never release data from the web site to any unauthorized persons or agencies.

I agree

620.    The formal policies and procedures of the Kansas Criminal Justice Information System codify these restrictions.



## Criminal Justice Agencies:

## Proper Use of KCJIS

*KCJIS shall be accessed on a need to know basis. KCJIS information may be accessed and used for any authorized purpose consistent with the inquiring agency's responsibility. Improper access, use or dissemination of information provided through KCJIS is serious and may result in sanctions including, but not limited to, termination of services and/or criminal and civil penalties.*

## Policies and Procedures

*KCJIS has adopted the FBI CJIS Security Policy as the foundational document for KCJIS policies. Included as policy by reference are: Title 28 part 20, Code of Federal Regulations (CFR); The NCIC 2000 Operating Manual and associated Technical and Operational Updates (TOUs), The N-Dex Operations manual, The NLets manual (aka the NLets Wiki/Users Guide), and Kansas Statutes and Regulations.*

621.    Wrongful disclosure of CJIS information is a crime. *See* K.S.A. 22-4707(c).

622.    If former Marion County Sheriff's Deputy [**********] improperly accessed CJIS information and provided it to the operators of the "Marion Crime" Facebook page—as the

officers believed—he would have committed the crimes of identity theft and unauthorized use of a computer.

623.    Despite that fact, neither the Marion County Sheriff's Office nor the Marion Police Department ever executed a search warrant on former Dep. [***********]'s home, office, computer, car, or other property.

624.    Defendants, however, executed search warrants on the Meyer home, the Herbel home, and the *Marion County Record* newsroom for evidence of these same so-called "crimes," even though the Kansas Department of Revenue's Driver's License Status Check tool has none of the restrictions which are applicable to the Kansas Criminal Justice Information System.

625.    Such disparate treatment is further evidence of the pretextual nature of Defendants' actions.

### Remaining Elements of Cause of Action

626.    The actions of Mayor Mayfield, Chief Cody and Sheriff Soyez would chill a person of ordinary firmness from exercising their First Amendment rights and did, in fact, chill the *Record*.

627.    As a result, the *Marion County Record*, along with Joan and Eric Meyer, have been injured.

628.    Additionally, the public has been injured in that the *Record* has not reported on matters of public interest as a result of this chilling effect.

629.    When the offices of the *Marion County Record* and the home of Joan and Eric Meyer were raided, Defendants did not have an objectively reasonable belief that Eric or Joan Meyer, or anyone else associated with the *Record*, were in possession of any contraband, fruits, instrumentalities, or evidence of any crime.

630.    The *Marion County Record* and its owners have been damaged by Defendants' wrongful actions.

631.    Defendants acted maliciously and wantonly in violating the First Amendment rights of the *Marion County Record* and Joan and Eric Meyer.

WHEREFORE, Plaintiffs Eric Meyer, both individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, request they be awarded actual and punitive damages against Defendants City of Marion, Kansas; former Mayor David Mayfield, in his official and individual capacities; former Chief Gideon Cody, in his official and individual capacities; Board of County Commissioners of the County of Marion; and Sheriff Jeff Soyez, in his official and individual capacities, together with Plaintiffs' attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just.

### Count III
### Fourth Amendment (42 U.S.C. § 1983)
### (All Defendants)

632.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-631.

633.    The Fourth Amendment to the United States Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

634.    The Fourteenth Amendment to the United States Constitution extends the protection of the Fourth Amendment to actions taken by local governments and by local government officials.

635.    Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the Fourth Amendment

prohibited the government, including the police, from raiding a person's home or a corporation's offices unless the police had (a) a valid warrant, (b) issued upon probable cause, (c) supported by an application made under oath or affirmation, and (d) which particularly described the items to be seized.

## The Invalid Search Warrants

636.    The search warrants issued by Magistrate Judge Laura Viar for the *Marion County Record* newsroom and the home of Joan and Eric Meyer were not valid.

637.    No probable cause, nor even arguable probable cause, existed to issue the search warrants for the *Marion County Record* newsroom and the home of Joan and Eric Meyer and no reasonable police officer could have believed there was probable cause to issue the search warrants.

638.    The search warrants were issued based on materially false statements of fact by Chief Cody.

639.    The search warrants were issued based on omissions of material facts by Chief Cody.

640.    The search warrants were not supported by "oath or affirmation."

641.    The search warrants did not "particularly describe the place to be searched, and the persons or things to be seized."

