IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERIC MEYER, individually and as executor of the estate )
of Joan Meyer, )
and )
 )
THE HOCH PUBLISHING CO., INC., doing business as )
the Marion County Record, )
                                            Plaintiffs, )     Case No. 24-cv-02122-DCC-GEB
v. )
 )
CITY OF MARION, KANSAS, et al. )
                                            Defendants. )
_____ )

**DEFENDANT CODY'S MEMORANDUM IN SUPPORT**
**OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendant Gideon Cody, by and through his counsel of record Edward L. Keeley and Jennifer M. Hill of McDonald Tinker PA, submits this memorandum in support of his motion to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiffs' Complaint (Doc. 1) alleges that Cody (in his individual capacity) violated Plaintiffs' rights under the First and Fourth Amendments of the U.S. Constitution. However, Plaintiffs' theories of recovery under 42 U.S.C. §1983 fail to state any viable claim against this Defendant as a matter of law. Moreover, Cody is entitled to qualified immunity. Furthermore, Plaintiffs have blatantly violated Rules 1 and 8 of the Federal Rules of Civil Procedure which warrants dismissal of the Complaint until Plaintiffs comply. Therefore, Cody respectfully requests that the Court dismiss Plaintiffs' claims.

## TABLE OF CONTENTS

I.    Nature of the Case ............................................................................2

II.   Plaintiff's Factual Allegations. ........................................................2

   A.   General Background. .....................................................................3
   B.   Kari Newell's Driver's Records ...................................................4

1

C.  The Investigation ...........................................................................8
D.  Execution of the MCR Search Warrant .......................................11
E.  Execution Of The Meyer Residence Search Warrant..................12

III.  Issues...................................................................................................15

IV.  Arguments and Authorities.................................................................15

A.  Plaintiffs' Complaint Should Be Dismissed Because It Blatantly Fails To Comply With Rules 1 and 8 of the Federal Rules Of Civil Procedure ....15
B.  Cody's Qualified Immunity Defense Bars Plaintiff's Fourth Amendment Claims.......................................................................................19
C.  Cody's Qualified Immunity Defense Bars Plaintiffs' First Amendment Claims.......................................................................................33
Conclusion ...................................................................................................35

## I.   NATURE OF THE CASE

Plaintiffs Eric Meyer (individually and as representative of Joan Meyer's Estate) and the Hoch Publishing Co. (d/b/a *Marion County Record*) allege that Defendant Gideon Cody (former Marion Police Chief) violated Plaintiffs' rights under the First and Fourth Amendments in August 2023 when Cody obtained and executed search warrants (approved by a neutral judge) at Plaintiffs' newspaper and the Meyer residence. The case is brought pursuant to 42 U.S.C. §1983. Defendant Cody denies Plaintiffs' claims are viable and asserts his qualified immunity defense. He also objects to Plaintiffs' Complaint because it blatantly violates the Federal Rules of Civil Procedure. Cody moves for a dismissal of all claims against him as a matter of law.

## II.   PLAINTIFFS' FACTUAL ALLEGATIONS

Plaintiffs have asserted **714** paragraphs (**125** pages) of factual and legal allegations in their Complaint. (Doc. 1 at 1-125) Many of these assertions do not pertain to Cody or the claims against him but rather to claims against other Defendants. There are also numerous claims which can only be made by other potential Plaintiffs who are not parties in this case. The allegations irrelevant to

Cody or the named Plaintiffs will not be discussed herein.

For purposes of this motion only, Plaintiffs' non-conclusory factual allegations may be assumed to be true. *Ashcroft v. Iqbal*, 556 U.S. at 679-680. However, Plaintiffs' conclusory assertions of purported fact or law may not be considered by the Court in deciding this motion. *Id.* However, relevant facts may be established herein by documents referred to in Plaintiffs' Complaint if the documents are central to Plaintiffs' claim and/or the materials are subject to judicial notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The Court may consider such evidence without converting this motion to dismiss into a summary judgment motion. *Id.*

A.   **General Background (Paragraphs From Plaintiffs' Complaint)**

**¶5. Marion is in south central Kansas and has a population of less than 2,000 people. (Doc. 1 at 3)**

**¶6. During the period at issue, Defendant David Mayfield was the Mayor of Marion. Mayfield is a former Kansas Highway Patrol Trooper and former Police Chief of Marion who works part-time transporting prisoners for Sheriff Jeff Soyez. (*Id.*)**

**¶9-11. In late 2022, the Marion Police Chief quit. Mayor Mayfield asked Sheriff Soyez to help Mayfield find a new Police Chief. (*Id.* at 4)**

**¶13. Soyez was a friend of Gideon Cody who was a Captain in the Kansas City Missouri Police Department (KCMPD). Soyez encouraged Cody to apply for the Marion Police Chief position. (*Id.*)**

**¶14-15. Cody applied to be Marion Police Chief in April 2023. Sheriff Soyez strongly urged Mayor Mayfield to hire Cody. (*Id.*)**

**¶21-24. The *Marion County Record* (MCR) is a weekly newspaper published in Marion. The newspaper is owned by Plaintiff Hoch Publishing Co., Inc. Since 2006, Hoch**

Publishing (Hoch) has been primarily owned by Joan Meyer (Joan) and her son, Plaintiff Eric Meyer (Meyer). (*Id.* at 5-6)

¶25. Eric Meyer returned to Marion at the outset of the Covid-19 pandemic to take care of his mother (Joan). He became the editor and publisher of the MCR in 2021. (*Id.* at 6)

¶28. When Cody became a candidate for the Marion Police Chief job, an MCR reporter (Deb Gruver) began investigating alleged misconduct by Cody at KCMPD. (*Id.*)

¶40-42. Mayor Mayfield offered the Police Chief position to Cody in May 2023. Chief Cody was hired by the Marion City Council at a meeting on May 30, 2023. (*Id.* at 7-8)

¶60. Kari Newell (Newell) owned a coffee shop and restaurant in Marion. (*Id.* at 11)

¶64-65. On August 1, 2023, Newell and Chief Cody asked Meyer and reporter Phyllis Zorn to leave an event involving Congressman Jake LaTurner which Newell was hosting at her coffee shop. (*Id.* at 12)

**B.**    **Kari Newell's Driver's Records**

¶68. The following day, Wednesday, August 2, 2023, MCR reporter Zorn received a message via Facebook about Newell. (*Id.* at 13)

¶69. The tipster (Pam Maag) stated that Newell's driver's license was suspended due to a prior DUI conviction. (*Id.*)

¶70. Maag also told Zorn that local law enforcement had known for years that Newell was driving without a valid driver's license, but had taken no action against Newell. (*Id.*)

¶71. That same day, Maag sent Zorn, via Facebook messenger, a copy of an August 1, 2023 letter from the Kansas Department of Revenue to Newell ("the KDOR letter"). (*Id.*)

¶72. The header to Maag's message shows it was received by Zorn on August 2, 2023. (*Id.*)

¶73. And the footer shows the letter was received as an attachment to a message sent via Facebook Messenger. (Id.)

