IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ERIC MEYER, individually and as executor of the estate of Joan Meyer, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE HOCH PUBLISHING CO., INC., doing business as the Marion County Record, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 24-cv-02122-DCC-GEB |
| v. | ) | |
| | ) | |
| CITY OF MARION, KANSAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT
BY DEFENDANTS MAYFIELD, HUDLIN AND CITY OF MARION, KS**

Defendants David Mayfield, Zach Hudlin and the City of Marion, Kansas, by and through their counsel of record Edward L. Keeley and Jennifer M. Hill of McDonald Tinker PA, submit this legal memorandum in support of these Defendants' motion to dismiss. Plaintiffs' Complaint (Doc. 1) alleges that these Defendants violated Plaintiffs' rights under the First and Fourth Amendments of the U.S. Constitution. However, Plaintiffs' theories of recovery under 42 U.S.C. §1983 and the Privacy Protection Act fail to state any viable cause of action against these Defendants as a matter of law. Moreover, Mayfield and Hudlin are entitled to qualified immunity. Plaintiffs' Complaint also blatantly violates Fed. R. Civ. P. 1 and 8. Thus, Mayfield, Hudlin, and the City of Marion request that the Court dismiss Plaintiffs' claims with prejudice.

## **TABLE OF CONTENTS**

I.     Nature of the Case ............................................................................2

II.    Plaintiff's Factual Assertions. ..........................................................3

A.   General Background. ....................................................................................3
B.   Kari Newell's Driver's Records ..................................................................4
C.   The Investigation .........................................................................................9
D.   Execution Of The MCR Search Warrant ..................................................12
E.   Execution Of The Meyer Residence Search Warrant..................................13

III.   Issues...................................................................................................................15

IV.   Arguments and Authorities ..........................................................................16

A. Plaintiffs Have Not Stated Any Plausible §1983 Claim Against These
Defendants Under *Twombly* .......................................................................16
B. Plaintiffs' First And Fourth Amendment §1983 Claims Against Defendant
Mayfield Are Barred By Qualified Immunity .............................................18
C. Plaintiffs' First And Fourth Amendment §1983 Claims Against Defendant
Hudlin Are Barred By Qualified Immunity..................................................18
D. Plaintiffs' Have Not Stated Any Viable §1983 Conspiracy Claim Against The
Individual Defendants...................................................................................19
E. Plaintiffs' §1983 Claims Against The City Of Marion Should Be Dismissed
For Failure To State A Viable Cause Of Action...........................................20
F. Plaintiffs' Claim Under The Privacy Protection Act (PPA) Against The City Is
Not Viable.....................................................................................................22
G. This Court Does Not Have Subject Matter Jurisdiction Over Plaintiffs' KORA
Claim.............................................................................................................23
H. Plaintiffs' Miscellaneous Claims Are Not Viable .........................................24

Conclusion ............................................................................................................25

# I.   NATURE OF THE CASE

The Plaintiffs (Eric Meyer, the Estate of Joan Meyer, and Hoch Publishing Co. (d/b/a *Marion County Record*) allege that these Defendants violated their rights under the First and Fourth Amendments during August 2023 in Marion, Kansas when law enforcement officers obtained and executed search warrants (approved by a neutral judge) at the MCR office and Eric Meyer's residence. This case is brought pursuant to 42 U.S.C. §1983 and the Privacy Protection Act (PPA). These Defendants deny Plaintiffs' claims and assert qualified immunity and the failure to state a

plausible claim under *Twombly*. They request that the Court dismiss all claims against them with prejudice.

## II.    PLAINTIFF'S FACTUAL ASSERTIONS

Plaintiffs have asserted **718** paragraphs (**125** pages) of factual and legal allegations in their Complaint. (Doc. 1) Many of these assertions do not pertain to these Defendants or the claims against them but rather to the claims against other Defendants. The factual and legal allegations irrelevant to these Defendants will not be discussed herein.

For purposes of this motion only, Plaintiffs' non-conclusory factual allegations may be assumed to be true. *Ashcroft v. Iqbal*, 556 U.S. at 679-680. However, their conclusory assertions of purported fact or law may not be considered by the Court in deciding this motion. *Id.* Moreover, relevant facts may be established herein by a) documents referred to in Plaintiffs' Complaint if the documents are central to Plaintiffs' claims and/or b) by documents which are subject to judicial notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The Court may consider such evidence without converting this motion to dismiss into a summary judgment motion. *Id.*

### A.    General Background (Paragraphs From Plaintiffs' Complaint)

**¶5. Marion is in south central Kansas and has a population of less than 2,000 people. (Doc. 1 at 3)**

**¶6. During the period at issue, Defendant David Mayfield was the Mayor of Marion. Mayfield is a former Kansas Highway Patrol Trooper and former Police Chief of Marion who works part-time transporting prisoners for Sheriff Jeff Soyez. (*Id.*)**

**¶9-11. In late 2022, the Marion Police Chief quit. Mayor Mayfield asked Sheriff Soyez to help Mayfield to find a new Police Chief. (*Id.* at 4)**

**¶13-14. Soyez was a friend of Gideon Cody who was a Captain in the Kansas City**

Missouri Police Department (KCMPD). Soyez encouraged Cody to apply for the Marion Police Chief position. (Id.)

