IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ERIC MEYER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-02122-DDC-GEB |
| | ) | |
| CITY OF MARION, KANSAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' COMBINED RESPONSE TO
DEFENDANTS' VARIOUS MOTIONS TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT

Bernard J. Rhodes- KS #15716
Emma C. Halling - KS #27924
2345 Grand Blvd., Ste. 2400
Kansas City, MO  64108
(816) 292-2000 – Telephone
(816) 292-2001 – Facsimile
bernie.rhodes@lathropgpm.com
emma.halling@lathropgpm.com

ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**

PAGE(S)

I.     Introduction ........................................................................................................ 5

II.    Summary of factual allegations in the First Amended Complaint ................................ 5

III.   Plaintiffs' First Amended Complaint complies with Rule 8 ........................................ 9

IV.    The proper Rule 12(b)(6) standard ............................................................................ 11

V.     Plaintiffs have stated a claim for a direct violation of the First Amendment ............ 13

       A.    The Tenth Circuit recognizes a claim for direct First Amendment violations ... 14

       B.    Plaintiffs were engaged in constitutionally protected activity ............................ 16

             1.    No one at the *Record* violated the Driver's Privacy Protection Act ........... 18

             2.    No one at the *Record* violated the Kansas motor vehicle records statute .... 20

             3.    No one at the *Record* committed computer tampering ............................... 20

             4.    No one at the *Record* committed identity theft ........................................... 21

       C.    Defendants' other arguments are without merit ................................................ 22

             1.    Plaintiffs' First Amendment rights were violated ........................................ 22

             2.    An ordinary person would be "chilled" ....................................................... 23

             3.    Sheriff Soyez' personal involvement ........................................................... 24

             4.    Det. Christner's personal involvement ........................................................ 25

             5.    Mayor Mayfield's personal involvement ..................................................... 25

             6.    Officer Hudlin's personal involvement ........................................................ 26

VI.    Plaintiffs have stated a claim for First Amendment Retaliation ................................ 26

       A.    Plaintiffs do not have to show a lack of probable cause .................................... 29

VII.   Plaintiffs have stated a claim for violation of the Fourth Amendment ...................... 31

       A.    The Tenth Circuit has repeatedly upheld the *Zurcher* requirements ................ 32

2

B.     Defendants' conduct is not excused by reason of the search warrants .............. 33

C.     Defendants' circular firing squad argument ...................................................... 37

D.     Defendants "grossly exceeded" the scope of the warrants ............................... 38

VIII.   Plaintiffs have stated a claim for conspiracy .................................................... 41

IX.    Plaintiffs have stated claims for individual liability .................................................. 43

A.     The brazenness of Defendants' conduct is not a 'Get out of jail free' card ....... 44

B.     The law was clearly established such that Defendants were on fair notice ....... 45

1.   The First Amendment protects the free press ................................................ 46

2.   The First Amendment guarantees the freedom of the press to gather news  46

3.   The First Amendment guarantees the right to view public records ............ 46

4.   Law enforcement cannot physically interfere with newsgathering ............ 46

5.   The First Amendment protects confidential sources .................................... 47

6.   The First Amendment prohibits retaliation .................................................... 47

7.   The First Amendment and Fourth Amendment ............................................. 47

8.   The warrant requirement .................................................................................. 47

9.   The probable cause requirement .................................................................... 48

10. The prohibition against false testimony ........................................................ 48

11. The oath or affirmation requirement ............................................................. 48

12. The prohibition against general searches ...................................................... 48

C.     Plaintiffs have pled the violation of federal rights ............................................. 49

X.     Plaintiffs have stated claims for municipal liability .................................................. 49

A.     Mayfield, Cody, and Soyez were final policymakers ......................................... 49

B.     The City and County's deliberate indifference to the need for training ............ 52

3

C.      The City ratified the actions of the officers ........................................................ 54

XI.     Plaintiffs have stated a claim for violation of the Privacy Protection Act .................. 55

A.      The "suspect exception" does not apply ........................................................... 55

B.      There is no "good faith" defense available to the City or the County ............... 56

C.      Both "work product materials" and "documentary materials" were seized ...... 58

XII.    Conclusion ............................................................................................................. 59

Plaintiffs Eric Meyer and the *Marion County Record* submit the following combined response to (a) the motion to dismiss of Defendants Sheriff Jeff Soyez, Det. Aaron Christner, and Marion County, Kansas (Docs. 55 & 56), (b) the motion to dismiss of Defendant Chief Gideon Cody (Docs. 57 & 58), and (c) the motion to dismiss of Defendants Mayor David Mayfield, Officer Zach Hudlin, and the City of Marion, Kansas (Docs. 59 & 60).

## I.     Introduction

Defendants' motions to dismiss are paradoxical. On the one hand, they complain that Plaintiffs included too many specific factual allegations in their First Amended Complaint, violating Rule 8. On the other hand, they disregard Plaintiffs' specific, well-pleaded allegations and ask this Court to dismiss Plaintiffs' claims under Rule 12(b)(6). As set forth below, Plaintiffs sufficiently—and properly—pled Defendants' participation in and liability for violating Plaintiffs' constitutional rights. Accordingly, Defendants' motions to dismiss constitute a false dilemma and should be denied.

## II.     Summary of factual allegations in the First Amended Complaint[1]

Last summer, then-Marion Police Chief Gideon Cody led a series of raids on the *Marion County Record*, on the home of the newspaper's co-owners, and on the home of the city's vice mayor. (Doc. 44 ¶ 1). The next day, one of the paper's co-owners, 98-year-old Joan Meyer, died of a "sudden cardiac arrest" caused by the stress of the two-plus hour raid on her home by seven armed officers. (Doc. 44 ¶ 2).

The ostensible reason for the raids was to look for proof that the newspaper and the vice mayor had committed "identity theft" when they obtained a record showing that a local

---

[1] This summary is provided as an aid to the reader and is not intended to be a complete recitation of the detailed factual allegations in the First Amended Complaint.

businessperson had been driving around town for more than a decade with a suspended driver's license. (Doc. 44 ¶¶ 689-694). Both the paper and the vice mayor had received the record via Facebook, and *Record* reporter Phyllis Zorn had used the "Driver's License Status Check" tool on the public-facing Kansas Department of Revenue website to verify the accuracy of the record. (Doc. 44 ¶¶ 68-75, 86-100, 140-41, 183).

When the Marion City Administrator first learned the vice mayor had obtained the record, he directed the police chief to stand down, saying that because driver's licenses are issued by the state, it was a state matter. (Doc. 44 ¶¶ 751-56). But then-Mayor David Mayfield overruled the city administrator and directed Chief Cody to open an investigation. The mayor could do this because he had "superintending control of all the officers and affairs of the city." (Doc. 44 ¶¶ 177-78).

Mayor Mayfield had spent the prior year trying to get the vice mayor—one of his fiercest critics—removed from office, including sponsoring a failed recall effort and trying to trick the vice mayor into signing a document saying she served at the will of the mayor. (Doc. 44 ¶¶ 151-168). Mayor Mayfield had also spent the prior year claiming that journalists are the "real villains" and had even publicly promised to "silence the MCR," *i.e.*, the *Marion County Record*, which frequently criticized the mayor (and supported the vice mayor). (Doc. 44 ¶¶ 157-58, 169-171).

Chief Cody was happy to follow the mayor's direction to open an investigation because the newly-hired chief detested the newspaper, which was investigating why he had left a job with the Kansas City, Missouri Police Department that had paid him $115,000 a year and took the chief's job in Marion—a town so small it doesn't have a stoplight—that paid him just $60,000. (Doc. 44 ¶¶ 28-37 43). Chief Cody was angry that the *Record* was pursuing stories about him and was afraid the paper would learn about his repeated episodes of misconduct in Kansas City. (Doc. 44 ¶¶ 33, 37).

News of the unprecedented raids caused international uproar. (Doc. 44 ¶ 582). Not only had officers searched the *Record*'s offices and the two homes, but they had also seized all of the newsroom's computers and its file server and had taken the phones of the paper's editor and all of the paper's reporters. (Doc. 44 ¶¶ 1, 329-30, 355). They did this even though the search warrants explicitly required officers to conduct a "preview search" on each device, to "exclude from seizure those which have not been involved in the identity theft." (Doc. 44 ¶¶ 542-545). But the officers' stomachs started growling while waiting for the results of the first preview search on one of the computers and, instead of performing preview searches on the other computers or any of the phones, they decided to "just take them all." (Doc. 44 ¶¶ 317-30, 378-79, 389-90). As a result, the police had literally "stopped the press[es]." (Doc. 44 ¶¶ 575-79).

The uproar caused the Marion Police Department and the Marion County Sheriff's Office—which had participated in the planning for, and the execution of, the raids—to be removed from the investigation; they were replaced by the Kansas Bureau of Investigation. (Doc. 44 ¶¶ 416, 429, 638, 727-30). Within days of taking over, the lead KBI agent reached out to the General Counsel of the Kansas Department of Revenue, the state agency that issues driver's licenses and the agency which the city administrator believed should investigate the matter. (Doc. 44 ¶ 493).

The KBI agent said he had a "very straightforward question" for the agency's top lawyer: "Is it a violation of the law for someone to access another's Kansas driver's license information via the State[']s KDOR public access website. (yes or no)." (Doc. 44 ¶¶ 493-497). The answer was, as the agent had requested, straightforward: "Answer: <u>no</u>." (Doc. 44 ¶¶ 493-497) (emphasis in original). The lawyer explained that the publicly accessible website "will provide non-confidential information regarding driving accidents, driving record history, and driver driving status." (Doc. 44 ¶¶ 493-500).

The state agency lawyer further explained that KDOR's records showed that "a Ms. Phyllis Zorn, identifying herself as such, accessed our free service and requested non-personal information" regarding the status of the local businessperson's driver's license. (Doc. 44 ¶¶ 499-502). The lawyer said the website returned the "non-personal information" that the businessperson's license was suspended and that she would need to install an ignition interlock to have her license reinstated. (Doc. 44 ¶¶ 499-502).

Thus, the entire premise of the search warrant applications that the police department and the sheriff's office had prepared—*i.e.*, that someone at the newspaper, as well as the vice mayor, had illegally accessed the businessperson's confidential driver's license records—was fraudulent. (Doc. 44 ¶¶ 237-241). In fact, the information obtained by the paper and by the vice mayor was "non-confidential," "non-personal information" that was available to anyone using the "Driver's License Status Check" tool on the public-facing KDOR website. (Doc. 44 ¶¶ 498-501).

The search warrants themselves were invalid because of numerous legal issues, including the many false statements and omissions in the search warrant affidavits, the fact the affidavits were not submitted under oath or affirmation, and the extreme overbreadth of the warrants. (Doc. 44 ¶¶ 475-491, 514-19, 520-538). Because the officers either knew the information they put in the applications was false, or acted with reckless disregard for whether it was true or false, because they considered the applications to be a mere pretext for their illegal searches, the warrants were invalid. (Doc. 44 ¶¶ 209-249, 488-491). And even if the warrants were valid (which they weren't) the officers grossly exceeded the scope of the warrants when they seized all the computers and phones and effectively put the paper out of business. (Doc. 44 ¶¶ 499-559).

Accordingly, Defendants violated Plaintiffs' civil rights when they executed and exceeded the invalid search warrants and, in doing so, killed Joan Meyer.

### III.   Plaintiffs' First Amended Complaint complies with Rule 8

Rule 8 requires that a pleading contain "a short and plain statement *of the claim showing that the pleader is entitled to relief*." Fed. R. Civ. P. 8(a)(2) (emphasis added). Defendants misread this requirement as meaning the pleading itself must be short, suggesting Plaintiffs violated an artificial page or paragraph limit. *See* Doc. 58 at 3 ("The Complaint before this court covers **154 pages** and is **854 paragraphs long.**") (emphasis in original). But that's not the law.

"Rule 8(a)(2) speaks of a short and plain statement of each claim, not a short and plain pleading." 5 Arthur R. Miller, Mary K. Kane & A. Benjamin Spencer, FEDERAL PRACTICE AND PROCEDURE § 1217 (4th ed. 2020) "Hence, in the context of a multiparty, multiclaim complaint each claim should be stated as succinctly and plainly as possible even though the entire pleading may prove to be long and complicated by virtue of the number of parties and claims." *Id*.

