IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERIC MEYER, et al.,

                    Plaintiffs,                     Case No. 24-2122-DDC-GEB

v.

CITY OF MARION, KANSAS, et al.,

                    Defendants.

MEMORANDUM AND ORDER

This case involves "the precious liberties established and ordained by the Constitution." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). Plaintiffs Eric Meyer, individually and as executor of the estate of Joan Meyer, and The Hoch Publishing Co. (doing business as the *Marion County Record*) allege constitutional violations against a litany of defendants. Plaintiffs allege that defendants sought political revenge against plaintiffs and encroached on their First and Fourth Amendment rights by unlawfully procuring search warrants, raiding the *Marion County Record* newspaper office and the Meyer home, and seizing property in flagrant disregard of warrant requirements. Defendants include: the City of Marion, Kansas; David Mayfield, former mayor the City of Marion, in his official and individual capacity; Gideon Cody, former chief of the Marion Police Department, in his official and individual capacity; Zach Hudlin, acting chief of the Marion Police Department, in his individual capacity; the Board of Commissioners of Marion County, Kansas; Jeff Soyez, Sheriff of the Marion County Sheriff's Office, in his official and individual capacities; and Aaron Christner, detective with the Marion County Sheriff's office, in his individual capacity.

The Board of County Commissioners of Marion County, Soyez, and Christner (collectively, "county defendants") filed a Motion to Dismiss (Doc. 55).  Cody filed a separate Motion to Dismiss (Doc. 57).  And the City of Marion, Hudlin, and Mayfield (collectively, "city defendants") filed a third Motion to Dismiss (Doc. 59).  Plaintiffs responded to all three motions in a single Response (Doc. 63), and defendants filed Replies (Doc. 72 (county defendants' Reply); Doc. 73 (jointly-filed Reply by Cody and city defendants)).  After defendants filed their Replies, plaintiffs filed a Motion for Leave to File Supplemental Response (Doc. 75), and the city defendants and Cody then filed a Motion to Strike (Doc. 77) that Response.

This Order grants in part and denies in part the county defendants' Motion to Dismiss (Doc. 55) and the city defendants' Motion to Dismiss (Doc. 59).  This Order denies Cody's Motion to Dismiss (Doc. 57).  This Order also denies plaintiffs' Motion to File a Supplemental Response (Doc. 75).  And it denies the city defendants and Cody's Motion to Strike (Doc. 77) as moot.

The court explains these rulings, below.

## I.  Background

The following facts come from plaintiffs' Amended Complaint (Doc. 44).  The court accepts plaintiffs' "well-pleaded facts as true, view[s] them in the light most favorable to Plaintiffs, and draw[s] all reasonable inferences from the facts in favor of Plaintiffs."  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted).

Because this lawsuit involves a host of characters, the following table summarizes the players and their roles for the reader's reference:

| Name | Role |
|---|---|
| **Plaintiffs and Associated Individuals** | |
| The Hoch Publishing Co. (d/b/a *Marion County Record*) | |
| Eric Meyer | Publisher and editor for the *Record* |
| Phyllis Zorn | Reporter for the *Record* |
| Deb Gruver | Reporter for the *Record* |
| Ruth Herbel | Vice Mayor of Marion City Council |
| **Defendants and Associated Individuals** | |
| Board of County Commissioners of Marion County* | |
| Jeff Soyez* | Sheriff of the Marion County Sheriff's Office |
| Aaron Christner* | Detective for the Marion County Sheriff's Office |
| City of Marion, Kansas** | |
| David Mayfield** | Former Mayor of Marion, Kansas |
| Gideon Cody | Former Chief of Police of Marion Police Department |
| Zach Hudlin** | Acting Chief/Officer for Marion Police Department |
| Kari Newell | Coffeeshop owner with suspended driver's license |

\*: County defendants
\*\*: City defendants

### *An Introduction to Marion, KS*

Marion, Kansas, is a small city in south central Kansas.  Doc. 44 at 3 (Am. Compl. ¶ 5). Its population numbers fewer than 2,000 people.  *Id.*  During the period relevant to this lawsuit— the summer of 2023—David Mayfield served as Marion's mayor.  *Id.* (Am. Compl. ¶ 6).  During this same period Jeff Soyez served as Marion County's[1] sheriff.  *Id.* at 4 (Am. Compl. ¶ 11). When the City's police chief quit in late 2022, Mayfield—who also worked for Soyez in a part-time capacity transporting prisoners—sought input from Soyez about who to hire as police chief. *Id.* (Am. Compl. ¶¶ 9–11, 16).  Soyez strongly recommended Captain Gideon Cody of the Kansas City, Missouri Police Department.  *Id.* (Am. Compl. ¶¶ 13, 16).  The *Marion County*

---

[1]    Hoping to simplify matters, this Order refers to the City of Marion, Kansas, simply as as "the City" and to Marion County simply as "the County."

*Record* learned that the City was considering hiring Cody as police chief, and it reported as much. *Id.* at 6 (Am. Compl. ¶ 28).

"The *Marion County Record* is a weekly newspaper published in Marion, Kansas, and is the paper of record for the City of Marion and Marion County." *Id.* at 5 (Am. Compl. ¶ 21). One of the plaintiffs, The Hoch Publishing Co., owns the *Record*. *See id.* at 6 (Am. Compl. ¶ 23). And plaintiff Eric Meyer, who is the primary owner of The Hoch Publishing Co., serves as editor and publisher of the *Record*. *See id.* (Am. Compl. ¶¶ 23, 24, 27).

After reporting Cody's candidacy, the *Record* received a series of tips from people who wished to remain anonymous for fear of retribution by Cody. *Id.* (Am. Compl. ¶ 28). These tips included myriad unflattering descriptions of Cody's behavior and leadership during his tenure with the Kansas City, Missouri Police Department. *Id.* at 6–7 (Am. Compl. ¶¶ 30–33). When asked about these allegations by *Record* reporter Deb Gruver, Cody expressed that "he was angry the newspaper was investigating him."[2] *Id.* at 7 (Am. Compl. ¶¶ 36–37). In late spring 2023, Mayfield offered Cody a position as Marion's police chief. *Id.* at 7 (Am. Compl. ¶ 40). Cody accepted. *Id.* at 7–8 (Am. Compl. ¶¶ 40, 42–43).

Now that the court has described the characters and set the scene, it turns to a series of interactions that precipitated the constitutional violations alleged here.

### Drama Begins to Brew

In late July 2023, United States Representative Jake LaTurner announced a visit to the City on August 1, 2023, for an event called "Coffee With Your Congressman." *Id.* at 11 (Am. Compl. ¶ 57). The congressman's communications director sent Meyer an email and invited him

---

[2]    Gruver also has filed suit, asserting claims arising from this same series of events. Complaint, *Gruver v. Cody*, No. 23-cv-1179-DDC-GEB (D. Kan. Aug. 30, 2023), ECF No. 1.

to the event. *Id.* (Am. Compl. ¶ 59). Kari's Kitchen—a coffeeshop in the City owned by Kari Newell—hosted the event. *Id.* (Am. Compl. ¶ 60). When Meyer and *Record* reporter Phyllis Zorn tried to attend the event, Newell kicked them out of her coffeeshop.[3] *Id.* (Am. Compl. ¶¶ 63–64).

The day after the event, an anonymous tipster contacted Zorn on Facebook. *Id.* at 13 (Am. Compl. ¶ 68). The tipster informed her "that Newell's driver's license was suspended due to a prior DUI conviction." *Id.* (Am. Compl. ¶ 69). The tipster also alleged to Zorn that local law enforcement had known that Newell didn't have a valid driver's license for years but had allowed Newell to continue driving. *Id.* (Am. Compl. ¶ 70). The tipster then shared a copy of a driver's license reinstatement letter, addressed to Newell, from the Kansas Department of Revenue (KDOR). *Id.* (Am. Compl. ¶¶ 71–74). The letter included Newell's full name, address, driver's license number, and date of birth. *Id.* at 13–14 (Am. Compl. ¶ 74). Zorn shared the letter with Meyer. *Id.* at 14 (Am. Compl. ¶ 76).

### Driver's License Status Check

The next day—August 3, 2023—Meyer found a webpage titled "Kansas Driver's License Status Check" located on KDOR's website. *Id.* at 15 (Am. Compl. ¶ 82). That website "allows anyone to check the status of a Kansas driver's license so long as the person knows the driver's license number, first and last name, and date of birth of the driver[.]" *Id.* (Am. Compl. ¶ 83). The website is public facing. *Id.* at 16 (Am. Compl. ¶ 84). It doesn't require any login and doesn't offer any warning about accessing its information. *Id.* The only "disclaimer" the website provides is that its information "is a summary only and will not display any sanctions from another state." *Id.* (Am. Compl. ¶ 85).

---

[3]     Zorn also has filed suit, asserting claims arising out of this same series of events. Complaint, *Zorn v. City of Marion*, No. 24-cv-2044-DDC-GEB (D. Kan. Feb. 6, 2024), ECF No. 1.

Meyer inputted Newell's information—which he had gotten from the letter provided by the tipster—into the KDOR website. *Id.* (Am. Compl. ¶ 86). Doing so, he confirmed Newell's DUI conviction and confirmed that Newell's driver's license was suspended. *Id.*

The next day—August 4, 2023—Zorn called the KDOR and learned that a user could access the letter from the same webpage that Meyer had searched. *Id.* (Am. Compl. ¶ 88). The next day, Zorn went to that same webpage. *Id.* (Am. Compl. ¶ 89). The KDOR website asked for the "Requester's Information," so Zorn input her own name. *Id.* at 17 (Am. Compl. ¶¶ 90–91). "Zorn then entered Newell's driver's license number and address" again. *Id.* (Am. Compl. ¶ 92). Before advancing, the website required Zorn to check a box with this warning: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)." *Id.* (Am. Compl. ¶ 93). The website then presented Zorn with 19 documents, including the letter the tipster had supplied Zorn. *Id.* (Am. Compl. ¶ 94).[4]

Meyer emailed Cody and Soyez to inform them about the document the *Record* had received. *Id.* at 24–25 (Am. Compl. ¶¶ 127–36). This email told Cody and Soyez that a confidential source had provided the *Record* with a letter from the KDOR addressed "to a Marion businesswoman who recently had been in the news." *Id.* at 24 (Am. Compl. ¶ 128). The email described the letter's contents and explained that though Meyer had concerns that the tipster unlawfully had accessed the letter, the *Record* had checked with the KDOR and

---

[4]       The Amended Complaint contains a host of assertions and conclusions about Kansas and federal law. *E.g.*, Doc. 44 at 17 (Am. Compl. ¶ 96) ("Zorn's use of the Driver's License Status Check tool for this purpose was 100% legal under both state and federal law."); *id.* at 18 (Am. Compl. ¶¶ 97–100) (describing Kansas law governing driver's license records); *id.* at 18–19 (Am. Compl. ¶¶ 101–06) (describing the federal Driver's Privacy Protection Act). But it's well established that the court needn't accept these legal conclusions as true. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012); *see also Tucker v. Univ. of N.M. Bd. of Regents*, 618 F. Supp. 3d 1201, 1208 (D.N.M. 2022) ("The court is not required to accept conclusions of law or the asserted application of law to the alleged facts.").

confirmed that anyone with the driver's "identification card number, name, and date of birth" could access the letter. *Id.* (Am. Compl. ¶¶ 129–31). Meyer also let Cody and Soyez know that the tipster had alleged that local law enforcement was aware that "the businesswoman"—whom the email didn't identify—didn't have a valid driver's license and that the *Record* was considering pursuing a story on that topic. *Id.* at 25 (Am. Compl. ¶¶ 133–34).

### Vice Mayor Involvement

The same day that Meyer emailed law enforcement—August 4, 2023—Marion's Vice Mayor, Ruth Herbel, sent an email to the Marion City Administrator with a screenshot of the same KDOR letter about Kari Newell's driver's license status.[5] *Id.* (Am. Compl. ¶¶ 138–39). Herbel explained that she had received the letter from local resident Pam Maag, who later publicly identified herself as the tipster who had provided the letter to the *Record*. *Id.* at 26 (Am. Compl. ¶¶ 140–41). The City Administrator forwarded Herbel's email to Mayor Mayfield. *Id.* (Am. Compl. ¶ 142). The email forwarding that email to the mayor stated that the City wouldn't look into the matter because "the State is oversight for this." *Id.* (Am. Compl. ¶ 143).

### Finding a Crime

On August 7, 2023, the City Administrator forwarded Herbel's email—which contained the screenshot of the KDOR letter about Newell's driver's license—to all members of Marion's City Council. *Id.* at 32–33 (Am. Compl. ¶ 172). Mayfield and another city council member both contacted Newell to let her know about this development. *Id.* at 33 (Am. Compl. ¶ 173).

Mayfield told Newell that the only way he could remove Herbel from the city council was if Herbel was convicted of a crime. *Id.* at 34 (Am. Compl. ¶ 176). He then directed Cody to

---

[5]        Herbel also has filed suit, asserting claims arising out of this same series of events. Complaint, *Herbel v. City of Marion*, No. 24-cv-2224-HLT-GEB (D. Kan. May 28, 2024), ECF No. 1. Cheri Bentz, the *Record*'s office manager, likewise filed suit. Complaint, *Bentz v. City of Marion*, No. 24-cv-2120-DDC-GEB (D. Kan. Mar. 29, 2024), ECF No. 1.

begin investigating Herbel and the *Record*. *Id.* (Am. Compl. ¶ 177). Cody subsequently told

Newell that someone from the *Record* had stolen her identity to access her driver's license record

even though he knew that Pam Maag—not someone from the *Record*—had provided Herbel the

copy of the letter. *Id.* (Am. Compl. ¶¶ 181–83).

### Soyez Joins

On August 8, 2023, the day after the city council meeting, Cody met with Sheriff Soyez.

*Id.* at 36 (Am. Compl. ¶ 191). Soyez "had deep animus toward" the *Record* and its staff,

including Meyer. *Id.* (Am. Compl. ¶ 192). For example, Soyez routinely refused requests for

information from the *Record* "due to his disdain for the newspaper." *Id.* (Am. Compl. ¶ 193).

Soyez also harbored concerns that the *Record* would "expose his office" for allowing Newell to

drive without a valid driver's license. *Id.* at 37 (Am. Compl. ¶ 199). During his meeting with

Cody, Soyez agreed to help Cody "take down" Mayfield's political enemies—the *Record* and

Herbel. *Id.* (Am. Compl. ¶ 200).

Soyez appointed Marion County Sheriff's Detective Aaron Christner, a defendant here, to

assist the investigation into the *Record* and Herbel. *Id.* (Am. Compl. ¶ 201). And Cody and

Soyez met with Christner later in the day on August 8. *Id.* Cody and Christner decided to try to

procure a search warrant. *Id.* at 38 (Am. Compl. ¶ 205).

### Planning the Raids

The following morning, Soyez, Cody, Christner, and Marion Police Officer Zach Hudlin

met at the Marion County Sheriff's office. *Id.* (Am. Compl. ¶ 206). The four agreed on a plan to

"tak[e] down Mayor Mayfield's chief enemies, the *Marion County Record* and Ruth Herbel." *Id.*

(Am. Compl. ¶ 207). The "four men agreed on a scheme to [procure] search warrants for the

*Record* and Ruth Herbel's home, even though" none of them had conducted any investigation or

had reasonable suspicion that criminal activity was afoot. *Id.* (Am. Compl. ¶ 208).

### *Drafting the Warrant Application*

Christner went to work drafting the application for the warrant authorizing a search of the *Record*'s office, even though he "did not do the investigation." *Id.* (Am. Compl. ¶¶ 209–10). The search warrant application Christner drafted allegedly "was replete with either intentional, knowing, or reckless false statements." *Id.* (Am. Compl. ¶ 211). Plaintiffs allege Christner falsified the application in the following ways:

- Christner included a false statement in the warrant application that Zorn would have had to select from a list of options on the KDOR website to access Newell's driving record information. *Id.* at 39 (Am. Compl. ¶ 212).

- Christner included a screenshot purporting to list these options. The KDOR website doesn't require users to select any of these options. *Id.* (Am. Compl. ¶¶ 213–14).

- Christner included a false statement in the warrant application that Zorn would have had to impersonate or lie to access Newell's driving records. *Id.* at 40 (Am. Compl. ¶ 220).

- Christner included a false statement in the warrant application that someone at the *Record* had given the letter about Newell's driving status to Herbel. But Christner knew that Zorn didn't access KDOR's website until *after* Herbel already had received the letter from Pam Maag. *Id.* at 41 (Am. Compl. ¶¶ 223–24).