## The Seizures Exceeded the Scope of the Search Warrant

642.    Prior to the August 11, 2023, raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer, it was clearly established that the Fourth Amendment prohibited the government, including the police, from conducting warrantless raids on a person's

home or a corporation's offices except in strictly limited circumstances, such as exigent circum-
stances, with consent of the property owner, an item is plain view, etc.

643.   No exceptions to the warrant requirement applied to the August 11, 2023, raids on
the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer.

644.   Yet numerous items were seized which were not listed on the search warrant.

**Remaining Elements of Cause of Action**

645.   The *Marion County Record* and its owners have been damaged by Defendants'
wrongful actions.

646.   Defendants acted maliciously and wantonly in violating the Fourth Amendment
rights of the *Marion County Record* and Joan and Eric Meyer.

WHEREFORE, Plaintiffs Eric Meyer, both individually and as executor of the estate of
Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*,
request they be awarded actual and punitive damages against Defendants City of Marion, Kansas;
former Mayor David Mayfield, in his official and individual capacities; former Chief Gideon
Cody, in his official and individual capacities; Officer Zach Hudlin, in his individual capacity;
Board of County Commissioners of the County of Marion; Sheriff Jeff Soyez, in his official and
individual capacities; and Det. Aaron Christner, in his individual capacity, together with Plaintiffs'
attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further
relief as this Court deems just.

**Count IV**
**Privacy Protection Act (42 U.S.C. § 2000aa)**
**(City of Marion, Marion County, and Sheriff Soyez, in his official capacity)**

647.   Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-646.

**The Privacy Protection Act**

648.    The Privacy Protection Act of 1980 provides that "it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any documentary [or work product] materials possessed by a person in connection with a purpose to disseminate to the public a newspaper … or other similar form of public communication, in or affecting interstate or foreign commerce." 42 U.S.C. § 2000aa.

649.    The Act defines "documentary materials" as "materials upon which information is recorded," including "written or printed materials," was well as "other mechanically, magentically [sic] or electronically recorded cards, tapes, or discs." 42 U.S.C. § 2000aa-7(a).

650.    The Act defines "work product materials" as materials prepared in connection with a purpose of communicating such materials to the public and which include mental impressions, conclusions, opinions, or theories of the author. 42 U.S.C. § 2000aa-7(b).

651.    The search warrants for the *Marion County Record* newsroom and the home of Joan and Eric Meyer sought both "documentary" and "work product materials."

652.    For example, the search warrant sought "Documents and records pertaining to Kari Newell," which would include reporter's notes about Newell, drafts of yet-to-be-published newspaper articles about Newell, internal communications about Newell, etc.

653.    Additionally, the search terms which were used to conduct the so-called "preview search" included "Kansas" and "Brogan Jones" (the Marion City Administrator) and "Ruth Herbel" (the Marion Vice-Mayor).

654.    These terms would include reporter's notes about the state, the city administrator, and the vice-mayor; drafts of yet-to-be-published newspaper articles about the state, the city

administrator, and the vice-mayor; internal communications about the state, the city administrator, and the vice-mayor, etc.

655.    The *Marion County Record* is a newspaper "in or affecting interstate commerce" in that prior to the raids it regularly mailed copies of the newspaper to subscribers in, *inter alia*, Arizona, California, Colorado, Illinois, Iowa, Minnesota, Missouri, and Wisconsin.

656.    Additionally, the *Marion County Record* hosts a website, marionrecord.com, on which it posts the content of its newspaper.

657.    That website is an "other similar form of public communication" under the Act and is regularly accessed by readers outside the State of Kansas.

**Probable Cause Did Not Exist**

658.    At the time of the raids, probable cause did not exist to believe that Eric or Joan Meyer, Phyllis Zorn, Deb Gruver, or anyone else at the *Marion County Record* had committed or were committing any criminal offense.

659.    Specifically, at the time of the raids, probable cause did not exist to believe that Eric or Joan Meyer, Phyllis Zorn, Deb Gruver, or anyone else at the *Marion County Record* had violated or were violating K.S.A. 21-6107 or K.S.A. 21-5839.

660.    Eric Meyer and Phyllis Zorn's use of the Kansas Driver's License Status Check tool on the public-facing website of the Kansas Department of Revenue was 100% legal and did not violate any Kansas law.

661.    Quite the contrary, the very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any

person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

662.    Thus, the information which the *Record* accessed, *i.e.*, that Newell's driver's license was suspended due to a DUI conviction, was specifically authorized under Kansas law, which states such information is subject to the Kansas Open Records Act.

663.    As such, neither Meyer, Zorn, nor anyone else at the *Record*, committed identity theft, identity fraud, or unlawfully accessing a computer.