¶74. The KDOR letter is addressed to Newell and includes Newell's full name, address, driver's license number and date of birth. (To comply with this Court's redaction rules, all but the last four of Newell's driver's license number and all but the year of her birth have been redacted; that information was not redacted from the letter provided to Zorn by Maag)[1] (*Id.* at 13-14)



Driver Solutions
300 SW 29th Street
PO Box 12021
Topeka KS 66601-2021
Mark A. Burghart, Secretary

Telephone: (785) 296-3671
Fax: (785) 296-6851
www.ksrevenue.gov
Laura Kelly, Governor

08/01/2023



NEWELL KARI ANNE

DL Number: ██████5505
Date of Birth: ██████1977

¶75. The KDOR letter set forth various requirements Newell would have to meet in order to restore her driving privileges, including having an ignition interlock device installed on her car. (*Id.* at 14)

¶76. Zorn printed the copy of the letter from Facebook and shared it with Eric Meyer. (*Id.*)

¶77. After talking to Zorn and reviewing the letter, Eric Meyer had several questions, including, how did Maag obtain the letter and why had local law enforcement allowed Newell to drive for years without a valid license? (*Id.*)

¶78. Meyer's first question, *i.e.*, how did Maag obtain the letter, was of interest to Meyer because Meyer knew that Maag had law enforcement connections and Meyer

---

[1] Also redacted in Defendant Cody's motion to dismiss herein is Newell's address pursuant to the Driver's Privacy Protection Act (DPPA).

wondered whether Maag had obtained the letter illegally. (*Id.* at 15)

¶79. The second question, *i.e.*, why had local law enforcement allowed Newell to drive for years without a valid license, was only triggered if the information about Newell's driver's record was true. (*Id.*)

¶80. Maag had told Zorn that she (Zorn) could confirm the status of Newell's license through the Department of Revenue website, by using Newell's name, address, driver's license number, and date of birth-all of which were on the letter from the Department of Revenue. (*Id.*)

¶81. Maag also told Zorn that Zorn could obtain a copy of the August 1, 2023, KDOR letter to Newell from the same website. (*Id.*)

¶82. The following day, Thursday, August 3, 2023, Meyer located the webpage titled "Kansas Driver's License Status Check" on the Kansas Department of Revenue (KDOR) website by performing a simple Google search. (*Id.*)

¶83. The tool allows anyone to check the status of a Kansas driver's license so long as the person knows the driver's license number, first and last name, and date of birth of the driver they are checking on. (*Id.*)

¶84. This public-facing webpage does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site. (*Id.* at 16)

¶85. In fact, the "Disclaimer" on the website merely warns users that the information "is a summary only and will not display any sanctions from another state." (*Id.*)

¶86. Using the information from the August 1 Department of Revenue letter which Maag had provided Zorn, *i.e.*, Newell's first and last name, address, driver's license number,

and date of birth, Meyer used the Kansas Driver's License Status Check tool on the webpage to confirm Newell's DUI conviction and the fact Newell's license was suspended. (*Id.*)

¶87. Meyer did not, however, see the August 1 letter from the Kansas Department of Revenue to Newell which Maag had provided via Facebook Messenger. (*Id.*)

¶88. The next day, Zorn called the Department of Revenue and was told the document was available on the same public-facing website, a user simply must keep clicking to find the link. (*Id.)*

¶89. Zorn then went to the same website Meyer had used and saw that at the bottom of the screen showing Newell's DUI conviction and suspension there was a box to click to view "Documents." (*Id.*)

¶90. When Zorn clicked on that box, a form appeared on the webpage and asked for "Requester's Information." (*Id.* at 17)

¶91. Zorn then inserted her own name (*i.e.*, Phyllis Zorn) into the form. (*Id.*)

¶92. Zorn then entered Newell's driver's license number and address. (*Id.*)

¶93. The Kansas Driver's License Status Check tool on the webpage then required Zorn to check a box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)." (*Id.*)

¶94. After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen-the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell, *i.e.*, the same document that Maag had previously provided Zorn. (*Id.*)

¶95. Having confirmed that the document Maag had provided was legitimate, Zorn

informed Meyer that she had verified that the information (and letter) provided by Maag was accurate. (*Id.*)

¶123-124. Meyer subsequently decided not to publish the information about Newell because he believed the newspaper was being drawn into a bitter divorce. (*Id.* at 23)

¶127-129. On Friday, Aug. 4, Meyer emailed Chief Cody and Sheriff Soyez and advised them that a "confidential source" had provided the MCR with a KDOR letter addressed to a "Marion County business woman" recently in the news. Meyer did not identify the MCR's source. Meyer said the KDOR letter disclosed the steps needed to reinstate the business woman's drivers license, including installing an ignition interlock device. (*Id.* at 24) (*See* Meyer email in Exh. 1; Complaint reference; *Gee*)

¶138-139. Also on August 4, the Marion Vice Mayor, Ruth Herbel (Herbel) sent an email to the Marion City Administrator. Attached to Herbel's email was a screenshot of the same KDOR letter to Newell which reporter Zorn had received from Maag. (Doc. 1 at 25) (*See* redacted KDOR letter in screenshot at ¶74 above)

¶140. Herbel advised the City Administer that Herbel had received Newell's KDOR letter from Maag. (Doc. 1 at 25)

¶142. The City Administrator forwarded Herbel's email (with Newell's KDOR letter) to Mayor Mayfield. (*Id.* at 26)

¶146. Mayor Mayfield and Herbel had often verbally battled one another in the MCR newspaper. (*Id.* at 27)

¶176. On August 7, Mayor Mayfield directed Chief Cody to begin an investigation into Herbel and the MCR. (*Id.* at 34)

C.    The Investigation.

**¶176A. On Monday, August 7, Chief Cody directed Defendant Zach Hudlin (a Marion police officer) to contact the Kansas Department of Revenue (KDOR) regarding how someone would be able to acquire a copy of a letter to someone else about their driver's license. Hudlin made contact with a representative in KDOR's information technology department. Hudlin gave the KDOR representative the information for Kari Newell. The KDOR representative advised that on Friday, Aug. 4, Newell's driver's license information was accessed on a KDOR website by someone identifying themselves as "Phyllis Zorn." Three minutes later information was accessed by someone identifying themselves as "Kari Newell." (Hudlin memo in Exh. 2; referenced in MCR search warrant application;** *Gee***)**

**¶176B. On August 9, Kari Newell provided Chief Cody with a written statement in which she described a phone call with Eric Meyer on Aug. 7 at around 7:01 p.m. Newell stated that Meyer admitted Phyllis Zorn had downloaded Newell's KDOR letter and that was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant." (Newell's written statement in Exh. 3; referenced in MCR Search Warrant application;** *Gee***)**

**¶199-201. Also on Aug. 9, Sheriff Detective Aaron Christner drafted an application for a search warrant for the MCR office and forwarded the draft to Cody. Because he had not conducted the investigation, Christner indicated he would not sign the application himself. (Doc. 1 at 37)**

**¶222. On Thursday, Aug. 10, Cody had taken Christner's draft and prepared search warrant applications for the MCR office and for the residences of Herbel and Maag. (***Id.* **at 43)**

9

¶224. Later on August 10, Cody discussed the draft applications with Sheriff Soyez and a decision was made to also prepare a search warrant application for the residence shared by Eric Meyer and his mother, Joan. (*Id.*)

¶224A. On the morning of Friday, August 11, Chief Cody presented his nine-page affidavit to Magistrate Judge Laura Viar in an application requesting issuance of the search warrant for the MCR office. Cody's affidavit stated in part that he had probable cause to believe and did believe that the crimes of identity theft (KSA 21-6107) and unlawful acts concerning computers (KSA 21-5839) had been committed and that evidence of such criminal offenses was located in the MCR office. (MCR search warrant application in Exh. 4; Complaint reference; *Gee*) Cody also submitted a virtually identical search warrant application to Judge Viar for the search of the Meyer residence. (Meyer search warrant application in Exh. 6; Complaint reference, *Gee*)

¶224B. To establish probable cause for the search, Cody's affidavit listed the following information in the search warrant applications. (Exh. 4 and 6):

a) The August 4 email from Meyer in which Meyer stated he received a copy of someone's private KDOR records (Exh. 1);

b) The August 4 email from Herbel to the City Administrator which contained a screenshot of Newell's KDOR letter;

c) Newell told Cody that Newell had not given anyone permission to open or access her mail;

d) KDOR advised police that the individuals who downloaded the Newell letter from the KDOR website were "Phyllis Zorn" and "Kari Newell". Newell's name was used three minutes after Zorn's was used. (Exh. 2);

e) Cody contacted Newell again who said she did not download or authorize anyone to download her letter from the KDOR website;

f) On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7 around 7:01 pm. Newell stated that Meyer

admitted Zorn had downloaded Newell's KDOR letter and that was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant." (Newell's written statement in Exh. 3; referenced in MCR Search Warrant application; *Gee*);

g) In a newspaper article published on August 9, Meyer wrote that the MCR received Newell's KDOR letter from a "source" and verified that it was accurate and obtained from a "public website.";

h) Under the federal DPPA, personal information obtained by KDOR cannot be released unless the request for that information falls within one of the exceptions within that Act.