¶15-16. Defendant Cody applied to be Marion Police Chief in April 2023. Sheriff Soyez strongly urged Mayor Mayfield to hire Cody. (*Id.*)

¶21-24. The *Marion County Record* (MCR) is a weekly newspaper published in Marion. The newspaper is owned by Plaintiff Hoch Publishing Co., Inc. Since 2006, Hoch Publishing Company has been primarily owned by Joan Meyer (Joan) and her son, Plaintiff Eric Meyer (Meyer). (*Id.* at 5-6)

¶25. Eric Meyer returned to Marion at the outset of the Covid-19 pandemic to take care of Joan. Eric became the editor and publisher of the MCR in 2021. (*Id.* at 6)

¶28. When Cody became a candidate for the Marion Police Chief job, an MCR reporter (Deb Gruver) began investigating allegations of misconduct by Cody at the KCMPD. (*Id.*)

¶36. Reporter Deb Gruver was investigating the allegations of Cody's misconduct. (*Id.* at 7)

¶40-42. Mayor Mayfield offered the Police Chief position to Defendant Cody in May 2023. Chief Cody was hired by the Marion City Council at a meeting on May 30, 2023. (*Id.* at 8)

¶60. Kari Newell (Newell) owned a coffee shop and restaurant in Marion. (*Id.* at 11)

¶64-65. On August 1, 2023, Newell and Chief Cody asked Eric Meyer and reporter Phyllis Zorn to leave an event involving Congressman Jake LaTurner which Newell was hosting at her coffee shop. (*Id.* at 12)

B.   Kari Newell's Driver's Records

¶68. The following day, Wednesday, August 2, 2023, *Marion County* Record reporter Phyllis Zorn received a message via Facebook about Newell. (*Id.* at 13)

¶69. The tipster (Pam Maag) stated that Newell's driver's license was suspended due to a prior DUI conviction. (*Id.*)

¶70. Maag also told Zorn that local law enforcement had known for years that Newell was driving without a valid driver's license, but had taken no action against Newell.

¶71. That same day, Maag sent Zorn, via Facebook messenger, a copy of an August 1, 2023 letter from the Kansas Department of Revenue to Newell ("the KDOR letter"). (*Id.*)

¶72. The header to the message shows it was received by Zorn on August 2, 2023. (*Id.*)

¶73. And the footer shows the letter was received as an attachment to a message sent via Facebook Messenger. (Id.)

¶74. The KDOR letter is addressed to Newell and includes Newell's full name, address, driver's license number and date of birth (to comply with this Court's redaction rules, all but the last four of Newell's driver's license number and all but the year of her birth have been redacted; that information was not redacted from the letter provided to Zorn by her source)[1] (*Id.* at 13-14)

Driver Solutions
300 SW 29th Street
PO Box 12021
Topeka KS 66601-2021
Mark A. Burghart, Secretary

**Kansas**
Department of Revenue
*Division of Vehicles*

Telephone: (785) 296-3671
Fax: (785) 296-6851
www.ksrevenue.gov
Laura Kelly, Governor

08/01/2023

NEWELL KARI ANNE

DL Number: ████5505
Date of Birth: ████1977

---

[1] Also redacted in this motion to dismiss is Newell's address pursuant to the Driver's Privacy Protection Act (DPPA).

¶75. The KDOR letter set forth various requirements Newell would have to meet in order to restore her driving privileges, including having an ignition interlock device installed on her car. (*Id.* at 14)

¶76. Zorn printed the copy of the letter from Facebook and shared it with Eric Meyer. (*Id.*)

¶77. After talking to Zorn and reviewing the letter, Meyer had several questions, including, how did the source obtain the letter and why had local law enforcement allowed Newell to drive for years without a valid license? (*Id.*)

¶78. Meyer's first question, *i.e.*, how did the source obtain the letter, was of interest to Meyer because Meyer knew the source (Maag) had law enforcement connections and Meyer wondered whether the source had obtained the letter illegally. (*Id.* at 15)

¶79. The second question, *i.e.*, why had local law enforcement allowed Newell to drive for years without a valid license, was only triggered if the information about Newell's driver's record was true. (*Id.*)

¶80. Maag had told Zorn that she (Zorn) could confirm the status of Newell's license through the Department of Revenue website, by using Newell's name, address, driver's license number, and date of birth-all of which were on the letter from the Department of Revenue. (*Id.*)

¶81. Maag also told Zorn she could obtain a copy of the August 1, 2023, letter from the Kansas Department of Revenue to Newell from the same website. (*Id.*)

¶82. The following day, Thursday, August 3, 2023, Meyer located the webpage titled "Kansas Driver's License Status Check" on the Kansas Department of Revenue (KDOR) website by performing a simple Google search. (*Id.*)

¶83. The tool allows anyone to check the status of a Kansas driver's license so long as the person knows the driver's license number, first and last name, and date of birth of the driver they are checking on. (*Id.*)

¶84. This public-facing webpage does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site. (*Id.* at 16)