The County Defendants admit that "[c]omplaints brought under § 1983 … 'typically include complex claims against multiple defendants.'" (Doc. 56 at 5) (quoting *Rider v. Werboltz*, 548 F. Supp. 2d 1188, 1195 (D. Kan. 2008)). The First Amended Complaint here asserts six separate claims on behalf of three different plaintiffs against seven different defendants. The Defendants' various motions to dismiss and suggestions total 88 pages, plus another 98 pages in exhibits, for a total of 186 pages. Nor is this complexity unusual. In another Section 1983 case involving law enforcement misconduct, this Court's opinion denying the defendants' motion to dismiss was itself 162 pages long. *See* Doc. 158, Mem. and Order, *Bledsoe v. Jefferson C'nty Bd. of Comm'rs*, Case No. 16-2296-DDC-JPO (Nov. 18, 2020).

"From a review of the case law in the Tenth Circuit and the District of Kansas, it is apparent that the courts correctly focus on the quality and not exclusively on the tonnage of the complaint, *i.e*., whether the complaint provides adequate notice of plaintiffs' claims." *Sonnino v. Univ. of Kansas Hosp. Auth*., No. 02-civ-2576-KHV, 2003 WL 1562551, at *2 (D. Kan. Mar. 24, 2003).

9

Thus, a pleading which is "very lengthy [but] reasonably intelligible and clearly sets forth plain-tiffs' proposed claims" satisfies Rule 8. *Azim v. Tortoise Cap. Advisors*, LLC, No. 13-2267-KHV, 2014 WL 707235, at *2 (D. Kan. Feb. 24, 2014), *objections overruled*, No. 13-2267-DDC-JPO, 2014 WL 4352069 (D. Kan. Sept. 2, 2014).

When judged against this standard, Defendants' cases are inapposite. For example, Judge Teeter's description of the complaint in *Givens v. City of Wichita*, No. 6:23-CV-01033-HLT-TJJ, 2024 WL 1198503 (D. Kan. Mar. 20, 2024), does not fit Plaintiffs' First Amended Complaint. She refers to the complaint in that case as "complicated [and] confusing" and points out that "[l]egally distinct claims are conflated into single counts" and "the timeline is nearly impossible to construct because the first amended complaint contains relatively few dates." *Id*. at *7.

Here, by contrast, Plaintiffs' First Amended Complaint sets forth a detailed statement of facts, in chronological order, concluding with distinct claims set forth in separate counts, which specifically identify the defendants against whom each count is asserted. The facts are set forth in plain, declarative sentences, which are separated by headings[2] alerting the reader to what comes next, and are supported by the use of graphics and photos to assist the reader's comprehension. To call Plaintiffs' pleading confusing is a misnomer. And Defendants do not claim otherwise; at no point do any of the Defendants claim they cannot understand Plaintiffs' claims.

Quite the contrary, Defendants spill much ink making specific arguments against Plaintiffs' claims, frequently citing to the *Twombly/Iqbal* standard and asserting that Plaintiffs' First Amended Complaint does not contain enough facts to make Plaintiffs' claims plausible. If this Court were to

---

[2] In one of the many ironic arguments Defendants make, they object to the heading "The Real Villains." (*See* Doc. 58 at 5). But the heading is nothing more than a verbatim quote from Defendant Mayor David Mayfield's social media screed that "'radical 'journalists,' 'teachers' & 'professors'" are "[t]he real villains in America." (Doc. 44 ¶ 170).

recognize the irony in Defendants' combining a Rule 8 challenge with an *Twombly/Iqbal* challenge, it would not be alone. *See McGill v. Corr. Healthcare Companies, Inc.*, No. 13-CV-01080-RBJ-BNB, 2014 WL 2922635, at *5 (D. Colo. June 27, 2014) (noting "[t]here is some irony here" in defendant making both a Rule 8 argument and a *Twombly/Iqbal* challenge).

Accordingly, Defendants' motions to dismiss based on Rule 8 should be denied.[3]

## IV.    The proper Rule 12(b)(6) standard

In addition to moving to dismiss the First Amended Complaint under Rule 8, Defendants have also moved to dismiss the pleading under Rule 12(b)(6) for failure to state a claim. It is, of course, well-settled that in ruling on a motion to dismiss for failure to state a claim, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in original). This means the court must accept as true the well-pled factual allegations in the complaint, along with "'reasonable inference[s] that [show] the defendant is liable for the misconduct alleged.'" *Roland v. Letgo, Inc.*, No. 22-1456, 2024 WL 372218, at *2 (10th Cir. Feb. 1, 2024) (quoting *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023)). And, of course, the court must view the pleaded facts "in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

When evaluating a motion to dismiss based on qualified immunity, the court considers whether the plaintiff has alleged facts which establish a violation of a constitutional right and

---

[3] Cody and the other City Defendants also cite Rule 1 as a basis for dismissing Plaintiffs' First Amended Complaint in their motions to dismiss (*see* Docs. 57 at 1; Doc. 59 at 1), but never explain how the complaint violates Rule 1, saying simply that Rule 1 should be "read in conjunction with Rule 8." (*See* Doc. 58 at 2).

To the extent the City Defendants are relying on Rule 1 as a separate basis for dismissal, this Court should deny that request as well. *See Sports Rehab Consulting, LLC v. Vail Clinic, Inc*, No. 19-CV-02075-WJM-GPG, 2022 WL 17976702, at *15 (D. Colo. Oct. 21, 2022) ("[i]t is axiomatic that a party who fails to raise an issue in their initial moving papers waives that issue").

whether at the time of the alleged misconduct, the right at issue was clearly established. *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011). Put simply, where the plaintiff has plausibly pleaded the violation of a constitutional right and that the right was clearly established, a motion to dismiss on qualified immunity grounds should be denied. *See Hawkins v. Bd. of Cnty. Commr's of Coffey Cnty. Kan.*, 376 F.Supp.3d 1200, 1217 (D. Kan. 2019) (denial of qualified immunity on motion to dismiss First Amendment retaliation claim).

In addition to the First Amended Complaint, the court may also consider "an indisputably authentic copy" of a "document [that] is referred to in the complaint and is central to the plaintiff's claim." *GFF Corp. v. Associated Wholesale Grocers, Inc*., 130 F.3d 1381, 1384 (10th Cir. 1997). Each of the Defendants have attached copies of the search warrant applications and the search warrants themselves; Plaintiffs have no objection to the Court's consideration of these true and accurate copies. (*See* Docs. 56-1; 56-2; 58-5; 58-6; 58-7; 58-8; 60-5; 60-6; 60-7; 60-8).

Chief Cody and the City Defendants, however, attach numerous other documents to their motion; Plaintiffs object to the Court's consideration of these documents. None of these documents are "central to the plaintiff's claim" and at least one of the documents—an undated self-serving "memo" allegedly written by Defendant Zachary Hudlin (*see* Doc. 58-3; Doc. 60-3)—is not even mentioned in the complaint. Moreover, there are serious authenticity questions as to many of the documents. For example, the authenticity of the Hudlin "memo" referred to above is unknown—it is not dated, it is not on letterhead of any sort, and it is not signed.

Defendants also attach a purported handwritten "statement" by Kari Newell. (*See* Doc. 58-4; Doc. 60-4). But in an interview with KSHB investigative reporter Jessica McMaster, Newell stated that the "statement" was missing half of the pages.[4]

Finally, Plaintiffs question the authenticity of the "inventory" of items seized from the *Marion County Record*. (*See* Doc. 58-10; Doc. 60-10). As Plaintiffs explain in detail in their First Amended Complaint, there are two separate copies of the "inventory," each of which contain different items. (*See* Doc. 44 ¶¶ 431-38).

Defendants' extraneous exhibits, other than the search warrant affidavits and actual search warrants, are not properly before this Court on a motion to dismiss and should not be considered when evaluating Defendants' motions. *See* Fed. R. Civ. P. 12(d).

## V.   Plaintiffs have stated a claim for a direct violation of the First Amendment

Count I of Plaintiffs' First Amended Complaint asserts a direct violation of the First Amendment. The complaint alleges that Defendants orchestrated and carried out a raid on the newspaper that resulted in the *Record*'s computers—and the *Record*'s reporters' phones—being seized. In so doing, Defendants figuratively yelled "Stop the presses" just the same as if they had padlocked the doors to the newsroom. It is impossible in the 21st century to either gather the news—or publish the news—without access to these devices.

As Chief Justice Roberts explained in *Riley v. California*, 573 U.S. 373, 393 (2014), today's computers and cell phones store vast amounts of information that allow a person to carry out their day-to-day duties. *Id*. at 393-94 (explaining that cell phones "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or

---

[4]   https://www.kshb.com/news/local-news/investigations/pages-missing-from-witness-statement-in-marion-raids-according-to-witness

newspapers"). It is hard to imagine a more direct violation of the freedom of the press right en-shrined in the First Amendment.

### A.  The Tenth Circuit recognizes a claim for direct First Amendment violations

Despite that fact, the County Defendants question whether the Tenth Circuit recognizes a claim for a First Amendment direct violation, suggesting that only a claim for First Amendment retaliation or prior restraint is recognized. (Doc. 56 at 10). The County Defendants also assert that even if the Tenth Circuit recognizes a direct violation claim, a plaintiff cannot assert both a direct violation claim and a retaliation claim in the same lawsuit. (Doc. 56 at 11). The County Defendants are mistaken on both points.

Section 1983 claims under the First Amendment are typically of three types: claims for direct violation, claims for prior restraint, and claims for retaliation. For example, the First Amendment protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. Thus, a complete ban on speaking at a public forum is a direct violation of the First Amendment. *See MacQuigg v. Albuquerque Pub. Sch. Bd. of Educ.*, No. CV 12-1137 MCA/SCY, 2015 WL 13650030, at *8 (D.N.M. Feb. 6, 2015) ("Excluding a plaintiff from a public forum … is a direct First Amendment violation ….").

"Generally, a 'prior restraint' restricts speech in advance on the basis of content and carries a presumption of unconstitutionality .... Prior restraints generally take one of two classic forms: judicial injunctions and administrative licensing schemes." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013).

Where the government targets a specific individual because of that individual's exercise of their First Amendment rights, the government is engaged in First Amendment retaliation. For example, in *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022), the Court of Appeals found that a

YouTube journalist who sued a police officer who interfered in his effort to film a police traffic stop "alleged a First Amendment retaliation claim under clearly established law." *Id*. at 1288.

The Tenth Circuit routinely recognizes direct First Amendment claims—that is, Section 1983 claims alleging neither retaliation nor prior restraint. See *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1264 (10th Cir. 2022) (recognizing news service could pursue preliminary injunction against state courts under Section 1983 for "First Amendment right of access to newly filed civil complaints" when state courts routinely delayed availability of complaints to news service and public); *Cressman v. Thompson*, 719 F.3d 1139, 1141 (10th Cir. 2013) (reversing dismissal of Plaintiff's Section 1983 suit alleging government-compelled speech); *Brown v. Saline Cnty. Jail*, 303 F. App'x 678, 682 (10th Cir. 2008) (reversing dismissal of prisoner's First Amendment claim against sheriff and jail officials for allegedly failing to process prisoner's outgoing mail because "refusal to process any mail from a prisoner impermissibly interferes with the [sender's] First Amendment and Fourteenth Amendment rights.").

Moreover, it is plainly proper in this Circuit to assert the "parallel claims" of a "direct violation of his right to free speech, and … for retaliation motivated by his protected speech." *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282 (D. Colo. 2018). While such claims may be "closely related," they are separate claims and stand on their own. *Id*. As such, the County Defendants' assertion that a plaintiff cannot bring both claims in a single lawsuit is simply wrong.

Moreover, the elements of the claims are distinguishable. To make a First Amendment retaliation claim, a plaintiff must show (a) he engaged in protected speech, (b) a person of ordinary firmness would have been chilled by the defendant's actions, and (c) the defendant's action was substantially motivated as a response to the plaintiff's protected activity. *Irizarry*, 38 F.4th at 1288. In "a direct First Amendment violation … there is no need to complicate the analysis injecting the

additional element of 'chilling.'" *MacQuigg*, 2015 WL 13650030, at *8.[5] Furthermore, to sustain a direct violation claim the plaintiff need not show that his or her speech is targeted; it is enough to show that speech generally is targeted. See *MacQuigg*, 2015 WL 13650030, at *8 (complete ban on all public comments).