Plaintiffs also allege that Christner omitted material facts from the warrant application. These omissions included that the *Record* had acquired Newell's personal information from tipster Maag and that such personal information allows anyone to access the status of Newell's license on the KDOR website.[6] *Id.* at 41–43 (Am. Compl. ¶¶ 226–28). After completing the warrant application draft, Christner sent it to Cody. *Id.* at 44 (Am. Compl. ¶ 230). Cody then copied Christner's draft and used it to make "virtually identical" search warrant applications for the homes of Herbel and Maag. *Id.* (Am. Compl. ¶ 231). He discussed the draft applications

---

[6]    The Amended Complaint lists a bundle of other "facts" that Christner and Cody allegedly omitted from the search warrant application. Doc. 44 at 42–43 (Am. Compl. ¶ 226(d)–(o)). But all of these omitted "facts" are statements of law. The court needn't accept such statements as true. *Khalik*, 671 F.3d at 1190. The court thus excludes them from this factual background.

with Soyez, and the two men decided to pursue a fourth warrant authorizing a search of the

Meyer home. *Id.* (Am. Compl. ¶ 234). Each application contained the same falsehoods used in

the application for the *Record*'s office. *Id.* (Am. Compl. ¶¶ 235–36). Cody also included more

allegedly false statements in his warrant applications. *Id.* (Am. Compl. ¶ 237). For instance, he

falsely stated that the KDOR website requires the user to agree to a warning about compliance

with the Driver's Privacy Protection Act of 1994, even though it doesn't. *Id.* at 45 (Am. Compl.

¶¶ 238–41).

Cody shared his drafts with Hudlin, who reviewed them and forwarded them to Christner.

*Id.* at 46 (Am. Compl. ¶ 248).

### Presenting the Warrant Applications

Cody sent the search warrant applications to the Marion County District Attorney, who

directed his office manager to present them to a Kansas judge. *Id.* at 48 (Am. Compl. ¶ 265).

The office manager presented them to Magistrate Judge Laura Viar, a magistrate judge in Morris

County, Kansas. *Id.* at 46, 51 (Am. Compl. ¶¶ 251, 274, 276). Magistrate Judge Viar signed the

search warrants for the *Record*'s office, the Meyer home, and Herbel's home. *Id.* at 47 (Am.

Compl. ¶ 258). When Magistrate Judge Viar signed the search warrants, she crossed out a blank

for a notary signature and signed a portion of the application providing that Cody had

"subscribed and sworn" the application before her. *Id.* at 48 (Am. Compl. ¶ 263). But according

to plaintiffs, Cody didn't appear before Magistrate Judge Viar at all. *Id.* at 48–49 (Am. Compl.

¶¶ 264–65). In fact, Cody had pre-signed the warrant applications before Hudlin and Christner

reviewed them. *Id.* at 52 (Am. Compl. ¶ 279).[7]

---

[7]      While not alleged by the Amended Complaint, the court notes that Marion County and Morris
County are part of the same judicial district—the 8th Judicial District in the Kansas State court system.
*District Courts*, Kansas Judicial Branch, https://kscourts.gov/About-the-Courts/District-Courts (last
accessed Feb. 24, 2025).

### *Raid of the Record*

On Friday, August 11, 2023, Cody led a team of law enforcement officers from the Marion Police Department and the Marion County Sheriff's office on raids of the *Record*'s office, the Meyer home, and Herbel's home. *Id.* (Am. Compl. ¶ 280). The group first raided the *Record*'s office. *Id.* (Am. Compl. ¶ 281). The following defendants participated in that raid: Cody, Hudlin, and Christner. *Id.*

The warrant authorizing the search required the officers to conduct a preview search before seizing items, thereby excluding items unrelated to the alleged identity theft. *Id.* at 54 (Am. Compl. ¶ 285); Doc. 58-7 at 1 (search warrant for the *Record*'s offices); Doc. 58-8 at 1 (search warrant for the Meyer home).[8] Asserting adherence to this requirement, Christner connected an external drive to Zorn's computer in the *Record*'s newsroom and executed software called osTriage, which can search the connected computer for keywords. Doc. 44 at 54 (Am. Compl. ¶¶ 286–88). The search terms that Christner used—"Kansas" and "vehicle," for instance—were so vague that they returned many results unrelated to the investigation. *Id.* at 54–57 (Am. Compl. ¶¶ 289–301). None of the hits from this preview search suggested Zorn's computer contained evidence of a crime. *Id.* at 57 (Am. Compl. ¶ 302). Still, Cody directed officers to seize the computer. *Id.* (Am. Compl. ¶ 305).

While Christner was running the preview software on Zorn's computer, defendant Hudlin searched physical files in the *Record*'s office. *Id.* (Am. Compl. ¶ 306). While searching, Hudlin ran across a file in Deb Gruver's desk titled "Capt. Gideon Cody." *Id.* at 58 (Am. Compl.

---

[8]    The court properly may consider the search warrants attached to defendants' motions because they're "'central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). Plaintiffs also agree that these warrants are "true and accurate copies" that the court may consider. Doc. 63 at 12.

¶¶ 307–09).  Hudlin looked inside the file, found information provided by anonymous sources, and then encouraged Cody to look at the file.  *Id.* at 59–60 (Am. Compl. ¶¶ 310–14).  Cody turned off his body camera while reviewing that file, even though he left it on for hours that day, including while he "reliev[ed] himself at Casey's General Store between the search of the Herbel home and the search of the Meyer home."  *Id.* at 60–61 (Am. Compl. ¶¶ 315–16).

Christner's preview search of Zorn's computer took more than an hour to complete.  *Id.* at 61 (Am. Compl. ¶¶ 317–18).  After the first preview search concluded, Hudlin said, "We'd be here all freakin' day if we were going to do that to all those computers."  *Id.* (Am. Compl. ¶ 319).  Cody then called Soyez, brought him up to speed on the state of the search, and said, "Alright, we'll just take them all."  *Id.* at 62 (Am. Compl. ¶¶ 321–22).  In effect, Cody and Soyez decided to seize Meyer's computer, Gruver's computer, and the *Record*'s network file server without performing the warrant-mandated preview search on those devices.  *Id.* at 63 (Am. Compl. ¶¶ 326, 328).  Hudlin then seized those items by physically removing them from the *Record*'s office.  *Id.* (Am. Compl. ¶ 327).  The seizure of these items effectively shut down the newspaper.  *Id.* at 64 (Am. Compl. ¶ 329).  Cody also ordered Hudlin to seize Zorn and Gruver's cell phones, even though officers didn't perform any preview search of those devices either.  *Id.* at 64, 65, 66 (Am. Compl. ¶¶ 330, 337, 341).

### *Raid of the Meyer Home*

While Cody and the other officers were searching the *Record*'s office, State Fire Marshal Investigator Chris Mercer and Marion County Sheriff's Sergeant Matt Regier went to the Meyer home and announced that they were there to seize the Meyers' digital devices.  *Id.* at 67 (Am. Compl. ¶¶ 347–48).  When Meyer objected and asked to speak to his attorney, the officers refused his request, entered the home, and seized Meyer's cell phone.  *Id.* at 67–68 (Am. Compl. ¶¶ 349–55).  After entering the home, the officers declared that they had to wait for Cody to

arrive and then stayed in the home for more than two hours waiting for Cody. *Id.* at 69 (Am. Compl. ¶¶ 357–58). During this time, Joan Meyer—who is now deceased but whose estate is a plaintiff in this case—became increasingly agitated. *Id.* at 69–70 (Am. Compl. ¶¶ 358–63).

Before entering the Meyer home, Christner asked Cody whether they should perform a preview search of the Meyers' computers and phones. *Id.* at 72 (Am. Compl. ¶ 378). Cody responded that they didn't need to, they could just seize the devices. *Id.* at 73 (Am. Compl. ¶ 379). Christner seized Joan Meyer's computer, Eric Meyer's laptop, Eric Meyer's cell phone, a portable hard drive, and a router—all without performing the preview search required by the warrant. *Id.* at 75 (Am. Compl. ¶¶ 389–90).

During the raid of the Meyer home, 98-year-old Joan Meyer warned police that the stress of the events would kill her. *Id.* at 75–76 (Am. Compl. ¶¶ 391–94). About 24 hours after officers completed the raid of the Meyer home, Joan Meyer died from sudden cardiac arrest. *Id.* at 79–80 (Am. Compl. ¶¶ 410–15).

### *After the Raids*

After the officers finished the raids, they gathered at the Marion County Sheriff's Office for a pizza party with Soyez. *Id.* at 77 (Am. Compl. ¶ 398). Two days after the raids—on August 13, 2023—the Kansas Bureau of Investigation announced that it was taking over the investigation. *Id.* at 80 (Am. Compl. ¶ 416). Still, Christner and Cody exchanged drafts of probable cause affidavits for the arrest of Meyer, Zorn, and Herbel. *Id.* (Am. Compl. ¶¶ 417–19).

The next week, Marion County's district attorney filed a motion to release the evidence seized during the raids and published a press release asserting that "insufficient evidence" existed "to establish a legally sufficient nexus" between any crime and the seized evidence. *Id.* at 81 (Am. Compl. ¶¶ 420–21).

Later that day, a forensic analyst retained by the *Record* went to the Marion County Sheriff's office to retrieve the seized items. *Id.* (Am. Compl. ¶ 425). Soyez oversaw return of these seized items and commented to Zorn—who was also present during retrieval—that it wasn't "his" search warrant and that he wasn't present for the raids. *Id.* (Am. Compl. ¶¶ 426–28). During retrieval, the sheriff's office didn't return the "OS Triage Digital Data"—the drive that Christner "had used to extract data" from Zorn's computer. *Id.* at 83 (Am. Compl. ¶ 434). Soyez didn't authorize return of that drive for more than two weeks. He did so only after the *Record*'s attorney threatened to pursue contempt charges against him. *Id.* at 84 (Am. Compl. ¶ 438). The forensic analyst's subsequent review of the digital drive revealed that Christner had downloaded over 18 gigabytes of data from the *Record*'s network. *Id.* (Am. Compl. ¶ 439). That quantity of data is equivalent to some 18 pick-up trucks full of paper. *Id.* at 85 (Am. Compl. ¶¶ 440–41).

Summarizing, the court provides the following timeline. It briefly outlines the key events for the current motions:



*Lawsuit*

Plaintiffs bring a series of claims against defendants.  The first five counts rely on 42

U.S.C. § 1983.  The claims consist of the following causes of action:

- *Count I*:  First Amendment "Direct Violation" against the individual defendants.  *Id.* at 89–113 (Am. Compl. ¶¶ 466–617).

- *Count II*:  First Amendment Retaliation against Mayfield, Cody, and Soyez.  *Id.* at 113–23 (Am. Compl. ¶¶ 618–70).

- *Count III*:  Fourth Amendment Violation against the individual defendants.  *Id.* at 123–30 (Am. Compl. ¶¶ 671–714).

- *Count IV*:  Municipal Liability against the City of Marion; Mayfield, in his official capacity; Cody, in his official capacity; the Board of County Commissioners of Marion County; and Mayfield, in his official capacity.  *Id.* at 130–35 (Am. Compl. ¶¶ 715–49).

- *Count V*:  Conspiracy against the individual defendants.  *Id.* at 135–46 (Am. Compl. ¶¶ 750–97).

- *Count VI*:  Privacy Protection Act against the City of Marion; the Board of County Commissioners of Marion County; and Soyez, in his official capacity.  *Id.* at 146–52 (Am. Compl. ¶¶ 798–841).

Plaintiffs' Amended Complaint also contains "placeholders" for state law claims, but it doesn't actually assert any state law claims in its current form.[9]  Doc. 44 at 152–154 (Am. Compl. ¶¶ 842–54).

## II.  Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).  The Tenth Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'"  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)).  "'[A] well-pleaded complaint

---

[9]    The Amended Complaint explains that—seeking to comply with Kan. Stat. Ann. § 12-105b— plaintiffs "have served notice of claim asserting various state law claims and will be amending their Complaint to formally assert such claims once [d]efendant(s) either deny the claim(s), or 120 days has passed following the service of the notice."  Doc. 44 at 152 n.7.  The original Complaint contained the same footnote and explanation.  Doc. 1 at 125 n.7.  But well more than 120 days have passed since plaintiffs filed the original Complaint and the Amended Complaint, and plaintiffs haven't sought leave to amend their pleading further.  The court thus assumes that plaintiffs have abandoned any intent to assert state law claims.

may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely[.]'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana*, 973 F.3d at 1034).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

This Order's analysis unfolds in this sequence: *First*, the court addresses defendants' Rule 8 challenges about the form of plaintiffs' Amended Complaint. *Second*, the court analyzes the individual defendants' challenges to plaintiffs' conspiracy allegations. *Third*, the court assesses plaintiffs' substantive Fourth and First Amendment claims against the individual defendants, addressing defendants' assertions of qualified immunity along the way. And *last*, the court addresses the defendants' challenges to plaintiffs' claims asserting municipal liability, starting with the § 1983 claims and ending with the Privacy Protection Act claim.

### A.    Rule 8

The county defendants and Cody first argue that the Amended Complaint doesn't abide Rule 8 of the Federal Rules of Civil Procedure, and so, the court should thus dismiss the Amended Complaint in its entirety. Doc. 56 at 5–6; Doc. 58 at 2–3. They contend that the Amended Complaint's 154 pages and 841 paragraphs contain "numerous digressions and vignettes that have no relevance to claims or parties in this case." Doc. 56 at 5. And they assert

that the sheer volume of the Amended Complaint proves that it isn't a short and plain statement. Doc. 56 at 5. The court isn't persuaded.

The Federal Rules require pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). And our Circuit has explained that complaints "'written more as a press release, prolix in evidentiary detail'" fail the Rule 8 standard if they don't clearly communicate which parties the "'plaintiffs are suing for what wrongs[.]'" *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (quoting *McHenry v. Renne*, 84 F.3d 1172, 1180 (9th Cir. 1996)). "The policy behind Rule 8 is to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Schupper v. Edie*, 193 F. App'x 744, 745–46 (10th Cir. 2006) (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993)); *see also Mann*, 477 F.3d at 1148 ("Rule 8 serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted."). "Whether to dismiss under Rule 8 is a matter within a district court's discretion." *Herbel v. City of Marion*, No. 24-cv-2224-HLT-GEB, 2024 WL 4416849, at *10 (D. Kan. Oct. 4, 2024).

The Amended Complaint here is long. Very long. Its length—154 pages and 854 paragraphs—vastly exceeds the typical pleading filed in our court. And the court agrees that the Amended Complaint includes some graphics and details that aren't necessary to state any of plaintiffs' claims. *E.g.*, Doc. 44 at 3 (picture of David Mayfield); *id.* at 5 (*Marion County Record* logo); *id.* at 10 (Am. Compl. ¶ 54) (mentioning that Cody "self-describes himself as a 'real estate investor'" and including screenshot of Cody's LinkedIn profile). No doubt, a more succinct and to-the-point complaint would have made the court's work easier. *See Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) ("[D]istrict judges

assigned the task of measuring legal pleadings against certain criteria embodied in Rule 12(b) . . . have their task made immeasurably more difficult by pleadings [that are] rambling[.]").  The court encourages future litigants not to use the Amended Complaint as a model.  It's simply too long-winded.

But—and this part is critical—the Amended Complaint isn't difficult to follow.  "It is generally easy to determine what occurred, when it occurred, and who was involved."  *Herbel*, 2024 WL 4416849, at *10.  The Amended Complaint explicitly labels its six claims and lists which claims involve which defendants.  Ordinarily, a court shouldn't dismiss a complaint under Rule 8 just because of its length.  *In re Roberts*, No. 20-3182, 2021 WL 4438744, at *3 (10th Cir. Sept. 28, 2021) ("'Some complaints are windy but understandable.  Surplusage can and should be ignored.  Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case.'" (quoting *U.S. ex. rel Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)).  Given the purpose undergirding Rule 8—to give defendants notice—the clarity of the Amended Complaint suffices to avoid dismissal on that basis.  And its readability distinguishes it from complaints that courts have dismissed for violating Rule 8.  *See id.* (compiling cases where courts have dismissed complaints under Rule 8 because they aren't sufficiently clear); *see also Mann*, 477 F.3d at 1148 (dismissing pleading under Rule 8 where it "neither identifie[d] a concrete legal theory nor target[ed] a particular defendant" and explaining that "prolixity is not even the main problem").

Defendants' Motions to Dismiss underscores this conclusion.  Every defendant filed a nuanced Motion to Dismiss, suggesting that they didn't "struggle[] to discern the claims against them."  *Herbel*, 2024 WL 4416849, at *10.

Finally, the court is cognizant of its duty to administer the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1. Dismissing the Amended Complaint because it is too long would prolong this action needlessly. That's so because dismissal on a Rule 8 basis likely would not prejudice refiling. *See Nasious*, 492 F.3d at 1162 (listing factors court must weigh to dismiss with prejudice under Rule 8). So, plaintiffs would refile their pleading, which would then force the three groups of defendants to refile their Motions to Dismiss. Avoiding that refiling promotes the speedy and inexpensive resolution of this case.

In sum, while the Amended Complaint is long, breezy, and includes some unnecessary details, the court declines to dismiss it under Rule 8. It's sufficient to give defendants notice of the claims against them and of the alleged factual basis for those claims. On to those claims and their adequacy for this stage of the case.

### B.    Section 1983 and Qualified Immunity Overview

The law governing 42 U.S.C. § 1983 claims—which the first five Counts invoke—and a qualified immunity defense are relevant throughout this Order. So, the court starts with a brief overview of these subjects.