### "The Receipt [or] Possession … of Such Materials"

664.    The Privacy Protection Act explicitly provides that "a government officer or employee may not search for or seize [documentary or work product] materials under the provisions of this paragraph if the offense to which the materials relate consists of **the receipt, possession, communication, or withholding of such materials or the information contained therein**." 42 U.S.C. § 2000aa(a)-(b).

665.    The Act provides that such materials (or the information in such materials) can only be obtained by a court ordered subpoena, which would allow the party in possession of materials an opportunity to object to the subpoena.

666.    As described by Chief Cody in the search warrant applications, the purpose of the search was to seize the "Department of Revenue record" of Kari Newell, the "letter" to Newell, and the "information" in the "record" and "letter."

667.    As such, the purpose of the search of the *Record* and the home of its owners was to seize the very items which the Act states cannot be seized with a search warrant and must instead be sought with a court ordered subpoena.

668.    Neither Chief Cody, nor any other law enforcement officer, ever sought a subpoena and, as a result, neither the *Record*, its owners, its staff, or its lawyers ever had an opportunity to object to the subpoena.

### No Other Exceptions Apply

669.    At the time of the raids, there was no reason to believe that the immediate seizure of any materials was necessary to prevent the death of, or serious bodily injury to, a human being.

670.    Prior to the time of the raids, no subpoena duces tecum had been issued for any of the materials sought in the search warrants for the newsroom of the *Marion County Record* or the home of Joan and Eric Meyer.

671.    At the time of the raids, there was no reason to believe that the giving of notice pursuant to a subpoena duces tecum would result in the destruction, alteration, or concealment of such materials.

672.    Quite the contrary, it was Eric Meyer who originally notified both Chief Cody and Sheriff Soyez of the existence of the August 1, 2023, letter from the Kansas Department of Revenue, and explicitly offered to cooperate in any subsequent criminal investigation into how the source obtained the letter or in why local law enforcement had knowingly allowed Kari Newell to drive without a license for years.

### Plaintiffs' Claims

673.    The Act provides that "[a] person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure against … any other governmental unit, … which shall be liable for violations of this chapter by their officers or employees while acting within the scope or under color of their office or employment." 42 U.S.C. § 2000aa-6(a)(1).

674.    The *Marion County Record*, along with Joan and Eric Meyer, are "person[s] aggrieved by a search for or seizure of materials in violation of" the Act.

675.    The Act defines "any other governmental unit" as "any local government, unit of local government, or any unit of State government." 42 U.S.C. § 2000aa-7(c).

676.    The City of Marion, Kansas; Marion County; and the Marion County Sheriff are therefore "other governmental units" under the Act.

677.    Chief Cody, Officer Hudlin, and Det. Christner were "acting within the scope or under color of their office or employment" when they raided the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer.

678.    Sheriff Soyez was "acting within the scope or under color of [his] office or employment" when he directed the raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer.

679.    The *Marion County Record* and its owners have been damaged by Defendants' wrongful actions.

680.    Defendants acted maliciously and wantonly in violating the rights of the *Marion County Record* and Joan and Eric Meyer.

681.    The Act provides that in addition to actual damages, a person having a cause of action under the Act is entitled to recover their attorney's fees. 42 U.S.C. § 2000aa-6(f).

WHEREFORE, Plaintiffs Eric Meyer, both individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, request they be awarded actual and punitive damages against Defendants City of Marion, Kansas; Board of County Commissioners of the County of Marion; and Sheriff Soyez, in his official

capacity, together with their attorney's fees pursuant to 42 U.S.C. § 2000aa-6(f), the costs of this action, and such other and further relief as this Court deems just.

### Count V
### Failure to Train, Supervise, and Have Proper Policies (42 U.S.C. ¶ 1983)
### (City of Marion, Marion County, and Sheriff Soyez, in his official capacity)

682. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-681.

683. Marion County, the Marion County Sheriff, and the City of Marion failed to properly hire, train, supervise, discipline, and control their officers regarding:

    a.    the constitutional protections afforded the press under the First Amendment,

    b.    the constitutional requirements contained in the Fourth Amendment,

    c.    the statutory protections contained in the Privacy Protection Act,

    d.    the statutory protections of the Kansas Shield Law,

    e.    the methods and manner of preparing a valid search warrant application,

    f.    the methods and manner of properly executing a search warrant, and

    g.    the methods and manner of conducting a valid "preview search" of a digital device.