¶224C. Judge Viar signed Cody's search warrant applications for the MCR office and the Meyer residence. Her signature shows that the applications were "subscribed and sworn to" before her. (Exh. 4 at 9; Exh. 6 at 9).

¶224D. On August 11 at 9:00 a.m., Judge Viar also signed the requested search warrants for the MCR office and Meyer residence. The Court found that there was probable cause to believe that crimes had been committed in violation of K.S.A. 21-6107 and 21-5839 and that evidence of the offenses could be found at those locations. The search warrants further commanded that the listed items of evidence (including computers and cell phones, as well as documents pertaining to Newell) could be seized. (MCR Search Warrant in Exh. 5; Meyer residence Search Warrant in Exh. 7; Complaint reference; *Gee*).

D.    <u>Execution of the MCR Search Warrant</u>

¶260. On Friday, August 11, Chief Cody led a team of law enforcement officers in executing search warrants at the MCR office and the residences of Meyer and Herbel. (Doc. 1 at 48)

¶261. The first search occurred at the MCR office led by Chief Cody who was assisted by Marion officers Hudlin and Benavidez, as well as Sheriff detectives Christner and Janzen.

(*Id.*)

¶266-268. Detective Christner conducted or attempted to conduct a "preview search" on reporter Zorn's work computer utilizing special software. (*Id.* at 50)

¶277-281. The preview search was unsuccessful in obtaining evidence of the download of Newell's KDOR letter. (*Id.* at 52-53)

¶288-291. During the MCR search, Officer Hudlin brought to Cody's attention a file in reporter Gruver's desk labeled "Capt. Gideon Cody." (*Id.* 54-55)

¶297-298. According to the log created by the special software, Detective Christner began his preview search at 11:11:57 a.m. and completed it at 12:32:05 p.m. (*Id.* at 57)

¶301-302. After Cody talked to Sheriff Soyez by phone, Cody decided not to conduct a "preview search" on the other work computers in the MCR office but rather to seize them all, including Zorn's. (*Id.* at 58)

¶306-307. Chief Cody directed that Meyer's work computer and the work computers of reporters Deb Gruver and Zorn be seized without a preview search. The network file server was also seized. Officer Hudlin physically removed this equipment from the MCR office. (*Id.* at 59) Also found and seized in the MCR office was a hard copy of Newell's KDOR letter. (MCR items seized in Exh. 9, Judicial notice; *Gee*).

E.     Execution of the Meyer Residence Search Warrant.

¶327-330. At the same time as the MCR office search was being conducted, law enforcement officers Chris Mercer and Matt Regier went to the house of Joan and Eric Meyer. When Eric Meyer came to the door, he was handed the search warrant for his residence. He objected but the officers entered the home. (*Id.* at 63; See also Meyer residence Search Warrant in Exh. 7)

¶331-335. Deputy Regier demanded that Eric Meyer turn over his cell phone. Despite Eric's repeated objections, Regier seized Meyer's cell phone. (*Id.* at 64)

¶336-337. Joan Meyer, Eric's 98-year-old mother, came out from her bedroom using a walker. The two officers said they had to wait for Chief Cody to arrive before they could conduct the search of the residence. (*Id.* at 65)

¶338-343. During the two and one-half hours before Cody arrived, Joan became increasingly upset at the presence of the officers. At times she cried. (*Id.* at 65-66)

¶344-351. Because he could not reach any of the MCR staff by telephone, Eric walked to the MCR office. At the MCR, Chief Cody told Meyer that he could only enter the MCR for the purpose of being *Mirandized* and questioned. Meyer said he needed access to the phone number of his attorney which was in the office. After being denied access, Eric waited outside the MCR for the search to end. (*Id.* at 66-67)

¶357. When the MCR search ended, Chief Cody and four officers went to the residence of Eric and Joan Meyer to execute that search warrant. Officers Regier and Mercer were still there. (*Id.* at 68)

¶358-359. At that location, Cody told Deputy Christner not to take time to do a "preview search" of the computers and cell phones at the residence. Officer Hudlin took the devices. (*Id.* at 68-69)

¶360-363. At the Meyer residence, Joan became upset when she was told the home computer would be taken. During a verbal exchange with Chief Cody, Joan shouted, "Get out of my house!" (*Id.* at 69)

¶369-370. At the Meyer residence, officers took (without a preview search) Joan's computer, Eric's laptop and Eric's cell phone, along with a portable hard drive and router.

(*Id.* at 71) Also found and seized at the Meyer residence was a hard copy of Newell's KDOR letter. (Meyer residence items seized in Exh. 10, Judicial notice; *Gee*)

¶372-374. During the search of the Meyer residence, Joan made statements to the officers such as, "You know, if I have a heart attack and die, it's going to be all your fault; I've had two of 'em already." (*Id.* at 71-72)

¶378. After all the searches were completed, Cody debriefed Sheriff Soyez at the Sheriff's Office while sharing pizza. (*Id.* at 73)

¶391-395. Tragically Joan Meyer died of a sudden cardiac arrest on August 12, 2023. (*Id.* at 75-76)

¶396-398. On August 13, the KBI issued a statement that it was taking over the investigation. On August 15, Cody and Detective Christner exchanged drafts of probable cause affidavits supporting arrest warrants for Zorn, Eric Meyer, and Herbel. (*Id.* at 76)

¶400-401. On August 16, Joel Ensey (Marion County Attorney) filed a motion to release the items seized during the searches. The District Judge, Benjamin Sexton, granted Ensey's motion the same day. In a press release, the County Attorney stated that insufficient evidence existed to establish "a legally sufficient nexus" between the crimes being investigated and the places searched and the items seized. (*Id.* at 77) In the same press release, however, the County Attorney stated his belief that Chief Cody's affidavit "established probable cause to believe that an employee of the newspaper may have committed the crime" prohibited by K.S.A. 21-5839 relating to computers. (Ensey press release in Exh. 8; Complaint reference; *Gee*).

¶405-406. Later on August 16, a forensic examiner retained by the MCR took possession of all the seized items at the Sheriff's Office. This transfer of property was

personally supervised by the Sheriff. (Doc. 1 at 77)

¶416-418. On August 29, the contents of the "preview search" of Zorn's work computer was released to the MCR after a second court order. (*Id.* at 80)

III.   **ISSUES**

    A.    **Does Plaintiffs' Complaint Blatantly Violate Rules 1 And 8 Of The Federal Rules Of Civil Procedure Which Warrants Dismissal Until Plaintiffs' Comply?**

    B.    **Are Plaintiffs' Fourth Amendment Claims Barred By Cody's Qualified Immunity Defense?**

    C.    **Are Plaintiffs' First Amendment Claims Barred By Cody's Qualified Immunity Defense?**

IV.   **ARGUMENTS AND AUTHORITIES**

**A. PLAINTIFFS' 127-PAGE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO COMPLY WITH RULES 1 AND 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 1 states as a whole the Rules of Civil Procedure are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." When read in conjunction with Rule 8, it is clear that the goal of the Federal Rules of Civil Procedure is to eliminate parties from trying their cases to the court of public opinion using the judicial process and their filed pleadings and documents.