¶85. In fact, the "Disclaimer" on the website merely warns users that the information "is a summary only and will not display any sanctions from another state." (*Id.*)

¶86. Using the information from the August 1 Department of Revenue letter which Maag had provided Zorn, *i.e.*, Newell's first and last name, address, driver's license number, and date of birth, Meyer used the Kansas Driver's License Status Check tool on the webpage to confirm Newell's DUI conviction and the fact Newell's license was suspended. (*Id.*)

¶87. Meyer did not, however, see the August 1 letter from the Kansas Department of Revenue to Newell which Maag had provided via Facebook Messenger. (*Id.*)

¶88. The next day, Zorn called the Department of Revenue and was told the document was available on the same public-facing website, a user simply must keep clicking to find the link. (*Id.)*

¶89. Zorn then went to the same website Meyer had used and saw that at the bottom of the screen showing Newell's DUI conviction and suspension there was a box to click to view "Documents." (*Id.*)

¶90. When Zorn clicked on that box, a form appeared on the webpage and asked for "Requester's Information." (*Id.* at 17)

¶91. Zorn then inserted her own name (*i.e.*, Phyllis Zorn) in to the form. (*Id.*)

¶92. Zorn then entered Newell's driver's license number and address. (*Id.*)

¶93. The Kansas Driver's License Status Check tool on the webpage then required Zorn to check a box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)." (*Id.*)

¶94. After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen-the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell, *i.e.*, the same document Maag had previously provided Zorn. (*Id.*)

¶95. Having confirmed that the document Maag had provided was legitimate, Zorn informed Meyer that she had verified that the information (and document) provided by Maag was accurate. (*Id.*)

¶123-124. Meyer "ultimately" decided not to publish Newell's KDOR information because Meyer believed the newspaper was being drawn into a bitter divorce between Newell and her estranged husband. (*Id.* at 23)

¶127-129. On Friday, Aug. 4, Meyer emailed Chief Cody and Sheriff Soyez and advised them that a "confidential source" had provided the MCR with a KDOR letter addressed to a "Marion County business woman" recently in the news. Meyer did not identify the MCR's source. Meyer said the KDOR letter disclosed the steps needed to reinstate the business woman's drivers license, including installing an ignition interlock device. (Id. at 24) (See Meyer email in Exh. 1; Complaint reference; Gee)

¶138-139. Also on August 4, the Marion Vice Mayor, Ruth Herbel (Herbel) sent an email to the Marion City Administrator. Attached to Herbel's email was a screenshot of the

same KDOR letter to Newell which reporter Zorn has received from Maag. (Doc. 1 at 25) (See redacted KDOR letter screenshot at ¶74 above)

¶140. Herbel advised the City Administer that Herbel had received Newell's KDOR letter from Maag. (Doc. 1 at 25)

¶142. The City Administrator forwarded Herbel's email (with Newell's KDOR letter) to Mayor Mayfield. (Id. at 26)

¶146. Mayor Mayfield and Herbel had often verbally attacked one another in the MCR. (Id. at 27)

¶176. On August 7, Mayor Mayfield directed Chief Cody to begin an investigation into Herbel and the MCR. (Id. at 34)

C.     The Investigation.

¶176A. On Monday, August 7, Chief Cody directed Officer Zach Hudlin to contact the Kansas Department of Revenue (KDOR) regarding how someone would be able to acquire a copy of a letter to someone else about their driver's license. Hudlin made contact with a representative in KDOR's information technology department. Hudlin gave the KDOR representative the information for Kari Newell. The KDOR representative advised that on Friday, Aug. 4, Newell's driver's license information was accessed on a KDOR website by someone identifying themselves as "Phyllis Zorn." Three minutes later that information was accessed by someone identifying themselves as "Kari Newell." (Hudlin memo in Exh. 2; referenced in MCR search warrant application; *Gee*)

¶176B. On August 9, Kari Newell provided Chief Cody with a written statement in which she described a phone call with Eric Meyer on Aug. 7 at around 7:01 p.m. Newell stated that Meyer admitted Phyllis Zorn had downloaded Newell's KDOR letter and that

was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant." (Newell's written statement in Exh. 3; referenced in MCR search warrant application; Gee)

¶199-201. Also on Aug. 9, Sheriff Detective Aaron Christner drafted an application for a search warrant for the MCR office and forwarded the draft to Cody. Because he had not conducted the investigation, Christner indicated he would not sign the application himself. (Doc. 1 at 37)

¶222. On Thursday, Aug. 10, Cody had taken Christner's draft and prepared search warrant applications for the MCR office and for the residences of Herbel and Maag. (Id. at 43)

¶224. Later on August 10, Cody discussed the draft applications with Sheriff Soyez and a decision was made to also prepare a search warrant application for the residence shared by Eric Meyer and his mother, Joan. (Id.)