### B.    Plaintiffs were engaged in constitutionally protected activity

In his motion to dismiss, Chief Cody makes the remarkable assertion that Plaintiffs—the 154-year-old local newspaper and the paper's current co-owners—were not "engaged in constitutionally protected activity." (Doc. 58 at 33-34). Specifically, Cody argues that the newspaper engaged in "criminal activity" (Doc. 58 at 23) when its reporters verified that the document Phyllis Zorn had received from a confidential source concerning the status of Kari Newell's driver's license was accurate and suggests that this "criminal action" voided Plaintiffs' First Amendment rights. (Doc. 58 at 33-34). But journalism is not a crime.

The First Amended Complaint alleges that on August 2, 2023, a confidential source (later identified as Pam Maag) provided Zorn with a copy of an August 1, 2023 letter from the Kansas Department of Revenue addressed to Kari Newell. (Doc. 44 ¶ 144). The complaint alleges that the copy of the letter contained Newell's name, address, date of birth, and driver's license number. (Doc. 44 ¶ 74). Thus, the *Record* "obtained" this personal information about Newell from the letter on August 2.

The complaint further alleges that Phyllis Zorn's source (Maag) had told Zorn that she (Zorn) could confirm the authenticity of the letter by using the "Driver's License Status Check" tool on the public-facing Kansas Department of Revenue's website. (Doc. 44 ¶¶ 80-81). The

---

[5] Because a direct violation does not require "chilling," the County's discussion of the chilling requirement in prior restraint cases—which typically involve a threat of punishment, vs. an actual restraint—is inapposite. (*See* Doc. 56 at 10-11).

complaint alleges that on August 3, Eric Meyer used the information the paper had obtained about Newell from the letter to access the "Driver's License Status Check" tool but could not see the August 1 letter; as a result, Zorn took up the task of authenticating the letter. (Doc. 44 ¶¶ 82-87).

The complaint alleges that Zorn then called the Department of Revenue, where a representative told her that a user simply had to keep clicking on the online tool to see the letter. (Doc. 44 ¶ 88). The complaint alleges that Zorn then went to the "Driver's License Status Check" tool and kept clicking until she saw the August 1 letter. (Doc. 44 ¶¶ 88-94). The complaint alleges that in order to get to the level where the letter was stored, Zorn inserted her own name, *i.e.*, "Phyllis Zorn," into the form when she requested the letter. (Doc. 44 ¶ 91).

The First Amended Complaint further alleges that Chief Cody and Sheriff Soyez knew all this—that on August 4, 2023, Eric Meyer wrote both Cody and Soyez and told them that a source had provided the letter to the paper (Doc. 44 ¶ 128) and that "the *Record* had checked with the Kansas Department of Revenue and was told 'that anyone could obtain the document if he or she possessed the recipient's Kansas identification card number, name, and date of birth.'" (Doc. 44 ¶ 131).

Despite these factual allegations, in his motion papers, Cody re-argues the false claim he made in the affidavits he signed in support of the search warrants for the *Record*: that Zorn committed identity theft to "obtain" Newell's name, address, date of birth, and driver's license number. (Doc. 58 at 20-29). But Zorn "obtained" Newell's personal information, *i.e.*, her name, address, date of birth, and driver's license number, from the letter provided by her confidential source. Black's Law Dictionary defines "obtain" as "[t]o bring into one's own possession." *Obtain*, Black's Law Dictionary (12th ed. 2024). Zorn was in "possession of Newell's information on August 3, two days before she "confirmed" the information by accessing the "Driver's License Status Check"

tool, using her (Zorn's) own name. *See confirm*, Black's Law Dictionary (12th ed. 2024) ("To verify or corroborate").[6]

All of which is why the General Counsel of the Kansas Department of Revenue told the KBI within days of the raids that it was perfectly legal for Zorn to have used the "Driver's License Status Check" tool to verify the information contained in the letter that Zorn's source had provided her. (Doc. 44 ¶¶ 493-502).

Cody, however, conveniently ignores these factual allegations in the First Amended Complaint and continues his false claim that Meyer and Zorn are dirty, rotten scoundrels who forfeited their First Amendment rights. Nothing could be further from the truth—and he knows that.

### 1.   No one at the *Record* violated the Driver's Privacy Protection Act

Cody asserts that "Zorn and Meyer patently violated the federal Drivers Privacy Protection Act." (Doc. 58 at 23). Cody is wrong.

As Cody acknowledges in his motion papers, "'[t]he DPPA was enacted as a public safety measure designed to prevent stalkers and criminals from utilizing motor vehicle records to **acquire** information about their victims.'" (Doc. 58 at 24) (quoting *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 940 (7th Cir. 2015)) (emphasis added). Before the DPPA, in most states, anyone could provide a license plate number to the department of motor vehicles and obtain the owner's home address. (Doc. 58 at 24). In one case, an obsessed fan used the California Department of Motor Vehicles to obtain the unlisted home address of a television actress then killed her. (Doc. 58 at 24).

---

[6] Even if the DPPA applies (which it does not), the act contains an exception for "use in research activities." 18 U.S.C. 2721§ (b)(5). Plaintiffs specifically alleged that Zorn's review of KDOR's copy of the August 1 letter was a permitted use pursuant to the "research" exception. (*See* Doc. 44 ¶¶ 119-22).

To solve this problem, the DPPA makes it "unlawful for any person knowingly to **obtain** … personal information, from a motor vehicle record." 18 U.S.C. § 2722(a) (emphasis added). It also makes it "unlawful for any person to make false representation to **obtain** any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722(b) (emphasis added).

But as noted above, the *Record* already had Kari Newell's home address, date of birth, and driver's license number from the copy of the August 1 letter that had been given to the paper by a source. Thus, the *Record* did not "obtain" (to use the DPPA's language) or "acquire" (to use *Dahlstrom*'s language)[7] this personal information from the Kansas Department of Revenue; rather, the newspaper already had this information.[8] And Defendants knew this as early as August 4, when Eric Meyer emailed both Sheriff Soyez and Chief Cody and told them that a source had provided the paper with the letter. (Doc. 44 ¶¶ 127-37).

Thus, no violation of the DPPA occurred.[9]

---

[7] Cody relies heavily on *Dahlstrom*. (*See* Doc. 58 at 25). But *Dahlstrom* is inapposite because there, the reporter obtained individual's birth dates, heights, weights, hair color, and eye color from the state motor vehicle department. *See Dahlstrom*, 777 F.3d at 940-41.

[8] As the General Counsel of the Kansas Department of Revenue explained to the KBI within days of the raids, because Meyer and Zorn already had Kari Newell's personal information, they were free to use the "Driver's License Status Check" tool on the KDOR's public-facing website to verify the status of Newell's driver's license. (Doc. 44 ¶¶ 493-502). That tool is designed to comply with the DPPA because it requires users to already have (and input into the tool) the driver's personal information in order to access other documents containing the same information. (Doc. 44 ¶¶ 496-507).

[9] Cody offers no explanation for how, even if the DPPA had been violated, a city police officer could have obtained a state search warrant to investigate a federal violation.

## 2.   No one at the *Record* violated the Kansas motor vehicle records statute

The Kansas statute governing motor vehicle records[10] states that "[a]ll motor vehicle records shall be subject to the provisions of the open records act," subject to exceptions for (a) records which disclose the physical or mental condition of the driver, (b) records which have been expunged, or (c) driver's license photos. K.S.A. § 74-2012(a)(1).

The August 1 letter does not contain any excepted information.[11] (Doc. 44 ¶ 139).

## 3.   No one at the *Record* committed computer tampering

Cody also asserts that Meyer and Zorn committed the crime of unauthorized computer access. (Doc. 58 at 21). In his motion papers, he bolds the text of the statute, which he claims makes it a crime to "**knowingly and without authorization, access any computer, computer system [or] computer network**." (Doc. 58 at 21) (quoting K.S.A. 21-5839(a)(5)) (emphasis added by Cody).

But the General Counsel of the Kansas Department of Revenue—which owns the computer network in question—explicitly told the KBI that anyone is authorized to use "Driver's License Status Check" tool on the KDOR public-facing website so long as they have the driver's name, address, date of birth, and driver's license. (Doc. 44 ¶¶ 493-508). Cody's search warrant affidavit

---

[10] The statute defines "motor vehicle records" as including "any record that pertains to a motor vehicle driver's license." K.S.A. § 74-2012(a)(3).

[11] Because Kansas law provides that the only information concerning the holder of a driver's license that is closed are these three excepted materials, even if Meyer and Zorn had "obtained" Newell's personal information from the KDOR (which they did not), their actions would have fallen with the exception in the DPPA for "any state-authorized purpose relating to the operation of a motor vehicle or public safety." 18 U.S.C. §2721(b)(14). Reporting that local law enforcement had allowed an unlicensed person to drive around town for years clearly relates to the "operation of a motor vehicle [and] public safety."

thus contained false statements and critical omissions concerning the "authorization" necessary to use the status check tool. (*See* Doc. 44 ¶¶ 226-49). As such, Cody's claim is specious.

### 4.      No one at the *Record* committed identity theft

Cody also asserts that Meyer and Zorn committed the crime of identity theft. (Doc. 58 at 22). Once again, in his motion papers he bolds the text of the statute, which he claims makes it a claim to "**obtain[ or] possess[] any personal identifying information, or document containing the same, belonging to another person, with the intent to 1) defraud the person … or 2) mispresent the person in order to subject that person to economic or bodily harm**." (Doc. 58 at 22) (quoting K.S.A. 21-6107(a)) (emphasis added by Cody).

There are a host of fatal defects in Cody's argument. First, the First Amended Complaint alleges that Phyllis Zorn used her own name—not Kari Newell's name—to access the KDOR's copy of the August 1 letter. (Doc. 44 ¶¶ 91, 501).[12]

Second, the statute refers to "obtaining" personal identifying information. As explained above, the *Record* did not "obtain" Kari Newell's personal information from the KDOR website; instead, the newspaper obtained it from Phyllis Zorn's confidential source.

Third, there is no basis whatsoever—either in fact or in the warrant affidavits—for claiming that anyone at the *Record* intended to use the confirmation of the accuracy of the August 1 letter to "defraud" Newell. In fact, as alleged in the First Amended Complaint, the *Record* did not intend to publish any information about Newell, just about local law enforcement. Doc. 44 ¶¶ 133-35).

---

[12] No name was required to be used by either Meyer or Zorn to simply access the status of Newell's driver's license; a name is required only if a user clicks through to see documents. (Doc. 44 ¶¶ 82-92).

Fourth, there is similarly no basis whatsoever—either in fact or in the warrant affidavits—for claiming anyone at the *Record* intended to "misrepresent" Newell in order to subject her to harm; no one intended to impersonate Newell, masquerade as her, or steal her identity.

In short, there is no basis to believe that anyone at the *Record* committed identity theft.

### C.    Defendants' other arguments are without merit

Defendants assert a number of other arguments, none of which have merit.

### 1.    Plaintiffs' First Amendment rights were violated

For example, Chief Cody asserts that Plaintiffs' First Amendment rights were not violated because there is no right to gather the news. (Doc. 58 at 33-34). But Cody's effort to limit Plaintiffs' claim is unavailing for several reasons.

First, it ignores the fact that he and his fellow raiders shut down the newspaper—a literal direct violation of the freedom of the press guaranteed by the First Amendment. U.S. Const. Amend. I ("Congress shall make no law … abridging the freedom of speech, or of the press").

Second, contrary to Cody's argument, the right to gather the news is constitutionally protected—and that right was recognized as constitutionally protected prior to Cody and his fellow raiders' actions. As the Supreme Court explained in *Branzburg v. Hayes*, 408 U.S. 655, 681 (1972), "without some protection for seeking out the news, freedom of the press could be eviscerated." And in *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022), the Tenth Circuit ruled that it was clearly established that the First Amendment prohibited police officers from physically preventing a journalist from filming a traffic stop.