### 1.    Section 1983

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted). A plaintiff may assert a § 1983 claim against either a municipality or an individual. *See Brown*, 124 F.4th at 1264 (permitting § 1983 suit for policies and practices of municipal police department); *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity). As a defense against a § 1983 claim, an individual defendant may assert qualified immunity. *Id.*

at 1266.  But "[q]ualified immunity is not available as a defense to municipal liability."  *Pyle v. Woods*, 874 F.3d 1257, 1264 (10th Cir. 2017) (citing *Owen v. City of Independence*, 445 U.S. 622, 637–38 (1980)).  The court outlines the broad contours of the qualified immunity defense, next.

### 2.  Qualified Immunity

"When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time.'"  *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  That's so because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed."  *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established.").  If plaintiff fails to carry that burden, "'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed."  *Losee v. Preece*, No. 18-CV-195-TC, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is

doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted). A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation cleaned up). But such authority is unnecessary and "a government official may still have notice that their conduct violates a constitutional right" when "it is so apparent as to apply with obvious clarity." *Brown*, 124 F.4th at 1265. "In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

## C.    Count IV: Conspiracy

Because the conspiracy allegations provide a mechanism to impute liability to each defendant under Counts I, II, and III, the court begins its substantive analysis with plaintiffs' conspiracy allegations. Plaintiffs style their conspiracy allegations as a separate "count" in the

Amended Complaint.  Doc. 44 at 135.  As discussed more extensively below, however, a § 1983

conspiracy allegation isn't a standalone theory of liability.  Instead, it's a mechanism to impute

liability to a broader collection of defendants.

The county defendants argue that the Amended Complaint fails to allege any conspiracy

involving either Soyez or Christner.  Doc. 56 at 9–10.  According to the county defendants, there

"are no well-pleaded allegations that Soyez had any illegal agreement or intended to violate

anybody's rights."  *Id.* at 9.  The thrust of the county defendants' argument is that plaintiffs'

allegations are too conclusory to state a plausible claim.  Doc. 72 at 3–4.  City defendants argue

the same.[10]  Doc. 60 at 19.  They maintain that plaintiffs haven't stated a "cognizable conspiracy

claim" and that plaintiffs have failed to allege the elements of a § 1983 conspiracy claim.  *Id.*

Plaintiffs disagree.  They maintain that they have alleged an unlawful conspiracy with

specificity.  Doc. 63 at 41.

As explained below, plaintiffs have the better of this dispute.  The court thus declines to

dismiss their conspiracy allegations.

### 1.  Law on § 1983 Conspiracies

A § 1983 "'conspiracy claim allows for imputed liability[.]'"  *Bledsoe*, 53 F.4th at 609

(quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990)).  That is, a § 1983

conspiracy theory isn't a standalone claim on which a plaintiff may recover.  It requires "'an

---

[10]    Plaintiffs argue that Cody waived any arguments about a § 1983 conspiracy by failing to raise it in his Motion to Dismiss.  Doc. 63 at 41 n.20.  The city defendants—represented by the same counsel as Cody—purportedly made their conspiracy arguments on behalf of Cody, too.  Doc. 60 at 19.  The court needn't consider whether one defendant properly can raise arguments on behalf of another defendant because the court rejects the substance of the city defendants' arguments.  Also, as already explained (and discussed in more depth below), a conspiracy isn't a standalone claim.  It's merely a method for imputing liability to other members of the conspiracy.  Because the Amended Complaint plausibly alleges Cody's direct involvement in all claims against individual defendants, the court wouldn't dismiss any of those claims against Cody even if the Amended Complaint asserted no conspiracy allegations.

underlying constitutional deprivation'" for which "'a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy.'" *Id.* (quoting *Dixon*, 898 F.2d at 1449 n.6). To prevail on a conspiracy theory under § 1983, "a plaintiff must show 'at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective.'" *Frasier*, 992 F.3d at 1024 (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021)). The general conspiratorial objective must take the form of "'a common, unconstitutional goal.'" *Bledsoe*, 53 F.4th at 609 (quoting *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021)); *see also Frasier*, 992 F.3d at 1025 ("[P]roof that defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities— would be inadequate to support a § 1983 conspiracy claim.").

But "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'" *Id.* (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998)). Instead, our Circuit demands specificity to plead conspiracy. "A § 1983 plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'" *Bledsoe*, 53 F.4th at 609 (emphasis in original) (quoting *Robbins*, 519 F.3d at 1250); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants").

## 2. Conspiracy Analysis

At this procedural juncture, the court concludes that plaintiffs have alleged a cognizable conspiracy theory. The Amended Complaint alleges that the conspiracy had a clear goal, that the

defendants took "specific actions" to "carry out the plan" and that each defendant "participated in the conspiracy." *Bledsoe*, 53 F.4th at 609–610.  Take those points one at a time.

*First*, the Amended Complaint alleges that the conspiracy had a specific goal:  "to get the *Marion County Record* and Ruth Herbel."  Doc. 44 at 98 (Am. Compl. ¶ 510).  It further asserts that Mayor Mayfield and Cody "agreed on the common, unconstitutional goal of fabricating false criminal charges and conducting unconstitutional searches and seizures against Vice Mayor Ruth Herbel, *Marion County Record* publisher and editor Eric Meyer, and the *Record* itself, the perceived enemies of the two original co-conspirators."  *Id.* at 138 (Am. Compl. ¶ 764).  Plaintiffs allege that all the co-conspirators "cemented their agreement to violate Plaintiffs' First and Fourth Amendment rights" when they "met to discuss strategy for the sham 'investigation'" on August 9, 2023.  *Id.* at 139–40 (Am. Compl. ¶ 781).[11]

*Second*, plaintiffs "identified specific actions [d]efendants allegedly took to carry out the plan[.]"  *Bledsoe*, 53 F.4th at 610.  "The co-conspirators conducted a sham 'investigation' that was not supported by even a reasonable suspicion of a crime[.]"  Doc. 44 at 140 (Am. Compl. ¶ 782).  They procured search warrants by knowingly or recklessly including false information in and omitting material facts from the search warrant applications.  *Id.* at 124–25, 140 (Am. Compl. ¶¶ 681, 783).  They employed those warrants to raid the *Record* and the Meyer home as retaliation for using their First Amendment rights.  *Id.* at 141 (Am. Compl. ¶¶ 784–88).  And

---

[11]    The Amended Complaint isn't altogether clear whether Mayfield was present at this August 9 strategizing-and-planning meeting.  Some paragraphs in the Amended Complaint imply that only the four other co-conspirators—Cody, Hudlin, Christner, and Soyez—were present.  *E.g.*, Doc. 44 at 38, 116 (Am. Compl. ¶¶ 206, 639).  But another paragraph asserts that "*all* of the co-conspirators met to discuss strategy" on August 9.  *Id.* at 139–40 (Am. Compl. ¶ 781) (emphasis added).  Viewing these discrepancies in the light most favorable to plaintiffs—as the court must at this stage—the court assumes that Mayfield was present for that meeting.

defendants exceeded the scope of the search warrants by "rummaging at large" through the *Record*'s files. *Id.* at 142 (Am. Compl. ¶ 790) (quotation cleaned up).

*Third*, the Amended Complaint plausibly alleges involvement in the conspiracy of each individual defendant. As in *Bledsoe*, "the allegations [here] are stronger for some [defendants] than others." 53 F.4th at 610. But, in the end, the court finds the allegations sufficient for each one of them. Viewed in the light most favorable to plaintiffs, the acts alleged in the Amended Complaint—if true—could support a reasonable inference that each defendant participated in the conspiracy to violate plaintiffs' constitutional rights by: inventing a criminal investigation; unlawfully procuring search warrants; searching and seizing property beyond the scope of the search warrants; and physically interfering with plaintiffs' First Amendment rights.

For instance, as alleged, Cody signed the search warrant affidavit knowing that it included false statements or material omissions. Doc. 44 at 143 (Am. Compl. ¶ 793(c)). Cody also exceeded the scope of the warrants to search the *Record* and the Meyer home by reviewing the *Record*'s file on him, and by seizing items from both locations without conducting the requisite preview search. *Id.* (Am. Compl. ¶ 793(e)).

Hudlin planned and strategized the investigation with the other individual defendants, assisted it by helping create the search warrant affidavits, and then executed the search warrants. *Id.* at 143–44 (Am. Compl. ¶ 794). What's more, he exceeded the scope of the search warrant by searching Deb Gruver's desk, locating her file on Cody, and sharing that file with Cody during the search. *Id.* at 138 (Am. Compl. ¶ 768). Hudlin also seized the cell phones of *Record* reporters Zorn and Gruver, and Meyer's computer and laptop—all without conducting the warrant-required preview search. *Id.* at 64, 144 (Am. Compl. ¶¶ 330, 794(d)).

Mayfield—the City's mayor—had "superintending control of all officers and affairs of the city[.]" *Id.* at 34, 137 (Am. Compl. ¶¶ 178, 758) (quoting Marion, Kan. Code § 1-205(a)). He "direct[ed] Chief Cody to conduct a sham 'investigation' as a pretext for his desire to retaliate against" Herbel and Meyer. *Id.* at 142 (Am. Compl. ¶ 792(a)). He "convinced Kari Newell to play the role of complaining victim, falsely convincing her the *Record* and Herbel were conspiring against her." *Id.* at 116, 142 (Am. Comp. ¶¶ 636, 792(b)). And Mayfield provided Cody with "Herbel's emails to use as 'evidence'" against her. *Id.* at 142 (Am. Compl. ¶ 792(d)).

Christner advanced the conspiracy's goals by drafting the search warrant affidavit "even though he admitted he had no personal knowledge of any crime[.]" *Id.* at 139 (Am. Compl. ¶ 779). Christner attended the meeting where co-conspirators planned the investigation and raids. *E.g.*, *id.* at 145 (Am. Compl. ¶ 796(a)). He also drafted the search warrant affidavit, knowingly or recklessly including false statements and omitting material facts that would have negated probable cause. *Id.* at 38–43, 145 (Am. Compl. ¶¶ 209–29, 796(b)).

Finally, Soyez helped strategize and plan the raids. *Id.* at 38, 116, 144 (Am. Compl. ¶¶ 206–08, 639, 795(a)). He came up with the idea to include the Meyer home as a target for the search warrants. *Id.* at 44, 144 (Am. Compl. ¶¶ 234, 795(b)). Soyez also was in contact with Cody and the other defendants on the day of the raid, and he encouraged (or approved) their decision to seize property without performing the required preview search. *Id.* at 145 (Am. Compl. ¶ 795(c)). Plaintiffs also emphasize Soyez's "consciousness of guilt[.]" Doc. 63 at 42–43. They assert that Soyez tried to distance himself from the raids after the fact by telling Zorn, "You didn't see me there[.]" *Id.*; Doc. 44 at 81–82 (Am. Compl. ¶¶ 428–30). *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 113 (2d Cir. 2008) ("A defendant's

knowing and willing participation in a conspiracy may be inferred from . . . . acts exhibiting a

consciousness of guilt, such as making false exculpatory statements." (quotation cleaned up)).

### 3.  Conclusion about the Conspiracy Allegation

The court acknowledges that the line dividing plausible conspiracy allegations from

implausible is not a bright one.  But the Amended Complaint adequately alleges the conspiracy's

members, the conspiracy's timeframe, the purpose and motivation of the conspiracy, and the

overt acts taken to achieve its aim.  Taken collectively, those allegations suffice.  They raise a

plausible inference of a conspiracy.  *See Cash v. Wetzel*, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014)

("Only allegations of conspiracy which are particularized, such as those addressing the period of

the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators

taken to achieve that purpose will be deemed sufficient." (internal quotation marks and citation

omitted)); *see also Twombly*, 550 U.S. at 565 n.10 (suggesting conspiracy claim failed where

complaint alleged "no specific time, place, or person involved").

A review of recent decisions in other conspiracy cases confirms that plaintiffs'

allegations satisfy the plausibility mark.  *Compare, e.g.*, *Bledsoe*, 53 F.4th at 609–610 (affirming

denial of motion to dismiss where plaintiff alleged "specific goal of the conspiracy" and

"identified specific actions" each individual defendant took to consummate conspiracy),

*Montoya v. City and County of Denver*, No. 21-1107, 2022 WL 1837828, at *8 (10th Cir. 2022)

(affirming denial of motion to dismiss where allegations of conspiracy weren't "impressively

detailed" and included some "boilerplate language" but still advanced sufficient allegations to

infer an implicit agreement), *and Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1204 (D.

Colo. 2020) (declining to dismiss conspiracy where complaint alleged that defendants made a

plan, assigned roles to co-conspirators, and carried out roles), *with Lacey v. Maricopa County*,

693 F.3d 896, 937 (9th Cir. 2012) (en banc) ("The conclusory conspiracy allegations in the

28

original complaint do not define the scope of any conspiracy involving Thomas, what role he

had, or when or how the conspiracy operated."), *Hooks v. Martin*, No. CV 09-2167-KHV, 2010

WL 11561722, at *5 (D. Kan. Apr. 8, 2010) (dismissing conspiracy claim where complaint

failed to allege "'how, when, and where' the alleged conspiracy was formed or its specific

content"), *and Garth O. Green Enters., Inc. v. Harward*, No. 15-CV-00556-DN-EJF, 2017 WL

1184024, at *10 (D. Utah Mar. 29, 2017) (finding allegation that parties "had a meeting of the

minds" insufficient to state a conspiracy claim).  In short, the Amended Complaint's

allegations—taken as true and viewed in the light most favorable to plaintiffs—suffice.  They

state a plausible § 1983 claim against each of the individual defendants based on a conspiracy

theory.[12]

> Next up, the alleged Fourth Amendment violation.

## D.    Count III:  Fourth Amendment Violation

> The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures" and instructs that "no

Warrants shall issue, but upon probable cause[.]"  U.S. Const. amend. IV.  The Amended

Complaint alleges that defendants violated the Fourth Amendment by lying about and omitting

material information from the search warrant applications; violating the oath-and-affirmation

---

[12]    Our court reached a different conclusion about different conspiracy allegations in *Herbel*.  2024
WL 4416849, at *27–28.  There, Judge Teeter concluded that the *Herbel* Complaint contained "no non-
conclusory allegations that any of the individuals shared a conspiratorial goal."  *Id.* at *27.  Here, in
contrast, the Amended Complaint alleges facts with sufficient specificity to nudge its conspiracy
allegations over the plausibility hurdle.  *Compare* Doc. 44 at 135–146 (Am. Compl. ¶¶ 750–97) (outlining
contours of conspiracy in detail), *with* Complaint, *Herbel*, No. 24-cv-2224-HLT-GEB, ECF No. 1, at 85–
86 (stating that defendants "had a meeting of the minds and entered an agreement").  In particular, the
*Herbel* Complaint didn't allege that the co-conspirators had a meeting where they solidified their
conspiracy and its aims.  *See generally* Complaint, *Herbel*, No. 24-cv-2224-HLT-GEB, ECF No. 1.  The
Amended Complaint here survives the "low bar" of a motion to dismiss.  *Clinton*, 63 F.4th at 1276.  As
explained, the Amended Complaint plausibly sets forth the who, what, and when of the conspiracy, and
alleges those elements with sufficient specificity.

requirement; and exceeding the scope of the warrants.  *See* Doc. 44 at 123–130 (Am. Compl. ¶¶ 671–714).  The court addresses each of these theories of wrongdoing, starting with the procurement of the warrant.

### 1.  Warrant Application

To state a Fourth Amendment violation based on misrepresented or omitted facts in a search warrant affidavit, a plaintiff must show that (1) the omitted or misrepresented facts were material and (2) the affiant acted reckless or knowingly.  *Robitaille v. Spitzer*, 175 F. Supp. 3d 1299, 1305 (D. Colo. 2016).  Start with the first requirement—materiality.

### a.  Materiality of Falsehoods

To determine whether alleged omissions and falsehoods in a warrant affidavit were material, the court must determine "whether probable cause existed in light of all the evidence, including the omitted information" but excluding the falsehoods.  *Pierce*, 359 F.3d at 1293 (citations omitted).  The Amended Complaint alleges that Christner—and Cody, by extension, when he signed the search warrant affidavit—"intentionally, knowingly, or recklessly omitted material facts which, if included, would have prevented a finding of probable cause[.]"  Doc. 44 at 41 (Am. Compl. ¶ 226).  Specifically, plaintiffs allege the following falsehoods or omissions from the search warrant affidavit:

- Falsely claiming that "the only way Zorn could have accessed the Kansas Department of Revenue records was through 'either impersonating or lying about the reasons why the record was being sought.'"  *Id.* at 40 (Am. Compl. ¶ 220).

- Falsely claiming "that in order to access the Kansas Department of Revenue website Zorn was required to select from several 'options available on the Kansas DOR records website.'"  *Id.* at 39 (Am. Compl. ¶ 212).

- Falsely claiming that the KDOR license status check tool requires users to consent to a confidentiality agreement and expressly affirm their authorization to access the data under the Drivers' Privacy Protection Act of 1994.  *Id.* at 45 (Am. Compl. ¶ 240).

- Omitting the fact that "the *Record* already had Kari Newell's first name, last name, date of birth, and driver's license number[.]" *Id.* at 41 (Am. Compl. ¶ 226(a)).