684. Marion County, the Marion County Sheriff, and the City of Marion failed to have proper policies, procedures, or practices concerning these subjects.

685. That failure to train is the result of deliberate indifference on the part of the City, the County, and the Sheriff's Office.

686. The failures of Marion County, the Marion County Sheriff, and the City of Marion in this regard led to, and/or contributed to, the wrongful acts committed by their officers in obtaining and conducting the illegal raids.

687. As a result, Marion County, the Marion County Sheriff, and the City of Marion are responsible for the actions of their officers in obtaining and conducting the illegal raids.

WHEREFORE, Plaintiffs Eric Meyer, both individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, request they be awarded actual and punitive damages against Defendants City of Marion, Kansas; Board of County Commissioners of the County of Marion; and Sheriff Soyez, in his official capacity, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just.

### Count VI
### Kansas Open Records Act (K.S.A. 45-215 *et seq.*)
### (City of Marion)

688.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1-687.

### Kansas Open Records Act

689.    The Kansas Open Records Act (KORA) guarantees that public records shall be open and available to all persons.

690.    The Act explicitly states: "It is declared to be the public policy of the state that public records shall be open for inspection by any person unless otherwise provided by this act, and this act shall be liberally construed and applied to promote such policy." K.S.A. 45-215(a).

691.    The City of Marion, Kansas, is subject to the Kansas Open Records Act.

### The City Denies the *Record*'s KORA Request

692.    On October 19, 2023, after learning that Chief Gideon Cody had asked Kari Newell to delete his text messages with her, the *Marion County Record* made a Kansas Open Records Act request to the City of Marion for all text messages—whether from city-owned phones or privately owned phones—sent to or from Chief Cody, City Administrator Brogan Jones, Mayor David Mayfield, and the members of the city council, between August 1 and August 18, that related to the *Record*, Eric Meyer, Ruth Herbel, Kari Newell, Phyllis Zorn, Deb Gruver, Pam Maag, or that mentioned or related to the search warrants or investigation.

693.    On October 24, 2023, Jennifer Hill, an attorney with the McDonald Tinker law firm in Wichita, Kansas, responded to the request from the *Record*, writing: "Please be advised that our law firm is responding to all Kansas Open Record Act requests on behalf of the City of Marion."

694.    Jennifer Hill had been hired immediately following the illegal raids by EMC Insurance, which faces potential multi-million-dollar losses as a result of issuing to the City of Marion both a "Law Enforcement Liability" insurance policy and a "Commercial Umbrella" insurance policy.

695.    In her response, Hill stated, "the City is not aware of any responsive text messages sent on City-owned property;" Hill also said "[t]he City has no custody over personal cell phones."

696.    Accordingly, Hill wrote, "no responsive records exist that the City is obligated to produce."

697.    Hill's claim that the City is not obligated to produce text messages from the personal cell phones of city officers and employees is false and is designed to protect the City—and EMC Insurance—from further liability based on the content of the damning text messages.

**The 2016 Amendments to KORA**

698.    In 2016, the Kansas Legislature amended the definition of "public record" in the Kansas Open Records Act.

699.    As a result of the 2016 amendments, the Kansas Open Records Act now defines "public record" as follows: "'Public record' means any recorded information, **regardless of** form, characteristics or **location**, that is **made, maintained or kept by or in the possession of** any public agency[,] or **any officer or employee of a public agency** pursuant to the officer's or employee's official duties and that is related to the functions, activities, programs or operations of any public agency." K.S.A. 45-217(l)(1)(a)-(b) (emphasis added).

700. The 2016 amendments followed discovery by the *Wichita Eagle* of the fact former Gov. Sam Brownback's budget director, Shawn Sullivan, used a private email account to discuss budget proposals with lobbyists.

701. The 2016 amendments were specifically intended to ensure that emails, text messages, and other forms of communications sent to/from government officers and employees on their private devices and accounts, fell within the definition of "public records."

702. The Kansas Judicial Council Open Records Advisory Committee, in its report supporting the proposed change in the definition of "public records," wrote "that public employees and officers should not be able to avoid open records laws simply by conducting public business or official duties on a private account or device."

703. University of Kansas Law Professor Mike Kautsch—who was on the Judicial Council Advisory Committee—testified that "[u]nder the definition" in the bill, a "public record … would encompass electronic communications … that are about public business and are exchanged by public officers and employees using personal devices."

704. The amendments accomplished this objective by explicitly stating that records held by government officers and employees were "public records" regardless of where the records were located.

705. As Melissa Wangemann, the General Counsel of the Kansas Association of Counties, testified, the new "definition no longer defines a public record by its location with a public agency but instead by the content of the record."