Dismissal under Rule 8 is a matter within the District Court's discretion, independent of the question of whether the complaint is subject to dismissal under Rule 12. *Schupper v. Edie*, 193 F. App'x. 745 (10th Cir. 2006). Rule 8(e), requiring each averment of a pleading to be "simple, concise, and direct," applies to good claims as well as bad. *Baker v. Blue Valley Sch. Dist. USD 229*, 2021 U.S. Dist. LEXIS 116896, at *12 (D. Kan. June 23, 2021). While complex pleadings are certainly not unheard of in federal court, it is not job of the Court or the opposing party to sort

through a pleading to try to construct a plaintiff's claims. *Schupper,* 193 F. App'x at 746.

The Complaint before this court covers **127 pages** and is **714 paragraphs long**. It should be noted that the claims alleged are approximately half of the claims that Plaintiffs intend to assert, as paragraphs 715-727 are merely "placeholder" paragraphs related to their later intended state law claims currently being considered pursuant to K.S.A. § 12-105b. Presumably, Plaintiffs intend to file a subsequent Amended Complaint probably 2 to 2.5 times in length more than the current one.

However, it is not merely the length which is problematic under Rule 8, Plaintiffs' Complaint reads like a press release, a summary judgment brief, a trial brief and a graphic novel all in one.

### 1.   PICTURES AND GRAPHIC IMAGES

As early as paragraph 4, Plaintiffs insert screen shots, photographs, logos and other irrelevant and inappropriate graphic images. What possible use in a federal civil Complaint do the images appearing at pages 2-5 serve? The Plaintiffs insert an image of the *Marion County Record's* logo appearing to try to argue the case through pictures. Defendant has no way to respond to pictures as is required by Rule 8(b), thereby making the Complaint itself inherently defective through its overuse of photos and graphic images.

### 2.   ARGUMENTATIVE CAPTIONS

When used properly, captions in pleadings are an appropriate and helpful tool for lawyers and parties to organize their submissions to the Court.

In the current Complaint, however, the vast majority of Plaintiffs' captions are thinly disguised argumentative conclusory allegations with no connection to short plain statements of fact. These captions include language such as "The 'Marion Crime' Vigilante Group" (ECF 1 at 4); "Cody Lawyers Up" (ECF 1 at 7); "Cody Begins His Crackdown" (ECF 1 at 8); "Journalism

101 – Verify Facts" (ECF 1 at 16); "The Real Villains" (ECF 1 at 31); "Garbage In, Garbage Out" (ECF 1 at 43); and "The Sham 'Preview Search' ". There are many more examples of these captions that literally serve no purpose other than to provide inflammatory conclusory language in the Complaint.

### 3.   ARGUMENTS AND AUTHORITIES RECITED AS STATEMENTS OF FACT

Plaintiffs' Complaint is required to set forth a "short and plain statement of the claim." While it is expected and arguably required that Plaintiffs identify the legal claims they are asserting by referencing statutory authority or causes of action, *this* Complaint includes full sections of legal argument as if presenting analysis for summary judgment.

Dispositive motions, such as Defendant Cody's motion, must cite to applicable law and apply the facts of the case to the legal authority at issue. Such argument is proper for motions and briefing but not for a Rule 8 statement of the claim in a Complaint. This Defendant respectfully requests that the Court evaluate and determine that the following paragraphs are not proper for a Complaint and should be stricken and reserved for later legal briefing. The paragraphs referenced below render this Complaint confusing and vexatious and places an unfair burden on the Court and the Defendants to ascertain how to "admit or deny" these legal arguments: 96-106, 109-120, 122-123, 212, 217, 227-231, 258-259, 326, 419, 443-447, 450-475, 485-488, 490-495, 506-513, 519-527, 533, 553-556, 567-576, 578-583, 617-622, 629-631, 651-654, 660-671, 698-714.

### 4.   LENGTH

This Court has recently reviewed and rejected multiple Complaints filed by other Plaintiffs because their pleadings violated Rule 8. *Newton v. City of Atchison, Kansas, et. al.,* 2024 WL 2272565 at 4-5 (D. Kan. 5/20/24); *Givens, et al. v. City of Wichita, et. al.* 2024 WL 1198503 at 6-7 (D. Kan. 3/20/24); *Phelps v. State of Kansas, et. al.*, 2024 WL ****** at **** (D. Kan. 2/23/24).

The analysis of Judges Teeter, Broomes and Schwartz in these decisions contain helpful and concise recitations to legal authority related to the Rule 8 issue presented. In the *Givens* decision, Judge Teeter notes that the Complaint at issue was 41 pages and 243 paragraphs long and was complicated, confusing and contained excessive references to seemingly irrelevant matters. By comparison, the *Givens* Complaint contains a fraction of the rambling and unnecessary prolix provided in the matter before this Court.

The Complaint in the current case includes pages of discussion regarding Mayor Mayfield's wife's Facebook posts; Gideon Cody's work outside of law enforcement; whether Judge Laura Viar appropriately signed the subject warrants (Viar is not a party); various press releases by Joel Ensey (Ensey is not a party); allegations made by other Plaintiffs (Phyllis Zorn and Deb Gruver) in their lawsuits; and countless pages all clearly designed to provide a dramatic and emotional story. The Tenth Circuit, however, has held that a Complaint can run afoul of Rule 8 through unnecessary length and the burying of material allegations in "a morass of irrelevancies." *Robledo-Valdez,* 2020 WL 8834795, at *2 (quoting *Mann v. Boatright,* 477 F.3d 1140, 1148 (10th Cir. 2007)).

In this case, the sheer length of the pleadings, the rambling and confusing statement of facts, the miscellaneous citation to facts and witnesses irrelevant to the claims at issue and other Rule 8 defects are more than sufficient to strike the Complaint. The Plaintiffs don't need **127 pages** to explain the basis for their § 1983 and Privacy Protection Act claims. In addition to the **714 paragraphs** themselves, the Court should review the nature of the language used throughout the Complaint. The allegations are inherently inflammatory and exaggerated. Plaintiffs open their Complaint discussing "the intolerable violation of their constitutional rights" and the need to "deter the next crazed cop from threatening democracy the way Chief Cody did…in an ill-fated attempt

to silence the press." These conclusory and inflammatory arguments, posed as a "fact" are quite obviously neither a short, nor a plain statement of the case. Instead, this is a voluminous press release, parading as a Complaint, which should be rejected outright. The Tenth Circuit has established such a Complaint is improper: "something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *McHenry v. Renne,* 84 F.3d 1172, 1179-80 (9th Cir. 1996). Therefore, Plaintiffs' Complaint (Doc. 1) should be dismissed until it fully complies with Fed. R. Civ. P. 1 and 8.

## B. CODY'S QUALIFIED IMMUNITY DEFENSE BARS PLAINTIFFS' FOURTH AMENDMENT CLAIMS

To avoid Cody's qualified immunity defense, Plaintiffs have the burden to show that a) Cody's conduct violated their constitutional rights and b) that the law was "clearly established" at the time of the incident. *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). "Clearly established" means that every reasonable police officer would understand that his conduct was unlawful. *Ashcroft v. al-Kidd,* 131 S. Ct. 731, 741 (2011). Moreover, the existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Id.* Indeed, the constitutional rule must be "settled law." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Only a high degree of specificity will satisfy this standard. *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015). Based on their own allegations, Plaintiffs have failed to show that Cody violated their constitutional rights or that the law was clearly established. Thus Cody is entitled to qualified immunity which bars Plaintiffs' claims as a matter of law.