¶224A. On the morning of Friday, August 11, Chief Cody presented his nine-page affidavit to Magistrate Judge Laura Viar in an application requesting issuance of the search warrant for the MCR offices. Cody's affidavit stated in part that he had probable cause to believe and did believe that the crimes of identity theft (KSA 21-6107) and unlawful acts concerning computers (KSA 21-5839) had been committed and that evidence of such criminal offenses was located in the MCR offices. (MCR search warrant application in Exh. 4; Complaint reference; *Gee*) Cody also submitted a virtually identical search warrant application to Judge Viar for the search of the Meyer residence. (Meyer Search Warrant application in Exh. 6; Complaint reference, *Gee*)

¶224B.To establish probable cause for the search, Cody's affidavit listed the following information in the search warrant applications (Exh. 4 and 6):

a) The August 4 email from Meyer in which Meyer stated he received a copy of someone's private KDOR records (Exh. 1);

b) The August 4 email from Herbel to the City Administrator which contained a screenshot of Newell's KDOR letter;

c) Newell told Cody that Newell had not given anyone permission to open or access her mail;

d) KDOR advised police that the individuals who downloaded the Newell letter from the KDOR website were "Phyllis Zorn" and "Kari Newell". Newell's name was used three minutes after Zorn's was used. (Exh. 2);

e) Cody contacted Newell again who said she did not download or authorize anyone to download her letter from the KDOR website;

f) On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7 around 7:01 pm. Newell stated that Meyer admitted Zorn had downloaded Newell's KDOR letter and that was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant." (Newell's written statement in Exh. 3; referenced in MCR search warrant application; *Gee*);

g) In a newspaper article published on August 9, Meyer wrote that the MCR received Newell's KDOR letter from a "source" and verified that it was accurate and obtained from a "public website.";

h) Under the federal DPPA, personal information obtained by KDOR cannot be released unless the request for that information falls within one of the exceptions within that Act.

¶224C. Judge Viar signed Cody's applications for the search warrants at the MCR and Meyer residence which shows that they were subscribed and sworn to before her. (Exh. 4 at 9; Exh. 6 at 9).

¶224D. On August 11 at about 9:00 a.m., Judge Viar signed Cody's requested search warrants for the MCR and Meyer residence. The Court found that there was probable cause to believe that crimes had been committed in violation of K.S.A. 21-6107 and 21-5839 and that evidence of the offenses could be found at those locations. The search warrants further commanded that the listed items of evidence (including computers and cellular devices, as well as documents pertaining to Newell) could be seized. (Exh. 5 and 7).

### D.   Execution of the MCR Search Warrant

¶260. On Friday, August 11, Chief Cody led a team of law enforcement officers in executing search warrants at the MCR office and the residences of Meyer and Herbel. (Doc. 1 at 48)

¶261. The first search occurred at the MCR office led by Chief Cody who was assisted by Marion officers Hudlin and Benavidez, as well as Sheriff detectives Christner and Janzen. (Id.)

¶266-268. Detective Christner conducted or attempted to conduct a "preview search" on reporter Zorn's work computer utilizing special software. (Id. at 50)

¶277-281. The preview search was unsuccessful in obtaining evidence of the download of Newell's KDOR letter. (Id. at 52-53)

¶288-291. During the MCR search, Officer Hudlin brought to Cody's attention a file in reporter Gruver's desk labeled "Capt. Gideon Cody." (Id. 54-55)

¶297-298. According to the log created by the special software, Detective Christner began his preview search at 11:11:57 a.m. and completed it at 12:32:05 p.m. (Id. at 57)

¶301-302. After Cody talked to Sheriff Soyez by phone, Cody decided not to conduct a "preview search" on the other work computers in the MCR office but rather to seize them all, including Zorn's. (Id. at 58)

¶306-307. Chief Cody directed that Meyer's work computer and the work computers of reporters Deb Gruver and Zorn be seized without a preview search. The network file server was also seized. Officer Hudlin physically removed this equipment from the MCR office. (Id. at 59) Also found and seized in the MCR office was a hard copy of Newell's KDOR letter. (MCR items seized in Exh. 9, Judicial notice, *Gee*)

E.    Execution of the Meyer Residence Search Warrant.

¶327-330. At the same time as the MCR office search was being conducted, law enforcement officers Chris Mercer and Matt Regier went to the house of Joan and Eric Meyer. When Eric Meyer came to the door, he was handed the search warrant for his residence. He objected but the officers entered the home. (Id. at 63) (*See also* Meyer residence search warrant in Exh. 7)

¶331-335. Deputy Regier demanded that Eric Meyer turn over his cell phone. Despite Eric's repeated objections, Regier seized Meyer's cell phone. (Id. at 64)

¶336-337. Joan Meyer, Eric's 98-year-old mother, came out from her bedroom using a walker. The two officers said they had to wait for Chief Cody to arrive before they could conduct the search of the residence. (Id. at 65)

¶338-343. **During the two and one-half hours before Cody arrived, Joan became increasingly upset at the presence of the officers. At times she cried. (Id. at 65-66)**

¶344-351. **Because he could not reach any of the MCR staff by telephone, Eric walked to the MCR office. At the MCR, Chief Cody told Meyer that he could only enter the MCR for the purpose of being Mirandized and questioned. Meyer said he needed access to the phone number of his attorney which was in the office. After being denied access, Eric waited outside the MCR for the search to end. (Id. at 66-67)**