Moreover, the Tenth Circuit has explicitly recognized a First Amendment "'general right to inspect and copy public records and documents.'" *Courthouse News Service v. New Mexico Administrative Office of Courts*, 53 F.4th 1245, 1263 (2022) (quoting *Courthouse News Service v.*

*Brown*, 908 F.3d 1063 (7th Cir. 2018)). That is exactly what Zorn was doing, *i.e.*, inspecting the public records of the Kansas Department of Revenue.[13]

Third, the Tenth Circuit has explicitly held that "the First Amendment protects the right to criticize police." *Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir. 2023), cert. denied sub nom. *Donnellon v. Jordan*, 144 S. Ct. 1343 (2024). In *Jordan*, the court denied qualified immunity to police officers who arrested a police critic for allegedly violating an obstruction of justice charge. Quoting the Supreme Court's decision in *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987), the court wrote: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Jordan*, 73 F.4th at 1168-69.

As such, Cody's actions plainly violated Plaintiffs' First Amendment rights to gather and publish the news, specifically including news that is critical of the police.

### 2.     An ordinary person would be "chilled"

Cody also argues that Plaintiffs have not shown "that an ordinary person in their position would have been 'chilled'" by the unprecedented raids. (Doc. 58 at 34). But as explained above, in "a direct First Amendment violation … there is no need to complicate the analysis injecting the additional element of 'chilling.'" *MacQuigg*, 2015 WL 13650030, at *8.

---

[13] In his motion papers, Chief Cody cites the Fifth Circuit's decision in *Villarreal v. City of Laredo, Texas*, 94 F.4th 374 (5th Cir. 2024) (en banc), for the proposition that there is no First Amendment right to gather the news. (*See* Doc. 58 at 33-34). But the 9-7 decision in *Villarreal*–with four dissenting opinions—is simply wrong. As one of the dissenters wrote, the majority opinion "treat[s] the First Amendment as a second-class right" and "contradicts" the Supreme Court's holdings that "subject arrests to First Amendment scrutiny." *Id*. at 413, 415 (Ho, J., dissenting). The decision is subject to a pending petition for writ of certiorari with the Supreme Court. Pet. for Cert., *Villarreal v. Alaniz*, No. 23-1155 (U.S. Sup. Ct. Apr. 22, 2024). Of course, the decision is not binding on the Tenth Circuit, whose First Amendment jurisprudence is clear.

Moreover, it defies logic to suggest that an "ordinary" owner of a newspaper would not be "chilled" when the paper's offices are raided, the paper's computers are seized, the reporters' phones are seized, and the co-owner of the paper died as a result of the stress brought on by the raid.[14] To that end, numerous professional journalism organizations have specifically recognized Plaintiffs' bravery in the face of this chilling conduct. (Doc. 44 ¶¶ 582-84).

### 3.   Sheriff Soyez' personal involvement

Sheriff Soyez, Det. Christner, Mayor Mayfield, and Officer Hudlin all provide self-serving descriptions of their role in the constitutional violations; these descriptions are misleading and violate the applicable standard of review, which requires this Court to construe all facts in the light most favorable to Plaintiffs. *See Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Sheriff Soyez argues he "had no personal involvement in the investigation or drafting of [sic] execution of the warrants." (Doc. 56 at 11). Soyez' assertion is contrary to the allegations of the First Amended Complaint.

Specifically, Plaintiffs alleged that Soyez personally met with Chief Cody and the other co-conspirators to plan the raids. (Doc. 44 ¶¶ 191, 201). Plaintiffs alleged that Soyez helped to bring in Christner to assist as a co-conspirator. (Doc. 44 ¶ 201). Plaintiffs also alleged that it was Soyez who recommended raiding the Meyer home, and not just the *Record*'s offices. (Doc. 44 ¶ 234). Plaintiffs also alleged that it was Soyez and Cody who jointly agreed to just to "take them all," in

---

[14] As the Tenth Circuit has recognized, hedonic damages are appropriate in Section 1983 death cases like the one here, including "medical and burial expenses, pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions." *Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990). The Tenth Circuit's recognition of a laundry list of available damages in the event of an individual's death is compelling evidence that death would have a "chilling effect."

referring to the *Record*'s computers, rather than comply with the preview search requirement in the warrants. (Doc. 44 ¶¶ 321-22, 611). And it was Soyez who personally hosted the after-action meeting at his office. (Doc. 44 ¶¶ 398-401).

### 4.      Det. Christner's personal involvement

Det. Christner's attempts to foreswear personal involvement are also contrary to the factual allegations in the First Amended Complaint. Plaintiffs alleged that Det. Christner wrote the first draft of the search warrant affidavits and reviewed Chief Cody's later drafts; Chief Cody specifically credits Det. Christner as having "assisted in this investigation." (Doc. 44 ¶¶ 208-33) Det. Christner personally selected the sham preview search terms (including "Kansas" and "vehicle") and conducted the preview search. (Doc. 44 ¶¶ 285-304). Despite the search warrant's requirement for a preview search to exclude computers not involved in the "identity theft," Det. Christner personally agreed to not complete the preview search on the *Record*'s computers (Doc. 44 ¶¶ 322-23) and refrain from performing a preview search of the Meyer home computers. (Doc. 44 ¶¶ 378-79). Det. Christner also later collaborated with Chief Cody on probable cause affidavits supporting arrest warrants for Meyer and Zorn on the basis of the illegal searches and seizures. (Doc. 44 ¶¶ 417-19).

### 5.      Mayor Mayfield's personal involvement

Mayor Mayfield asserts that because he did not personally participate in the raids, he did not violate Plaintiffs' First Amendment rights. (Doc. 60 at 17). But the First Amended Complaint alleges that it was Mayfield who ordered the investigation into Eric Meyer and his newspaper, overruling the City Administrator, who had said Chief Cody was not to open an investigation into the matter. (Doc. 44 ¶¶ 176-77). The Complaint further alleges that Mayfield's decision was not merely the result of a difference in opinion between himself and the City Administrator but was an element of Mayfield's plan to "silence the MCR." (Doc. 44 ¶¶ 157-58, 623-27). Additionally,

Mayfield sought Newell's assistance as a complaining witness, falsely telling her that Meyer and Herbel were conspiring against her and that he could help Newell by getting Herbel off the city council—but only if she was convicted of a felony. (Doc. 44 ¶¶ 174-76).

### 6. Officer Hudlin's personal involvement

Officer Hudlin, who did personally participate in the raids, claims he only "assisted" in the raids and did not violate Plaintiffs' First Amendment rights. (Doc. 60 at 18). But as recited by Hudlin himself in his own motion papers, it was Hudlin who conducted the "investigation" into the so-called "identity theft." (Doc. 60 at ¶ 177A). It was Hudlin who personally seized each of the computers and phones that were seized at both the *Record* and the Meyer home. (Doc. 44 ¶¶ 330, 794). Hudlin reviewed multiple drafts of the deficient search warrant affidavits. (Doc. 44 ¶¶ 230, 232, 248). It was Hudlin who read the *Record* reporters their *Miranda* rights. (Doc. 44 ¶¶ 339). It was Hudlin whose signature appears on both copies of the search warrant return, including the falsified return omitting the seized OS Triage data. (Doc. 44 ¶¶ 431-438). And, of course, it was Hudlin who scoured the newsroom until he found Deb Gruver's confidential file on Chief Cody and then shared the file with Cody, using code words because he knew his body camera was recording him. (Doc. 44 ¶¶ 306-314).

### VI. Plaintiffs have stated a claim for First Amendment Retaliation

A First Amendment retaliation claim requires a plaintiff to show that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007).

Defendants argue that their actions were not in retaliation for Plaintiffs' reporting (and editorializing). (Doc. 56 at 11-12; Doc. 60 at 18-19). But Defendants ignore the well-pleaded factual allegations in the First Amended Complaint and, once again, inappropriately construe the allegations in Defendants' favor, contravening the standard of review. *See Alvarado*, 493 F.3d at 1215.

Mayor Mayfield had publicly expressed his intent to "silence the MCR," *i.e.*, the *Marion County Record*, because he had such disdain for the newspaper's coverage of him. (Doc. 44 ¶¶ 157-58). He had also publicly expressed his view that "journalists [are] the real villains in America." (Doc. 44 ¶¶ 169-71). And he had stated that the only way he could rid himself of his archenemy on the City Council, Ruth Herbel, was to get her convicted of a crime. (Doc. 44 ¶¶ 176, 604). Thus, the raids against the *Record*, Eric Meyer, and Ruth Herbel all fit squarely within his plan to retaliate against his enemies.

Chief Cody had a vendetta against the *Record*, which he knew was digging into his sordid past in Kansas City. (Doc. 44 ¶¶ 28-37). He had already told the newspaper he had hired a lawyer. (Doc. 44 ¶ 38). He had refused to continue the long-time practice of providing the *Record* with a weekly log of activity (Doc. 44 ¶¶ 44-52) and had tried to convince a *Record* reporter to leave and help him start a new, more "positive," local paper. (Doc. 44 ¶¶ 55-56).

Sheriff Soyez was responsible for bringing Cody to Marion and was concerned about blowback on him if the *Record* reported on Cody's problems in Kansas City. (Doc. 44 ¶¶ 628-633). Soyez also shared Cody's disdain for the *Record*, including telling Cody, "We don't work for the press!" (Doc. 44 ¶ 629). Significantly, Sheriff Soyez and Chief Cody began their efforts to raid the *Record* and the Meyer home mere days after Meyer informed them both that the *Record* would be

investigating allegations that City and County law enforcement had permitted a citizen with a DUI conviction to drive, unlicensed, for over a decade. (Doc. 44 ¶¶ 128-134. 191-201. 806).[15]

"Because the ultimate fact of retaliation is about defendants' state of mind, it is particularly difficult to establish by direct evidence. Therefore, improper motive can be shown with circumstantial evidence, such as the close temporal proximity of the retaliatory act to the protected activity." *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1224 (D. Colo. 2001).

In *Douglass v. Garden City Cmty. Coll.*, 652 F. Supp. 3d 1329, 1344 (D. Kan. 2023), appeal dismissed sub nom. *Douglass v. Swender*, 2023 WL 5179124 (10th Cir. Mar. 1, 2023), Douglass was a booster of a Kansas community college who criticized the college's handling of alleged Title IX violations at a meeting of the college's board and in a meeting with a college administrator. Following this criticism, the campus police banned Douglass from campus and all college-sponsored events.

Douglass sued, alleging First Amendment retaliation. She presented evidence that the college had never issued a similar ban, that Defendants banned her 15 days after she criticized the school, and that Defendants spread humiliating rumors about her after she criticized the school. The court denied the motion for summary judgment of the police chief, trustees, and college president on Douglass' retaliation claim, finding that Douglass established a genuine issue of material fact as to retaliatory intent. *Id*. at 1347-48.

Here, Plaintiffs pleaded direct and indirect evidence of Defendants' retaliatory intent. Mayor Mayfield's plain statement of intent to "silence the MCR" is direct evidence of his retaliatory intent. And the temporal proximity of the protected activity and the retaliatory conduct in

---

[15] In his motion papers, Officer Hudlin argues that Plaintiffs failed to allege he had the necessary retaliatory intents. (*See* Doc. 60 at 18-19). But Hudlin is not named as a defendant in Plaintiffs' claim for First Amendment retaliation. (*See* Doc. 44 at 113, 123).

*Douglass* was 15 days, not less than a week, as is the case here from the date of the raids to when Meyer told both Chief Cody and Sheriff Soyez the newspaper was investigating why local law enforcement allowed an unlicensed driver to drive around town for a decade.

As such, Plaintiffs have plainly pled factual allegations sufficient to support an inference of retaliation.

### A.     Plaintiffs do not have to show a lack of probable cause

Plaintiffs suing individual defendants for retaliation for their exercise of First Amendment rights typically have to show a lack of probable cause;[16] this is because where there is probable cause, it is difficult to determine the defendant's motive—was the motive to retaliate or was the motive to enforce the law? *See Nieves v. Bartlett*, 587 U.S. 391, 401 (2019).