- Omitting the fact that the Kansas "Driver's License Status Check tool permits any requester with" that information "to view the status of Newell's driver's license" and "documents concerning the status Newell's driver's license[.]" *Id.* (Am. Compl. ¶ 226(b), (c)).

The court concludes that these alleged omissions and falsehoods were material.[13]  Without them, probable cause didn't support the warrants.

"'Probable cause'" in this context "'means that there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (quoting *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001)).  This standard doesn't "require metaphysical certitude or proof beyond a reasonable doubt."  *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (emphasis omitted).  "At the same time, probable cause requires, of course, more than mere suspicion that unlawful activity is afoot."  *Id.*

Cody argues that he had probable cause to believe that Zorn or Meyer had committed state crimes.  Doc. 58 at 19–29.  And separately, he argues that he had probable cause to believe that Zorn or Meyer committed a federal crime.  *Id.*  The court addresses each of those arguments.

### i.      State Law Crimes

Cody argues that arguable probable cause existed that Meyer and Phyllis Zorn had violated Kan. Stat. Ann. §§ 21-5839(a)(5) (unlawful computer access) and 21-6107(a) (identify theft).  Doc. 58 at 21–22; Doc. 73 at 12–13.  Begin with unlawful computer access.  Kan. Stat. Ann. § 21-5839(a) provides:  "It is unlawful for any person . . . (5) to knowingly and without

---

[13]      Cody argues that all these falsehoods are legal interpretations.  Doc. 58 at 31.  The court agrees that some of the falsehoods and omissions listed in the Amended Complaint draw legal conclusions.  *See above* n.6.  But the assertions and omissions listed above are factual in content, not legal.

authorization, access or attempt to access any computer, computer system, social networking website, computer network or computer software, program, documentation, data or property contained in any computer, computer system, or computer network."

Stripped of the allegedly false statements, the search warrant applications contain almost no information suggesting that criminal activity was afoot. *See* Doc. 58-5 at 5–8 (search warrant application for the *Record*); Doc. 58-7 at 5–8 (search warrant application for the Meyer home). In particular, the search warrant affidavit furnishes no explanation how Zorn or Meyer's access of the KDOR license status check tool was "without authorization[.]" Kan. Stat. Ann. § 21-5839(a)(5). The thrust of Cody's position presumes—without justification—that the act of downloading publicly available documents is illegal. *See* Doc. 58 at 21. But Cody doesn't offer any justification for the conclusion that plaintiffs or Zorn acted "knowingly and without authorization" when they downloaded documents from a publicly accessible internet terminal. Kan. Stat. Ann. § 21-5839(a)(5). Without some rationale for believing that plaintiffs or Zorn lacked authority to access the KDOR license status check tool, probable cause couldn't support Cody's searches.

The argument in support of probable cause for identify theft is even weaker. Kan. Stat. Ann. § 21-6107(a) criminalizes identify theft. The statute defines "identify theft" as

> obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: (1) Defraud that person, or anyone else, in order to receive any benefit; or (2) misrepresent that person in order to subject that person to economic or bodily harm.

*Id.* Cody maintains that he had probable cause to believe that Zorn and Meyer retrieved "the KDOR letter containing Newell's personal identifying information . . . with the intent to defraud KDOR (by mispresenting their purpose)[.]" Doc. 58 at 22. But a party cannot "defraud" another without intending to deceive. *State v. Valdiviezo-Martinez*, 486 P.3d 1256, 1267–68 (Kan.

2021).  And the Kansas Supreme Court has explained that "authorized activity is not deception[.]"  *Id.* at 1268.  Again, Cody had no reasonable basis to believe that Zorn or Meyer's access of the KDOR license status tool wasn't authorized.  Cody argues that Zorn and Meyer "misrepresent[ed] their purpose" but offers no explanation for that conclusion.  Doc. 58 at 22.

Cody didn't have probable cause to believe that Zorn, Meyer, or anyone at the *Record* had committed a state crime.  The court next assesses Cody's argument that he had arguable probable cause to believe that someone had committed a federal crime.

### ii.        Driver's Privacy Protection Act

Cody argues that he had probable cause to believe criminal activity was afoot for another reason:  He contends that "Zorn and Meyer patently violated the federal Driver[']s Privacy Protection Act[.]"  Doc. 58 at 23.  According to Cody, the Driver's Privacy Protection Act (DPPA) prohibits individuals from "obtaining" protected personal information from a state's motor vehicle records.  *Id.* at 24.

The DPPA prohibits a "State department of motor vehicles" from disclosing personal information "about any individual obtained by the department in connection with a motor vehicle record[.]"  18 U.S.C. § 2721(a).  It also makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record[.]"  *Id.* § 2722(a).  Separately, the DPPA makes it "unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record."  *Id.* § 2722(b).  This act carves out a series of exceptions.  *Id.* § 2721(b).  The DPPA contains an enumerated list of 14 carveouts.  *Maracich v. Spears*, 570 U.S. 48, 58 (2013); 18 U.S.C. § 2722(a) (exempting carveouts listed in § 2721(b)); *id.* § 2721(b) (listing 14 exceptions).  So, to assemble probable cause for a DPPA violation, Cody needed probable cause none of those 14 exceptions applied.  *See Hinkle v.*

33

*Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1224 (10th Cir. 2020) (explaining that probable cause requires officer to "develop probable cause for each element of the offense"); *cf. Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1110–14 (11th Cir. 2008) (holding—in context of the DPPA's civil provision—that plaintiff bears burden to plead that no exception applies); *Kost v. Hunt*, 983 F. Supp. 2d 1121, 1133 (D. Minn. 2013) (same).

Here, the Amended Complaint asserts that plaintiffs' use of the KDOR website qualified for several of the DPPA's exceptions. Doc. 44 at 21–22 (Am. Compl. ¶¶ 114–22). But in their Response to the current motion, plaintiffs invoke only the "research" exception, listed in § 2721(b)(5). Doc. 63 at 18 n.6. So, the court addresses that argument only. *See Lebahn v. Owens*, 813 F.3d 1300, 1307–08 (10th Cir. 2016) ("It is not the court's job to comb the record in order to make the non-movant's arguments for him." (quotation cleaned up)).

The DPPA's "research" exception allows disclosure and access of otherwise protected personal information for "use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals." § 2721(b)(5). Plaintiffs argue that "Zorn's review of KDOR's copy of the August 1 letter was a permitted use pursuant to the 'research' exception." Doc. 63 at 18 n.6.

The DPPA doesn't define "research." *See* § 2721. Absent a statutory definition, the Supreme Court has instructed that courts should interpret words "'as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (characterizing this principle as a "fundamental canon of statutory construction"). "Research" is the "[s]erious study of a subject with the purpose of acquiring more knowledge, discovering new facts, or testing new ideas" or

the "activity of finding information that one needs to answer a question or solve a problem."
*Research*, Black's Law Dictionary (12th ed. 2024).[14]  So defined, Zorn and Meyer's conduct—as
alleged in the Amended Complaint—could qualify as "research."  Zorn and Meyer accessed the
KDOR website to "confirm" the information provided by the tipster.  Doc. 44 at 16 (Am. Compl.
¶ 86).  That is, they were searching for information to answer a question—research.  Cody offers
no rebuttal to this line of reasoning.  *See generally* Doc. 58; Doc. 73.

In conclusion, Cody didn't have probable cause to procure a warrant.  Thus, the alleged
falsehoods and omissions infecting the warrant were material.  That is, without those alleged
falsehoods and omissions—and without probable cause to believe criminal activity was afoot—
the warrants wouldn't have issued.  So, plaintiffs successfully have satisfied the first requirement
for stating a Fourth Amendment violation premised on warrant procurement.

Christner's arguments about plaintiffs' warrant-application allegations fare no better than
Cody's.  The court explains, next, why this is so.

### b.    Recklessly or Knowingly

Christner trains his arguments on the second element for a Fourth Amendment violation
based on falsehoods in or omissions from in a warrant—the affiant acted recklessly or
knowingly.  The Amended Complaint plausibly alleges that Christner knowingly or recklessly
misrepresented and omitted material facts from the search warrant affidavit.

---

[14]    The Supreme Court has emphasized that the relevant inquiry is the meaning of the words "'at the time Congress enacted the statute.'"  *Wis. Central Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quoting *Perrin*, 444 U.S. at 42).  Dictionary definitions of "research" from around the time Congress enacted the DPPA—1994—don't differ meaningfully from the Black's Law Dictionary cited here. *Research*, Oxford English Dictionary (2d ed. 1989) (defining "research" as a "search or investigation directed to the discovery of some fact by careful consideration or study of a subject" or "[i]nvestigation, inquiry into things").

Christner, for his part, argues he had no obligation to investigate and that he reasonably could rely on Cody.  Doc. 56 at 13–14 (first citing *Eckert v. Dougherty*, 658 F. App'x 401, 407 (10th Cir. 2016); and then citing *Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 216 (10th Cir. 2002)).  Christner's right about the general proposition he advances.  Officers reasonably may rely on "'observations, statements, and conclusions of their fellow officers[.]'" *Eckert*, 658 F. App'x at 407 (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998)).  But the reasonableness of that reliance withers when an officer knows those observations, statements, or conclusions aren't true—or recklessly disregards that possibility. And here, plaintiffs have alleged plausibly that Christner included information in the warrant application that he knew was inaccurate—including a falsified screenshot that doesn't appear on the KDOR website.  Doc. 44 at 39 (Am. Compl. ¶¶ 212–13).[15]

In other words, the subsequent chain of events allegedly leading to the Fourth Amendment violations relied on Christner's drafting of the warrant, including its fabrications and omissions.  *Cf. Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989) (holding defendant "caused" constitutional violation where decisionmaker "listened to" and "to some extent, relied on" defendant's recommendation).  And the Amended Complaint plausibly alleges that Christner acted with the requisite culpability.  He knowingly or recklessly mispresented and omitted material facts from the search warrant affidavit.  As such, he knew or should have known that his actions would "set in motion a series of events" that "would cause others" to violate plaintiffs' constitutional rights.  *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010)

---

[15]     Christner argues that "none of the justifications set forth on the KDOR site apply to Zorn and Meyer accessing Newell's records."  Doc. 56 at 16.  That argument ignores, however, plaintiffs' allegation that Christner himself falsely included that list of justifications in the warrant application. Christner can't rely reasonably on a fabrication for which he is responsible.

(internal quotation marks and citation omitted). Christner can't avoid liability just because he refused to sign the affidavit.

In sum, the Amended Complaint alleges—with specificity—that Christner knowingly or recklessly drafted the search warrant affidavit to include false statements and omit material information. And then Cody signed his name to it, allegedly adding more false statements in his warrant applications. Doc. 44 at 44 (Am. Compl. ¶ 237). Given the "low bar" for surviving a motion to dismiss, *Clinton*, 63 F.4th at 1276, and given the court's obligation to view plaintiffs' allegations in the light most favorable to them, plaintiffs plausibly have alleged that Cody and Christner are liable for violating their Fourth Amendment rights by participating in the drafting and procurement of the search warrants.[16]

### c.    Qualified Immunity

Defendants aren't entitled to qualified immunity for their allegedly unlawful procurement of the search warrants.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Still, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry[.]" *Id.* at 547. "When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the

---

[16]    Our court reached a different conclusion about Christner's liability in *Herbel*. 2024 WL 4416849, at *16. Critically, the complaint there didn't allege that Christner recklessly or knowingly had included false statements in the warrant affidavit. *Id.* (explaining that "there are no allegations that Christner . . . knew of any misstatements by Cody"); *see also* Complaint, *Herbel*, No. 24-cv-2224-HLT-GEB, ECF No. 1, at 31–32 (Compl. ¶¶ 189–91). Here, in contrast, the Amended Complaint explicitly alleges that Christner knowingly or recklessly included false information in the warrant affidavit. Doc. 44 at 38–43 (Am. Compl. ¶¶ 211–28).

obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original) (quotation cleaned up).  To that end, a warrant can't "protect officers who misrepresent or omit material facts to the magistrate judge."  *Stonecipher v. Valles*, 759 F.3d 1134, 1142–45 (10th Cir. 2014) (affirming decision granting qualified immunity to officer who incorrectly claimed—in a warrant affidavit—plaintiff previously was convicted of a crime of violence even though plaintiff had received a suspended sentence, which under Missouri law doesn't qualify as a conviction).

"In the context of a qualified immunity defense on an unlawful search or arrest claim, [the court] ascertain[s] whether a defendant violated clearly established law 'by asking whether there was arguable probable cause' for the challenged conduct."  *Id.* at 1141 (quotation cleaned up) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)).  That is, a "defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed[.]"  *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc); *see also Turner v. Lotspeich*, 77 F.3d 493, 1996 WL 23195, at *2 (10th Cir. 1996) ("'The law is clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause.'" (quotation cleaned up) (quoting *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991))).

The court already has concluded that probable cause didn't support the warrants here. *See above* § III.D.1.a.  Now, the court also concludes from plaintiffs' pleaded facts that not even arguable probable cause supported them.  Under those facts, defendants didn't have any reason to believe that plaintiffs' access of the KDOR website was without authorization.  Plaintiffs accessed information that was publicly accessible from a Kansas-run website.  And defendants

knew from Meyer's letter that the KDOR had confirmed to Meyer that he lawfully could access the information that he accessed. Doc. 44 at 24 (Am. Compl. ¶ 131). Viewing these allegations in the light most favorable to plaintiffs, defendants had no objectively reasonable basis to seek search warrants for either the *Record*'s office or the Meyer home. They thus aren't entitled to qualified immunity.

Christner's refusal to sign the warrant affidavit complicates the qualified-immunity inquiry, however. Still, the court concludes that Christner isn't entitled to qualified immunity at this stage for four reasons.

*First*, the Amended Complaint alleges Christner knowingly or recklessly included false information in the affidavit he drafted. Doc. 44 at 38–43 (Am. Compl. ¶¶ 211–28). So even if Christner was relying on Cody's directions, his actions weren't objectively reasonable if he knew—or recklessly disregarded the possibility—that the statements he included in the warrant weren't true. *See Robitaille*, 175 F. Supp. 3d at 1305–06 (rejecting officer defendant's position that he reasonably could rely on fellow officers' observations when defendant had reason to question veracity of those observations); *see also Montoya v. City and County of Denver*, No. 16-cv-01457-JLK, 2021 WL 1244264, at *17 (D. Colo. Mar. 4, 2021) (rejecting officer defendant's argument that "he was just the messenger" where evidence he included in warrant affidavit was "obviously false"), *aff'd*, No. 21-1107, 2022 WL 1837828 (10th Cir. June 3, 2022).

*Second*, because Christner prepared the bulk of the affidavit and allegedly knew that much of its information was false, he should have known that probable cause didn't support the search warrants. *See Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005) ("[L]iability under *Malley* may lie . . . against . . . an officer who actually prepares the warrant application . . . . Such an officer is in a position to see the whole picture, to understand his responsibility, and thus fully

to assess probable cause questions.").  In other words, as alleged, Christner knew—or should have known—that the warrant affidavit he drafted failed to support even arguable probable cause.  Still, he went forward.

*Third*, viewing the allegations in the light most favorable to plaintiffs, a reasonable jury could interpret Christner's refusal to sign the affidavit as evidence Christner intentionally distanced himself from wrongful conduct—a consciousness of guilt.  *See Sanford v. Russell*, 531 F. Supp. 3d 1221, 1227 (E.D. Mich. 2021) (explaining that evidence manifesting a defendant's "consciousness of his unlawful conduct" is admissible in a § 1983 case).

*Fourth*, the court must accept plaintiffs' allegations as true and view them in the light most favorable to plaintiffs.  *Brooks*, 985 F.3d at 1281.  Perhaps evidence will emerge that Christner merely copied Cody's allegations and had no reason to doubt their veracity.  But that's not what plaintiffs have alleged.  Should plaintiffs fail to muster evidence for their allegations about Christner's culpability, it seems likely he'll prevail at summary judgment.  But at the current stage, the court must view Christner's conduct "as alleged in the complaint[.]" *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) ("The procedural posture of the qualified-immunity inquiry may be critical. . . . Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." (second ellipsis in original) (internal quotation marks and citation omitted)).

So, the court concludes, plaintiffs' claim of a Fourth Amendment violation premised on warrant procurement survives against defendants Cody and Christner.  And, at this stage, any qualified immunity defense against this claim fails because no arguable probable cause existed. The only remaining question, then, is whether any other defendants were involved with the

warrant procurement at a level that suffices—at this stage—to support a claim against them, as well. Two other defendants allegedly were involved in procuring the warrants: Soyez and Hudlin. Next, the court addresses whether plaintiffs' allegations support warrant-procurement claims against those two defendants.

### d.    Soyez

The Amended Complaint alleges that Soyez was the person who suggested procuring a warrant for the Meyer home. Doc. 44 at 44 (Am. Compl. ¶ 234). Plaintiffs allege that Soyez knew that none of his compatriots had conducted an investigation and that neither he nor any of the coconspirators reasonably believed that anyone had committed a crime. *Id.* at 38 (Am. Compl. ¶ 208). Viewed against the backdrop of that allegation, it was objectively unreasonable for Soyez to suggest that the group procure a search warrant for the Meyer home and raid it. Soyez's briefing never grapples with this allegation. The court thus concludes that plaintiffs have stated a plausible Fourth Amendment violation against Soyez based on his suggestion to procure a warrant for the Meyer home.