706. In supporting the proposed amendment, Wangemann said "[t]he concept of open government should not be dependent on the location of the public record."

707.    Doug Anstaett with the Kansas Press Association testified that "if we do not close this loophole, we might as well throw the entire Kansas Open Records Act out the window."

708.    Even The League of Kansas Municipalities—no friend of open records—recognized that the 2016 amendments to the Kansas Open Records Act brought e-mails and text messages sent to/from government officers and employees using private devices and accounts within the statutory definition of "public records."

709.    Specifically, the League's 2016 *Kansas Open Records Manual*—which was prepared after the 2016 amendments took effect—states as follows:

> (2)    "*[R]egardless of form, characteristics, or location*" encompasses all forms of recorded information – paper, videotape, audiotape, compact discs (CDs), DVDs, USB drives, external hard drives, photographs, slides, computer disks or tape, and any other digital information whether stored on server systems maintained by the public agency, third party providers, or employees' personal devices. See also *Wichita Eagle & Beacon Pub. Co. v. Simmons*

710.    Thus, the City is wrong in claiming it is not obligated to produce text messages from the personal cell phones of city officers and employees.

### The City's Denial Was Not in Good Faith

711.    The Kansas Open Records Act provides that "the court shall award costs and a reasonable sum as attorney's fees for services rendered in such action … if the court finds that the agency's denial of access to the public record was not in good faith and without a reasonable basis in fact or law." K.S.A. 45-222(d).

712.    Since the 2016 amendments to the Kansas Open Records Act, it has been well-accepted that text messages by government officers and employees are public records under KORA, even when the officer/employee uses their personal device.

713.    The City of Marion's refusal to provide the requested text messages is not because the City believes the messages are not "public records" under KORA, but because the messages

are damning to both it and its insurer, each of which face multi-million-dollar liability for the illegal raids.

714.    As such, the City's action in wrongfully denying the *Record*'s Kansas Open Records Act request was not in good faith and was without a reasonable basis in fact or law.

WHEREFORE, Plaintiff The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, request the Court order Defendant City of Marion, Kansas, to provide the requested text messages to Plaintiff and award Plaintiff its attorney's fees pursuant to K.S.A. 45-222(d), together with the costs of this action, and such other and further relief as this Court deems just.

**Count [\*\*\*][7]**
**Wrongful Death (K.S.A. 60-1901 *et seq.*)**

715.    [Reserved]

**Count [\*\*\*]**
**Abuse of Process**

716.    [Reserved]

**Count [\*\*\*]**
**Outrage**

717.    [Reserved]

**Count [\*\*\*]**
**Negligent Infliction of Emotional Distress**

718.    [Reserved]

---

[7] Pursuant to K.S.A. 12-105b, Plaintiffs have served a notice of claim asserting various state law claims and will be amending their Complaint to formally assert such claims once Defendant(s) either deny the claim(s), or 120 days has passed following the service of the notice. A copy of the notice is attached as Exhibit A.

**Count [\*\*\*]**
**Negligent Hiring and Retention**

719.   [Reserved]

**Count [\*\*\*]**
**Negligent Supervision**

720.   [Reserved]

**Count [\*\*\*]**
**Invasion of Privacy**

721.   [Reserved]

**Count [\*\*\*]**
**Trespass**

722.   [Reserved]

**Count [\*\*\*]**
**Trespass to Chattels**

723.   [Reserved]

**Count [\*\*\*]**
**Conversion**

724.   [Reserved]

**Count [\*\*\*]**
**Negligence**

725.   [Reserved]

**Count [\*\*\*]**
**Negligence Per Se**

726.   [Reserved]

**Count [\*\*\*]**
**Respondeat Superior**

727.   [Reserved]

**Jury Demand**

Plaintiffs Eric Meyer and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, demand a trial by jury on all issues triable to a jury.

**Designation of Place of Trial**

Plaintiffs Eric Meyer and The Hoch Publishing Co., Inc., doing business as the *Marion County Record*, hereby designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,

LATHROP GPM, LLP

By: */s/Bernard J. Rhodes*
  Bernard J. Rhodes  KS #15716
  Emma C. Halling  KS #27924
  2345 Grand Blvd., Ste. 2200
  Kansas City, MO  64108
  (816) 292-2000 – Telephone
  (816) 292-2001 – Facsimile
  bernie.rhodes@lathropgpm.com
  emma.halling@lathropgpm.com

  ATTORNEYS FOR PLAINTIFFS