Plaintiffs allege that Cody violated their Fourth Amendment rights by a) preparing and executing "invalid" search warrants and b) by unlawfully seizing Plaintiffs' computers and cell phones. However, Plaintiffs' own factual allegations do not establish any Fourth Amendment

violation or that the law was clearly established in the way Plaintiffs claim. Therefore, this Court should grant Cody's motion to dismiss based on his qualified immunity defense. *Pauls, Mullenix.*

### 1. THE SEARCH WARRANTS IN QUESTION WERE VALID BECAUSE BY PLAINTIFFS' OWN ALLEGATIONS ERIC MEYER AND PHYLLIS ZORN VIOLATED THE KANSAS CRIMINAL CODE AND THE DRIVER'S PRIVACY PROTECTION ACT (DPPA) BOTH OF WHICH PROHIBITED THEIR UNLAWFUL CONDUCT IN ACCESSING NEWELL'S PRIVATE KDOR LETTER

Plaintiffs allege in their Complaint that Meyer's and Zorn's actions in accessing and obtaining the KDOR letter to Kari Newell from the KDOR website was not unlawful. Plaintiffs further assert that the DPPA was not even applicable to their actions in obtaining Newell's letter. Both of these conclusory legal assertions are false as a matter of law and render their legal claims equally false and without any viable basis.

Cody's application for the search warrants (Exh. 4 at 1; Exh. 6 at 1) plainly sets forth in the narrative portion probable cause for the violation of two specific Kansas criminal statutes designed to protect Kansas citizens from unwarranted invasions of privacy and misuse of their personal identifying information. These statutes codify that the actions of Zorn and Meyer were criminal because they could not *legally* use their computers or cell phones to knowingly and without authorization access Newell's personal protected information. Further, Zorn and Meyer could not legally use Newell's full name, address, date of birth and driver's license number to obtain Newell's legally protected documents for the purpose of causing Newell economic or other harm. Their criminal activity under state law is further established by analysis of the applicable federal law enacted to protect access to exactly this type of personal identifying information.

Zorn patently violated the Drivers Privacy Protection Act (DPPA) which is the key to understanding the basis for the initial criminal investigation. As her supervisor, Meyer either directed Zorn to violate that law or knowingly allowed or encouraged her to do so. The

investigation ultimately resulted in the search warrants at issue being prepared, approved by a neutral state judge, and executed at the MCR office and Meyer's residence. Based on Plaintiffs' own allegations, Zorn and Meyer are guilty of criminally violating the DPPA in at least two separate ways with respect to Newell's KDOR letter. That formed the basis for Chief Cody's probable cause to believe they had also committed related state computer crimes which were being investigated at the same time.

The federal DPPA, 18 U.S.C.§2721, *et seq.*, prohibits individuals from knowingly obtaining or disclosing "personal information" from a state's motor vehicle records. *Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 940 (7th Cir. 2015) ("personal information" of individuals includes name, address, driver's license number and date of birth). Furthermore, the media has no First Amendment right to obtain "personal information" from state motor vehicle records in violation of the DPPA. *Id.* Thus, Plaintiffs' lawsuit at bar is based entirely on a false legal theory. *Id.* By their own admission, Zorn and Meyer knowingly obtained "personal information" regarding Kari Newell from KDOR for an impermissible reason in obvious violation of the DPPA. (Doc. 1 at 13-17) Moreover, Zorn's status as a journalist and Meyer's status as a newspaper editor did not provide them any First Amendment privilege to do so contrary to Plaintiffs' pleadings. *Dahlstrom* states in relevant part:

> The DPPA was enacted to protect personal privacy and promote public safety:
>
> The underlying purpose of the DPPA also supports reading "personal information" to extend to the personal details at issue here. The DPPA was enacted as a public safety measure designed to prevent stalkers and criminals from utilizing motor vehicle records to acquire information about their victims. Prior to the law's enactment, anyone could contact the department of motor vehicles in most states and, simply by providing a license plate number and paying a nominal fee, obtain the corresponding driver's address and other pertinent biographical information—no questions asked.  At congressional hearings on the proposed legislation, numerous witnesses testified about the risks posed by unfettered public access to motor vehicle records. The most highly publicized impetus for the Act's passage was the 1989 murder of television actress Rebecca Schaeffer by an obsessed fan

who obtained her unlisted home address from the California Department of Motor Vehicles. The DPPA's legislative history reveals that "the intent of [the Act] is simple-to protect the personal privacy and safety of all American licensed drivers."

*Dahlstrom*, 777 F.3d at 944 (citations to legislative history, case law, and footnote omitted). *See also Senne v. Village of Palatina, Ill.*, 695 F.3d 597, 607 (7th Cir. 2012) (the legislative history shows DPPA was to protect personal privacy and prevent criminals from obtaining easily available "personal information" to commit crimes).

It is legally dispositive in this case that Zorn and her supervisor, Meyer, obtained "personal information" regarding Kari Newell from the KDOR website by accessing and obtaining the private KDOR letter to Newell. The DPPA expressly defines "personal information" as:

Information that identifies an individual, including an individual's photograph, social security number, *driver identification number*, *name*, *address* (but not the 5-digit zip code), *telephone number*, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status. 18 U.S.C. §2725(3). (emphasis added)

The KDOR letter at issue expressly included Newell's *full name*, *date of birth*, *driver's license number*, and *address*, as well as additional personal information regarding steps she must take related to her driver's license. (*See* Doc. 1 at 13-17; ¶71-75, 82-83, 86, 90-95) (emphasis added) The entire letter constituted "personal information" protected by the DPPA. *See Dahlstrom* (date of birth is also protected from disclosure by DPPA) The KDOR letter went far beyond general "driver's status" information which is not DPPA protected. *See* 18 U.S.C. §2725(3). *Id.*

In *Dahlstrom*, a newspaper was investigating local police for possible misconduct. 777 F.3d at 940-941. The newspaper obtained "personal information" (including birth dates) for five officers from state motor vehicle records and published that information within a newspaper article. *Id.* The five officers sued and the Seventh Circuit (on interlocutory appeal) held that indeed the officers possessed a viable DPPA claim. *Id.* at 942-945. The *Dahlstrom* court further stated that the

newspaper had violated the DPPA when it "knowingly obtained the officer's personal details from the Illinois Secretary of State and proceeded to publish them." *Id.* at 945. Moreover, the newspaper's First Amendment defense was rejected. *Id.* at 954.

Based on Plaintiffs' own allegations, Zorn and Meyer did not obtain Newell's "personal information" (i.e., the KDOR letter) for any of the 14 permissible uses listed in the DPPA. 18 U.S.C. §2725(b). Plaintiffs allege that Zorn obtained Newell's letter for the permissible reason that it was related "to the operation of a motor vehicle or public safety." *See* §2725(b)(14). That contention is patently false on its face, however. See *The McClatchy Company v. Town of Chapel Hill*, 657 F. Supp. 3d 769, 777-778 (M.D. N. Car. 2023) (DPPA-protected personal information should be redacted from accident reports unless requester has permissible reason to have that information). Plaintiffs admit in their Complaint that Zorn obtained the KDOR letter to confirm the authenticity of the same letter conveyed to Zorn by Pam Maag. (Doc. 1 at 17, ¶95) Zorn's admitted purpose does not satisfy any of the 14 legitimate reasons provided in §2725(b) and thus was unlawful as a matter of law. *Hedquist v. Walsh*, 786 Fed. Appx. 130, 135 (10th Cir. 2019) (personal or political reasons to obtain "personal information" would be an impermissible purpose); *United States v. Hastie,* 854 F.3d 1298, 1300-1301 (11th Cir. 2017)(same); *Pavona v. Law Officers of Anthony Mancini, LTD,* 118 F. Supp. 3d 1004, 1007-1008 (N.D. Ill.) (the accident report obtained was not used for a legitimate purpose relating to the operation of a motor vehicle).