¶357. **When the MCR search ended, Chief Cody and four officers went to the residence of Eric and Joan Meyer to execute that search warrant. Officers Regier and Mercer were still there. (Id. at 68)**

¶358-359. **At that location, Cody told Deputy Christner not to take time to do a "preview search" of the computers and cell phones at the residence. Officer Hudlin took the devices. (Id. at 68-69)**

¶360-363. **At the Meyer residence, Joan became upset when she was told the home computer would be taken. During a verbal exchange with Chief Cody, Joan shouted, "Get out of my house!" (Id. at 69)**

¶369-370. **At the Meyer residence, officers took (without a preview search) Joan's computer, Eric's laptop and Eric's cell phone, along with a portable hard drive and router. (Id. at 71) Also found and seized at that location was a hard copy of Newell's KDOR letter. (Meyer residence items seized in Exh. 10; Judicial notice; *Gee)***

¶372-374. **During the search of the Meyer residence, Joan made statements to the officers such as, "You know, if I have a heart attack and die, it's going to be all your fault; I've had two of 'em already." (Id. at 71-72)**

¶378. After all the searches were completed, Cody debriefed Sheriff Soyez at the Sheriff's Office while sharing pizza. (Id. at 73)

¶391-395. Tragically Joan Meyer died of a sudden cardiac arrest on August 12, 2023. (Id. at 75-76)

¶396-398. On August 13, the KBI issued a statement that it was taking over the investigation. On August 15, Cody and Detective Christner exchanged drafts of probable cause affidavits supporting arrest warrants for Zorn, Eric Meyer, and Herbel. (Id. at 76)

¶400-401. On August 16, Joel Ensey (Marion County Attorney) filed a motion to release the items seized during the searches. The District Judge, Benjamin Sexton, granted Ensey's motion the same day. In press release, the County Attorney stated that insufficient evidence existed to establish "a legally sufficient nexus" between the crimes being investigated and the places searched and the items seized. (Id. at 77) In the same press release, however, the County Attorney stated his belief that Chief Cody's affidavit "established probable cause to believe that an employee of the newspaper may have committed the crime" prohibited by K.S.A. 21-5839 relating to computers. (Ensey press release in Exh. 8; Complaint reference; *Gee*).

¶405-406. Later on August 16, a forensic examiner retained by the MCR took possession of all the seized items at the Sheriff's Office. This transfer of property was personally supervised by the Sheriff. (Doc. 1 at 77)

¶416-418. On August 29, the contents of the "preview search" of Zorn's work computer was released to the MCR after a second court order. (Id. at 80)

III.   ISSUES

    A.    Have Plaintiffs Stated Any Plausible §1983 Claim Against Mayfield, Hudlin Or The City Under *Twombly*?

**B.**     Are Plaintiffs' First and Fourth Amendment Claims Against Defendant Mayfield Barred By Qualified Immunity?

**C.**     Are Plaintiffs' First and Fourth Amendment Claims Against Defendant Hudlin Barred By Qualified Immunity?

**D.**     Have Plaintiffs Stated Any Viable §1983 Conspiracy Claim Against The Individual Defendants?

**E.**     Does Plaintiffs' §1983 Theory Of Recovery Against The City Of Marion Fail To State Any Viable Claim?

**F.**     Does Plaintiffs' PPA Claim Against The City State A Viable Claim?

**G.**     Is Plaintiff's Claim Under The Kansas Open Records Act (KORA) Viable?

## IV.    ARGUMENTS AND AUTHORITIES

### A.     <u>Plaintiffs' Have Not Stated Any Plausible §1983 Claim Against These Defendants Under *Twombly*</u>

To avoid a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual allegations, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal.* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 570 (2007)). In other words, "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

The Tenth Circuit has construed the *Twombly* court's use of the term "plausible" to refer to "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' " *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 127 S. Ct. at 1874). This requirement of plausibility not only weeds out claims that do not have a reasonable chance of success but also serves to give defendants fair notice of the factual grounds for each

claim. *Id.* at 1248.

In §1983 cases, the *Twombly* pleading standard requires specific plausible allegations against each individual defendant:

> In §1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore, it is particularly important in such circumstances that the complaint make clear exactly <u>who</u> is alleged to have done <u>what</u> to <u>whom</u> to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

*Robbins,* 519 F.3d 1249-50 (emphasis in original) (citing *Twombly*, 127 S. Ct. at 1970-71 n. 10.).

The Tenth Circuit applies a two-step process when analyzing a motion to dismiss under *Twombly* and *Iqbal. Hall v. Witteman,* 584 F.3d 859, 863 (10th Cir. 2009). First the court must identify conclusory allegations not entitled to the assumption of truth. *Id.* "Thus, mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, L.L.C. v. Collins,* 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). Second, the court must determine whether the remaining factual allegations plausibly suggest the plaintiff is entitled to relief. *Hall*, 584 F.3d at 863. "In other words, a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming,* 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555).