In 2019, however, the Court ruled in *Nieves* that "[t]he existence of probable cause does not defeat a plaintiff's claim if [plainitff] produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Id*. at 407. The Court explained that this type of evidence is sufficient to present a question of fact as to the reason for the retaliatory conduct. The *Nieves* court offered an example: if a plaintiff was arrested for jaywalking at an intersection, but filed suit alleging First Amendment retaliation and offers evidence that other individuals routinely jaywalk but are not arrested, it would be "insufficiently protective of First Amendment rights to dismiss the [plaintiff's] retaliatory arrest claim on the ground that there was undoubted probable cause of the arrest." *Id*.

Here, Plaintiffs specifically plead that "otherwise similarly situated individuals" were not investigated, searched, or arrested for alleged identity theft or unlawful use of a computer. (Doc. 44

---

[16] First Amendment retaliation claims against municipal defendants can proceed even where there is probable cause where the retaliatory conduct was conducted pursuant to municipal policy. *See Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018).

¶¶ 642-50). Plaintiffs even provided "specific comparator evidence" of County and City law enforcement's awareness of—and failure to investigate or prosecute—a sheriff's deputy's alleged improper leaks of confidential criminal justice information from the Kansas Criminal Justice Information Systems (information that is <u>actually</u> restricted and accessible only via a secure system) to the Facebook vigilante group Marion Crime. (Doc. 44 ¶¶ 651-64).

Further, just last term, in *Gonzalez v. Trevino*, 144 S. Ct. 1683 (2024), the Supreme Court held that a First Amendment retaliation plaintiff is not limited to director comparator evidence; instead, other forms of objective evidence may be relied on. The facts in *Gonzalez* are strikingly similar to the facts here.

Sylvia Gonzelez, a 72-year-old member of the Castle Hills, Texas city council, organized a petition drive seeking the removal of the city manager. At the conclusion of a city council meeting to address the petition, Gonzalez accidentally picked up the original petition and placed it with her belongings. When the mayor asked her for the petition, she discovered she had placed it in her binder and gave it to the mayor. At the request of the mayor, the city police launched an "investigation" into the momentary mishandling of the petition, and Gonzelez was subsequently charged with tampering with official documents. The district attorney subsequently dismissed the charge.

Following the dismissal of the charge against her, Gonzalez brought a Section 1983 lawsuit against the mayor, the police chief, and the original investigator. In her lawsuit, Gonzalez conceded that probable cause existed for her arrest. But she relied on the *Nieves* exception, pointing out that her review of the prior decade of charges brought in Bexar County (where Castle Hills is located) showed no one had ever been charged with tampering with official documents under similar circumstances. The district court agreed with Gonzalez, but the Fifth Circuit reversed, finding that

Gonzalez had failed to put forth direct comparator evidence, *i.e.*, that another city council member had misappropriated official documents and had not been charged.

The Supreme Court rejected the Fifth Circuit's view as "overly cramped." 144 S. Ct. at 1667. The Court explained that the *Nieves* exception applied whenever the "'circumstances [show] officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Id.* (quoting *Nieves*, 587 U.S. at 406). The Court went on to find that Gonzalez' survey evidence of past charges fit within the *Nieves* exception. *Id.*

Here, Plaintiffs alleged that in their role as the local newspaper of record, they are not aware of any person ever being investigated or charged in Marion County with computer tampering or identity theft under similar circumstances. (Doc. 44 ¶¶ 642-64).

As a result, Plaintiffs do not need to show a lack of probable cause to prevail on their First Amendment retaliation claim.[17]

### VII.   Plaintiffs have stated a claim for violation of the Fourth Amendment

Nearly fifty years ago, the United States Supreme Court—in a case involving the search of another newsroom—mandated that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). The Court further outlined the requirements for both obtaining a search warrant for a newsroom and executing the warrant.

First, the Court held that "[w]here presumptively protected materials [under the First Amendment] are sought to be seized, the warrant requirement should be administered to leave as

---

[17] If Plaintiffs are required to show the lack of probable cause, Defendants' claim that they had actual or even arguable probable cause rebutted in Section VII.

little as possible to the discretion or whim of the officer in the field." *Id*. at 564; *id*. at 565 ("the warrant requirement [should be applied] with particular exactitude when First Amendment interests would be endangered by the search"). Second, it dictated that "rummag[ing] at large in newspaper files" is plainly unconstitutional." *Id*. at 565.

Despite the fact Plaintiffs' First Amended Complaint contains these very quotes from *Zurcher* (*see* Doc. 44 ¶¶ 226(l), 472, 521, 553), none of the Defendants even mention *Zurcher* in their motion papers—no less try to show they complied with these strict constitutional mandates.

### A.    The Tenth Circuit has repeatedly upheld the *Zurcher* requirements

Since *Zurcher*, the Tenth Circuit has repeatedly upheld these constitutional requirements. For example, in *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985), the court voided a warrant that violated the *Zurcher* standards. The court held that "the warrant's overbreadth" was "egregious" given that it sought materials that "implicate free speech." *Id*. at 405. Among the items seized were copies of the Internal Revenue Service code, the Federal Rules of Criminal and Civil Procedure, and *The Federalist Papers*. *Id*.

In its attempt to save the warrant from being voided, the government argued "that where there is probable cause to believe that an enterprise has engaged in a pervasive scheme to defraud, all of its business records may be seized." *Id*. The Tenth Circuit rejected this argument, finding that the government had presented no evidence that illegal activity pervaded the subject's operations. *Id*. at 406.

In *Pleasant v. Lovell*, 876 F.2d 7873 (10th Cir. 1989), the court, in rejecting the defendants' claim of qualified immunity, reiterated the requirement from *Zurcher* that when First Amendment interests are present, "the requirements of the fourth amendment must be applied with "'scrupulous exactitude.'" *Id*. at 803 (collecting cases). The court found that the defendants had violated this requirement by seizing items that were not included within the warrant. *Id*. at 803-04.

More recently, in *Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010), the court rejected qualified immunity for a prosecutor whose determination of probable cause rested on speech that no reasonable prosecutor could believe was not protected by First Amendment. *Id*. at 1003-04.

As set forth above, Zorn was engaged in First Amendment-protected activity when she lawfully accessed public records made available by the Kansas Department of Revenue using KDOR's public-facing status check tool. *See Courthouse News Serv.*, 53 F.4th at 1264 (recognizing First Amendment access to public records). Because journalism is not a crime, no reasonable officer could conclude that probable cause existed to suspect Zorn or Meyer of a crime on the basis of this First Amendment-protected activity.

## B.    Defendants' conduct is not excused by reason of the search warrants

Rather than addressing *Zurcher* and its progeny, Defendants seek to hide behind the fact Magistrate Judge Viar issued the search warrants and claim this exonerates them. (Doc. 56, 18-19; Doc. 58, 19-20). Defendants are wrong.

"The fact that a neutral magistrate[18] has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Here, there are myriad issues with the search warrant affidavits—and the warrants themselves—that prevent dismissal of Plaintiffs' Fourth Amendment claims.

First, Defendants are not shielded from liability "'where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely

---

[18] As Plaintiffs alleged in the First Amended Complaint, Judge Viar was not a neutral, detached magistrate; rather, she has her own troubled past with multiple DUIs, making her particularly susceptible to Chief Cody's claim that the *Record* was exposing Kari Newell for her DUIs. (*See* Doc. 44 ¶¶ 250-57).

unreasonable.' Nor will a warrant protect officers who misrepresent or omit material facts to the magistrate judge." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (quoting *Messerschmidt*, 565 U.S. at 547).

Here, Plaintiffs pled both that (a) the warrants were based on an affidavit so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable, and (b) that Chief Cody, Det. Christner, and Officer Hudlin all engaged in misrepresentations and factual omissions such that Judge Viar's signature does not vest them with qualified immunity.

Specifically, the First Amended Complaint alleges that no probable cause, or even arguable probable cause, existed for the raids, both because no crime was committed and because the probable cause affidavits contained false statements and material omissions. (Doc. 44 ¶¶ 209-249, 475-513). As described above, no reasonable law enforcement would have believed that a crime had occurred when the alleged offense consisted solely of viewing a publicly accessible website to verify information the *Record* had already been provided. The unreasonableness of Defendants' conduct is established beyond doubt by the fact that within days of taking over the investigation, the lead KBI contacted the General Counsel of the Kansas Department of Revenue and was told within 39 minutes that Phyllis Zorn's use of the "Driver's License Status Check" tool on the KDOR website to verify the contents of the Newell letter was perfectly legal. (Doc. 44 ¶¶ 215-19, 492-508). As such, the well-pleaded factual allegations in the First Amended Complaint establish that "a reasonably well-trained officer in [Defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345-46 (1986).

These well-pleaded allegations concerning lack of probable cause and the unreasonable-ness of relying on such deficient affidavits, when construed in the light most favorable to the Plaintiffs, are fatal to Defendants' claims they are protected by the issuance of the search warrants. *See Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991) (affirming denial of summary judgment for defendants on Section 1983 Fourth Amendment violation where "Plaintiff came forward with specific evidence from which one could infer that Defendants recklessly made false statements in, and omitted material information from, their affidavits"). As in *Bruning*, the misstatements and omissions alleged by Plaintiffs were "clearly critical" to any finding of probable cause. *Id*. at 360. (*See* Doc. 44 ¶¶ 209-249, 475-513).

Second, investigating officers "may not ignore available and undisputed facts" while determining probable cause. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998). Here, Defendants included in the affidavits the false statement that the only way Zorn could have accessed the letter was by "either impersonating or lying about the reasons why the record was being sought." (Doc. 44 ¶¶ 220, 235-36). This statement was false because, as Plaintiffs have explained, Zorn could (and did) legally access the letter because the letter she was provided by a source contained all the information needed to verify the contents of the letter via the online status check tool. (Doc. 44 ¶¶ 492-508).

Both Chief Cody and Sheriff Soyez knew that the *Record* and Ruth Herbel had obtained the letter not from the KDOR, but from a source. In his August 4, 2023 e-mail to both Cody and Soyez, Meyer told the two chief law enforcement officers "that a confidential source had provided the paper with a letter from the Kansas Department of Revenue 'to a Marion businesswoman who recently had been in the news.'" (Doc. 44 ¶ 128). Both Cody and Soyez also knew that Ruth Herbel had been provided a copy of the same letter; Herbel had screenshot the copy of the letter she had

received via Facebook and forwarded it to the City Administrator, who forwarded it to Cody. (Doc. 44 ¶¶ 138-40).

Third, a warrant is invalid if the affidavit was not submitted under oath or affirmation. *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997). Plaintiffs' First Amended Complaint plainly shows that Chief Cody, Officer Hudlin, and Det. Christner all knew that the warrant was issued on the basis of an affidavit that was not supported by oath or affirmation. (*See* Doc. 44 ¶¶ 215-19; 492-508).[19] Thus, even if the warrant otherwise complied with the Fourth Amendment—which it did not—it was void.

Fourth, as the County Attorney himself recognized when he withdrew the warrants (Doc. 44 ¶ 421), the affidavits provided no nexus that evidence of any crime would be found at the Meyer home or at the *Record*; rather, they simply stated that Meyer was Zorn's boss, that Zorn had accessed the KDOR record on an unknown electronic device (from an unknown location), and that Meyer worked from home. (Doc. 44 ¶¶ 535-38). Even if there was probable cause to believe that Zorn committed a crime (and there was not), there was certainly not probable cause to believe that evidence of any crime would be found at the Meyer home or in the *Record* newsroom.

Despite that fact, Sheriff Soyez advised Chief Cody and the raiders to raid the Meyer home and Chief Cody, Officer Hudlin, and Det. Christner did just that, as well as raid the newsroom of the *Marion County Record*. In so doing, they violated clearly established Fourth Amendment law banning searches where "the affidavit was wholly lacking in indicia of probable cause because it

---

[19] In Cody's motion papers, he argues that the applications "were sworn under oath." (Doc. 58 at 32-33). But his entire argument requires this Court to disregard Plaintiffs' well-pleaded facts about Cody pre-signing the affidavits that were presented to Judge Viar by the County Attorney staff. (Doc. 44 ¶¶ 260-79). On a motion to dismiss, this Court cannot disregard Plaintiffs' well-pleaded facts and must construe all inferences in favor of Plaintiffs. *Alvarado*, 493 F.3d at 1215.

failed to establish any connection between the place to be searched and the suspected criminal activity." *United States v. Gonzales*, 399 F.3d 1225, 1229 (10th Cir. 2005).