Soyez doesn't raise a qualified immunity defense to this theory of recovery. His briefing doesn't discuss this theory of recovery at all. But in any event, it's clearly established law that officers have a duty not to seek a warrant where not even arguable probable cause supports it. *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (explaining that if "a reasonably well-trained officer . . . would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant[,]" then "the officer's application for a warrant was not objectively reasonable"); *see also Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) ("Because there was no probable cause to issue the warrant, the search of the [plaintiffs'] property violated their Fourth Amendment rights."); *id.* at 734 ("It is clearly established in our Fourth Amendment

jurisprudence that probable cause for a warrant requires a fair *probability* that the evidence sought would be found on the property." (emphasis in original)).

### e.    Hudlin's Review of the Applications

But the Amended Complaint's allegations about Hudlin's involvement in the warrant procurement are different.  They don't suffice to state a plausible claim against him.

The relevant parts of the Amended Complaint allege that Hudlin assisted Cody with creating the search warrant affidavits and reviewed the search warrant affidavit.  Doc. 44 at 46, 144 (Am. Compl. ¶¶ 248, 794(b)).  Those naked assertions won't do.  Plaintiffs don't allege sufficient facts for the court to infer that Hudlin's participation in the procurement of the warrant causally related to defendants violating plaintiffs' constitutional rights.  Nor do plaintiffs allege that Hudlin knew or should have known that his review of the warrant affidavit would cause a violation of plaintiffs' constitutional rights.  Hudlin thus isn't directly responsible on Count III to the extent that it's predicated on the procurement of the warrants.  *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation" (quotation cleaned up)).  Still, as discussed above, *see* § III.C., plaintiffs may impute liability to Hudlin if they can establish that Hudlin joined the unlawful conspiracy they allege.

### 2.   Oath or Affirmation

Plaintiffs also contend that Cody violated their Fourth Amendment rights because he pre-signed the warrant applications and didn't personally appear before Magistrate Judge Viar.[17]

---

[17]    Plaintiffs argue that Magistrate Judge Viar "was not a neutral, detached magistrate" because "she has her own troubled past with multiple DUIs, making her particularly susceptible to Chief Cody's claim that the *Record* was exposing Kari Newell for her DUIs."  Doc. 63 at 33 n.18; Doc. 44 at 46–47 (Am. Compl. ¶¶ 250–57).  This contention doesn't persuade the court.  *First*, the Amended Complaint doesn't allege that Magistrate Judge Viar knew about any of the drama swirling around Newell, plaintiffs, and defendants.  *See generally* Doc. 44.  So, one plausibly can't find or infer that Magistrate Judge Viar was

Doc. 44 at 47–50 (Am. Compl. ¶¶ 260–79).  In response, Cody asserts that Magistrate Judge Viar swore him in and that he submitted his affidavit under oath.  Doc. 58 at 32–33.  But at this stage the court must abide the well-pleaded facts of the Amended Complaint.  And they allege that "Cody never appeared before Judge Viar[.]"  Doc. 44 at 48 (Am. Compl. ¶ 264).  So, the court declines to dismiss the Amended Complaint's allegation of a Fourth Amendment violation based on Cody failing to appear before the magistrate.  *See Herbel*, 2024 WL 4416849, at *20 (characterizing Cody's arguments on this issue—which were essentially identical to this case— as "miss[ing] the mark" and declining to dismiss this theory of recovery for Cody).[18]

On the other hand, plaintiffs' allegations on this theory against Hudlin and Christner fall short.  Plaintiffs argue that Hudlin and Christner "knew" that the warrant issued without an oath or affirmation.  Doc. 63 at 36 (citing Doc. 44 at 39–40, 94–98 (Am. Compl. ¶¶ 215–19, 492– 508)).  But the problem is this:  their allegations don't square with their argument.  To the contrary, the Amended Complaint doesn't contain any well-pleaded allegations from which the

---

concerned about plaintiffs exposing Kari Newell.  *Second*, even if she knew about the Amended Complaint's allegations, Magistrate Judge Viar's prior criminal history is too tenuous a link to Newell to call into question her neutrality.  Plaintiffs cite no authority suggesting that this attenuated connection between Magistrate Judge Viar and the object of defendants' alleged conspiracy made her anything other than neutral and detached.  *Cf. United States v. Bowling*, 619 F.3d 1175, 1186 (10th Cir. 2010) (rejecting argument that judge's prior "position adverse to [defendant] while engaged as a lawyer" rendered him biased).

[18]    Cody never argues that he's entitled to qualified immunity against plaintiffs' oath-or-affirmation theory.  *See* Doc. 58 at 33 (arguing only that Cody is entitled to qualified immunity "for reasonably relying *on the validity* of the search warrants" (emphasis added)).  That is, Cody never argues that the law about oath or affirmation isn't clearly established.  So, the court doesn't consider that contention in resolving Cody's Motion to Dismiss.  *See Fullen v. City of Salina*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *12 (D. Kan. Sept. 30, 2021) (declining to consider qualified immunity where defendants didn't "address whether the Fourth Amendment rights at issue were clearly established"); *see also Tillmon v. Douglas County*, 817 F. App'x 586, 589–90 (10th Cir. 2020) (explaining that single-paragraph, "cursory" presentation of qualified immunity defense wasn't adequate to preserve it for appellate review).  Nor does Cody argue that plaintiffs' oath-or-affirmation theory fails to allege a Fourth Amendment violation against him.  So the court doesn't consider such a position.  *See Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived.").

court could infer that Hudlin or Christner were responsible for—or even knew—that the warrants issued without oath or affirmation. As such, the court dismisses any alleged Fourth Amendment violation against Hudlin and Christner that plaintiffs predicate on the warrants violating the oath-or-affirmation requirement.

That leaves one final way plaintiffs allege defendants violated the Fourth Amendment—executing the warrants.

### 3. Warrant Execution

Plaintiffs' third theory of recovery for a Fourth Amendment claim is based on defendants' execution of the warrants. *See* Doc. 44 at 128–29 (Am. Compl. ¶¶ 704–12).

"The Fourth Amendment's particularity requirement targets the constitutional evil of 'general exploratory rummaging in a person's belongings' pursuant to a warrant." *Bowling v. Rector*, 584 F.3d 956, 971 (10th Cir. 2009) (quoting *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)). And the Supreme Court has warned that the particularity requirement has special force where "the materials sought to be seized may be protected by the First Amendment[.]" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). The Fourth Amendment categorically prohibits officers from "rummag[ing] at large in newspaper files[.]" *Id.* at 566. The court concludes that plaintiffs have stated plausible Fourth Amendment violations against Cody, Hudlin, Soyez, and Christner for unlawfully executing the warrants.

The core allegations against Cody based on execution of the search warrant are that he directed seizures of property without the warrant-required preview search and that he searched Gruver's file on him, in flagrant disregard of the warrant. Doc. 44 at 143 (Am. Compl. ¶ 793(e)). The Amended Complaint alleges that Hudlin searched Gruver's file cabinets, located the *Record*'s file on Cody, and showed that file to Cody. *Id.* at 144 (Am. Compl. ¶ 794(d)). Hudlin also directly participated in executing the search warrant, and he personally seized cell phones

and computers from both the *Record*'s office and the Meyer home without conducting the preview search the warrant required.  *Id.*  Soyez directed Cody to violate the search warrants' preview requirement.  *Id.* at 112 (Am. Compl. ¶ 611).  And Christner was present for and aided in the searches and seizures at both the *Record*'s office and the Meyer home.[19]  *Id.* at 52, 72 (Am. Comp. ¶¶ 281, 377–78).

### a.  Ignoring the Preview Requirement

Below, the court considers defendants' arguments that the court should dismiss plaintiffs' warrant-execution-premised claims.  This analysis unfolds in three parts—arguments based on: (a) the preview requirement, (b) the scope of the warrant, and (c) qualified immunity.  In the end, none of these arguments convince the court to dismiss plaintiffs' claims based on execution of the warrants.

Cody argues that because it took so long for Christner to perform the preview search, "it was objectively reasonable" for Cody to order the seizure of the devices without performing the warrant-required preview search.  Doc. 58 at 30.  Cody cites *United States v. Hargus*, 128 F.3d 1358 (10th Cir. 1997), to support this argument.  *Id.*  In *Hargus*, a search warrant authorized officers to "seize ten broad categories of records" but due to "the impracticability of on-site sorting and the time constraints of executing a daytime search warrant[,]" the officers seized file cabinets, miscellaneous papers, and "property not specified in the search warrant[.]"  128 F.3d at 1363.  Our Circuit was "given pause" by these seizures but nonetheless affirmed the decision

---

[19]     Plaintiffs also argue that Christner is liable for selecting "keywords" for the preview search that were overly broad and thus exceeded the scope of the warrant.  Doc. 44 at 145 (Am. Compl. ¶ 796(c)). Christner argues that he's entitled to qualified immunity for a violation based on the preview search itself. Doc. 56 at 19.  Even if using broad terms for the preview search could qualify as a constitutional violation, plaintiffs haven't carried their burden to plead facts that clearly could establish that violation. The warrants here didn't give officers any direction about *how* to perform the preview search.  The court thus concludes that Christner is entitled to qualified immunity for any claim based on using broad terms for the preview search of Zorn's computer.

denying of the defendant's motion to suppress, and it concluded that the officers' seizures didn't "grossly exceed" the scope of the warrant.  *Id.*

Hargus doesn't control here.  In *Hargus*, oil records—which the warrant authorized officers to seize—"were present in every drawer of the file cabinets[.]"  *Id.*  Not true here. Defendants had no reason to believe that *any* of the devices they seized contained evidence of crimes.  What's more, the warrants here plainly instructed the officers how to separate the wheat from the chaff.  Doc. 58-6 at 1 (instructing officers executing the warrant to "[c]onduct a preview search of all located digital communications devices and digital storage media *to exclude from seizure* those [devices] which have not been involved in the identity theft" (emphasis added)); Doc. 58-8 at 1 (same).  The warrants' explicit instructions and the absence of any evidence of crime on the seized devices factually distinguish *Hargus*.

In any event, the court isn't persuaded that an hour-long preview search is unmanageable. Defendants could have procured another hard drive to preview search multiple devices at once. They also could have reduced the preview search time by limiting the number of terms to search. A minor inconvenience to law enforcement officers can't justify disregarding Fourth Amendment safeguards.  In sum, Cody's alleged conduct ignoring the preview requirement and searching Gruver's file on him states a claim for a Fourth Amendment violation.

Separately, Christner argues that seizing devices from the *Record*'s office and from the Meyer home didn't "grossly exceed" the terms of the search warrant because the search warrants "did not require an on-site search[.]"  Doc. 56 at 16–17.  To support this argument, Christner cites the search warrants themselves.  *Id.* at 17.  They direct officers to "[f]orensically process and analyze *in a controlled setting* all listed electronic media[.]"  Doc. 58-7 at 1 (emphasis added); Doc. 58-8 at 1.  The court isn't convinced.

46

The critical language in the search warrants requires officers to "[c]onduct a preview search of all located digital communications devices and digital storage media *to exclude from seizure* those [devices] which have not been involved in the identity theft[.]"  Doc. 58-6 at 1 (emphasis added); Doc. 58-8 at 1 (same).  The search warrants' separate direction to "[f]orensically process and analyze in a controlled setting" doesn't suggest that the preview search could occur at a different location.  Doc. 58-6 at 1; Doc. 58-8 at 1.  To the contrary, both the search warrants are explicit.  The purpose of the search preview requirement was "to exclude from seizure" those devices not connected to the alleged crimes that defendants were investigating.  Doc. 58-6 at 1; Doc. 58-8 at 1.  By ignoring that requirement, Christner—at the direction or in coordination with Cody—grossly exceeded the terms of the search warrant and thus violated plaintiffs' Fourth Amendment rights.

Soyez is also liable for this violation.  The Amended Complaint alleges that Soyez "schemed" with Cody to seize the computers at the *Record*'s office and the Meyer home without conducting the required preview search.  Doc. 44 at 112 (Am. Compl. ¶ 611).  It also asserts that Cody brought "Soyez up to speed on the search" before Cody announced, "Alright, we'll just take them all."  *Id.* at 62 (Am. Compl. ¶ 322).  Taking these allegations as true, as it must, the court finds it's reasonable to infer that Soyez was aware of the preview search requirement, understood that the first preview search had taken a long time, and then directed, suggested, or authorized Cody to seize the remaining devices without conducting a preview search.  Based on that inference, Soyez "'knew or reasonably should have known'" that directing or supporting

Cody's seizure of the devices would violate plaintiffs' rights. *Mink*, 613 F.3d at 1001 (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).[20]

### b.    Exceeding the Scope of the Warrant

Plaintiffs have also stated a plausible claim against Hudlin and Cody for exceeding the warrant's scope by searching Deb Gruver's file on Cody. Hudlin and Cody's attack on this claim is meager. Hudlin cites two cases for the proposition that an "officer assisting in executing a search warrant is entitled to rely on the presumed validity of the search warrant procured by another officer[.]" Doc. 60 at 18 (first citing *Wigley v. City of Albuquerque*, 567 F. App'x 606, 609–10 (10th Cir. 2014), and then citing *Harte v. Bd. of Cnty. Comm'rs*, No. 13-2586-JWL, 2017 WL 5068907, at *6 (D. Kan. Nov. 3, 2017)). But even if Hudlin reasonably could rely on the validity of the warrants, he had no authority to exceed the scope of them. In other words, Hudlin's reasonable reliance on the warrants' validity doesn't excuse his unlawful and unreasonable *execution* of the warrants. Cody, meanwhile, fails to respond to plaintiffs' argument on the theory that he violated the Fourth Amendment by searching Deb Gruver's file on him. *See generally* Doc. 58. The court declines to dismiss this theory against either Cody or Hudlin.

### c.    Qualified Immunity

Finally, defendants aren't entitled to qualified immunity against execution-of-the-search-warrant-based claims. It's clearly established law that exceeding the scope of a search warrant is unlawful. *Bowling*, 584 F.3d at 971 ("As it would have been clear to a reasonable officer in July of 2006 that exceeding the scope of a search warrant was unlawful, the constitutional right at

---

[20]    Hudlin is also liable for exceeding the scope of the warrants by seizing items in flagrant disregard of the warrants' preview search requirement. Hudlin's brief fails to advance a developed argument to escape liability for this claim. *See generally* Doc. 60.

issue was clearly established at the time of [defendant's] conduct."); *see also Patel v. Hall*, 849
F.3d 970, 984 (10th Cir. 2017) ("When 'a warrant clearly and precisely specifies items to be
seized, and the officers executing the warrant seize additional items, those officers act
unreasonably for Fourth Amendment purposes unless their conduct may be justified under an
exception to the warrant requirement.'" (quoting *Bowling*, 584 F.3d at 971)).  It's also clearly
established law that "[w]here the materials sought to be seized may be protected by the First
Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous
exactitude.'"  *Zurcher*, 436 U.S. at 564 (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).
As alleged, defendants flouted these clearly established constitutional mandates.  They thus
aren't entitled to qualified immunity at this stage of these proceedings.

### 4.  Mayfield

Before the analysis can move past the universe of plaintiffs' Fourth Amendment claims,
the court must make one last stop.  Plaintiffs sweep Mayor Mayfield in with the other
defendants, alleging he, too, violated plaintiffs' Fourth Amendment rights.  But as the court
explains below, none of plaintiffs' allegations about Mayfield can support a claim that he
*directly* violated the Fourth Amendment.

Mayfield argues that plaintiffs haven't advanced any fact allegations that implicate him
on their Fourth Amendment claims.  Doc. 60 at 17.  Alternatively, Mayfield argues that he's
entitled to qualified immunity.  *Id.*  Plaintiffs respond, arguing that Mayfield ordered the
investigation into Meyer and the *Record* and that Mayfield secured the assistance of Newell as a
complaining witness by falsely stating "that Meyer and Herbel were conspiring against her[.]"
Doc. 63 at 25–26.  Neither of these allegations, however, can establish the requisite causal
connection between Mayfield's actions and plaintiffs' alleged constitutional violations.

To state a § 1983 claim against an individual defendant, plaintiffs must come forward with allegations that each defendant was causally connected to the constitutional violations. *See Snell*, 920 F.2d at 700 ("[T]here must be cause in fact between the conduct complained of and the constitutional deprivation."); *see also Gallagher*, 587 F.3d at 1069 ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation" (quotation cleaned up)). "'The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Mink*, 613 F.3d at 1001 (quoting *Snell*, 920 F.2d at 700). Neither of the alleged bases for Mayfield's liability—directing the investigation or recruiting Newell as a complaining witness—"caused" plaintiffs' constitutional injuries. The court addresses each alleged basis, in turn, below.