Plaintiffs admit that Eric Meyer (the newspaper's editor), went to the "Status Check" page of the KDOR website prior to Zorn. (Doc 1 at 14-16) Meyer confirmed on the "Status Check" page that Kari Newell had a DUI conviction and that her driver's license was suspended. (*Id.*) KDOR's "Status Check" first page was consistent with the DPPA which does not include general information regarding a person's driver's license status or driving violations within the definition

of the protected "personal information." 18 U.S.C. 2725(3). Zorn and Meyer then had that general

information. Thus, Zorn and Meyer had absolutely no reason to go back to the "Status Check"

page except to try to impermissibly "confirm" that the confidential KDOR letter to Newell was

authentic. (*Id.*) Plaintiffs even expressly admit this impermissible purpose. (*Id.* at 16-17) It is

certainly reasonable to believe that Zorn took that action because she was directed to do so by her

supervisor, Meyer, or at least with his knowledge and tacit approval. Meyer admits that at that

point he was at least considering using Newell's information in a newspaper story but later decided

against it. (*Id.* at 23, ¶123)

Zorn's and Meyer's actions became unlawful under the DPPA as soon as Zorn checked the

box on KDOR's "Status Check" page requesting Newell's "documents." (Doc. 1 at 16-17) By

checking that box she was expressly affirming (as Plaintiffs admit) that her request for Newell's

private KDOR documents was both a) "specifically authorized by Kansas law" and b) "related to

the operation of a motor vehicle or public safety." (*Id.*) That language was required by the DPPA

to protect Newell's "personal information" and privacy from exactly this kind of illegal request for

confidential documents and information which Zorn was making. *See* 18 U.S.C. §2721(b);

§2722(a) and (b). Zorn and Meyer knew or should have known that making the false

representations to KDOR (i.e., checking the box) to obtain Newell's protected documents was a

gross violation of the DPPA and Newell's rights under federal and state law. *Maracich*, 570 U.S.

at 74 (each distinct use of personal information must be specifically permitted by the DPPA); *See

also The McClatchy Company*, 657 F. Supp. 3d at 776-778.

The DPPA clearly provides that it "shall be unlawful for any person knowingly to obtain

or disclose personal information from a motor vehicle record, for any use not permitted under

§2721(b) of this title." 18 U.S.C. §2722(a).  As already noted, Plaintiffs admit Zorn did not obtain

Newell's KDOR letter for any of the 14 permissible DPPA uses. (Doc 1 at 16-17) Clearly based on Plaintiffs' own admissions, Zorn "knowingly" obtained Kari Newell's personal information from KDOR for a use not permitted by the DPPA. §2722(a). For purposes of the DPPA, the term "knowingly" merely means "voluntary action," not knowledge of illegality. *Senne*, 695 F.3d at 603; *Pichler v. UNITE*, 542 F.3d 380, 396-397 (3rd Cir. 2008) (same). In addition, ignorance of the DPPA restrictions on "personal information" is not a defense. *Hastie*, 854 F.3d at 1305. Even if the KDOR letter was never used further by Zorn or Meyer, merely accessing it or directing that it be obtained through the KDOR website constituted a clear DPPA violation. *McDonough v. Anoka County,* 799 F.3d 931, 944-945 (8th Cir. 2015) (the DPPA term "obtain" unambiguously includes access and observation).

In addition, the DPPA expressly makes it "unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. §2722(b).   Plaintiffs admit that when the KDOR website asked for "Requestor's Information," Zorn inserted her own name but entered Newell's driver's license number and address. (Doc. 1 at 16-17) Then Zorn checked the box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety." (Id.)

After Zorn checked the box and clicked "accept," 19 "documents" pertaining to Newell appeared on the screen including the KDOR letter at issue. (Doc. 1 at 16-17) Zorn's misrepresentation to KDOR that her request was specifically authorized by Kansas law and was for a valid purpose constituted a clear "false representation" to obtain Newell's personal information (i.e., the KDOR letter) for an improper purpose.  That is a separate and distinct violation of the DPPA. 18 U.S.C. §2722(b). Again, it is reasonable to believe that Zorn was directed

by Meyer to obtain Newell's KDOR letter or at least Meyer knowingly permitted it to happen.

Zorn's and Meyer's two separate violations of the DPPA (§2722(a) and (b)) constitute both a federal crime and the basis for civil liability to the victim, Newell. *See* 18 USC §2723(a) and §2724. Had Zorn and Meyer not committed those obvious DPPA violations which victimized Newell, the search warrant executed on the MCR office and Meyer's residence would likely have never occurred.

Plaintiffs contend that Kansas law authorized Zorn's and Meyer's actions despite their DPPA violations. (Doc. 1 at 18-22) However, that contention is patently false. The primary KDOR records statute, K.S.A. 74-2012, did not authorize the misrepresentations (i.e., checking the website box) to obtain illegal access to the KDOR letter. Moreover, the Kansas Open Records Act (KORA) expressly protects the confidentiality of records "the disclosure of which is specifically prohibited or restricted by federal law." 45 K.S.A. §221(a)(1). *See also* §221(a)(30) (records which invade personal privacy are not open to the public). Newell's KDOR letter was ***not*** an open public record. *Id. See also The McClatchy Company,* 657 F. Supp. 3d at 777-778 (State open records statute inapplicable if DPPA applies).

Moreover, it is immaterial whether Kansas law authorized Zorn's and Meyer's actions. The DPPA pre-empts state law based on the supremacy clause of the U.S. Constitution. *Maracich*, 570 U.S. at 71-72; *State of Oklahoma ex rel. Okl. Dept. of Public Safety v. U.S.*, 161 F.3d 1266, 1272 (10th Cir. 1998). Zorn's and Meyer's blatant violations of the DPPA led directly to Defendant Cody's investigation of the related state criminal offenses which had victimized Kari Newell.

### 2. AT LEAST "ARGUABLE" PROBABLE CAUSE EXISTED TO ISSUE THE SEARCH WARRANTS SO CODY IS ENTITLED TO QUALIFIED IMMUNITY

In the context of a qualified immunity defense, a court determines whether "arguable" probable cause existed for a search warrant to issue. *Stonecipher v. Valles,* 759 F.3d 1134, 1141

(10th Cir. 2014). "Arguable probable cause is another way of saying that officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* at 1141; *See also Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). Certainly Chief Cody had at least "arguable" probable cause to believe (based on the information he set forth in his search warrant applications) that evidence could be found at the MCR office and/or Meyer residence regarding state-law crimes related to the downloading of Newell's KDOR letter. *Stonecipher; Hoskins v. Withers,* 92 F.4th 1279, 1289-1290 (10th Cir. 2023); *Mocek v. City of Albuquerque,* 813 F.3d 912, 924-927 (10th Cir. 2015). Indeed, a hard copy of the KDOR letter was found in both locations. (Exh. 9; 10)

A neutral magistrate judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). In the case at bar, Plaintiffs do not make any credible allegation that Judge Viar was incompetent or biased against them. Thus, the Judge's approval of Cody's search warrant applications and the approved search warrants themselves are "the clearest indication" that Cody acted in an objectively reasonable manner in seeking the search warrants. *Id.* Indeed, Judge Viar denied the requested search warrant for Pam Maag's residence.