In the case at bar, Plaintiffs' conclusory claims against Defendants Mayfield, Hudlin and the City of Marion utterly fail the pleading standard required by *Twombly* and *Iqbal*. First, Plaintiffs' allegations against these Defendants are almost entirely conclusory assertions "not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679-680. Second, Plaintiffs' few factual allegations are insufficient to raise Plaintiffs claims "above the speculative level" with respect to Mayfield, Hudlin, and the City. (*Id.*) Thus, they have not been given fair notice of the factual basis

of the claims against them. (*Id.*) Therefore, these Defendants are entitled to dismissal pursuant to Rule 12(b)(6) because no plausible §1983 claim has been made against them. *Twombly, Iqbal, Robbins.*

**B.   Plaintiffs' First And Fourth Amendment §1983 Claims Against Defendant Mayfield Are Barred By Qualified Immunity.**

Plaintiffs assert conclusory claims that Defendant Mayfield violated their First and Fourth Amendment rights. However, they only factually allege that 1) Mayfield was Mayor; 2) Mayfield and Ruth Herbel (Vice Mayor) didn't like each other; and 3) Mayfield authorized Chief Cody to investigate after Herbel sent Kari Newell's confidential KDOR letter to the City Administrator. Plaintiffs do <u>not</u> allege that Mayfield had any personal involvement in Cody's investigation; in the preparation of Cody's MCR or Meyer residence search warrant applications; in the preparation of the search warrants themselves or in the execution of the search warrants. Thus, Plaintiffs' allegations do not state any viable First Amendment or Fourth Amendment claims against Defendant Mayfield. He is also entitled to qualified immunity because the law was not clearly established as Plaintiffs contend to render Mayfield liable. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (individual liability under §1983 requires personal involvement); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (an affirmative link must exist between the defendant's conduct and the alleged constitutional violation).

**C.   Plaintiffs' First And Fourth Amendment §1983 Claims Against Defendant Hudlin Are Barred By Qualified Immunity**

Plaintiffs assert conclusory claims that Defendant Hudlin violated their First and Fourth Amendment rights. However, they only factually allege that 1) Hudlin was a Marion police officer; 2) Hudlin participated in the execution of the search warrants; 3) Hudlin searched the MCR office, including the desk drawer of reporter Deb Gruver; 4) Hudlin brought it to the attention of Chief

Cody that Gruver had a file regarding Cody's alleged misconduct; 5) Hudlin complained that Detective Christner's "preview search" of Zorn's work computer was taking too long, and 6) Cody directed Hudlin to seize the electronic devices at the MCR and Meyer residence.

These few conclusory allegations do not state any viable §1983 First or Fourth Amendment claims by Plaintiffs against Defendant Hudlin. He was merely an assisting officer. Hudlin is also entitled to qualified immunity because the law was not clearly established as Plaintiffs contend. *Wigley v. City of Albuquerque*, 567 Fed. Appx. 606, 609-610 (10th Cir. 2014)(officer assisting in executing a search warrant is entitled to rely on the presumed validity of the search warrant procured by another officer); *Harte v. Board of Commissioners of Johnson County*, 2017 WL 5068907 at 6 (D. Kan.) (same); *Smith v. Plati,* 258 F.3d 1167, 1176-1178 (10th Cir. 2001) (three-pronged test for First Amendment liability must be satisfied to state a viable claim).

> **D.**    **Plaintiffs' Have Not Stated Any Viable §1983 Conspiracy Claim Against The Individual Defendants**

Plaintiffs allege that all of the individual Defendants in this case conspired with one another to violate their First and Fourth Amendment rights. However, Plaintiffs' §1983 conspiracy claim fails to state any viable cause of action against any of these Defendants, including Mayfield, Hudlin and Cody. *Tankovich v. Kansas Board of Regents,* 159 F.3d 504, 533 (10th Cir. 1998). For such a claim to be actionable, "a plaintiff must allege facts showing an agreement and concerted action amongst the defendants." *Id.* Conclusory allegations are insufficient. *Id*; *see also Banks v. Opat,* 814 Fed Appx. 325 (10th Cir. 2020) (a plaintiff must plead and prove not only a conspiracy but also an actual deprivation of rights); *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-1228 (10th Cir. 2010) (there must be an allegation of an agreement among the defendants regarding a general unlawful conspiratorial objective which is accomplished). No cognizable conspiracy claim has been stated here. *Id.* This was simply a police investigation in which probable cause of federal and state law

crimes existed, and the officers worked together to execute the resulting search warrants.

In the case at bar, Plaintiffs have failed to allege facts to show: a) an agreement among the individual Defendants; b) to achieve a general unlawful objective relating to Plaintiffs'; c) which resulted in the actual deprivation of Plaintiffs' constitutional rights. Therefore, no viable §1983 conspiracy cause of action has been stated against Mayfield, Hudlin or Cody. *Tankovich, Banks, Brooks*. These Defendants also are entitled to qualified immunity on this claim because the law was not clearly established as Plaintiffs contend to render Defendants liable. *Id.*

### E.   Plaintiffs' §1983 Claims Against The City Of Marion Should Be Dismissed For Failure To State A Viable Cause Of Action

Plaintiffs are making a conclusory §1983 municipal liability claim against the City of Marion. Before the City of Marion may be held liable under these theories, Plaintiffs must show that a City policy or custom was the "moving force" behind the violation of their constitutional rights. *Hinkle v. Beckham County Board of County Commissioners,* 962 F.3d 1204, 1239-1242 (10th Cir. 2020). Specifically, Plaintiffs must establish: a) an official policy or custom, b) causation, and c) the requisite state of mind (deliberate indifference) of the policy maker. *Burke v. Regalado*, 935 F. 3d 960, 998 (10th Cir. 2019).