### C.      Defendants' circular firing squad argument

Defendants' attempt to pass the buck by disclaiming involvement in the investigation, the affidavit drafting, and the searches—repeatedly blaming each other. (*See* Doc. 26 at 8 ("the 1AC clearly suggests Cody was the driving force behind the investigation and searches"); Doc. 58 at 29 ("Plaintiffs allege that Christner (not Cody) conducted the purported 'sham' preview search")). But the applicable standard of review is well-settled.

"It is axiomatic that, in resolving motions to dismiss, courts accept the well-pleaded factual averments of the plaintiff's complaint as true and construe the facts in the light most favorable to the plaintiff." *Sanchez v. Guzman*, 105 F.4th 1285, 1299 (10th Cir. 2024). Here, Plaintiffs well-pled the personal involvement of Chief Cody, Sheriff Soyez, Det. Christner, and Ofc. Hudlin in drafting the deficient affidavits and actively contributing to the raids. (Doc. 44 ¶¶ 231-47) (Chief Cody made false statements and omissions of material fact in his search warrant affidavits and was at the helm of the raids); (Doc. 44 ¶¶ 208-33) (Det. Christner wrote the first draft of the search warrant affidavits and Chief Cody specifically credits Det. Christner as having "assisted in this investigation"); (Doc. 44 ¶¶ 206-07, 234, 611, 781) (Sheriff Soyez helped plan the raids, suggested searching the Meyer home, and directed Cody to take all of the computers and phones even without a preview search). Defendants' attempts to exonerate themselves by passing the buck would require this Court to improperly disregard all of the above well-pleaded facts concerning Defendants' personal involvement in the affidavits and the raids.

### D.    Defendants "grossly exceeded" the scope of the warrants

Even if the search warrants were themselves valid (which they are not), Plaintiffs have alleged that Defendants grossly exceeded the scope of the warrants—even under traditional Fourth Amendment standards.

As the Defendants acknowledge, "'[s]earches that **grossly exceed the scope** of a search warrant are unconstitutional.'" (Doc. 56 at 16) (quoting *High Plains Livestock, LLC v. Allen*, No. 217CV00349PJKGBW, 2019 WL 2524323, at *4 (D.N.M. June 19, 2019)) (emphasis by County Defendants). (*See also* Doc. 58 at 30 (quoting *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir 1997) for the "grossly exceed" standard).

But Plaintiffs pled that the search warrants required a preview search to "exclude from seizure [devices] which have not been involved in the identity theft." (Doc. 44 ¶ 285). Plaintiffs also pled that the Defendants selected terms for the preview search that "were so vague and indistinct" that they would essentially exclude nothing. (Doc. 44 ¶¶ 285-305). For example, Defendants chose to use the word "Kansas" as a search term for the devices of a newspaper whose coverage area is Marion County, **Kansas** and whose headquarters are in Marion, **Kansas**. (Doc. 44 ¶ 290). And Plaintiffs pleaded that a reasonable officer would know that such vague search terms grossly exceeded the scope of the warrant. (Doc. 44 ¶ 303) ("it is obvious the keyword search terms were a sham and were never designed to comply with the requirement in the 'search warrant' that officers conduct a preview search 'to exclude from seizure those which have not been involved in the identity theft'").

Moreover, when the so-called "preview search" failed to turn up any evidence of a crime, the raiders—at the direction of Sheriff Soyez—decided to "just take them all," referring to all the newspaper's computers and phones. (*See* Doc. 44 ¶¶ 317-30, 378-79, 389-90). And at the Meyer home, Defendants did not even attempt a preview search. This conduct is the exact opposite of the

preview search requirement in the warrants and is the paradigm of "grossly exceeding" the scope of the warrants.

In an attempt to justify his seizure of every computer in the *Record* newsroom and the Meyer home, Cody analogizes the seizure of every electronic device to the seizure of a file cabinet. (Doc. 58 at 30). But the Tenth Circuit long ago rejected such an analogy in *United States v. Carey*, 172 F.3d 1268, 1270 (10th Cir. 1999). There, a police detective obtained a search warrant authorizing them to search the defendants' computer for "names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances." *Id*. at 1270. To conduct this search the detective used "key words, such as, 'money, accounts, people, so forth.'" *Id*. at 1271. But "[t]his search produced no files 'related to drugs.'" *Id*.

"Undaunted, Detective Lewis continued to explore" the contents of the computer and located numerous .jpg files. *Id*. The detective then open individual .jpg files and discovered that some of them contained child pornography. *Id*. The defendant moved to suppress the child pornography images, arguing "the search constituted general rummaging in 'flagrant disregard' for the terms of the warrant and in violation of the Fourth Amendment." *Id*. at 1272. The Tenth Circuit agreed and ordered the images suppressed. *Id*. at 1276.

Of particular interest here is that the government, in attempting to justify the general search of the computer and opening of individual .jpg files, argued that "'a computer search such as the one undertaken in this case is tantamount to looking for documents in a file cabinet, pursuant to a valid search warrant, and instead finding child pornography.'" *Id*. at 1272. The court of appeals disagreed, finding that the comparison was a false one, because while in a search of a file cabinet a printed image of child pornography would be in plain view while reviewing the contents of the

file cabinet, the same was not true with regard to computer files; instead, each file would have to be opened to view the contents. *Id*. at 1273. Accordingly, the court found that "[t]he government's argument the files were in plain view is unavailing." *Id*.

The same is true here. The warrants only allowed police to seize evidence of so-called "identity theft," but Defendants—even after their preview search turned up no evidence of identity theft—seized the entire contents of every computer in the *Record* newsroom and the Meyer home. As such, Defendants "grossly exceeded" the scope of the search warrants.

The County Defendants also pitch a "Hail Mary" in their motion papers, claiming that "[i]t did not grossly exceed the scope of the warrants for Christner to follow Cody's direction that the preview searches be conducted off site." (Doc. 56 at 17). But Plaintiffs specifically pled that Cody and Soyez directed the computers and devices be seized with no preview search whatsoever—not to search them off site. (Doc. 44 ¶¶ 317-24, 378-79). The standard of review applicable to motions to dismiss prohibits this Court from considering the County's unsubstantiated allegations and alternative interpretation of the well-pleaded facts.

Moreover, the conduct of Defendants while in the *Record* newsroom consisted of precisely the type of ""rummag[ing] at large in newspaper files" that is constitutionally prohibited. *See Zurcher*, 436 U.S. at 565. This rummaging led, of course, to the discovery of the *Record*'s file on Chief Cody and to the discovery by Cody of the identity of the newspaper's confidential sources who had been providing information on Cody's troubled past in Kansas City. (Doc. 44 ¶¶ 306-16). As such, Defendants simply compounded their Fourth Amendment violations.

## VIII.   Plaintiffs have stated a claim for conspiracy

Defendants Sheriff Soyez, Det. Christner, Mayor Mayfield, and Officer Hudlin argue that Plaintiffs' allegations of a conspiracy are ineffective. (*See* Doc. 56 at 8-10; Doc. 60 at 19).[20] Specifically, they assert "[t]his was simply a police investigation in which probable cause for federal and state law crimes existed" and that they had no unlawful objectives. (Doc. 60 at 19).[21] But the First Amended Complaint specifically—and repeatedly—alleges the Defendants possessed unlawful objectives.

For example, the complaint alleges that Mayor Mayfield had a publicly stated agenda to "silence the MCR." (Doc. 44 ¶¶ 157-58). It alleges that Chief Cody wanted to silence the *Record* because the newspaper was investigating his sordid background and threatened to expose the fact local law enforcement allowed Kari Newell to drive without a valid license for over a decade. (Doc. 44 ¶¶ 36-37). It alleges that Sheriff Soyez—who was singularly responsible for bringing Cody to Marion—feared he would get blowback if the *Record* exposed Cody's past and sought to suppress Plaintiffs' reporting on allegations he permitted Newell to drive without a valid license for years. (Doc. 44 ¶¶ 13-16, 773). It alleges that Christner and Hudlin were a couple of compliant cops who were willing to break the law to keep their bosses happy, with Christner drafting warrant applications he knew were baseless (Doc. 44 ¶¶ 777-79) and with Hudlin scouring the *Record*'s

---

[20] Chief Cody—who chose to file a separate motion to dismiss—did not make any argument concerning Plaintiffs' conspiracy claim; in fact, a keyword search of the memorandum in support of his motion to dismiss shows he never once even uses the word "conspiracy." (*See* Doc. 58). As a result, he has forfeited his right to challenge Count V of the First Amended Complaint. *See Wafra Leasing Corp. 1999-A-1 v. Prime Cap. Corp.*, 247 F. Supp. 2d 987, 999 (N.D. Ill. 2002).

[21] The fallacy of Defendants' argument is evidenced by their reference to so-called "federal crimes." Neither the Marion Police Department nor the Marion County Sheriff's Office is authorized to arrest anyone for violating a federal criminal statute.

offices until he found the newspaper's file on Cody, and then inviting Cody to view the file himself so Cody could identify the paper's confidential sources. (Doc. 44 ¶¶ 766-68).

And the First Amended Complaint alleges a specific agreement among Defendants regarding a general unlawful conspiratorial objective: to engage in unconstitutional, fishing-expedition raids of the newsroom and Meyer home in retaliation for protected speech. (Doc. 44 ¶¶ 201, 206-208) (describing series of meetings where conspirators met to collaborate on conspiratorial objective).

Moreover, Defendants' consciousness of guilt is pled as well. The First Amended Complaint recites how Chief Cody directed Kari Newell to destroy her text messages with him in an attempt to cover up his wrongdoing and directed Newell to only communicate with him via phone to keep their communications secret. (Doc. 44 ¶¶ 374, 446-48). It recites how Sheriff Soyez purposefully tried to hide his involvement in the raid by misleadingly stating "you didn't see me over there." (Doc. 44 ¶¶ 428-30). It alleges that Det. Christner tried to hide his involvement by refusing to sign the search warrant applications he drafted. (Doc. 44 ¶ 210). And it alleges that Officer Hudlin (who knew his words were being recorded on his body camera) used "code words" to invite Chief Cody to examine the contents of the *Record*'s file on Cody, saying, "Do YOU want to look through this file?" (Doc. 44 ¶¶ 306-14).

Courts have routinely found such consciousness of guilt to be probative evidence in Section 1983 cases. *See, e.g., Medina as next friend for N.M. v. Izquierdo*, 594 F. Supp. 3d 1045, 1060 (N.D. Ill. 2022) (evidence of "cover-up" admissible to "show[] consciousness of guilt"); *Sanford v. Russell*, 531 F. Supp. 3d 1221, 1227 (E.D. Mich. 2021) (evidence of defendant's "consciousness of his unlawful conduct" admissible); *Jennings v. Decker*, 359 F. Supp. 3d 196, 213 (N.D.N.Y. 2019) (evidence of consciousness of guilt admissible as "circumstantial evidence of an agreement,

either tacit or explicit, amongst the officers to protect themselves by portraying a false version of Plaintiff's arrest"); *Casias v. Dep't of Corr.*, No. 116CV00056JMCSCY, 2019 WL 2766900, at *3 (D.N.M. July 2, 2019) (defendant's false description of events was "an attempt to avoid liability and showed consciousness of guilt").

As a result, Plaintiffs have sufficiently alleged a "general conspiratorial objective," which is all that is required under Tenth Circuit precedent.

> An express agreement among all the conspirators is not a necessary element of a civil conspiracy. … To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] know to each person who is to be held responsible for its consequences."

*Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979)) (citations omitted).

### IX.     Plaintiffs have stated claims for individual liability

Each of the individual defendants assert that they are protected by qualified immunity.[22] Qualified immunity shields government officials "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[23] "Ordinarily, in

---

[22] Plaintiffs recognize this Court is bound to apply the qualified immunity doctrine pursuant to binding precedent. Plaintiffs, however, share the belief that the concept of qualified immunity is unfounded, *see Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020), and unconstitutional, *see Green v. Thomas*, No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133 (S.D. Miss. May 20, 2024). Accordingly, Plaintiffs preserve these challenges to the application of quality immunity.