### a.  Directing Investigations

Plaintiffs haven't alleged adequately that Mayor Mayfield is liable based on his directing Cody to investigate. And even if they had, Mayfield is entitled to qualified immunity on that claim. The court explains each of these conclusions.

### i.  Insufficient Allegations

As a starting point, plaintiffs' argumentation about this causality requirement and Mayfield's involvement is perfunctory. *See* Doc. 63 at 25–26. Plaintiffs list Mayfield's alleged participation but never explain how that participation *caused* plaintiffs' constitutional injuries. *See id.* And the court declines to comb plaintiffs' massive pleading to search for that required explanation. *See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) ("Judges are not like pigs, hunting for truffles buried in briefs." (quotation cleaned up)). Even if Mayfield's direction to his subordinates to investigate was the but-for cause of plaintiffs' injuries, plaintiffs haven't alleged any facts—apart from their conspiracy theory—that Mayfield

"'knew or reasonably should have known'" that his direction to investigate would deprive someone of their constitutional rights. *Mink*, 613 F.3d at 1001 (quoting *Snell*, 920 F.2d at 700).

### ii. Qualified Immunity

Alternatively, Mayfield is entitled to qualified immunity against this theory of recovery. Plaintiffs haven't presented any argument that it was clearly established that it's unconstitutional to direct subordinates to investigate, even where the person directing the investigation has no basis to believe that a crime was committed. *See Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("'The dispositive question is whether the violative nature of *particular* conduct is clearly established.'" (emphasis in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *cf. Frasier*, 992 F.3d at 1025 (explaining that proof defendants agreed to "engage in . . . lawful investigative activities" couldn't support a § 1983 claim). So, the court concludes, Mayor Mayfield is entitled to qualified immunity based on his alleged conduct directing an investigation.

### b. Recruiting Witness

As for plaintiffs' argument that Mayfield recruited Newell as a complaining witness, plaintiffs once again fail to explain how that action is causally connected to depriving plaintiffs of their constitutional rights. Even without Newell's participation, the falsehoods in the search warrant application—such as the assertion that Zorn either lied or impersonated Newell—likely would have sufficed to generate probable cause for the warrants to issue. In any event, plaintiffs haven't carried their burden of showing that Mayfield violated clearly established law by recruiting Newell to serve as a complaining witness. That is, plaintiffs haven't directed the court

to any Tenth Circuit or Supreme Court decision establishing that an official violates the law by recruiting a person—even absent probable cause—to act as a complaining witness.[21]

As already explained, plaintiffs have alleged facts sufficient to make Mayfield's participation in a conspiracy plausible. *See above* § III.C. But what plaintiffs haven't alleged plausibly are facts suggesting that Mayfield is responsible directly for violating their Fourth Amendment rights. Insufficient causation allegations also plague plaintiffs' First Amendment theory of recovery against Mayfield, so the court dismisses those claims, too. The court thus dismisses plaintiffs' Fourth and First Amendment claims against Mayfield to the extent they're predicated on Mayfield's direct involvement. *Cf. Bledsoe*, 53 F.4th at 616 n.24 (discussing that plaintiff "alleged alternate theories of liability for each [defendant]" and analyzing each alleged theory separately).

### 5. Fourth Amendment Conclusion

Summarizing, the court makes the following decision on plaintiffs' Fourth Amendment claims. The court dismisses the following:

---

[21] The court reads Circuit precedent to place both a *pleading* and a *briefing* burden on plaintiffs seeking to survive a qualified immunity defense. That is, a plaintiff must plead facts that plausibly allege a violation of federal law *and* show that the violation was clearly established. *See, e.g.*, *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006) ("To overcome a qualified immunity defense, a plaintiff must first *establish* a violation of a constitutional or statutory right and then *show* that the right was clearly established." (emphasis added)); *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If the plaintiff *establishes* a violation of a constitutional or statutory right, he must then *demonstrate* that the right at issue was clearly established at the time of the defendant's unlawful conduct." (emphasis added)); *Bledsoe*, 53 F.4th at 617 n.25 ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was Bledsoe's burden to show both that he had *alleged* a constitutional violation and that that violation was clearly established." (emphasis added)); *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (explaining that the plaintiff "bears the ultimate burden of persuasion to overcome qualified immunity" (quotation cleaned up)). Still, the court is cognizant of the Supreme Court's instruction that whether "an asserted federal right was clearly established at a particular time . . . presents a question of law," so a court reviewing qualified immunity should "use its full knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (quotation cleaned up). To that end, the court finds no precedent suggesting that recruiting a person to act as a complaining witness violates clearly established law.

- plaintiffs' Fourth Amendment claim against Hudlin, predicated on the procurement of the warrant;

- plaintiffs' Fourth Amendment claim against Hudlin, based on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Christner, predicated on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Christner, based on using broad terms for the preview search of Zorn's computer;

- any direct Fourth Amendment claim against Mayfield.

All other Fourth Amendment claims (and theories of recovery) survive.

Now, plaintiffs' First Amendment claims.

## E.    Counts I and II:  First Amendment Violations

The First Amendment forbids the government from "abridging the freedom of speech, or of the press[.]"  U.S. Const. amend. I.  These prohibitions apply to "both state and federal government action."  *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1182 (D.N.M. 2024) (first citing *Gitlow v. New York*, 268 U.S. 652, 666 (1925); and then citing *Near v. Minnesota*, 283 U.S. 697, 707 (1931)).  Plaintiffs assert two First Amendment claims—a "direct" claim and a retaliation claim.  Defendants move to dismiss both.

### 1.  Direct First Amendment Violation

The full text of § 1983 and the First Amendment support the court concluding that plaintiffs have stated a plausible direct violation claim.  Plaintiffs' claim that defendants violated their First Amendment rights by physically invading the *Record*'s offices and interfering with the *Record*'s ability to gather and publish news survives.[22]  Section 1983 imposes liability on

---

[22]    The county defendants argue that it's not clear whether the Tenth Circuit recognizes a § 1983 claim predicated on a direct First Amendment violation.  Doc. 56 at 10–11.  Instead, these defendants contend that the Tenth Circuit generally recognizes First Amendment retaliation claims and First Amendment claims based on prior restraint.  *Id.*  Plaintiffs disagree.  Doc. 63 at 14–16.  They argue that

actors—acting under color of state law—who "subject[], or cause[] to be subjected" any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. As described above, our Circuit has identified just two elements for a § 1983 cause of action. A plaintiff must allege a "(1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler*, 104 F.4th at 797 (quotation cleaned up). Just the first element is at issue here.

The court easily concludes that plaintiffs have alleged a violation for First Amendment freedom of press. The First Amendment prohibits the government from "abridging the freedom . . . of the press[.]" U.S. Const. amend. I. The Supreme Court has made clear that "the guarantees of freedom of speech and press were not designed to prevent the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential[.]" *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975) (quotation cleaned up). In other words, the government generally may not interfere—by any means—with the production and dissemination of ideas. The First Amendment also protects the right to circulate newspapers. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) (explaining that "circulation of newspapers . . . is constitutionally protected"); *see also Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) ("It is beyond dispute that the right to distribute newspapers is protected under the First Amendment." (quotation cleaned up)).

---

the Tenth Circuit recognizes "direct" First Amendment claims in addition to retaliation and prior restraint claims. *Id.* The court agrees about this much: Our Circuit hasn't ruled in a case where government actors raided a newspaper office without probable cause, effectively shutting it down. Simply put, the unusual facts of this case don't fit neatly within existing Circuit precedent. Still, as explained, the court holds that plaintiffs have stated a plausible claim that defendants violated their First Amendment rights by physically invading the *Record*'s office and interfering with the *Record*'s ability to gather and publish the news.

Plaintiffs can state a plausible First Amendment claim when the government physically disrupts protected First Amendment activities.  Many courts have concluded as much.  *E.g.*, *Keating v. City of Miami*, 598 F.3d 753, 764 (11th Cir. 2010) (holding plaintiffs had stated § 1983 claim for violating First Amendment where defendants "caused the subordinate police officers to disperse a crowd of peaceful demonstrators, including the Protesters, who were exercising their freedom of expression"); *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282–83 (D. Colo. 2018) (declining to grant summary judgment against "as-applied" First Amendment claim where police officers arrested plaintiff while he was protesting); *Irizarry v. City and County of Denver*, 661 F. Supp. 3d 1073, 1091–92 (D. Colo. 2023) (allowing First Amendment claim and First Amendment retaliation claim to survive motion to dismiss based on arrest of plaintiff while protesting); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1297 (10th Cir. 2022) (explaining that officer violated First Amendment rights when he "physically interfered with protected conduct" by standing in front of plaintiff and shining light into his camera while plaintiff was filming police); *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (concluding that officers violated plaintiff's First Amendment rights by confiscating his sign).  In short, the government violates the First Amendment when it physically interferes with plaintiffs engaging in protected First Amendment activities.

Here, plaintiffs have alleged that kind of physical interference.  They allege that defendants unlawfully raided the *Record*'s offices and seized the computers necessary for the newspaper's operation.  Doc. 44 at 64 (Am. Compl. ¶ 329).  And they allege that defendants' raid and seizures "effectively shut[] down" the *Record*.  *Id.*  Those actions thus violated plaintiffs' First Amendment rights by "restricting their ability to gather and report information about matters of public concern."  *Id.* at 107 (Am. Compl. ¶ 574).  The court has no difficulty

concluding that the government—with no lawful basis—may not physically restrain a newspaper (like the *Record*) from operating. This kind of physical disruption violated plaintiffs' First Amendment rights.

The court explains this conclusion by evaluating defendants' three arguments seeking a different result, below.

### a. Duplicative of Retaliation Claim

The county defendants argue that plaintiffs' direct First Amendment claim duplicates their First Amendment retaliation claim. Doc. 56 at 10–11. But that's not right. Plaintiffs' direct claim is based on defendants physically interfering with the *Record*'s media operations. *See* Doc. 63 at 22 (arguing that Cody "and his fellow raiders shut down the newspaper—a literal direct violation of the freedom of the press guaranteed by the First Amendment"). In contrast, the First Amendment retaliation claim relies on defendants' *response* to plaintiffs engaging in protected First Amendment activities. *E.g.*, Doc. 44 at 114 (Am. Compl. ¶¶ 623–27) (alleging that defendants were motivated to retaliate against plaintiffs for publishing negative commentary and investigating defendants). Also, some of the conduct relevant to plaintiffs' retaliation claim—for instance, the raid of the Meyer home and seizure of *Record* employees' cell phones—potentially isn't relevant to the direct claim because that conduct didn't interfere with *Record* operations. Regardless, other courts have acknowledged that First Amendment plaintiffs may assert both a direct claim and a retaliation claim based on the same government conduct. *E.g.*, *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1065 (D. Colo. 2021) (declining to dismiss First Amendment claim as duplicative of First Amendment retaliation claim where police officer arrested plaintiff after he "flipped off" officer); *Irizarry v. City and County of Denver*, 661 F. Supp. 3d at 1091–92 (finding First Amendment legal theory distinct from retaliation claim and denying motion to dismiss on basis of duplicative claim).

56

### b.    Inadequate Animus Allegations

The county defendants next argue that plaintiffs haven't alleged adequately that animus motivated defendants.  Doc. 56 at 10–11.  This argument assumes that plaintiffs must allege animus.  But in cases where officers physically prevent plaintiffs from exercising First Amendment rights, no animus is required for a plausible First Amendment claim.  *See, e.g.*, *Keating*, 598 F.3d at 764 (finding First Amendment claim plausible without assessing whether plaintiffs had alleged animus).  Of course—and as county defendants argue, Doc. 56 at 12— causation still is required.  *Snell*, 920 F.2d at 700.  But the court already has analyzed causation extensively in Fourth Amendment analysis, above.  Cody, Hudlin, Soyez, and Christner acted in a manner that caused—or at very least contributed to—defendants effectively shutting down the *Record*.  At this stage, the court declines to dismiss plaintiffs' First Amendment claims against these defendants.

### c.    Qualified Immunity

The court also concludes that defendants aren't entitled to qualified immunity on the direct claim.  Plaintiffs fail to direct the court to any Tenth Circuit or Supreme Court case that clearly establishes that raiding and shutting down a newspaper—without probable cause— constitutes a First Amendment violation.  Plaintiffs' citations about freedom of the press, *see* Doc. 63 at 46–47, define rights at "'a high level of generality,'" which the Supreme Court has "'repeatedly stressed'" cannot suffice.  *Frasier*, 992 F.3d at 1021 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  But plaintiffs also argue that defendants' conduct was so egregious that defendants aren't entitled to qualified immunity.  The court agrees with them.

Plaintiffs' allegations fit the mold of "the rare case or extreme circumstance where the conduct in question has not previously been held unlawful, but a government official may still have notice that their conduct violates a constitutional right because it is so apparent as to apply

with obvious clarity." *Brown*, 124 F.4th at 1265 (quotation cleaned up).  As alleged here, defendants manufactured probable cause to procure search warrants, used those search warrants to raid a newspaper's place of operations, and plainly violated the terms of the search warrant to seize the newspaper's every computer, effectively shutting it down.  Those allegations—if true—are astonishing.  Any reasonable official in defendants' shoes would know that this conduct is unlawful.  *Cf. Bailey v. Wheeler*, 843 F.3d 473, 485 (11th Cir. 2016) (affirming decision denying qualified immunity where defendant police chief issued a be-on-the-lookout advisory in retaliation for plaintiff "speaking up about alleged civil-rights abuses" because "it is certainly obvious, as a general proposition and without reference to case law" that defendant's conduct violated the First Amendment).  So, defendants aren't entitled to qualified immunity against plaintiffs' direct First Amendment claim.

Next, the court moves to defendants' arguments against plaintiffs' First Amendment retaliation claim.

### 2.  First Amendment Retaliation

To establish a § 1983 First Amendment retaliation claim, a "plaintiff must show that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007).  The court considers the various and sundry ways defendants try to repel this claim.  But first, the court offers a preliminary word about qualified immunity in this claim's context.

No defendant advances a developed qualified immunity argument against plaintiffs' First Amendment retaliation claim.  That makes sense.  "It has long been clearly established that the

First Amendment bars retaliation for protected speech and association." *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

Now, the court addresses the other arguments defendants make against plaintiffs' retaliation claim.

### a.  No Plausible Retaliation Claim:  Christner, Hudlin, Mayfield

Both Christner and Hudlin argue that plaintiffs haven't alleged that animus motivated them.  Doc. 56 at 11; Doc. 60 at 18.  That's correct but not terribly useful.  It's not useful because the Amended Complaint doesn't assert a First Amendment retaliation claim against Christner or Hudlin.  Doc. 44 at 113 (Am. Compl.) (Count II).  So, they aren't directly liable on that claim, and there's no need to say more about this red herring.

As the court explained above, *see* § III.D.4., plaintiffs haven't alleged plausibly that Mayfield caused their constitutional injuries, so the court dismisses plaintiffs' First Amendment claims against Mayfield, as well.  Now, on to the retaliation claims that survive.

### b.  Soyez

Soyez argues that plaintiffs' animus allegations are "conclusory and implausible."  Doc. 56 at 11.  He also contends that he isn't responsible for any First Amendment violation because he didn't participate in the investigation, or in the procurement or execution of the search warrants.  *Id.* at 11–12.  Plaintiffs respond, arguing that Soyez:  (1) met with Cody and the other defendants to plan the raids; (2) helped recruit Christner as a co-conspirator; (3) recommended raiding the Meyer home; (4) instructed Cody or colluded with Cody to seize the *Record*'s computers in violation of the search warrant's preview requirement; and (5) hosted a pizza party after the raids.  Doc. 63 at 24–25.

The court concludes that plaintiffs have stated a plausible claim for First Amendment retaliation against Soyez. Soyez's argument that plaintiffs fail to allege animus isn't persuasive. To the contrary, plaintiffs plausibly allege that Soyez was motivated to interfere with the *Record* for multiple reasons. *First*, they allege, Soyez was afraid of blowback if the *Record* published information about Cody's personnel problems because Soyez had recommended Cody for police chief. Doc. 44 at 139 (Am. Compl. ¶ 773). *Second*, he feared the *Record* exposing that his office had knowingly allowed Kari Newell to drive without a valid driver's license. *Id.* at 37, 139 (Am. Compl. ¶¶ 199, 774). And *third*, Soyez had his own personal animus against the *Record*—evidenced by his declaration to Cody that "[w]e don't work for the press!" *Id.* at 115, 139 (Am. Compl. ¶¶ 629, 775). Soyez also wanted to keep Mayfield—his employee—happy. *Id.* at 139 (Am. Compl. ¶ 776). These allegations suffice to support a reasonable inference that Soyez's conduct was substantially motivated as a response to the *Record*'s constitutionally protected activities.

Soyez next argues that he didn't participate in investigating plaintiffs, drafting the warrants, or executing the warrants. Doc. 56 at 12. The court already has addressed this argument in the context of plaintiffs' Fourth Amendment claim. *See above* § III.D. Its analysis there applies equally to this First Amendment claim. Soyez faces liability both for suggesting that defendants target the Meyer home and for colluding with Cody to violate the warrants' preview-search requirement. The court thus declines to dismiss plaintiffs' First Amendment retaliation claim against Soyez.