Chief Cody had actual probable cause (or at least arguable probable cause) as set forth in his search warrant applications. (*See* Exh. 4 at 5-8; Exh. 6 at 5-8) KDOR had advised Officer Hudlin on August 7 that a person identified as "Phyllis Zorn" had downloaded Newell's KDOR letter from the KDOR website. (*See* Exh. 2) When contacted, Newell denied that she herself had downloaded the letter and further said she had not authorized anyone to download the letter from the website. On the same day as the download (August 4), Meyer sent an email to Chief Cody and Sheriff Soyez indicating MCR had received a copy of "a local business woman's" private KDOR

records. (*See* Exh. 1) On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7. (*See* Exh. 3) According to Newell, Meyer admitted that Zorn had downloaded Newell's KDOR letter. Newell's written statement also asserted that Meyer threatened Newell if she pursued the matter. (*Id.*)

Therefore, Chief Cody had a solid basis to reasonably believe that 1) Phyllis Zorn of the MCR had downloaded Newell's federally-protected, private KDOR letter from the KDOR website on August 4; 2) Newell had not authorized Zorn to access and obtain Newell's confidential KDOR letter; 3) the MCR owner and editor (Meyer) had admitted to Newell on August 9 that Zorn had downloaded Newell's KDOR letter protected by the DPPA and state law, 4) Meyer showed his consciousness of guilt by threatening Newell if she pursued the illegality, and 5) Meyer likely directed Zorn to obtain Newell's letter from KDOR or knowingly permitted it. Thus, as a matter of law, Cody had probable cause (or at least arguable probable cause) to reasonably believe that Newell was the victim of computer related crimes involving the download of Newell's KDOR letter by Zorn and Meyer. In addition, Cody had a reasonable belief that relevant evidence would be found by searching the electronic devices at the MCR office and the Meyer residence for the source or sources of the illegal download.

Chief Cody was investigating the state law crime which prohibits certain unlawful acts concerning computers (K.S.A. 21-5839). (*See* Exh. 4 and 6) Under K.S.A. 21-5839(a)(5), it is unlawful for any person to "**knowingly and without authorization, access or attempt to access any computer, computer system, social networking website, computer network or computer software, program, documentation, data or property contained in any computer, computer system or computer network.**" Based on Plaintiffs' own allegations, Cody had probable cause (or at least arguable probable cause) to believe that Zorn and Meyer: a) knowingly and without

authorization, b) accessed KDOR's computer system, c) to obtain Newell's confidential documentation or data.  This crime is a class A nonperson misdemeanor under Kansas law. K.S.A. 21-5839(b)(3).

Chief Cody was also investigating an "identity theft" offense. (*See* Ex. 4 and 6) Under K.S.A. 21-6107(a), identity theft is "**obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: 1) defraud that person, or anyone else, in order to receive any benefit; or 2) misrepresent that person in order to subject that person to economic or bodily harm.**" Cody had probable cause (or at least arguable probable cause) to reasonably believe that Zorn and Meyer: a) obtained the KDOR letter containing Newell's personal identifying information, b) with the intent to defraud KDOR (by misrepresenting their purpose) for their benefit (i.e. to sell MCR newspapers). Alternatively, Zorn and Meyer acted with the illegal intent to misrepresent Newell (i.e. steal her identity) to cause Newell economic harm (i.e., damage to her reputation and business). Identity theft is a severity level 8, nonperson felony, in Kansas.

Because Cody had at least arguable probable cause for the search warrants in this case to be issued, he is entitled to qualified immunity. *Stonecipher; Hoskins; Mocek.*

## 3. CHIEF CODY IS ENTITLED TO QUALIFIED IMMUNITY REGARDING THE EXECUTION OF THE SEARCH WARRANTS

Plaintiffs also allege that Cody violated their Fourth Amendment rights by exceeding the scope of the search warrants and seizing their computers and cell phones. Plaintiffs more particularly allege that Detective Christner conducted a "sham" preview search (using special software) on Zorn's work computer which took more than 80 minutes using keywords such as "vehicle" and "Kansas." (Doc. 1 at 50-53) Then Cody directed that Zorn's work computer be

seized, as well as the MCR computers and cell phones on which a preview search had not been conducted. (*Id.*) Plaintiffs argue that the seizure of those items violated their Fourth Amendment rights because (according to Plaintiffs) the MCR search warrant required a preview search before any items were seized. (*Id.*) The same argument is made with respect to the electronic devices seized at the Meyer residence.

First, Plaintiffs allege that Christner (not Cody) conducted the purported "sham" preview search of Zorn's work computer. Plaintiffs do not allege that Cody ordered, directed or authorized any "sham" search of the computer. Thus, even if a "sham" preview search occurred, Chief Cody would not be responsible for it and would be entitled to qualified immunity on Plaintiffs' claim of a "sham" search.

Second, Plaintiffs do not explain how or why a "sham" search would take more than one hour and twenty minutes. It would seem that a truly fake search would take much less time than that and would also fake a "hit." Of course, we now know that Zorn indeed did download Newell's KDOR letter from Zorn's work computer as Plaintiffs themselves admit in their Complaint (Doc. 1 at 13-17). Moreover, Meyer admitted that fact to Newell before the search warrant issued. (*See* Exh. 3) Thus, Plaintiffs' conclusory assertion of a "sham" preview search is not plausible and Cody is entitled to qualified immunity for that reason as well.

Third, it is apparent from the length of the preview search (more than 80 minutes) that Detective Christner's software was not operating properly or was horrendously slow. If a preview search would have been conducted on the other electronic devices in the MCR offices and at the Meyer residence, it could have easily taken another six hours or more for the searches to be completed which would have meant even more inconvenience to the newspaper operations and Joan Meyer. Thus, it was objectively reasonable for Chief Cody to direct that the electronic devices

be seized at both locations for any additional preview searches to be conducted off premises.

Fourth, the search warrants (which incorporated the language of Cody's applications) did not *require* an on-premises preview search. (*See* Exh. 4 and 6) The language used certainly indicated that preview searches should be done, if reasonably possible. But the search warrant did not contemplate that preview searches of the electronic devices on-premises would take several hours or more.

This factual scenario is governed by *United States v. Hargus*, 128 F.3d 1358 (10th Cir 1997). In that case, law enforcement officers seized two file cabinets with all their contents rather than reviewing all the files on premises for relevant documents to be seized pursuant to the search warrant. *Id.* at 1363. The *Hargus* court upheld the seizures by stating:

> Although we are given pause by the wholesale seizure of file cabinets and miscellaneous papers and property not specified in the search warrant, the officers did not grossly exceed the scope of the warrant. Their conduct was motivated by the impracticability of on-site sorting and the time constraints of executing a daytime search warrant. *Id.* at 1363

Subsequent courts have reaffirmed this Fourth Amendment principle of law. *High Plains Livestock, LLC v. Allan,* 2019 WL 2524323 at 4-5 (D. N. Mex.); *United States v. Gimmett,* 2004 WL 3171788 at 4 (D. Kan.).

Because the scope of the search warrants was not grossly exceeded in the case at bar, Chief Cody is entitled to qualified immunity regarding their execution. *Hargus, High Plains, Gimmett.*

### 4. CODY DID NOT MAKE MATERIALLY FALSE STATEMENTS OF FACT IN THE APPLICATIONS FOR THE SEARCH WARRANTS

Plaintiffs assert a particularly specious argument by contending that the search warrants for the MCR office and Meyer residence were invalid because Chief Cody purportedly made materially false statements of fact in his search warrant application. (Doc. 1 at 43-44) However, the allegedly "false material facts" listed by Plaintiffs all have to do with the legal interpretation of the federal DPPA and whether the KDOR website (which Zorn and Meyer used) is subject to

the DPPA. *Id.* These are not "statements of fact" but rather legal arguments about which a neutral judge would have knowledge or could research in deciding whether to approve the search warrants.

In his search warrant applications, Cody did refer to Zorn's apparent downloading of Newell's KDOR letter from the KDOR website and Zorn's apparent DPPA violation. (*See* Exh. 4 at 6-8; Exh. 6 at 6-8) However, Cody made no materially false statement in that regard as Plaintiffs' own allegations in their Complaint demonstrate. Indeed, Plaintiffs have now confirmed in their pleadings that Zorn did download Newell's private KDOR letter in blatant violation of the DPPA, as well as committing the related state-law crimes of identity theft and computer misuse. Moreover, a hard copy of Newell's KDOR letter was found at both the MCR office and Meyer's residence.