One of Plaintiffs' §1983 municipal liability theories against the City of Marion is based on the conclusory assertion that the City failed to train its police officers as to the protections guaranteed under the First and Fourth Amendment. However, Plaintiffs' Complaint is devoid of any alleged facts to show what specific training supposedly was not given that should have been or how the purported lack of training caused Plaintiffs' alleged constitutional injuries. *Hinkle, Burke.* Nor are any facts alleged to show that the lack of training was motivated by deliberate indifference. *Id.*

Indeed, Plaintiffs' §1983 municipal liability claim is foreclosed by Tenth Circuit precedent.

In *Waller v. City and County of Denver,* 932 F.3d 1277, (10th Cir. 2019), §1983 municipal policy or custom claims were made by the plaintiff against the defendant municipality. The *Waller* court stated that such claims may only be established in the following ways:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions-and the basis for them-of subordinates to whom authority was delegated subject to these policymakers' review and approval; (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* at 1283 (quoting *Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010)).

The *Waller* court further noted that even after establishing that an alleged improper municipal policy or custom exists, a plaintiff must also show "deliberate indifference" by the final policymaker, as well as a "direct causal link" (causation) between the municipal policy/custom and the injury alleged. *Id.* at 1284. Usually deliberate indifference may not be found absent a pattern of unconstitutional behavior. *Id.* A municipality may not be held liable under §1983 simply because it employed an employee or employees who violated a plaintiff's constitutional rights. *Id.*

Plaintiffs' conclusory §1983 policy or custom theory against the City of Marion in the case at bar fails for the same reasons stated in *Waller.* To generally assert that the City failed to properly hire, train, supervise, discipline and control their officers is legally insufficient. Plaintiffs have not alleged any facts (as opposed to conclusory assertions) to show an improper policy or custom, deliberate indifference, or causation with respect to the City of Marion. *Id.* Moreover, Plaintiffs' theory that the City "ratified" Hudlin's purported illegal acts when it appointed him acting Police Chief also fails to state any viable municipal

liability claim. *Waller*, 932 F. 3rd at 1289.

Therefore, the City of Marion is entitled to dismissal of Plaintiffs' §1983 municipal liability claim as a matter of law. *Id.* This would also include Plaintiffs' "official capacity" claims against Defendants Mayfield, Hudlin, and Cody. *Douglas v. Garden City Community College*, 543 F. Supp. 3d 1043, 1058-1059 (D. Kan. 2021) (official capacity claims are duplicative of municipal liability claims). Furthermore, Plaintiffs' §1983 claim against the City of Marion fails as a matter of law because Plaintiffs' constitutional rights were not violated by any City official or employee. *Rowell v. Board of County Commissioners*, 978 F. 3d 1165, 1175 (10th Cir. 2020).

**F.**     **Plaintiffs' Claim Under The Privacy Protection Act (PPA) Against The City Is Not Viable**

Plaintiffs' assert a PPA claim against the City of Marion. (Doc. 1 at 114-119). *See also* 42 U.S.C. §2000aa. However, their theory of recovery is not viable because it fails to state a cognizable cause of action under these facts.

The *prima facie* elements of a PPA claim which Plaintiffs must prove are as follows:

> (1) a government officer or employee, (2) in connection with the investigation or prosecution of a criminal offense, (3) searched for or seized (a) work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication; or (b) documentary materials possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication; (4) in or affecting interstate or foreign commerce. 42 U.S.C.§2000aa. *See Vann v. City of Rochester*, 2019 WL 1331572 at 5 (W.D.N.Y.).

Plaintiffs cannot show the following elements: a) that the officers searched for or seized "work product materials", b) which were possessed by Plaintiffs, c) whom the officers reasonably believed had a purpose of public dissemination, or d) "documentary materials" possessed by Plaintiffs with a purpose of public dissemination. 42 U.S.C. §2000aa.