[23] There is no "heightened pleading standard" in Section 1983 civil rights lawsuits. *See Leatherman v. Tarrant Cnty. Narcotics Intel. & Co-ordination Unit*, 507 U.S. 163, 168 (1993). Quite the contrary, the exact opposite is true. Because qualified immunity claims "turn on a fact-bound inquiry, 'qualified immunity defenses are typically resolved at the summary judgment stage' rather than on a motion to dismiss." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). Accordingly, "'[a]sserting a qualified immunity defense via a Rule 12(b)(6) motion ... subjects the defendant to a more challenging standard of review.'" *Id.*

order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point …." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

### A.     The brazenness of Defendants' conduct is not a 'Get out of jail free' card

Defendants claim they are protected from liability for their outrageous conduct because there is no reported decision from the Supreme Court or the Tenth Circuit prior to August 11, 2023, that involves local government officials conspiring with law enforcement to promote trumped up charges as a pretext to obtain illegal search warrants to use to "silence" the local newspaper by raiding the newspaper's office and the home of the paper's co-owners and seizing every computer and cell phone in sight. But Defendants overstate the reach of qualified immunity.

A defendant is not entitled to qualified immunity if they had fair notice that their conduct would violate a clearly established right. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). A clearly established right is one that would have been "known" or could have been "predicted" by the defendant at the time of the offending act. *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). While a Supreme Court or Court of Appeals decision directly on point can clearly establish a right, "this Court's case law does not require a case directly on point for a right to be clearly established." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam).

Thus, the Supreme Court's precedent "makes clear that officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). That precedent does not require that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In fact, the Court has "expressly rejected a requirement that previous cases be 'fundamentally similar.'" *Hope*, 536 U.S. at 731.

Instead, it is sufficient "to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. As a result, "a general constitutional rule already

identified in the decisional law" can clearly establish a right if it "appl[ies] with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741; see *York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008) (clearly established case law "does not mean that there must be a published case involving identical facts; otherwise, we would be required to 'find qualified immunity wherever we have a new fact pattern'").

Furthermore, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). Here, Defendants used a reporter's lawful access of public records via a state agency's public-facing portal as the basis for falsified search warrant affidavits, overbroad "warrants," and fishing expedition raids that exceeded the scope of the "warrants," hobbled the free press by revealing its confidential sources, seizing all of the paper's electronics, and killed one of the newspaper's co-owners. Such conduct is patently "obviously egregious."

Thus, Defendants are not entitled to play their 'Get out of jail free" card simply because no other actors have been as brazen as Defendants were in carrying out their plainly unconstitutional scheme.

### B.   The law was clearly established such that Defendants were on fair notice

The law was clearly established prior to the unprecedented raids on the newsroom of the *Marion County Record* and the home of Joan and Eric Meyer such that Defendants were on fair notice that each and every action they took before, during, and after the raids was illegal and unconstitutional. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged

45

against the backdrop of the law at the time of the conduct."); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) ("the touchstone of our inquiry is whether the 'officers [were] on notice [that] their conduct [was] unlawful'").

### 1.     The First Amendment protects the free press

Prior to August 11, 2023, it was clearly established that "[t]he First and Fourteenth Amendments bar government from interfering in any way with a free press." *Pell v. Procunier*, 417 U.S. 817, 834 (1974).

### 2.     The First Amendment guarantees the freedom of the press to gather news

Prior to August 11, 2023, it was clearly established that the First Amendment guaranteed the freedom of the press to gather and report information about matters of public concern. *See Branzburg v. Hayes*, 408 U.S. 655, 681 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated").

### 3.     The First Amendment guarantees the right to view public records

Prior to August 11, 2023, it was clearly established that the First Amendment grants a "'general right to inspect and copy public records and documents.'" *Courthouse News Service v. New Mexico Administrative Office of Courts*, 53 F.4th 1245, 1263 (2022) (quoting *Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018)).

### 4.     Law enforcement cannot physically interfere with newsgathering

Prior to August 11, 2023, it was clearly established that the First Amendment prohibited government officials, including the police, from physically interfering with the freedom of the press to gather and report information about matters of public concern. For example, in *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022), the Tenth Circuit ruled that it was clearly established

as of 2019 that the First Amendment prohibited police officers from physically preventing a journalist from filming a traffic stop.

### 5.   The First Amendment protects confidential sources

Prior to August 11, 2023, it was clearly established that a reporter's promise of confidentiality to a source was protected by the First Amendment. *See Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 438 (10th Cir. 1977); *In re Pennington*, 224 Kan. 573, 574, 581 P.2d 812, 814 (1978).

### 6.   The First Amendment prohibits retaliation

Prior to August 11, 2023, it was clearly established that the government, including the police, cannot retaliate against a person for engaging in protected activity under the First Amendment. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 572 (1968). Specifically, it was clearly established that the First Amendment prohibits criminal investigation, prosecution, and arrest in retaliation for protected First Amendment activity like speech on issues of public concern. *See Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018).

### 7.   The First Amendment and Fourth Amendment

Prior to August 11, 2023, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

### 8.   The warrant requirement

Prior to August 11, 2023, it was clearly established that the Fourth Amendment prohibited the government, including the police, from conducting warrantless raids on a person's home or a corporation's offices except in strictly limited circumstances, such as exigent circumstances, with consent of the property owner, an item is in plain view, etc. *See Payton v. New York*, 445 U.S. 573, 576 (1980).

### 9.    The probable cause requirement

Prior to August 11, 2023, it was clearly established that "[a]n affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Furthermore, "[p]robable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990).

### 10.    The prohibition against false testimony

Prior to August 11, 2023, it was clearly established that "[i]t is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit . . . or to knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996).

### 11.    The oath or affirmation requirement

Prior to August 11, 2023, it was clearly established that in order to be constitutionally valid a search warrant application must comply with the Fourth Amendment's "oath or affirmation" requirement. *See Kalina v. Fletcher*, 522 U.S. 118, 129 (1997).

### 12.    The prohibition against general searches

Prior to August 11, 2023, it was clearly established that "general searches" or "general exploratory rummaging" are unconstitutional. *See Mink v. Knox*, 613 F.3d 995, 1010-11 (10th Cir. 2010). Officers who display "flagrant disregard" for the terms of the search warrant violate the Fourth Amendment. *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996). "When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined, and a valid warrant is transformed into a general warrant" which violates the Fourth Amendment. *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988).

### C.      Plaintiffs have pled the violation of federal rights

As set forth above, Plaintiffs' rights under the First and Fourth Amendments were clearly established at the time of the raids. With respect to the second prong of the qualified immunity, Plaintiffs have adequately pled that Defendants' actions violated these rights. *See* Sections V-VIII, *supra*.

### X.      Plaintiffs have stated claims for municipal liability

The City and County Defendants acknowledge that municipal liability can be established by (a) the decision of an employee with final policymaking authority, (b) ratification of an action by a final policymaker, or (c) a failure to train that is the result of a deliberate indifference. (Doc. 56 at 7; Doc. 60 at 20-21).

### A.      Mayfield, Cody, and Soyez were final policymakers

Neither the City nor the County challenge the factual allegations in the First Amended Complaint that pursuant to both state statute and the Marion City Code former Mayor Mayfield had "superintending control of all officers and affairs of the city," (Doc. 44 ¶¶ 719-20), that pursuant to the City Code former Police Chief Cody had "the power to make such rules and regulations as may be necessary for the proper and efficient conduct of the department," (Doc. 44 ¶ 723), and that Sheriff Soyez is charged by state statute with "keep[ing] and preserv[ing] the peace in [Marion County]" and with "the service of process in … criminal cases, and in apprehending or securing any person for felony or breach of the peace." (Doc. 44 ¶ 728).

Nor do they challenge the legal conclusion that these men are final policymakers. *See Jackson v. City & Cnty. of Denver*, No. 20-1051, 2022 WL 120986, at *4 (10th Cir. Jan. 13, 2022) ("In

determining whether an official has final policymaking authority, we look to state and local law.").[24]

Instead, they argue these policymakers did not have requisite culpability because Plaintiffs do not allege "a pattern of unconstitutional behavior." (Doc. 60 at 21). But it is well-settled that such a pattern is not required. As the Tenth Circuit explained in *Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995), "if an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." *Id.* at 447.

In its decision in *Randle*, the Tenth Circuit relied on the Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), which is particularly apposite. There, two local sheriff deputies attempted to serve capias warrants at a physician's office. When the physician refused to allow the deputies to enter the patient area, the deputies called the assistant prosecuting attorney, who told the deputies to "go in and get" the witnesses. The deputies then used an axe to chop down the door and arrested two persons who appeared to fit the description of the two witnesses—but it was later determined neither person was the person named in the warrant.

The physician brought a Section 1983 lawsuit against the assistant prosecutor and his employer, the county. In its decision, the Supreme Court wrote that it had "little difficulty" concluding that the county was liable for the order of the assistant prosecuting attorney to "go in and get ['em]". *Id.* at 484. "[W]here action is directed by those who establish governmental policy, the

---

[24] The City argues at one point that only Chief Cody could be a final policymaker (and not Mayor Mayfield) because only Cody had authority to establish policy for the police department, citing *Smith v. Barber*, 195 F. Supp. 2d 1264, 1272-1273 (D. Kan. 2002). (*See* Doc. 60 at 21). But the City's citation to *Smith* is unavailing for a number of reasons, including the fact the mayor was not named as a defendant in *Smith*, and because it ignores Mayor Mayfield's "superintending control of all officers and affairs of the city."

municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id*. at 481. Put another way, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers." *Id*. at 480.

Thus, Chief Cody's directive to Det. Christner to "just take 'em," (Doc. 44 ¶ 379), when referring to the computers and phones at the Meyer home, and Sheriff Soyez' directive to Chief Cody to "just take them all," (Doc. 44 ¶322), when referring to the computers and phones at the *Record*'s offices, are paradigmatic orders of final policymakers under *Pembaur*.[25]

Sheriff Soyez also argues that the First Amended Complaint fails to allege he had the "requisite degree of culpability" and that his actions did not cause the deprivation of Plaintiffs' constitutional rights. (Doc. 56 at 7). But Soyez is wrong. The First Amended Complaint alleges that Soyez personally participated in planning for the raids, even hosting the planning meeting at his office two days before the raid. (Doc. 44 ¶¶ 206-07, 639, 781). The complaint also alleges it was Soyez who personally suggested raiding the Meyer home, and not just the *Record*'s offices. (Doc. 44 ¶ 234). And the complaint alleges it was Soyez who directed Chief Cody to take all of the computers and phones from the *Record*'s newsroom. (Doc. 44 ¶ 611).

Such personal participation in the planning of the illegal raids is legally sufficient, for Section 1983 liability "is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)

---

[25] Both the City and the County also argue that the final policymakers did not act with what they term "the requisite state of mind: deliberate indifference." (Doc. 56 at 8; Doc. 60 at 20). But "deliberate indifference" is used in place of intent in cases of inaction, such as lack of training claims, and does not apply to intentional policy choices. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 419 (1997) (Souter, J., dissenting).

The requirement also does not apply where the "policy" is facially unconstitutional. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). Here, Plaintiffs have alleged facts showing that the "policy," *i.e.*, to "silence the MCR," was facially unconstitutional. (Doc. 44 ¶¶ 157-58, 169-171).

(quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008)) (internal quotation marks and brackets omitted). "Personal involvement does not require direct participation because § 1983 states any official who causes a citizen to be deprived of her constitutional rights can also be held liable." *Id.* (quoting *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008)) (internal quotation marks omitted).

Instead, a "plaintiff may demonstrate causation by showing an affirmative link between the constitutional deprivation and the [defendant's] exercise of control or direction." *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010). Causation is thus established when a "defendant set[s] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [their] constitutional rights." *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006) (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).

That is precisely what Plaintiffs have alleged here, *i.e.*, that Sheriff Soyez personally planned the illegal raids (even targeting the Meyer home) and personally directed the raids in real time while they were occurring. As such, Plaintiffs have adequately alleged Soyez' personal involvement.

## B.    The City and County's deliberate indifference to the need for training

Neither the City nor the County dispute that the botched raids—as detailed in the First Amended Complaint—demonstrate a complete and total lack of training as to the constitutional, federal statutory, and state statutory protections the press have from governmental intrusion. Instead, they argue this abject failure was not the result of "deliberate indifference." (Doc. 56 at 8; Doc. 60 at 21).