The court continues with the arguments by former Chief of Police Cody. They fare no better.

### c.   Cody

Cody argues that plaintiffs haven't stated a First Amendment claim against him.  He first argues that there's "no general First Amendment right of access to all sources of information under government control."  Doc. 58 at 33–34 (citing *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001)).  That's accurate.  But it's not helpful.  Plaintiffs don't premise their First Amendment claim against Cody—or anyone else—on blocking their access to information.  Rather, it's based on defendants' wanton searches and seizures as retaliation for plaintiffs engaging in protected activity.  *See* Doc. 44 at 89–113 (Am. Compl. ¶¶ 466–617).

Next, Cody argues that plaintiffs haven't alleged the second element of a First Amendment retaliation claim—"the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[.]"  *Van Deelen*, 497 F.3d at 1155–56.  The court rejects this argument because it doesn't comport with circuit precedent.

For this element, our Circuit employs an objective test.  *Yehia*, 38 F.4th at 1292.  Procuring search warrants, raiding a place of business and home, and seizing electronic devices would chill a person of ordinary firmness from continuing to exercise protected First Amendment rights.  Cody's argument to the contrary "is unsupported and not persuasive[.]"  *Herbel*, 2024 WL 4416849, at *13.  Seizing computers and phones would chill a person of ordinary firmness.  *See United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) ("In today's world, if any place or thing is especially vulnerable to a worrisome exploratory rummaging by the government, it may be our personal computers.").  Likewise, a raid of a person's home—unsupported by probable cause—would chill a person of ordinary firmness.  The Supreme Court's Fourth Amendment jurisprudence has recognized the weighty interest that people have in keeping their homes free of government intrusion.  *Florida v. Jardines*, 569 U.S.

1, 6 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals. At the amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (internal quotation marks and citation omitted)). The court easily concludes that plaintiffs have alleged that Cody's actions would chill a person of ordinary firmness from engaging in constitutionally protected activities.[23]

The court thus declines to dismiss plaintiffs' First Amendment retaliation claim against Cody or Soyez.

### 3. Individual Liability – Summary

Before transitioning to plaintiffs' claims against the municipal defendants, the court summarizes its holdings to this point. The court dismisses the following claims:

- plaintiffs' Fourth Amendment claim against Hudlin, predicated on the procurement of the warrant;

- plaintiffs' Fourth Amendment claim against Hudlin, based on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Christner, predicated on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Christner, based on using broad terms for the preview search of Zorn's computer;

- any direct Fourth Amendment claim against Mayfield;

- any direct First Amendment claim against Mayfield.

All other claims against the individual defendants survive.

---

[23]      Cody also argues that plaintiffs can't state a claim for First Amendment retaliation because police had probable cause to search the *Record* and the Meyer home. The court needn't engage that argument because it already has concluded that plaintiffs' allegations, if true, could support a finding that police lacked probable cause to support either search. *See* § III.D.1.a.

The court turns now to the claims asserting municipal liability.  It begins with a brief primer on § 1983 municipal liability.

### F.    Count IV:  Municipal Liability

"A municipality or other local government may be liable under" § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).  But municipalities "are responsible only for 'their *own* illegal acts'" and "are not vicariously liable under § 1983 for their employees' actions."  *Id.* (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see also George v. Beaver County*, 32 F.4th 1246, 1253 (10th Cir. 2022) (same).

To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.'"  *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

A plaintiff may establish such municipal policy or custom by alleging facts capable of demonstrating one of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted).  The Amended Complaint here asserts constitutional violations caused by the failure to train or supervise employees adequately

and by decisions of employees with final policymaking authority. Doc. 44 at 133–35 (Am. Compl. ¶¶ 740–49).

This section's analysis proceeds as follows: The court assesses whether plaintiffs have alleged facts capable of supporting a plausible claim based on either of these theories. Then it addresses the City's argument that former Mayor Mayfield wasn't a final policymaker. And finally, the court addresses the county defendants' arguments that plaintiffs' claims against the County and Sheriff Soyez, in his official capacity, are redundant.

### 1. Failure to train

The City argues that plaintiffs' failure-to-train allegations are conclusory and "devoid of any alleged facts to show what specific training supposedly was not given that should have been[.]" Doc. 60 at 20–21. The county defendants make essentially the same argument. They contend plaintiffs haven't alleged that any details about the training that they did (or didn't) provide and that plaintiffs haven't alleged plausibly that they acted with deliberate indifference. Doc. 56 at 8.[24] Plaintiffs predictably disagree. Doc. 63 at 52–54. They insist that no pattern of violations is necessary where the need for training is obvious so that failure to train amounts to deliberate indifference. *Id.* Defendants have the better of these arguments, and the court thus dismisses plaintiffs' municipal liability claims based on a failure to train.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. To state a plausible claim based on a

---

[24] The county defendants also argue that since none of the sheriff defendants violated plaintiffs' constitutional rights, the county defendants can't incur municipal liability. Doc. 56 at 6. County defendants are right that "a failure-to-train claim may not be maintained without a showing of a constitutional violation by the allegedly un-, under-, or improperly-trained officer." *Crowson v. Washington County*, 983 F.3d 1166, 1187 (10th Cir. 2020). But the court already has concluded that plaintiffs have stated plausible § 1983 claims against Sheriff Soyez and Detective Christner, so this argument doesn't help the county defendants.

failure to train, a plaintiff must allege facts that raise a plausible inference that the municipality acted with deliberate indifference. *See Bryson*, 627 F.3d at 788 (explaining that plaintiff may state claim for failure to train "so long as that failure results from deliberate indifference to the injuries that may be caused" (quotation cleaned up)). "Ordinarily, a plaintiff must prove a pattern of untrained employees' constitutional violations to show deliberate indifference." *George*, 32 F.4th at 1253. "A deliberate indifference claim may be based on a single incident when the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.'" *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023) (quotation cleaned up) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Plaintiffs don't argue that they've alleged a pattern of constitutional violations. Doc. 63 at 52–54. Instead, they assert, they've satisfied the single-incident criterion. *See id.* Where, as here, a plaintiff alleges municipal liability for failure to train based on a single incident, the plaintiff must allege "(1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Valdez*, 66 F.4th at 816–17 (quotation cleaned up and citation omitted). To satisfy the third element at the pleading stage, a plaintiff must allege "(i) the municipality's policymakers 'know to a moral certainty that their employees will confront a given situation'; (ii) the situation 'presents the employee with a difficult choice of the sort that training or supervision will make less difficult'; and (iii) 'the wrong choice will frequently cause the deprivation of a citizen's constitutional rights.'" *Id.* at 817 (quoting *Lance v. Morris*, 985 F.3d 787, 802 (10th Cir. 2021)).

Here, plaintiffs' allegations of insufficient training are too conclusory to satisfy the exacting standard needed to state a claim for failing to train based on a single incident. The Amended Complaint alleges that the "City of Marion, Marion County, and the Marion County Sheriff failed to properly train their officers regarding: (a) constitutional protections afforded the press under the First Amendment, (b) the protections set forth in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1976), (c) the statutory protections contained in the Privacy Protection Act, (d) the statutory protections contained in the Kansas Shield Law, (e) the requirements for obtaining a valid search warrant, (f) the proper method of executing a search warrant, and (g) the proper use of a 'preview search.'" Doc. 44 at 134 (Am. Compl. ¶ 744). Such bare allegations don't suffice to state a failure-to-train claim. *Herbel*, 2024 WL 4416849, at *26 (explaining that it isn't "sufficient to merely allege general ways in which training was insufficient"). Plaintiffs haven't "alleged what additional specialized training or knowledge officers needed to be better equipped" for the situation alleged in the Amended Complaint. *Teetz v. Bd. of Cnty. Comm'rs*, No. 22-1134-EFM, 2023 WL 7698030, at *8 (D. Kan. Nov. 15, 2023).

What's more, none of those allegations establish deliberate indifference to injuries that could result from the ostensible training inadequacy. *See Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (affirming decision granting summary judgment where plaintiff "merely enumerate[d] the multiple ways" the training allegedly was inadequate "without proffering any evidence of knowledge of the purported deficiencies on the part of the City"). Plaintiffs haven't pleaded any facts "placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation." *Id.* at 1230; *see also Waller v. City and County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) ("'The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice

that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998))).

Plus, the allegations of deficient training here involve a host of subjects that City policymakers wouldn't have "a moral certainty" the officers would confront. *Valdez*, 66 F.4th at 817 (quotation cleaned up). The only training shortcomings that plaintiffs cite in their Response to the motion—training on *Zurcher*, the federal Privacy Protection Act, and the Kansas shield law, Doc. 63 at 53[25]—aren't the sort of topics that City policymakers would have a "moral certainty" officers would confront or that would "frequently cause the deprivation of a citizen's constitutional rights." *Valdez*, 66 F.4th at 817. And plaintiffs' assertion that defendants' deliberate indifference "is clear" is conclusory—at best—and unconvincing. Doc. 63 at 53.

Finally and independently, a plaintiff can't state a cognizable failure-to-train claim against a municipality "when the situation's proper response is obvious to all without training[.]" *Teetz*, 2023 WL 7698030, at *8 (internal quotation marks and citation omitted). The allegations in the Amended Complaint—retaliating against the press for political revenge—are so manifestly wrong that the City's failure to provide direct training on it doesn't raise an inference of deliberate indifference.

---

[25]    As discussed above, the Amended Complaint alleges failure to train on additional topics including "the constitutional protections afforded the press under the First Amendment," "the requirements for obtaining a valid search warrant," "the proper method of executing a search warrant, and" "the proper use of a 'preview search.'" Doc. 44 at 134 (Am. Compl. ¶ 744). While it's conceivable that officers would confront some of these issues with some regularity, plaintiffs' allegations about these training deficiencies are far too perfunctory to state a claim. And plaintiffs didn't raise these arguments in their Response, so the court needn't consider them anyway. *See Lebahn*, 813 F.3d at 1307–08 ("It is not the court's job to comb the record in order to make the non-movant's arguments for him." (quotation cleaned up)).

In short, plaintiffs haven't stated a plausible failure-to-train claim against any defendant. The court thus dismisses plaintiffs' failure-to-train claims. Plaintiffs' municipal liability claims based on acts by a final policymaker survive, however. The court explains this holding, next.

### 2. Final Policymaker

As explained above, a plaintiff may hold a municipality liable for actions by a person with "final policymaking authority[.]" *Whitson v. Bd. of Cnty. Comm'rs*, 106 F.4th 1063, 1667 (10th Cir. 2024) ("[W]hen an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action." (emphasis in original)). Where a plaintiff alleges that a policy is facially unconstitutional, "'issues of fault and causation'" are ordinarily "'straightforward.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1240 (10th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also Barney*, 143 F.3d at 1307 ("[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question."). But the "standard to meet the state-of-mind element changes depending on whether the plaintiff alleges that a policy is facially constitutional." *Velarde v. Bd. of Cnty. Comm'rs*, No. 23-cv-00878-DHU-JMR, 2024 WL 4692158, at *5 n.2 (D.N.M. Nov. 6, 2024) (citing *Hinkle*, 962 F.3d at 1240). When a "plaintiff bases her claims on a facially lawful policy, then the deliberate indifference standard applies." *Velarde*, 2024 WL 4692158, at *5 n.2.

County defendants argue that plaintiffs—to state a claim for municipal liability—must allege that any act of a final policymaker "'was taken with the requisite degree of culpability.'" Doc. 56 at 7 (quoting *Brown*, 520 U.S. at 404). County defendants also argue that the Amended Complaint never alleges that Sheriff Soyez acted with deliberate indifference. *Id.* at 7–8. Finally, county defendants argue that the Amended Complaint doesn't allege that Soyez "was the

moving force behind any violations of Plaintiffs' rights." *Id.* at 8. City defendants argue similarly. Doc. 60 at 21. The court isn't persuaded. So, it declines to dismiss plaintiffs' municipal liability claims based on acts by a final policymaker, explaining why in subparts a and b, following.

### a.   Facially Unconstitutional Policies

Here, the alleged acts of Sheriff Soyez and former Chief of Police Cody are facially unconstitutional and causally linked to plaintiffs' constitutional injuries. The unconstitutional nature of these acts satisfies the culpability requirement for a § 1983 claim against a municipality, *see Hinkle*, 962 F.3d at 1240, and plaintiffs thus needn't make a separate showing of deliberate indifference. As discussed further below, these actors are final policymakers, so their respective municipalities are liable for their unlawful acts. *See Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1287 (10th Cir. 2007) ("Actions taken by a municipality's final policymakers, even in contravention of their own written policies, are fairly attributable to the municipality and can give rise to liability.").

### b.   Identifying the Final Policymaker

County defendants don't dispute that Soyez is a final policymaker for purposes of § 1983 liability. Doc. 72 at 1. The City argues that only Cody—not Mayfield—was a final policymaker for municipal liability. Doc. 60 at 21–22. The court disagrees.

"The inquiry of whether a government employee is a policy-making official is a question of state law." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010). The relevant question turns on "'delegations of *legal power*.'" *Id.* (emphasis in original) (quoting *Milligan-Hitt v. Bd. of Trs*, 523 F.3d 1219, 1227 (10th Cir. 2008)). Our Circuit has identified three factors to "help . . . decide whether an individual is legally a final policymaker for a municipality: '(1) whether the official is meaningfully constrained by policies not of that

official's own making; (2) whether the official's decision[s] are final—*i.e.*, are they subject to

any meaningful review; and (3) whether the policy decision purportedly made by the official is

within the realm of the official's grant of authority.'" *Id.* (quoting *Randle v. City of Aurora*, 69

F.3d 441, 448 (10th Cir. 1995)).

The parties neglect to discuss these controlling factors. *See* Doc. 60 at 21–22; Doc. 63 at

50 n.24. Instead, the City argues—albeit in perfunctory fashion—that "Cody had the authority to

establish rules and regulations (i.e. policy) for the Police Department" and that "Cody would be

the only final policy maker for the City[.]" Doc. 60 at 21. To be certain, the Code of the City of

Marion gives the chief of police—here, former Chief Cody—"the power to make such rules and

regulations as may be necessary for the proper and efficient conduct of the department." Marion,

Kan., Code § 10-103. At the same time, the city code gives the mayor—here, Mayfield—

"superintending control of all officers and affairs of the city[.]" *Id.* § 1-205.

The City's argument assumes that just one person can act as a final policymaker. But the

City cites no authority for that proposition. And the Supreme Court—admittedly in a plurality

opinion—has indicated that multiple actors can share final policymaking authority. *City of St.*

*Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) ("We are also aware that there

will be cases in which policymaking responsibility is shared among more than one official or

body."); *see also McMillian v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996) ("With respect to a

particular action, more than one official or body may be a final policymaker; final policymaking

authority may be shared." (citing *Praprotnik*, 48 5U.S. at 126)). Here, the language of the city

code is explicit—the mayor has "superintending" authority over all city officers. Marion, Kan.,

Code § 1-205. Thus, none of the three *Brammer-Hoelter* factors suggests that Mayfield wasn't

an actor with final policymaking authority here.

The City concedes that former Chief Cody was a final policymaker for purposes of municipal liability. Doc. 60 at 21. The court thus needn't analyze the three *Brammer-Hoelter* factors, as applied to him. For now, plaintiffs' municipal liability claims against the City survive. The City may incur liability either for Cody or Mayfield's final policymaking acts. The court takes up one final argument before it moves on from plaintiffs' § 1983 claims of municipal liability—redundancy.

### 3. Redundancy of Actors

The Amended Complaint names both the Board of County Commissioners of the County of Marion and Marion County Sheriff Jeff Soyez, in his official capacity, as defendants. Doc. 44 at 1. The county defendants argue claims against these actors are legally redundant and that the court thus should dismiss claims against the Board of County Commissioners. Doc. 56 at 6 n.3. Plaintiffs disagree. They argue that the Federal Rules allow for alternative claims and that "dismissal at this stage is inappropriate" because plaintiffs "need not make a choice until the pre-trial order." Doc. 63 at 54 n.27.

Kansas law[26] is less than certain about an important decisional point, *i.e.*, whether a plaintiff who alleges misconduct by a sheriff's department should name the sheriff (in his official capacity) or the board of county commissioners. *See Bledsoe v. Bd. of Cnty. Comm'rs*, 501 F. Supp. 3d 1059, 1140–44 (D. Kan. 2020) (compiling cases from our court with inconsistent holdings on whether a plaintiff should bring municipal liability claims against the sheriff in his official capacity or the board of county commissioners), *rev'd in part on other grounds sub nom. Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022). *On one hand*, Kansas law requires litigants

---

[26]    The court consults Kansas law to determine whether the municipal defendants have the "Capacity to Sue or Be Sued[.]" Fed. R. Civ. P. 17(b); *id.* 17(b)(3) (instructing that "the law of the state where the court is located" governs whether a party has the "Capacity to Sue or Be Sued" when the party is neither an individual who is not acting in a representative capacity nor a corporation).

to name the board of county commissioners in "all suits or proceedings . . . against a county[.]" Kan. Stat. Ann. § 19-105.  And, our court has held, under Kansas law a sheriff's office isn't an entity that is "capable of being sued[.]"  *Estate of Holmes ex rel. Couser v. Somers*, 387 F. Supp. 3d 1233, 1248 (D. Kan. 2019), *aff'd on other grounds sub nom. Couser v. Gay*, 959 F.3d 1018 (10th Cir. 2020); *see also Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [plaintiff] brings a claim against [the sheriff] in his official capacity, it is the same as bringing a suit against the county.").  *On the other hand*, under Kansas law a board of county commissioners "does not control or make policies or procedures" for a sheriff's office.  *Jarrett v. City of Garnett*, No. 24-cv-2151-HLT-TJJ, 2024 WL 4363244, at *7 n.10 (D. Kan. Oct. 1, 2024); *see also Bd. of Cnty. Comm'rs v. Nielander*, 62 P.3d 247, 251 (Kan. 2003) (holding that a sheriff "is not a subordinate of the board of county commissioners" and that the sheriff's "duties, powers, and obligations . . . are coextensive with the county board").