Even more significantly, Plaintiffs do *not* argue that any of the following material facts set forth in Cody's search warrant applications were materially false or known by Cody to be materially false (Exh. 4 at 5-8; Exh. 6 at 5-8):

a)   **The August 4 email from Meyer in which Meyer stated he received a copy of someone's private KDOR records (Exh. 1);**

b)   **The August 4 email from Herbel to the City Administrator which contained a screenshot of Newell's KDOR letter;**

c)   **Newell told Cody that Newell had not given anyone permission to open or access her mail;**

d)   **KDOR advised police that the individuals who downloaded the Newell letter from the KDOR website were "Phyllis Zorn" and "Kari Newell". Newell's name was used three minutes after Zorn's was used. (Exh. 2)**

e)   **Cody contacted Newell again who said she did not download or authorize anyone to download her letter from the KDOR website;**

f)   **On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7 around 7:01 pm. Newell stated that Meyer admitted Zorn had downloaded Newell's KDOR letter and that was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant."**

(**Newell's written statement in Exh. 3; referenced in Search Warrant applications;** *Gee*);

g)  **In a newspaper article published on August 9, Meyer wrote that the MCR received Newell's KDOR letter from a "source" and verified that it was accurate and obtained from a "public website.";**

Therefore, Plaintiffs do *not* contend that the actual material facts set forth in Cody's search warrant applications to show probable cause were materially false. Those were the facts relied upon by Judge Viar, a neutral state-court judge, to find probable cause sufficient to issue the search warrants. Those facts established probable cause (or at least arguable probable cause) to reasonably believe that state-law identity theft and computer crimes had been committed by Zorn and Meyer. Probable cause also existed to reasonably believe evidence of those crimes would be found at the MCR office and/or the Meyer residence. Thus, Chief Cody is entitled to qualified immunity and dismissal of Plaintiffs' Fourth Amendment claims which are based on Plaintiffs erroneous argument that Cody presented materially false statements of fact to Judge Viar.

## C.   CODY'S QUALIFIED IMMUNITY DEFENSE BARS PLAINTIFFS' FIRST AMENDMENT CLAIMS

Plaintiffs claim that Chief Cody violated their First Amendment rights by a) restricting MCR's ability to gather information, and b) by retaliating against them with the search and seizure of their computers and cell phones. (Doc. 1 at 85, 104-106) Neither of those claims state a viable cause of action under §1983. *Villarreal v. City of Laredo, Texas,* 94 F.4th 374, 395-397 (5th Cir. 2024) (en banc) (First Amendment rights of on-line journalist were not violated when she was arrested for publishing confidential personal information in violation of state statute).

### 1.   PLAINTIFFS' FIRST AMENDMENT RIGHTS WERE NOT VIOLATED

To state a viable First Amendment claim, Plaintiffs must prove: a) they were engaged in constitutionally protected activity; b) Chief Cody's actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and c) Cody's

adverse action was substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct. *Smith v. Plati*; 258 F. 3d 1167, 1176-1178 (10th Cir. 2001) (on-line journalist restricted from some University information did not state viable First Amendment claim).

First, it is settled law that there is no general First Amendment right of access to all sources of information under government control. *Smith,* 258 F.3d at 1178. Moreover, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 681-682 (1972). Further, a newspaper "has no special immunity from the application of general laws" and "no special privilege to invade the rights and liberties of others." *Id* at 683. Thus, in the case at bar, Plaintiff MCR's First Amendment rights as a newspaper is constrained to news gathering "within the means of the law." *Villarreal. See also Dahlstrom*, 777 F.3d at 954 (First Amendment defense to DPPA violation was rejected). Therefore, Plaintiffs state no viable First Amendment claim based on their mere status as a newspaper or a newspaper editor. *Branzburg, Villarreal, Smith, Dahlstrom.*

In addition, Plaintiffs do not allege any facts to establish that Zorn, Eric Meyer, and/or Joan Meyer were engaged in protected First Amendment activity as required by the three-pronged *Smith* test. Instead, by Plaintiffs' own allegations, Zorn and Meyer were engaged in violating the federal DPPA and Kansas criminal law by accessing Newell's protected KDOR letter from KDOR. (Doc. 1 at 13-17) Thus, no viable First Amendment claim exists. *Smith, Villarreal.*

Plaintiffs also fail to allege any facts to establish that an ordinary person in their position would have been "chilled" by a search warrant directed at finding evidence of computer crimes and identity theft in the MCR office and/or Eric Meyer's residence. Zorn and Meyer were not arrested or charged criminally, and MCR was prevented from using its electronic devices for only five days. Except for Zorn's, the seized devices were never searched.  Again, no viable First

Amendment claim is stated. *Smith, Villarreal.*

Finally, Plaintiffs fail to allege any facts to establish that Chief Cody's motivation for obtaining the search warrants was anything other than to gather evidence of the computer crimes and identity theft committed by Zorn and Meyer based on probable cause. It was another reporter (Gruver) not Zorn who was allegedly investigating purported misconduct by Cody at his prior job. (Doc. 1 at 6-7) Plaintiffs even allege that Cody confidentially encouraged reporter Zorn to start her own newspaper to compete with the MCR and he would invest with her. (Doc. 1 at 11) Plaintiffs make no factual allegation establishing any retaliatory animus by Cody toward Plaintiffs, only against Gruver. Once again, no viable First Amendment claim has been stated under the applicable *Smith* test. Thus, Plaintiffs' claims must be dismissed with prejudice. *Smith, Villarreal.*

## 2.    NO CLEARLY ESTABLISHED LAW SUPPORTS PLAINTIFFS' FIRST AMENDMENT CLAIMS SO CODY HAS QUALIFIED IMMUNITY

As an alternative basis for dismissal of Plaintiffs' First Amendment claims, Chief Cody is entitled to qualified immunity because Plaintiffs cannot identify any Supreme Court or Tenth Circuit case which clearly establishes a constitutional violation under even arguably similar alleged facts. *Wise v. Caffery* 72 F.4th 1199, 1209 (10th Cir. 2023). Indeed, the clearly established law is contrary to Plaintiffs' contentions. *See Smith, Villarreal, Dahlstrom.* In the case at bar, the law is certainly not "settled" in Plaintiffs' favor. *Id.* Therefore, Cody is entitled to qualified immunity barring Plaintiffs' First Amendment claims. *Id.*

## V.    CONCLUSION

For the reasons stated herein, Defendant Gideon Cody requests the Court enter judgment against Plaintiffs as to all the claims in their Complaint, dismiss Defendant Cody from this action with prejudice and for any further relief the Court deems just and proper.

Respectfully submitted:

/s/Edward L. Keeley
Edward L. Keeley, #09771
Jennifer M. Hill, #21213
MCDONALD TINKER PA
300 West Douglas Avenue, Suite 500
Wichita, Kansas 67202
T: (316) 263-5851; F: (316) 263-4677
E: ekeeley@mcdonaldtinker.com
E: jhill@mcdonaldtinker.com
*Attorneys for Defendant Gideon Cody*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 31st day of May 2024, a true and correct copy of the above and foregoing **Defendants' Memorandum in Support Motion to Dismiss** was electronically filed with the United States District Court via the CM/ECF system, which will provide electronic notice to all attorneys of record:

Jeffrey L. Kuhlmann
WATKINS CALCARA, CHTD.
1321 Main Street – Suite 300
P.O. Drawer 1110
Great Bend, Kansas 67530
Tel: (620) 792-8231
Fax: (620) 792-2775
Email: jkuhlman@wcrf.com
*Attorneys for Defendants The Board of
County Commission of Marion County, KS,
Sheriff Jeff Soyez, Aaron Christner*

Bernard J. Rhodes
Emma C. Halling
Lathrop GPM, LLP
2345 Grand Blvd., Ste. 2200
Kansas City, MO 64108
*Attorney for Plaintiffs*

/s/Edward L. Keeley
Edward L. Keeley, #09771