First, "work product materials" are materials (*other than property used to commit a crime*) which are to be communicated to the public and contain the author's, opinions, conclusions or theories. 42 U.S.C. §2000aa-7(b) Because the officers were searching for evidence of the KDOR letter with the DPPA protected personal information of Kari Newell (a crime), the "work product" element of a PPA claim is not met. *Id.*

Second, "documentary materials" include materials like notes, photographs or tapes (*other than property used in a criminal offense).* 42 U.S.C. §2000aa-7(a). Thus, the alternative "documentary materials" element of a PPA claim is not met. *Id.*

Finally, the PPA's prohibition does not apply when the possessor of the materials searched for or seized is a criminal suspect (rather than an innocent third party) and police have probable cause. 42 U.S.C. §2000aa(a)(1). This is known as the suspect exception. *Guest v. Leis*, 255 F.3d 325, 341-342 (6th Cir. 2001)(no PPA liability if protected materials are commingled on a suspect's computer with criminal evidence); *Sennett v. U.S.,* 667 F. 3d 531, 536-537 (4th Cir. 2012) (Congress declined to exclude journalists suspected of a crime from the exception); *Pataky v. City of Phoenix,* 2009 WL 4755398 at 7-8 (D. Ariz. 2009) (website journalist was a suspect in a criminal investigation so the PPA does not apply). In the case at bar, Zorn and Meyer were criminal suspects (not innocent third parties). Moreover, the suspected crimes were committed on electronic devices at the MCR office and/or the Meyer residence. *Id.*

For all of these reasons, Plaintiffs fail to state a cognizable PPA claim in this case and their claim should be dismissed. *Guest, Sennett, Pataky.*

### G.   This Court Does Not Have Subject Matter Jurisdiction Over Plaintiffs' KORA Claim.

Plaintiffs also attempt to assert a state-law claim under the Kansas Open Records Act (KORA). *See* K.S.A. 45-215 *et seq.* However, it is firmly established that federal courts do not

have subject matter jurisdiction over such claims. *Newton v. City of Atchison, Kansas*, 2023 WL 8599377 at 16 (D. Kan.); *Robinson v. Wichita State Univ.*, 2018 WL 836294 at 22 (D. Kan.). Therefore, this claim should also be dismissed. *Id.*

    **H.**       <u>**Plaintiffs' Miscellaneous Claims Are Not Viable**</u>

Plaintiffs contend that the Kansas Shield Law (K.S.A. 60-480 et. seq.) is applicable to this case. It isn't. That law creates a privilege for journalists based on certain circumstances under the Kansas rules of evidence. *Id.* It is intended to require a hearing when a prosecutor or a third-party seeks to compel a journalist to disclose the journalists' work product gathered "for communication to the public." K.S.A. 60-480(b). It is certainly not intended to protect a journalist or newspaper editor from a search warrant seeking evidence (based on probable cause) of crimes committed by the journalist or the newspaper's editor. *Id.* In addition, the Kansas Shield Law does *not* create any cause of action for monetary damages if it is violated. *Id.*

Finally, Plaintiffs assert (without factual support) that Cody never appeared before Judge Viar because she scratched out "Notary" and signed the search warrant application herself. (Doc. 1 at 45-48) Plaintiffs contend this violated K.S.A. 53-5a606(a) and rendered the resulting search warrant void. (*Id.*) This is a specious argument for several reasons. First, state judges are expressly authorized to "swear in" witnesses without a separate notary present, K.S.A. 54-101. Second, Judge Viar did *not* cross out: "SUBSCRIBED and SWORN to before me." (*See* Exh. 4 at 9; Exh. 6 at 9) That indicates by implication that she did swear Cody in and that his affidavit was submitted under oath. (*Id.*) Third, Cody did sign the search warrant application. (*Id.*) Fourth, Plaintiffs' related argument that Judge Viar was biased because more than 10 years before she had been arrested for DUI is sheer speculation, not fact. Fifth, any procedural defect in the search warrant caused by Judge Viar would be her mistake, not Cody's. He would still be entitled to qualified

immunity for reasonably relying on the search warrant. *Wigley v. City of Albuquerque*, 567 Fed.
Appx. 606, 609-610 (10th Cir. 2014)

Therefore, Plaintiffs' theory of recovery based on a purported violation of K.S.A. 53-
5a606(a) fails to state any viable claim against Cody.

## V.   CONCLUSION

For the reasons stated herein, Defendants Mayfield, Hudlin, and the City of Marion request
that the Court enter judgment against Plaintiffs as to all the claims in their Complaint, dismiss
Defendants from this action with prejudice and for any further relief the Court deems just and
proper.

Respectfully submitted:

/s/Edward L. Keeley
Edward L. Keeley, #09771
Jennifer M. Hill, #21213
MCDONALD TINKER PA
300 West Douglas Avenue, Suite 500
Wichita, Kansas 67202
T: (316) 263-5851; F: (316) 263-4677
E: ekeeley@mcdonaldtinker.com
E: jhill@mcdonaldtinker.com
*Attorneys for Defendants Cody, Mayfield,
Hudlin & Marion*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of May 2024, a true and correct copy of the above and foregoing **Defendants' Memorandum in Support Motion to Dismiss** was electronically filed with the United States District Court via the CM/ECF system, which will provide electronic notice to all attorneys of record:

Jeffrey L. Kuhlmann
WATKINS CALCARA, CHTD.
1321 Main Street – Suite 300
P.O. Drawer 1110
Great Bend, Kansas 67530
Tel: (620) 792-8231
Email: jkuhlman@wcrf.com

Bernard J. Rhodes
Emma C. Halling
Lathrop GPM, LLP
2345 Grand Blvd., Ste. 2200
Kansas City, MO 64108
*Attorney for Plaintiffs*

/s/Edward L. Keeley
Edward L. Keeley, #09771