"To satisfy [Section 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate

indifference can be shown when "the unconstitutional consequences of a failure to train are highly predictable and patently obvious." *Waller v. City & Cty of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019).

Thus, deliberate indifference was shown where a city police chief and county sheriff instructed officers to conduct traffic stops for purposes of drug interdiction without any formal training on the applicable Fourth Amendment standards, for a lack of training in such circumstances "would predictably lead to constitutional violations." *Calvo-Pino v. Weidl*, 514 F. Supp. 3d 1321, 1330 (D. Kan. 2021). The court explained that "[u]nlike cases addressing allegations of sexual assault or discrimination, the factors relevant to an officer's reasonable suspicion determination during a traffic stop are not necessarily obvious to an untrained officer." *Id*.

The same is true here. As set forth in *Zucher*, the federal Privacy Protection Act, and the Kansas Shield Law,[26] journalists are entitled to strict protections that "are not necessarily obvious to an untrained officer." Yet, neither the City nor the County made any effort to train its officers on these protections—but set them out to search the town's newspaper's offices and the home of the paper's owners. Defendants' deliberate indifference to the consequences of its failure to train its officers on these protections before undertaking these searches is clear. *See Bailey v. Ramos*, 657 F. Supp. 3d 927, 961 (W.D. Tex. 2023) (finding that failure to train officers on the First Amendment right to videorecord officers "would amount to deliberate indifference").

Finally, Defendants argue—just as they did in regard to Plaintiffs' allegations regarding final policymakers—that that deliberate indifference is only shown by a "pattern of violations." (Doc. 56 at 8). But that is not the law. "A deliberate indifference claim may be based on a single

---

[26] Despite claiming that the Kansas Shield Law "is not applicable to this case," the City Defendants concede that "the law creates a privilege for journalists." (Doc. 60 at 24). Despite that fact, the City never trained its officers on that privilege.

incident when the need for training 'can be said to be "so obvious," that failure to do so could probably be characterized as "deliberate indifference" to constitutional rights.'" *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)) (collecting cases). Because that is precisely what Plaintiffs have alleged, they have satisfied the requirement of pleading deliberate indifference. (Doc. 44 ¶¶ 734-39).

### C.   The City ratified the actions of the officers

In the First Amended Complaint, Plaintiffs allege that the Marion City Council ratified the actions of its officers when, after Chief Cody resigned, it voted to promote Officer Hudlin to interim Police Chief, despite knowing Hudlin's role in the raid—specifically including Hudlin's role in showing Chief Cody the *Record*'s file on Cody, which included the names of the paper's confidential sources who had provided damaging information on Cody. (Doc. 44 ¶¶ 306-14).

The City acknowledges that ratification is a valid means of finding municipal liability (*see* Doc. 60 at 20-21) but makes the conclusory assertion that Plaintiffs' effort to show ratification "fails," citing *Waller v. City and County of Denver*, 932 F.3d 1277 (10th Cir. 2019). But *Waller* does not help the City, for in *Waller*, there was no "indication that a final decisionmaker ratified Deputy Lovingier's use of force; to the contrary, Mr. Waller alleges that Deputy Lovingier was criticized and suspended for using force in violation of Sheriff Department policies." *Id*. at 1291.

Here, Hudlin was not criticized or suspended, but promoted. *Waller* is plainly inapposite.[27]

---

[27] The County makes a separate procedural argument that the Defendant Board of County Commissioners should be dismissed because the claims against it are duplicative of the claims against Sheriff Soyez in his official capacity. (Doc. 56 at 6 n.3). But the Federal Rules explicitly allow alternative claims and provide that "the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Thus, dismissal at this stage is inappropriate. Rather, Plaintiffs need not make a choice until the pre-trial order.

XI.   **Plaintiffs have stated a claim for violation of the Privacy Protection Act**

The federal Privacy Protection Act, enacted in 1980, has a simple premise: law enforcement should use a subpoena—not a search warrant—to obtain evidence from journalists. This requirement allows journalists to object to the subpoena and requires law enforcement to obtain a court order to enforce a challenged subpoena.

The Act achieves this mandate by making it unlawful, with certain exceptions, for law enforcement officers (federal, state, or local) to search a journalist or a newsroom or to seize material from them. 42 U.S.C. § 2000aa. The Act provides that any person aggrieved by such an unlawful search or seizure has a civil cause of action for damages against the "governmental unit" whose officers conducted the search. 42 U.S.C. § 2000aa-6(a)(1).

A.   **The "suspect exception" does not apply**

One exception to the Act is the so-called "suspect exception" which allows a search where "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(a)(1) & (b)(1). Both the City and the County rely on this exception. (Doc. 56 at 19-20; Doc. 60 at 23).

But the law is well-settled that where there is no probable cause to believe the journalist has committed a crime, the suspect exception does not apply. "The 'suspect exception' to the PPA … does not apply here because, as the Court has already determined, there was no probable cause to support the arrest of Mr. Dunn for any crime, much less a crime related to the materials …." *Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347, 1369 (M.D. Ga. 2020).

As shown above, it is not a crime to use the "Kansas Driver's License Status Check" tool; rather, as the General Counsel of the Department of Revenue told the KBI, it is **not** a violation of the law "for someone to access another's Kansas driver's license information via the State[']s

KDOR public access website." (Doc. 44 ¶¶ 492-509). Because there was no probable cause to

believe anyone at the *Record* had committed a criminal act, the suspect exception does not apply.[28]

### B.      There is no "good faith" defense available to the City or the County

The County argues that even if there was no actual probable cause, the County is shielded

from liability because the Act contains a "good faith" defense. (Doc. 56 at 19-20) But the County

misreads the Act.

The Act provides in subsection (a)(1) of Section 2000aa-6 that a person aggrieved by an

unlawful search or seizure may bring a civil cause of action "against the United States, against a

State which has waived its sovereign immunity …, or against any other governmental unit, all of

which shall be liable for violations of this chapter by their officers or employees while acting

within the scope or under color of their office or employment." 42 U.S.C. § 2000aa-6(a)(1). The

Act defines "any other governmental unit" as including "any local government [or] unit of local

government." 42 U.S.C. § 2000aa-7(c).

The Act provides in subsection (a)(2) that an aggrieved person may bring a civil cause of

action "**against an officer or employee of a State** who has violated this chapter while acting

within the scope or under color of his office or employment, if such State has not waived its sov-

ereign immunity as provided in paragraph (1)." 42 U.S.C. § 2000aa-6(a)(2) (emphasis added).

Thus, it is plain that a claim under subsection (a)(2) is limited to claims against individual

state officers—and then, only when the state has not waived sovereign immunity. In such limited

cases, the state officer (who is sued in their individual capacity) can assert a good faith defense.

That is what the statute states when it says "[i]t shall be a complete defense to a civil action brought

---

[28] Defendants also do not (and cannot) assert there was probable cause to believe that Deb Gruver had committed any crime—and it was Gruver's desk that Hudlin searched to find her investigative file on Chief Cody in order to share that file with Cody. (Doc. 44 ¶¶ 307-14).

**under paragraph (2) of subsection (a)** that the officer or employee had a reasonable good faith belief in the lawfulness of his conduct." 42 U.S.C. § 2000aa-6(b) (emphasis added).

The Tenth Circuit addressed the distinction between claims against individual state officers on the one hand and claims against municipal "governmental units" on the other, in *Davis v. Gracey*, 111 F.3d 1472 (10th Cir. 1997). There, the court explained that the Act "creates a civil cause of action … against the United States, against a State (if the State has waived sovereign immunity), or against 'any other governmental unit.'" *Id*. at 1481. The court noted that a claim is available against individual officers only if they are state officers and the state has not waived sovereign immunity. *Id*. (citing 42 U.S.C. § 2000aa-6(a)(2)). "The PPA by its terms does not authorize a suit against *municipal* officers or employees in their individual capacities." *Id*. at 1482 (emphasis in original). Thus, the provision in subsection 6(b) allowing a good faith defense only applies to state officers who have been sued because their state has not waived sovereign immunity, and not to municipal officers. *Id*.

Here, Plaintiffs are not asserting a claim under subsection (a)(2) against a state officer; instead, they are only asserting claims under (a)(1) against municipal defendants, *i.e.*, the City of Marion and Marion County. As such, the "good faith" defense does not apply.

In fact, the Act states this explicitly in subsection (c) that "[t]he United States, a State, or **any other governmental unit** liable for violations of this chapter *under subsection (a)(1)*, **may not assert as a defense** to a claim arising under this chapter the immunity of the officer or employee whose violation is complained of or **his reasonable good faith belief in the lawfulness of his conduct**." 42 U.S.C. § 2000aa-6(c) (emphasis added).

Because Plaintiffs have only sued the City and the County for violating the Act, neither Defendant can assert a good faith defense.

### C.   Both "work product materials" and "documentary materials" were seized

Finally, both the City and the County assert the Act does not apply for various reasons related to the Act's definitions of "documentary material" and "work product material." (Doc. 56 at 20; Doc. 60 at 22-23). These arguments are misplaced.

The Act defines "documentary material" as "materials upon which information is recorded, and includes … written or printed materials [and] electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense." 42 U.S.C. § 2000aa-7(a).

The City argues that Kari Newell's driver's license record is "property used in a criminal offense" and is therefore not documentary material. (Doc. 60 at 23). Again, however, as the KDOR General Counsel told the KBI, the Kansas "Driver's License Status Check" tool only provides "non-confidential information regarding driving accidents, driving record history, and driver driving status." (Doc. 44 ¶¶ 492-509). As such, possession of such "non-confidential" information is not a crime.

Moreover, the officers searched the entire newsroom, going through file after file (Doc. 44 ¶ 306) and were searching not just for documents concerning the status of Kari Newell's driver's license, but any document containing any person's names, address, or telephone number. (Doc. 44 ¶¶ 526-33). Additionally, the officers seized over 18 gigabytes of data from the *Record*'s computer network. (Doc. 44 ¶¶ 439-41). For comparison's sake, one gigabyte of data is equivalent to a "[p]ick-up truck filled with paper." Tony R. DeMars, *Big Data*, in COMMUNICATIONS TECHNOLOGY UPDATE & FUNDAMENTALS 305, 307 (August E. Grant & Jennifer H. Meadows eds., 16th ed. 2018).

The Act defines "work product materials" as "materials, other than contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used, as the means of committing a criminal offense," which were prepared by journalist and are possess for the purpose of communicating such material to the public, and include—but are not limited to—mental impressions, conclusions, opinions, etc. 42 U.S.C. § 2000aa-7(b).

The County argues that because the *Record* did not intend to publish Kari Newell's driver's record, the material was not work product material. (Doc. 60 at 20). But the County ignores the fact Eric Meyer told both Chief Cody and Sheriff Soyez prior to the raids that the *Record* was pursuing "a news story" as to how the Marion Police and the Marion County Sheriff's Office had allowed Newell to drive around town with a suspended license "for nearly a quarter of a century." (Doc. 44 ¶¶ 134, 807).

The County also ignores the fact the search included a review of the *Record*'s file on Chief Cody, which contained information the *Record* intended to publish as soon as the report was ready—and which the paper in fact published on August 23, 2024. (Doc. 44 ¶¶ 810-11). The County also ignores the fact that 18 pick-up trucks worth of data was seized from the *Record*. (Doc. 44 ¶¶ 440-41). As such, the County's argument that the *Record* never intended to publish a single report about any of the information contained in its newsroom or on its computer server is simply wrong.

## XII.   Conclusion

Accordingly, Plaintiffs ask this Court to deny Defendants' motions. To the extent the Court otherwise grants any portion of Defendants' motions, Plaintiffs ask that they be given 21 days to replead their claim(s).

Respectfully submitted,

By: */s/ Bernard J. Rhodes*

Bernard J. Rhodes      KS #15716
Emma C. Halling       KS #27924
2345 Grand Blvd., Ste. 2400
Kansas City, MO  64108
(816) 292-2000 – Telephone
(816) 292-2001 – Facsimile
bernie.rhodes@lathropgpm.com
emma.halling@lathropgpm.com

ATTORNEYS FOR PLAINTIFFS