Also, our court has held that a suit may go forward against a sheriff in the sheriff's official capacity even if the board of county commissioners isn't a named (or surviving) defendant.  *Swearingen v. Pleasanton Unified Sch. Dist. 344*, 641 F. Supp. 3d 1141, 1185 (D. Kan. 2022).  But our court reached that conclusion only after dismissal of the board of county commissioners.  *Id.*  That is, our court hasn't resolved clearly the issue whether claims against the sheriff (in the sheriff's official capacity) and against the board of county commissioners both may proceed.  *Compare Jarett*, 2024 WL 4363244, at *7 n.10 (allowing suit against board of county commissioners to proceed based on sheriff's alleged wrongdoing), *with Rothermel v. Sedgwick Cnty.*, No. 22-1194-JWB, 2024 WL 814504, at *3 (D. Kan. Feb. 27, 2024) (dismissing claims against board of county commissioners for sheriff's alleged wrongdoing because "an elected county sheriff is not a subordinate of the board of county commissioners").  Given the

parties' perfunctory treatment of this issue—two sentences in a footnote, Doc. 56 at 6 n.3—the

court declines to dismiss either the Board of County Commissioners of Marion County or Sheriff

Soyez, in his official capacity, on the basis of redundancy.  *See Bledsoe*, 501 F. Supp. 3d at 1144

(declining to resolve the state of Kansas law on this issue without "the benefit of hearing the

parties' arguments on the question who should be named for a suit against the municipality

where a sheriff is a county officer with authority independent from the board").

To recap briefly, the court dismisses plaintiffs' claims based on a failure to train.

Plaintiffs' other § 1983 claims alleging municipal liability survive.

At long last, the court reaches the final claim asserted by the Amended Complaint, Count

VI's claim under the Privacy Protection Act.

### G.      Count VI:  Privacy Protection Act

Plaintiffs' final claim is against the City of Marion, Marion County, and Sheriff Soyez, in

his official capacity, for violations of the Privacy Protection Act (PPA).  Doc. 44 at 146–52 (Am.

Compl. ¶¶ 798–841).

The PPA "creates a right of action for the improper seizure of media materials[.]"  *Mink*

*v. Suthers*, 482 F.3d 1244, 1257 (10th Cir. 2007).  Our Circuit summarized the gist of this act in

this fashion:

> Notwithstanding any other law, it shall be unlawful for a government officer or
> employee, in connection with the investigation or prosecution of a criminal offense,
> to search for or seize any work product materials possessed by a person reasonably
> believed to have a purpose to disseminate to the public a newspaper, book,
> broadcast, or other similar form of public communication, in or affecting interstate
> or foreign commerce; but this provision shall not impair or affect the ability of any
> government officer or employee, pursuant to otherwise applicable law, to search
> for or seize such materials, if . . . there is probable cause.

*Id.* (ellipsis in original) (quoting 42 U.S.C. § 2000aa(a)).  Besides protecting "work product

materials," the PPA also applies to "documentary materials."  42 U.S.C. § 2000aa(b).  Plaintiffs

allege that the City of Marion—acting through its former and acting Chief of Police Cody and Hudlin—and Marion County—acting through Detective Christner—violated the PPA by searching and seizing files at the *Record* and at the Meyer home.  Doc. 44 at 146–52 (Am. Compl. ¶¶ 798–841).

County defendants make three arguments about this claim in their Motion to Dismiss. *First*, they argue that the PPA doesn't "apply when the person possessing materials is a criminal suspect, and law enforcement has probable cause"—and that law enforcement had probable cause here.  Doc. 56 at 19.  *Second*, they contend that the PPA contains an exception when officers act in good faith.  *Id.* at 19–20.  And *third*, they assert that the searched and seized materials weren't "work product materials" and so, plaintiffs haven't alleged a violation of the PPA.  *Id.* at 20.

The City advances similar arguments.  Doc. 60 at 22–23.  It argues that officers didn't search or seize "work product materials" or "documentary materials" because the PPA exempts property used to commit a crime.  *Id.* at 23.  The City also argues that the PPA carves out an exception when "the possessor of the materials searched for or seized is a criminal suspect" and officers have probable cause.  *Id.*

The court isn't persuaded by these arguments, so it declines to dismiss plaintiffs' PPA claim.

### 1.  Probable Cause

As the court already discussed at length, *see above* § III.D.1.a, probable cause didn't support officers' search of either the *Record* office or the Meyer home.  In fact, on the facts alleged in the Amended Complaint, neither the City nor County had even arguable probable cause to search either location.  The court thus declines to dismiss the PPA Claim on that basis.

### 2.   Good Faith Exception

The PPA contains a good faith exception, which exempts "an officer or employee of a State" from liability if that "officer or employee had a reasonable good faith belief in the lawfulness of his conduct."  42 U.S.C. § 2000aa-6(a)(2) & (b).  But, as plaintiffs note, Doc. 63 at 56–57, that provision doesn't apply to suits against a "governmental unit[,]" like the City or County, here.  § 2000aa-6(a)(1).

The PPA offers two different potential defendant groups.  The first—contained in subparagraph (1) of subsection (a)—authorizes suit "against the United States, against a State . . ., or against any other governmental unit[.]"  § 2000aa-6(a)(1).  The second—contained in subparagraph (2) of subsection (a)—authorizes suit "against an officer or employee of a State . . . if such State has not waived its sovereign immunity[.]"  § 2000aa-6(a)(2).  By its plain terms, the good faith defense applies only to the latter group—suits against officers or employees. § 2000aa-6(b) (restricting good faith defense to civil actions "brought under paragraph (2) of subsection (a)").  Plaintiffs assert their Privacy Protection Act claim against governmental units, not individuals.  Doc. 44 at 146 (Am. Compl.) (Count VI); *see also Davis v. Gracey*, 111 F.3d 1472, 1482 (10th Cir. 1997) ("The PPA by its terms does not authorize a suit against municipal officers or employees in their individual capacities." (emphasis omitted)).  The good faith defense thus doesn't apply here.

### 3.   Work Product or Documentary Materials

The county defendants' final argument—and the thrust of their Reply—is that plaintiffs haven't alleged any search or seizure of "work product materials."  Doc. 56 at 20; Doc. 72 at 8–9.  They argue, in essence, that plaintiffs allege that they didn't intend to publish information about Newell's driving record and so that information doesn't qualify as "work product materials."  Doc. 56 at 20.  To be sure, to come within the PPA's definition of "work product

materials," a journalist must have "prepared, produced, authored, or created" the materials "in anticipation of communicating such materials to the public[.]"  42 U.S.C. § 2000aa-7(b)(1); *see also id.* § 2000aa-7(b)(2) (including limitation that only materials that "are possessed for the purposes of communicating such materials to the public" are "work product materials").  And the Amended Complaint alleges that "the *Record* had no intent to publish" information retrieved from the Kansas Driver's Licenses Status check tool.  Doc. 44 at 22 (Am. Compl. ¶ 121); *see also id.* at 24 (Am. Compl. ¶ 127) ("Eric Meyer elected not to publish a report on Newell's DUI conviction and the fact she was driving without a valid license[.]").  Still, two reasons lead the court to conclude that plaintiffs have stated a plausible PPA claim.

*First*, the Amended Complaint alleges seizures of data that go well beyond information about Newell's driving status.  *E.g.*, Doc. 44 at 147 (Am. Compl. ¶ 803) (alleging that search warrant would return "reporter's notes about Newell" and "drafts of yet-to-be-published newspaper articles about Newell"); *id.* (Am. Compl. ¶ 805) (alleging that search warrant preview search terms would return "drafts of yet-to-be-published newspaper articles about the state, the city administrator, and the vice-mayor").  Viewing these allegations in the light most favorable to plaintiffs—as the court must for now—a jury reasonably could conclude that defendants searched and seized "work product materials."  Also, as plaintiffs argue, Doc. 63 at 59, the Amended Complaint suggests that the *Record* might pursue a news story about the Marion Police and Marion Sheriff's Office allowing Newell to drive with a suspended license.  *See* Doc. 44 at 147 (Am. Compl. ¶ 807) (alleging that in his email to Cody and Soyez, Meyer wrote: "We are obviously concerned how someone could escape detection as having an expired or suspended license for nearly a quarter of a century *and might pursue a news story in that regard*." (emphasis in original)).

In response to these arguments, the county defendants argue that the warrants didn't "call for the search or seizure of any documents related to such a story, and there is no allegation that any such documents were seized."  Doc. 72 at 8–9.  The court disagrees.  The Amended Complaint alleges that defendants "seized all the newsroom computers in the *Marion County Record*'s newsroom."  Doc. 44 at 64 (Am. Compl. ¶ 329).  Drawing all reasonable inferences in plaintiffs' favor, the court concludes that plaintiffs plausibly have alleged that defendants seized "work product materials" related to a story about nonenforcement of traffic laws.

*Second*, and independently, the Amended Complaint plausibly alleges that defendants searched and seized "documentary materials."  The PPA furnishes a sweeping definition of "documentary materials":

> "Documentary materials", as used in this chapter, means materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, mag[ne]tically or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense.

42 U.S.C. § 2000aa-7(a).  Plaintiffs allege that city and county officers searched and seized computers, phones, and a network file server.  Doc. 44 at 63–64, 75 (Am. Compl. ¶¶ 326, 328, 329, 389–90).  They further allege that Christner "copied 18.77 gigabytes of data from the *Record*'s computer network onto the drive."  Doc. 44 at 84 (Am. Compl. ¶ 439).  It's difficult to imagine an explanation why a massive seizure of data wouldn't fit within the PPA's definition of "documentary materials."  And defendants don't offer such an explanation.

In conclusion, plaintiffs have stated a plausible claim for violations of the Privacy Protection Act.  Defendants' arguments to the contrary are unavailing.

### H.    Motion to File a Supplemental Response and Motion to Strike

After briefing on defendants' Motions to Dismiss was complete, plaintiffs filed a Motion for Leave to File Supplemental Response (Doc. 75). That motion asks for leave to file a brief on a "limited issue"—whether the court should dismiss claims here with or without prejudice. Doc. 75 at 1. The court denies plaintiffs' motion to file additional papers.

"Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply." *Hampton v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1142 (D. Kan. 2020) (citing D. Kan. Rule 7.1(a), (c)), *aff'd on other grounds*, No. 20-3175, 2021 WL 3237082 (10th Cir. July 30, 2021). "'Surreplies are not typically allowed.'" *Id.* (quoting *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006)). Plaintiffs haven't cited any exception to this general rule that would permit them to file an additional brief on the present motions. Plaintiffs insist that their motion isn't a surreply because it doesn't rebut anything defendants argued in their reply briefs. Doc. 80 at 2. The court disagrees. Plaintiffs are trying to file another paper that addresses the Motions to Dismiss. That's a surreply.

Even if plaintiffs' proposed filing weren't a surreply, no other rule would allow them to file it. Plaintiffs cite no authority to permit their filing. The court denies plaintiffs' Motion for Leave to File a Supplemental Response (Doc. 75). Thus, the court also denies Cody and city defendants' Motion to Strike (Doc. 77) as moot.

### I.    Dismissal With or Without Prejudice

Finally, the court must determine whether the claims dismissed by this Order are dismissed with or without prejudice. It's a close call. The court is skeptical that plaintiffs could cure the shortcomings that led the court to dismiss certain claims. Plaintiffs are represented by experienced counsel. So, one would imagine—if plaintiffs had the ability to plead facts that'd

cure the alleged shortcomings of their Amended Complaint—they promptly would have filed a motion to amend. Plaintiffs didn't.

The way this case could unfold troubles the court. Defendants filed their motions seven months ago. Plaintiffs chose to litigate those motions on the merits instead of seeking leave to amend at any point before the court published this Order. Amending after the court adjudicates a motion to dismiss represents a "wait-and-see approach[,]" which undermines judicial efficiency. *Herbel*, 2024 WL 4416849, at *28 n.33 (internal quotation marks omitted). And the court wonders how any proposed amendment wouldn't represent an undue delay. *See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (explaining that "denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay" (quotation cleaned up)); *Castanon v. Cathey*, 976 F.3d 1136, 1145 (10th Cir. 2020) ("Unexplained delay alone justifies the district court's discretionary decision [to deny leave to amend]." (quotation cleaned up)).

Still, the court concludes that it must dismiss plaintiffs' claims without prejudice. Whether to dismiss with prejudice is a matter committed to the court's discretion. *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022). *But see id.* (explaining that the Circuit reviews de novo whether "leave to amend would be futile" (quotation cleaned up)). A "'dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'" *Id.* (emphasis in original) (quoting *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014)). But how can the court discern whether amendment is futile without a proposed amendment before it? *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994) ("We do not require district courts to engage in independent research or read the minds of litigants to determine if information justifying an

amendment exists."). Our Circuit's precedent suggests that the court should err on the side of dismissing without prejudice. *See id.* ("[W]here the record clearly reflects that the non-moving party possesses additional facts necessary for an amendment and where that party has repeatedly expressed a willingness to amend, the court should reserve to the non-movant leave to amend upon dismissal of the action."); *Seale*, 32 F.4th at 1029 (suggesting that dismissal with prejudice is appropriate only where claim's failure is "patently obvious"); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1487 (3d ed. 2024) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper." (quoted and cited approvingly in *Seale*, 32 F.4th at 1029)). *But see Seale*, 32 F.4th at 1028 (affirming dismissal with prejudice where pleading didn't "support the necessary elements" of the claim).

This Order's Rule 12(b)(6) dismissals are based on insufficient allegations, qualified immunity, and in some cases, both. So, the court can't conclude that it's "patently obvious" that amendment "would be futile." *Knight*, 749 F.3d at 1190 (quotation cleaned up). The court thus makes this Order's dismissals ones without prejudice. If plaintiffs properly can plead facts to cure their claims' shortcomings, they must seek leave to amend within 20 days of this Order. And that request must strictly comply with our local rule, D. Kan. Rule 15.1. Should plaintiffs fail to file a motion for leave to amend within 20 days of this Order, the Rule 12(b)(6) dismissals will convert to dismissals with prejudice.[27]

## IV.    Conclusion

Based on the above explanation, the majority of plaintiffs' claims survive defendants' Motions to Dismiss. The court dismisses the following claims without prejudice:

---

[27]    The court is mindful of *Herbel*'s decision to dismiss claims in that case with prejudice. 2024 WL 4416849, at *28 n.33. The efficiency interest in that approach has some serious Rule 1 appeal. But the pleading context of *this case* differs, so the court reads our Circuit's precedent to suggest that dismissal without prejudice here is the better outcome. Still, it's a close call.

- plaintiffs' Fourth Amendment claim against Acting Chief Hudlin, predicated on the procurement of the warrant;

- plaintiffs' Fourth Amendment claim against Acting Chief Hudlin, based on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Detective Christner, predicated on the oath-or-affirmation theory;

- plaintiffs' Fourth Amendment claim against Detective Christner, based on using broad terms for the preview search of Zorn's computer;

- any direct Fourth Amendment claim against former Mayor Mayfield (but imputed liability through the conspiracy survives);

- any direct First Amendment claim against former Mayor Mayfield (but imputed liability through the conspiracy survives);

- claims against the municipal entities based on a failure to train.

All other claims survive.

   **IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Aaron Christner; Board of County Commissioners of Marion County, Kansas; and Jeff Soyez's Motion to Dismiss (Doc. 55) is granted in part and denied in part, as set forth above.

   **IT IS FURTHER ORDERED THAT** defendant Gideon Cody's Motion to Dismiss (Doc. 57) is denied.

   **IT IS FURTHER ORDERED THAT** defendants Zach Hudlin; the City of Marion, Kansas; and David Mayfield's Motion to Dismiss (Doc. 59) is granted in part and denied in part, as set forth above.

   **IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Leave to File Supplemental Response (Doc. 75) is denied.

   **IT IS FURTHER ORDERED THAT** defendants Zach Hudlin; the City of Marion, Kansas; David Mayfield; and Gideon Cody's Motion to Strike (Doc. 77) is denied as moot.

**IT IS SO ORDERED.**

**Dated this 28th day of March 2025, at Kansas City, Kansas.**

<u>s/ Daniel D. Crabtree</u>
**Daniel D. Crabtree**
**United States District Judge**